# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT
* * * * * * * * *

MARVIN CHARLES GABRION, II,    )

             ) DEATH PENALTY CASE

        Petitioner - Appellant,    )

             ) Case No. 18-2382

        v.    )

             )

             )

UNITED STATES OF AMERICA,    )

             )

        Respondent - Appellee.    )

---

## <u>UNOPPOSED MOTION TO SET A DEADLINE FOR PETITIONER'S APPLICATION FOR A CERTIFICATE OF APPEALABILITY</u>

Petitioner Marvin Gabrion respectfully requests that this Court set a deadline of ninety (90) days for Mr. Gabrion to file his application for a Certificate of Appealability (COA). The Court should permit ninety days for Mr. Gabrion's request for a COA for three primary reasons: first, because in denying a COA, the district court did not conduct a specific analysis of whether Mr. Gabrion satisfied the COA standard, which means that counsel must prepare a detailed application that will facilitate this Court conducting the COA analysis in the first instance; second, because of undersigned counsel's significant workload, which includes three other capital cases; and, third, because if the district court's orders are allowed to stand, Mr. Gabrion will be executed without any opportunity to test the reliability of his conviction and sentence in collateral proceedings.

In support of this request, Mr. Gabrion shows the Court:

1. Mr. Gabrion was convicted of murder and sentenced to death in the United States District Court for the Western District of Michigan. Mr. Gabrion in the only prisoner sentenced to death in the State of Michigan in either state or federal court.

2. The litigation of Mr. Gabrion's direct appeal was not without controversy. Questions were raised regarding whether the federal government had jurisdiction to prosecute the case and it was remanded to the district court for a hearing. When the case returned to this Court, jurisdiction was confirmed by the three-judge panel with three separate opinions, one of which was a dissent. United States v. Gabrion, 517 F.3d 839 (6th Cir. 2008), *cert. denied*, 129 S.Ct. 1905 (2009).

3. Thereafter, in a 2-1 ruling, the Court upheld Mr. Gabrion's guilty verdict but vacated the death sentence. United States v. Gabrion, 648 F.3d 307 (6th Cir. 2011).

4. Thereafter, rehearing *en banc* was granted. In a 12-4 decision, the Court upheld the conviction and death sentence. United States v. Gabrion, 719 F.3d 511 (6th Cir. 2013) (*en banc*), *cert. denied*, 572 U.S. 1089 (2014).

5.    Mr. Gabrion filed a motion to vacate pursuant to 28 U.S.C. § 2255. The instant proceedings are an appeal from the denial of that motion.

6.    The district court denied Mr. Gabrion's § 2255 motion, without holding an evidentiary hearing or authorizing discovery. *See generally* Opinion, R. 156, PageID 5795–6000.

7.    The district court also denied Mr. Gabrion a COA, in an order that was less than two pages long. *See* Order Denying COA, R. 158 at 1–2, PageID 6012–13.

8.    This Court has made clear that it is improper to issue a blanket denial of a COA (or, for that matter, a blanket grant of a COA) without "undertak[ing] the individualized determination of each claim presented by petitioner." *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001). In deciding whether to grant or deny a COA, a court should "consider each issue raised by [petitioner] under the standards set forth by the Supreme Court in *Slack*." *Id.*

9.    The district court's analysis of whether any of Mr. Gabrion's claims satisfied the *Slack* standard consisted of two sentences, in which it stated, "The Court has carefully considered the issues in this matter and finds that reasonable jurists could not find that this Court's dismissal of Gabrion's claims was debatable or wrong. There is

overwhelming evidence supporting the jury's verdict at the guilt and penalty phases of the trial, and the Court is satisfied that Gabrion received the assistance to which he is entitled under the Sixth Amendment and that there is no constitutional or other reason to set aside his conviction or sentence." Order Denying COA, R. 158 at 1–2, PageID 6012–13.

10. Because the district court's two-page order denying a COA did not individually "consider each issue raised by [petitioner] under the standards set forth by the Supreme Court in *Slack*[,]" *Murphy*, 263 F.3d at 467, Mr. Gabrion must prepare an application for a COA that facilitates this Court's analysis of whether he has met the *Slack* standard as to any of the claims in his § 2255 motion.

11. In his § 2255 motion, Mr. Gabrion raised numerous issues that would cause a reasonable jurist to question the reliability of the conviction and death sentence. Painting with a broad brush, Petitioner presented claims that the government presented false and misleading testimony; that the government withheld material, exculpatory evidence; and that his counsel was ineffective, among others. The following are just some of the issues presented by Petitioner:

4

a. A primary piece of the government's guilt phase case was its contention that Mr. Gabrion killed Ms. Timmerman to prevent her from testifying in a separate state case where Mr. Gabrion was charged with raping Ms. Timmerman. The government alleged Mr. Gabrion manipulated the proceedings in the rape case for the purpose of delaying it until Ms. Timmerman was released from jail on separate charges and then killed her the weekend before she was to testify at the rape trial. At the guilt phase this evidence was important to establish motive. At the penalty phase, it was important because, if true, it established two aggravators supporting the death penalty: (1) substantial planning and premeditation, as well as, (2) obstruction of justice. In his § 2255 petition, Mr. Gabrion established that the rape case was *never* set for trial and that the hearing that was set for the week after Ms. Timmerman disappeared was continued prior to her disappearance and Mr. Gabrion was aware of that fact. Mr. Gabrion also established that key portions of the government's case on this point were perjured. Specifically, state prosecutor Crystal Roach testified that the procedure in Mr. Gabrion's rape case was suspect because she requested

5

preliminary hearings in all sexual assault cases in order to lock down the complainant's testimony and that she had made just such a request in Mr. Gabrion's case. The fact is that she never made that request in Mr. Gabrion's case. The truth that Gabrion's jury never knew was that Ms. Roach actually *moved to continue* a hearing that was set for that purpose. Moreover, Mr. Gabrion provided evidence in his § 2255 establishing that in the years surrounding Mr. Gabrion's rape case, Ms. Roach's office, in fact, *never* requested such a hearing. It is no small irony that Ms. Roach, in addition to being the rape case prosecutor, was also appointed Special Assistant United States Attorney to assist the government in this death penalty trial but she was removed by the Department of Justice for misconduct *in this case*. The government left a false and misleading impression with their testimony on this point and the defense failed to investigate and discover evidence within the state court's rape file that would have discredited the government's theory.

b. The government also alleged at trial that after her disappearance Mr. Gabrion forced Ms. Timmerman to write letters to her

father, the prosecutor on the rape case, and the state court judge on the rape case. These letters arrived with postmarks from Little Rock, Arkansas. Essentially, they exonerated Mr. Gabrion of rape. The government argued they were dictated by Mr. Gabrion. Thus, if true, they were potent evidence advancing the government's primary theme that Mr. Gabrion killed Ms. Timmerman to prevent her testimony in the rape case. What the jury did not know was that two FBI forensic analysts had examined these writings and concluded that all of the letters were likely written by the same person and that person was not Mr. Gabrion. The FBI examiners also opined that Ms. Timmerman was likely not under extreme duress when she penned the letters. The government trial testimony and argument left a false and misleading impression about who wrote the letters in question and trial counsel failed to correct that impression with evidence that was present in their file.

c. The government argued that Ms. Timmerman was last seen alive on June 3rd when she allegedly left with her infant daughter for a dinner date with a man named John. This date was important to the government's narrative because the

government falsely claimed Mr. Gabrion expected Ms. Timmerman to testify against him in the rape case on June 5th. But, as plead in Mr. Gabrion's § 2255, numerous persons saw Ms. Timmerman alive and well in the hours and days after she left her house for her date with John. This is not simply some mistake by a few people. The initial FBI field memos report that when she left her father's home Ms. Timmerman told others she would be gone for a few days and took a change of clothing. Her father did not report her missing for weeks after she left his house. When her body was recovered a month later she was unquestionably wearing different clothing than what she was wearing when she left her house. The false impression left with the jury was that Ms. Timmerman was abducted on June 3rd, two days before she was to testify against Mr. Gabrion in the rape case. This false impression allowed the government to advance its primary guilt and penalty phase theme – that Mr. Gabrion killed Ms. Timmerman to prevent her from testifying in the rape case.

d. Questions regarding Mr. Gabrion's mental health have been consistently noted by the judges who have touched this case.

Prior to trial, judges twice ordered him for mental health evaluations *sua sponte* due to his bizarre in-court conduct and his "vituperative and mean spirited letters" unremittingly mailed to the court. Government doctors noted bizarre behavior, including that Mr. Gabrion smeared his face with feces and refused to talk about it. During trial, he slept through proceedings with his head on counsel table, burped and made other loud noises, and punched his defense lawyer in the face in the presence of the jury. When he was allowed back in court following his banishment, outside the jury's presence, he told the court: "I am sorry to be represented by evil shysters in a kangaroo court in a prostitute evil nation that murders its babies by abortion. And I'll be quiet because I'm being forced to just as if I was in Nazi Germany. Thank you." He testified three times against the advice of counsel. That testimony was not at all helpful. He falsely told the jury he used to work for the CIA and that he was willing to submit to the drug sodium pentothal to prove he was telling the truth. He made bizarre claims about the victim's father abusing her. He complained that his lawyers were trying to prevent him from telling the truth about abortion.

9

Counsel consistently complained about an inability to communicate with Mr. Gabrion – these complaints spanned the entire case from preauthorization proceedings through to the very end of trial. In spite of this, counsel never requested an adversarial competency hearing. During the § 2255 proceedings, counsel alleged that Mr. Gabrion was incompetent to assist them and requested an adversarial hearing. Counsel alleged it was impossible to have a rational, fact-based conversation with Mr. Gabrion about his case. Direct appeal counsel had had a similar experience during the years they represented him. Not only was this hearing denied, the court also refused to sign an order for Petitioner's expert to see him. Then, the court said counsel had failed to support the allegations sufficiently to require a hearing. Mr. Gabrion's history of bizarre inexplicable conduct precedes by decades the crime committed here.

12. Judge Bell was the trial judge but he is not the judge who issued the judgment currently being appealed. Judge Bell retired and the current judge, Chief Judge Jonker, assumed jurisdiction of this case.

13. Prior to ruling on Mr. Gabrion's § 2255 motion, Chief Judge Jonker failed to timely rule on (and ultimately denied) a request for an order to allow Petitioner's expert to interview him at the prison (as required by the prison) even though travel arrangements had already been made and had to be cancelled at the last minute when no order was forthcoming, there was no request for funds associated with the request, and the court ultimately decided Petitioner had not presented enough evidence to justify a hearing, or discovery, or relief on the merits on claims associated with the expert's area of expertise.

14. Chief Judge Jonker ultimately denied Mr. Gabrion's § 2255 motion on the merits, without holding an evidentiary hearing. *See generally* Opinion, R. 156, PageID 5795–6000.

15. Chief Judge Jonker also denied discovery *in toto*. *See id.* at 197, PageID 5991. He also, as discussed above, denied a certificate of appealability without conducting a specific analysis of whether Mr. Gabrion's claims satisfied the *Slack* standard. *See* Order Denying COA, R. 158 at 1–2, PageID 6012–13.

16. Undersigned accepted an out-of-district appointment in this case. In addition to this case, undersigned counsel is handling three other death penalty cases that arose in her district after she accepted Mr.

11

Gabrion's case. Moreover, the non-capital caseload in the Southern District of Indiana has recently increased dramatically since accepting this appointment. Case filings have nearly doubled with no concomitant increase in staff.

17. Petitioners who are sentenced to death by the state courts have two opportunities to challenge their convictions and death sentences: state post-conviction proceedings and proceedings pursuant to 28 U.S.C. § 2254. Because Mr. Gabrion's conviction and death sentence were obtained in federal court, he has only one opportunity to collaterally challenge it and § 2255 is it. If the district court's orders are allowed to stand, Mr. Gabrion will be executed without any opportunity to test the reliability of his conviction and sentence in collateral proceedings. This decision will have been made in the first instance by a judge who did not preside over the trial, without any opportunity for a hearing or discovery.

18. For these reasons, counsel asks the Court for 90 days to file the motion for certificate of appealability.

WHEREFORE, Marvin Gabrion, requests the Court allow him 90 days to file a request for a certificate of appealability in this federal capital case and for any and all other relief to which he may be entitled.

**Date:  December 17, 2018**                    **Respectfully submitted,**

By:  /s/ *Monica Foster*                          By:  /s/ *Joseph M. Cleary*
       Monica Foster                                            Joseph M. Cleary
       Attorney for Petitioner-Appellant              Attorney for Petitioner-Appellant
Business Address:                                    Business Address:
       Indiana Federal Community                        Indiana Federal Community
       Defender, LLC                                            Defender, LLC
       111 Monument Circle, Suite 3200             111 Monument Circle, Suite 3200
       Indianapolis, Indiana 46204                      Indianapolis, Indiana 46204
       Telephone: (317) 383-3520                      Telephone: (317) 383-3520
       Email: Monica_foster@fd.org                   Email:  Joe_Cleary@fd.org


By:  /s/ *Scott Graham*
       Scott Graham
       Attorney for Petitioner-Appellant
Business Address:
       SCOTT GRAHAM PLLC
       1911 West Centre Avenue, Suite C
       Portage, Michigan 49024
       Telephone: (269) 327-0585
       Email: sgraham@scottgahampllc.com