**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**
**\* \* \* \* \* \* \* \* \***

| | |
|---|---|
| MARVIN CHARLES GABRION, II, | ) |
| | ) DEATH PENALTY CASE |
| Petitioner - Appellant, | ) |
| | ) Case No. 18-2382 |
| v. | ) |
| | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent - Appellee. | ) |

# <u>APPLICATION FOR A CERTIFICATE OF APPEALABILITY</u>

# TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................................1

II. ISSUES FOR WHICH GABRION SEEKS A COA ........................................16

III. ARGUMENT .....................................................................................................19

A. LEGAL STANDARDS........................................................................................19

1. The legal standard supports granting a Certificate of Appealability. .................19

2. The legal standard supports an evidentiary hearing. ..........................................23

3. The legal standard supports discovery................................................................26

4. Gabrion has met the burdens for an evidentiary hearing and discovery—but, more importantly, he has met the burden for a COA to allow the Court to consider these issues. .............................................................................................................29

B. GROUNDS FOR RELIEF ALLEGED IN GABRION'S § 2255 MOTION .....30

1. Gabrion is entitled to a COA from Ground One of his amended 2255 motion where he alleged, *inter alia*, that new guilt and penalty phase proceedings are required because false and misleading testimony by Newaygo County prosecutor and discharged SAUSA Chrystal Roach, false testimony by other government witnesses, and false statements by prosecutors denied Gabrion a fair trial and a fair penalty phase hearing (Ground One of amended § 2255 motion)..........................30

a. Gabrion alleged false and misleading testimony by Newaygo County prosecutor Chrystal Roach. ..............................................................................................................31

i. The details of the rape case..................................................................................32

ii. Roach gave false and misleading testimony about the rape case. .......................38

iii. Federal prosecutors relied on Roach's false and misleading testimony about the rape case...................................................................................................................40

iv. Federal prosecutors expanded on Roach's false testimony in a manner that compounded the prejudice to Gabrion at both phases of the proceedings. .............42

v. Gabrion is entitled to a hearing and discovery—or, at least, it is debatable whether Gabrion is entitled to a hearing and discovery. .........................................44

b. A COA is appropriate on Ground One of the amended 2255 motion where Gabrion alleged a pattern of false testimony by other government witnesses at both phases of the trial, including Gregory Leon, Linda Coleman and Nathan Brewster, all crucial government witnesses. ...................................................................................49

c. Gabrion alleged that the government made false statements about letters from Timmerman that contradicted the conclusions contained in an FBI forensic report. ...............................................................................................................................52

d. Gabrion alleged that the government made false statements about Timmerman's date of disappearance. ..........................................................................................54

e. Gabrion alleged that the government improperly restricted the testimony of Dr. Mark Cunningham. ................................................................................................56

f. Ground One is not procedurally defaulted because Gabrion relied on facts shown outside the trial record to support the claim. ..........................................................58

2. Gabrion alleged that the government withheld evidence in violation of *Brady v. Maryland* in relation to the testimony of Gregory Leon, Nathan Brewster, and Lloyd Westcomb (Ground Six of amended § 2255 motion). ...................................61

3. Gabrion alleged that he received Ineffective Assistance of Counsel at the penalty phase based upon numerous errors and omissions by trial counsel (Grounds Four and Eight of amended § 2255 motion)......................................................................64

a. Legal standard for ineffective assistance of counsel claims ...............................64

b. Gabrion alleged that trial counsel, *inter alia*, committed an egregious and prejudicial error by stating that Gabrion was guilty of the aggravating factor of obstruction of justice, and failed to oversee a proper penalty-phase investigation. 69

c. Gabrion alleged that trial counsel failed to challenge the obstruction of justice aggravator despite the existence of strong evidence showing that the aggravator was not proven, and Gabrion has alleged that counsel's performance was so deficient that they actually conceded the presence of the unproven aggravator. ....71

d. Gabrion alleged that trial counsel failed to oversee an adequate mitigation investigation by not obtaining sufficient funding or staff to perform the investigation. ..........................................................................................................73

e. Gabrion alleged that he suffered prejudice from trial counsel's concession of aggravating factors and failure to investigate mitigation evidence because powerful mitigation evidence exists and mitigation evidence matters to juries. ....................87

4. Gabrion alleged that he was incompetent to stand trial (Ground Five of amended § 2255 motion) ........................................................................................................94

5. Gabrion alleged that he is presently incompetent (Motion for Hearing to Determine Mental Competence, R. 101) ...............................................................102

6. Gabrion alleged that trial counsel was ineffective at the guilt phase, in part, by failing to appropriately deal with competency issues, failing to obtain funding, failing to investigate the government's case, and failing to retain investigative services (Ground Three of amended § 2255 motion). ...........................................109

a. Gabrion alleged that trial counsel was ineffective by failing to participate in an adversarial competency hearing despite the existence of strong evidence that Gabrion was incompetent. ..................................................................................111

b. Gabrion alleged that trial counsel was ineffective by failing to retain adequate investigative assistance or adequately investigate or test the government's case .116

7. Gabrion alleged that he was deprived of representation by conflict-free counsel where one of the attorneys who assisted and met with him represented a key government witness who testified against Gabrion (Ground Two of amended § 2255 motion). ..................................................................................120

8. Gabrion alleged that trial counsel was ineffective post-trial where counsel failed to properly present the claim that the jury foreperson lied during voir dire (Ground Ten of amended § 2255 motion). ..........................................................124

9. Gabrion alleged that he was deprived of effective assistance by appellate counsel where counsel failed to raise a meritorious claim on appeal (Ground Seven of amended § 2255 motion). ..................................................................................125

10. Gabrion alleged that the government failed to include necessary charges in the indictment (Ground Nine of amended § 2255 motion). ........................................128

11. Gabrion alleged that executing him would violate the Eighth Amendment because he suffers from a severe mental illness (Ground Eleven of amended § 2255 motion) ..................................................................................130

12. The cumulative effect of these errors deprived Gabrion of a constitutionally adequate trial and sentencing hearing. ..........................................................137

IV. CONCLUSION..................................................................................143

CERTIFICATE OF SERVICE ..........................................................158

iii

# I. INTRODUCTION

Justice Ruth Bader Ginsburg once famously said she had never seen a case resulting in a death sentence in which the defendant was well represented at trial.[1] And yet, the district court here was confident enough in the fairness of the trial proceedings that will result in Gabrion's execution that it denied his § 2255 motion without having heard any of the trial evidence, without allowing any opportunity to develop the factual record through discovery, and without holding a hearing on the claims contained in the § 2255 motion.

This capital habeas case was brought pursuant to 28 U.S.C. § 2255. It is structurally unlike capital habeas cases brought pursuant to 28 U.S.C. § 2254, and thus those cases are of only limited relevance when determining whether Gabrion received all the process he was due. Unlike in a § 2254 case, the Petitioner here has had no opportunity to test the reliability of his conviction and death sentence in any other court. In a § 2254 proceeding, the Petitioner would have the opportunity to test the fairness and reliability of his conviction and sentence on collateral attack

---

[1] Associate Justice Ruth Bader Ginsburg, U.S. Supreme Court, Joseph L. Rauh Lecture at the University of the District of Columbia, David A. Clarke School of Law: In Pursuit of the Public Good: Lawyers Who Care (Apr. 9, 2001), *available at* http://www.supremecourt.gov/publicinfo/speeches/viewspeeches.aspx?Filename=sp_04-09-01a.html, *quoted in* Mark Bennett, *Sudden Death: A Federal Trial Judge's Reflections on the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 42 Hofstra L. Rev. 391 (2013).

first in state court, and then again in federal court.[2] But Gabrion has one opportunity, and one opportunity only, to bring claims that were unavailable to him on direct appeal. And that opportunity was severely and unfairly restrained by the district court's refusal to allow discovery and permit a hearing on his detailed claims – procedures that would have been near automatic had he been suing for money damages as a consequence of a car accident involving a driver from another state instead of seeking to test the reliability of his death sentence.

To say this is a complicated case is an understatement. The trial lasted approximately three weeks. It involved allegations of five murders, one for which Gabrion was convicted and sentenced to death, and four others alleged during the penalty phase even though no bodies had been recovered, no cause of death identified, and no eyewitness testified.

The case was additionally complicated by Gabrion's mental health problems which have been an ongoing concern, starting with a *sua sponte* competence examination ordered very early in the trial proceedings by the magistrate judge, through the time on direct appeal, and including the interactions with his current counsel during these § 2255 proceedings. R. 93-1, Mot. for Hearing to Determine

---

[2] Another important distinction is the centrality of comity concerns when a federal court reviews a state court conviction, concerns that are not present here. Surely, the review of a federal conviction and death sentence by a federal court should not be less robust than that same review of state court convictions.

Mental Competence at 2, PageID 3862.  Gabrion's bizarre and self-injurious trial conduct has been well documented.  Every lawyer who has represented him since trial believes he is and was incompetent.  R. 101, Mot. for Hearing to Determine Mental Competence at 2, PageID 4715.  In spite of this, Gabrion's competence has never been the subject of an adversarial hearing.

The complexity of this case is demonstrated by the numerous decisions issued on a direct appeal that lasted thirteen years and never produced a unanimous decision. Ultimately the direct appeal was decided by a split *en banc* court.

In this § 2255 proceeding, Gabrion raised eleven primary issues in a 139-page motion.  Some of the issues had significant subparts.  R. 1, § 2255 Motion, PageID 1-139; *see also* R. 15, 16, § 2255 Motion and Exhibits, PageID 885–1732 (redacted motion and exhibits filed pursuant to R. 14, Am. Order, PageID 883–84). At least 707 pages of exhibits were appended. The 161-page amended § 2255 motion raised those same 11 issues. R. 100, Am. § 2255 Mot. PageID 885–1023. At least 1,416 pages of exhibits were appended.

Gabrion's § 2255 motion raised disturbing issues of prosecutorial misconduct that went to the heart of the government's motive theory and permeated both the guilt and penalty phases. These concerned, *inter alia*, the testimony of a Special Assistant United States Attorney (SAUSA) who was removed from this case prior to trial for misconduct *in this case*. *See* R. 100, § 2255 Mot., at 10 n.1, PageID 3896.

Gabrion's § 2255 motion also raised substantial claims of ineffective assistance of counsel. *See, e.g.*, R. 100, Am. § 2255 Motion at 43–75, PageID 3929–62. Counsel questioned Gabrion's mental competency. *See, e.g.*, *id.* at 146–47, PageID 4032–33.

Rule 6 of the Rules Governing § 2255 Proceedings authorizes a party to conduct discovery pursuant to the Federal Rules of Civil and Criminal Procedure if the court so authorizes after a showing of good cause. Good cause is not difficult to establish. A movant who has (1) made specific allegations warranting relief; (2) shown why the requested information is essential to the adequate factual development of his claims; and (3) demonstrated that the requested information is likely in the hands of the party from whom discovery is sought and cannot be obtained through other means, has established good cause. *Willis v. Newsome*, 771 F.2d 1445 (11th Cir. 1985). Even speculative claims establish good cause for discovery, as long as the claims, if proven, would entitle the movant to relief. *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997).

Gabrion requested leave to take the depositions of:

- trial counsel;

- the mitigation investigator;

- the fact investigator;

- consulting counsel who he alleged had a conflict of interest;

- the SAUSA and Newaygo County Prosecutor whose testimony was the primary focus of the prosecutorial misconduct claim and who was dismissed as SAUSA for ethical lapses in this case;

- the FBI agents who were not called as witnesses but who conducted the handwriting analysis concluding Gabrion likely did not author the letters from the decedent (which the government argued at trial he authored);

- some of the trial mental health experts;

- the pathologist who testified the decedent was alive when she was placed in Oxford Lake (contrary to Gabrion's § 2255 expert);

- two police officers who Gabrion alleged in § 2255 proceedings conducted an unlawful search and gave damning testimony that was not contained in the police reports discovered to trial counsel);

- the lead investigator from the Michigan State Police.

R. 59, Br. in Support of Mot. to Conduct Deps. at 8–13, PageID 2572-77.

Gabrion also moved for the production of various documents, including:

- Documents reviewed by government mental health experts that appear never to have been provided to, or requested by, trial counsel.

- Various documents related to the handwriting analysis conducted by the FBI concluding Gabrion did not author letters sent by the decedent (which the government claimed at trial were authored by Gabrion).

5

- Rachel Timmerman's probation file and records related to a group home where the decedent was apparently ordered to reside following a violation of her probation which would have provided an alternative explanation of her motive to leave her father's home that was unrelated to Gabrion (and unexplored by trial counsel).

- Medical and mental health records of government witness Lloyd Westcomb who testified damningly against Gabrion and who was determined to be incompetent in his own criminal case shortly after he testified against Gabrion.

- All evidence within the government's possession regarding the whereabouts of Shannon VerHage, the alleged child victim whose remains have never been recovered and who was believed by her family members to be alive. The SAUSA in this case also made comments to the media that Ms. VerHage left the State of Michigan alive.

- Gabrion's social security disability records. These support the claim that counsel was ineffective in failing to litigate competency issues. These records were not contained in trial counsel's file though that file did contain memos detailing the importance of these records and the difficulties encountered securing them. Gabrion was granted social security disability prior to the homicide here and was additionally required

to have a payee because of his disabilities. The Social Security Administration claims they gave the records to the government.

- All records maintained by the United States Probation Office on Gabrion's social security fraud case. Gabrion suggested the aforementioned social security records may be within the files of the USPO.

R. 51-1, Br. in Support of Mot. for Discovery at 1–10, PageID 2530-39; R. 67, Am. Br. to Conduct Discovery at 10, PageID 2604-13.

Initially, the district court ruled that it would not grant Gabrion's request for discovery at that time because a ruling on the request was, in the court's view, intertwined with the allegations in the § 2255 motion. Rather, the district court noted it would rule on discovery and the merits of claims in the 2255 motion. Ultimately, not one deposition was permitted. Not one page of discovery was ordered produced.

Gabrion also moved for a hearing on his claims. Again, the standard for relief at that stage is very liberal: "[w]here the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding." *Townsend v. Sain*, 372 U.S. 293, 312 (1963); *see also* Rules Gov'g Section 2254 and 2255 Proceedings (the language of 28 U.S.C. § 2255(b) governing hearings in 2255 cases was intended to incorporate the *Townsend* standard). "In reviewing a § 2255 motion . . . [a]n evidentiary hearing is required

unless the record conclusively shows that the petitioner is entitled to no relief." *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007) (quoting *Arredondo v. United States*, 178 F.3d 778 (6th Cir. 1999)); *see also Machibroda v. United States,* 368 U.S. 487 (1962); *MacLloyd v. United States*, 684 F. App'x 555, 559 (6th Cir. 2017). Gabrion filed a very detailed 36-page motion and brief establishing that he met the above described factors and that a hearing was mandated. R. 89-1, Motion for Evidentiary Hearing, PageID 3805-45. But no hearing was granted.

While all of these matters were pending before the district court, including the request to file an amended § 2255 motion, Judge Bell (the trial judge and first § 2255 judge) gave multiple interviews to local Grand Rapids media outlets. In one of these, two video segment interviews were aired and a written piece was generated which appears to be a synopsis of the video clips. R. 91-1, Mem. in Support of Motion to Recuse at 2–3, PageID 3849-50.

During one interview, a reporter asked Judge Bell if he considered Gabrion "evil" as compared to all the other defendants he had in his courtroom over the past 30 years. Judge Bell responded: "Yes. You said it and I agreed with you." Continuing on the "evil" theme, the court described Gabrion's eyes as "evil." The court also claimed Gabrion "had tried that on me. I just looked right back at him, and then I said on the record, 'The record should reflect Mr. Gabrion is staring at me

and has stared at me for the last two hours, and it's having no effect whatever upon me."[3] R. 91-1, Mem. in Support of Motion to Recuse at 2–3, PageID 3849-50.

In another interview with a different news outlet, the Judge Bell told the reporter that "Mr. Gabrion's in the right place." At that time, Gabrion was housed on the federal death row in Terre Haute, Indiana awaiting execution. R. 91-1, Mem. in Support of Motion to Recuse at 3, PageID 3850.

Gabrion moved for recusal. *Id.*; *see also generally*, *In re Al-Nashiri*, 921 F.3d 224 (D.C. Cir. 2019) (court must disqualify when its impartiality "might reasonably be questioned"; judge's employment application with the Department of Justice required recusal). That motion remained unresolved for approximately two months. *See* R. 95, Notice Reassignment of Case, PageID 3879. After Judge Bell retired, the motion for recusal was denied as moot. R. 99, Order, PageID 3885.

The case was transferred to Chief Judge Robert J. Jonker. On the day of transfer, Gabrion moved for a status conference without government opposition. R. 96, Unopposed Mot. for Status Conf. at 1, PageID 3880; R. 97, Certificate re: Motion Concurrence, PageID 3882. A number of motions remained pending and the purpose of the request was to "provide the parties with an opportunity to discuss with the Court the case and future steps to be taken toward resolution". *Id.* The

---

[3] The record does not reflect anything of this sort occurring during trial.

9

court nevertheless denied the motion, finding it, "unnecessary."[4] R. 99, Order at 2, PageID 3885.

Gabrion asked Chief Judge Jonker to reconsider whether to permit discovery because the standard was discretionary and the hallmark of discretion is that different jurists could rule differently. Gabrion also alleged that Judge Bell's rulings should be reconsidered because he had a disqualifying interest expressed in the public comments he made to the media. R. 121-1, Mem. in Support of Motion for Scheduling Order at 3, PageID 5323; *see also In re Al-Nashiri*, 921 F.3d at 240–41 (because court had to recuse, 440 rulings it had made had to be reconsidered).

Other attempts to investigate this case and develop the record were thwarted by the district court. For a six-month period, Gabrion cut short and refused attorney visits due to a painful medical problem that showed no signs of abating. Counsel

---

[4] The defenders from the federal defender office in the Southern District of Indiana, who were recruited to serve as lead counsel for this case and accepted the appointment as a courtesy to the district court, have never met nor spoken with the judge who denied Gabrion relief.

It was necessary to recruit experienced capital litigators from outside the district to handle this § 2255 litigation because the state of Michigan does not have the death penalty and this was the first federal capital case tried in Michigan. Having lead counsel with capital litigation experience is important because post-conviction capital litigation is complex, time-consuming, and expensive. *Guidelines for Appointment & Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 1085 (2003) ("[P]roviding high quality legal representation in collateral review proceedings in capital cases requires enormous amounts of time, energy, and knowledge.").

10

sought the aid of the court in the form of an order for medical records from the BOP and the hospital where Gabrion had been treated. Gabrion's health significantly deteriorated and his already compromised communication abilities became nonexistent. R. 131, Emergency Mot. for Release of Med. Recs., PageID 5364–66 (original request); R. 147, Renewed Mot. for Release of Med. Recs., PageID 5743-5747 (supplemental request). The court initially denied the request because "counsel has been appointed to represent Gabrion in Section 2255, not on any issues related to his conditions of confinement, or the adequacy of his medical care." R. 134, Order, PageID 5371. In spite of the fact that there had been no ruling on the competency motion filed as part of the § 2255 litigation or the allegations in the § 2255 motion about competence, the court also questioned why it should credit the validity of a release signed by Gabrion if his "present competence is really in question."[5] R. 125, Order at 2, PageID 5353. The supplemental request, which emphasized that Gabrion's health problems interfered with counsel's representation of Gabrion in the § 2255 case, was never ruled upon though the court did deny the

---

[5] This order was issued four months after he assumed jurisdiction and a year and four months before he ruled on the competency issues. Mr. Gabrion's competence was "really in question." Counsel does not file meritless or frivolous motions. There was never an adversarial competency hearing in this case. The record is littered with Mr. Gabrion's bizarre and self-injurious conduct. Had a hearing been permitted the court would have heard substantially more about the significant problems counsel had communicating and working with Gabrion throughout this case *from its inception*.

request to file it *ex parte* over Gabrion's assertions it should be private because it contained information about Gabrion's communications with counsel and his health condition. R. 149, Order, PageID 5749.

Counsel also sought permission, via an *ex parte* motion, for a psychiatrist to have a follow-up visit with Gabrion in USP Terre Haute. *See* R. 156, 10/04/18 Opinion at 203, PageID 5997 (discussing motion). Counsel explained why the psychiatrist's evaluation was critically important to Gabrion's § 2255 case, which addresses Gabrion's present and past incompetence and serious mental health issues. They also explained that this psychiatrist had been granted permission to visit inmates in other BOP facilities without incident, and that granting permission for such visits was routine in other courts. Nevertheless, the Court denied permission for the visit. R. 156, 10/04/18 Opinion at 203, PageID 5997.

Ultimately, the district court:

- dismissed Gabrion's § 2255 petition without holding an evidentiary hearing. R. 156, 10/04/18 Opinion at 39, PageID 5833;

- denied Gabion's detailed requests to conduct discovery. *Id.* at 197, PageID 5991;

- refused to hold a competency hearing. *Id.* at 202, PageID 5996;

- refused to even authorize a psychiatrist to visit Gabrion at federal death row at USP Terre Haute. *Id.* at 203, PageID 5997;

- denied Gabrion's Rule 59 motion, which asked the court to reconsider its ruling denying Gabrion a competency hearing, among other issues. R. 164, 11/08/18 Order at 1, Page ID 6065; and

- denied a COA on all issues without adequate explanation. R. 158, 10/04/18 Order Denying COA at 1–2, PageID 6012–13.

The district court's opinion denying Gabrion relief or an evidentiary hearing fails to engage the facts Gabrion presented in detail in his § 2255 motion. At several points, the court relies on speculation about what might have happened, rather than ordering an evidentiary hearing to determine what actually happened.

For example, in response to Gabrion's allegation that removed SAUSA and Newaygo County Prosecutor Chrystal Roach perjured herself in order to further the government's "obstruction of justice" theory, the district court speculates about what Roach's testimony "possibl[y]" meant. R. 156, 10/04/18 Opinion at 44, PageID 5838. The district court says although the record reflects that Roach did not request the remand she claimed to have requested, "[i]t is also *possible* that Roach" made a suggestion to the defense attorney, and that what she meant when she said she requested an action from the court was that she suggested an action to the defense attorney. *Id.* at 44, PageID 5838 (emphasis added). And the district court points to the actions of an unknown prosecutor "who *may have been Roach*" as further support that Roach's testimony was truthful. *Id.* (emphasis added).

13

Whether the *possibility* that Roach made a suggestion to the defense attorney means that Roach actually made a suggestion to the defense attorney, and whether the unknown prosecutor *who may have been Roach* was actually Roach, are precisely the sort of factual questions that "must" be sorted out in discovery and in a hearing. *Valentine*, 488 F.3d at 333 (6th Cir. 2007) (quoting *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999)); *see also MacLloyd*, 684 F. App'x at 559.

As another example, Gabrion's trial involved no adversarial testing of two aggravating factors because, during the penalty phase, Gabrion's own attorney told the jury that his client murdered Timmerman to obstruct justice, despite contrary evidence that existed but was apparently unknown by counsel. Without holding a hearing or authorizing the depositions of trial counsel to determine whether this was a strategic decision, the district court concludes that "it was not unreasonable for counsel to concede this issue as part of a strategic decision to focus on more promising avenues, like the mitigating factors." R. 156, 10/04/18 Opinion at 131, PageID 5925.

The district court's reliance on its factual inferences contravenes the Supreme Court's instruction that "the habeas court's commission is not to invent strategic reasons or accept any strategy counsel could have followed, without regard to what actually happened[.]" *Marcrum v. Luebbers*, 509 F.3d 489, 502 (8th Cir. 2007) (citing *Rompilla v. Beard*, 545 U.S. 374, 395-96 (2005) (O'Connor, J., concurring);

*Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003); *Kimmelman v. Morrison*, 477 U.S. 365, 377 (1986)). The district court's inference also ignores the anemic case counsel put on in mitigation. *See Hooks v. Workman*, 689 F.3d 1148, 1206 (10th Cir. 2012).

After denying Gabrion's § 2255 motion, the district court denied Gabrion a COA in a less-than-two-page order. The district court's analysis consisted of two sentences. It stated, "The Court has carefully considered the issues in this matter and finds that reasonable jurists could not find that this Court's dismissal of Gabrion's claims was debatable or wrong. There is overwhelming evidence supporting the jury's verdict at the guilt and penalty phases of the trial, and the Court is satisfied that Gabrion received the assistance to which he is entitled under the Sixth Amendment and that there is no constitutional or other reason to set aside his conviction or sentence." R. 158, Order Denying COA at 1–2, PageID 6012–13.

If this Court denies Gabrion's Application for a COA *in toto*, it would authorize Gabrion's execution without any court ever having a hearing on whether Gabrion's attorneys provided effective assistance of counsel; without any court ever having a hearing on whether Roach provided false and misleading testimony crucial at both the guilt and penalty phases; and without any court ever having a hearing on whether Gabrion was competent to stand trial or is now competent to take part in § 2255 proceedings. Gabrion would be executed not only without a hearing on these and other issues, but without any opportunity to develop the record through

15

discovery. The Court would authorize Gabrion's execution despite the district court denying permission for an expert to evaluate Gabrion's mental health and competence. And the Court would authorize Gabrion's execution based solely upon the speculative conclusions of a district judge who heard none of the trial evidence.

## II. ISSUES FOR WHICH GABRION SEEKS A COA

Gabrion hereby moves for a COA pursuant to 28 U.S.C. § 2253(c)(1), Rule 11(a) of the Rules Governing Section 2254 and 2255 Proceedings, and Federal Rule of Appellate Procedure 22(b)(1) because it is at least debatable whether he is entitled to discovery and an evidentiary hearing regarding these errors and many others, detailed below. Specifically, Gabrion requests a COA on each of the issues raised in his amended § 2255 motion, including:

1. Was Gabrion denied a fair trial and sentencing hearing because the government presented critical evidence that was false or misleading, including, *inter alia*, the false testimony of Newaygo County prosecutor Chrystal Roach, as Gabrion alleged in Ground One of his § 2255 motion?

2. Did the government withhold material, exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), as Gabrion alleged in Ground Six of his § 2255 motion?

3. Was trial counsel ineffective at the sentencing phase for, *inter alia*, conceding aggravating factors that could have been contested, overseeing an inadequate

mitigation investigation that resulted in an "abridged" social history that the mitigation investigator himself stated was incomplete, and failing to argue that the federal death penalty is unconstitutional as administered, as Gabrion alleged in Grounds Four and Eight of his § 2255 motion?

4.     Was Gabrion tried and sentenced while incompetent, as he alleged in Ground Five of his § 2255 motion?

5.     Is Gabrion presently incompetent, as he alleged in his Motion for a Hearing to Determine Mental Competence and Brief in Support of Motion for a Hearing to Determine Mental Competence?

6.     Was trial counsel ineffective at the guilt phase for, *inter alia*, waiving adversarial competency hearings, as Gabrion alleged in Ground Three of his § 2255 motion?

7.     Was Gabrion denied his right to conflict free counsel when the attorney for key government witnesses Joseph Lunsford assisted Gabrion's trial counsel in the preparation of his case, as Gabrion alleged in Ground Two of his § 2255 motion?

8.     Was trial counsel ineffective post-trial for failing to properly plead error based on the Jury Foreman's admission that he knew from reading the newspaper that Gabrion was "off the wall before trial," after testifying during voir dire that he had no opinion about the case, as Gabrion alleged in Ground Ten of his § 2255 motion?

9.     Was appellate counsel ineffective, as Gabrion alleged in Ground Seven of his § 2255 motion?

10.    Did the government violate Gabrion's constitutional rights by failing to include necessary charges in the indictment, as Gabrion alleged in Ground Nine of his § 2255 motion?

11.    Would executing Gabrion violate the Eighth Amendment because of his chronic and severe mental illness and organic brain impairments, as Gabrion alleged in Ground Eleven of his § 2255 motion?

12.    Does cumulative error invalidate Gabrion's conviction or death sentence?

13.    Did the district court wrongly deny an evidentiary hearing?

14.    Did the district court wrongly deny discovery?

To the extent that Gabrion does not highlight a particular issue in this COA application, that omission is not intended to waive the issue. This Court should grant, in full, Gabrion's Application for a COA, because every issue merits further review.

The burdens establishing the right to discovery and an evidentiary hearing are light. Gabrion has met the even lighter burden to establish that he is entitled to a COA to argue that he has met the light burdens for discovery and a hearing. Gabrion has received no meaningful legal process in his § 2255 case. To deny Gabrion a COA would deny any opportunity for collateral review to an individual under a

sentence of death after he made detailed claims including ineffective assistance of counsel, prosecutorial misconduct, and incompetence.

## III. ARGUMENT

A COA should issue to allow this Court to review whether the lack of discovery and an evidentiary hearing, ordered by a judge who did not preside over the trial and heard none of the evidence, is adequate process in this federal death penalty case.

### A. LEGAL STANDARDS

### 1. The legal standard supports granting a Certificate of Appealability.

A petitioner in a § 2255 proceeding is entitled to a COA if he can "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Lobbins v. United States*, 900 F.3d 799, 804 (6th Cir. 2018) (applying the *Slack* standard to a § 2255 case). Or, "[w]hen the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

The standard for a COA is, of course, distinct from the standard for prevailing on a claim. *See Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003). "Accordingly, a court of appeals should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief. The holding in *Slack* would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail. It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief." *Id.*

Additionally, "the nature of the penalty is a proper consideration" in determining whether to issue a COA—so although a COA is not automatically granted because the petitioner is under a sentence of death, this Court should consider that this is a death penalty case when deciding whether to grant a COA. *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983); *accord Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) ("[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. . . . Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."); *Porterfield v. Bell*, 258 F.3d 484, 486–87 (6th Cir. 2001) (acknowledging that courts "should err on the side of caution when it comes to the certification of claims that arguably have merit" in capital cases).

20

This Court should also consider that, because this is a *federal* death penalty case, a § 2255 motion is the only opportunity to raise collateral challenges to the conviction and death sentence. Unlike § 2254 cases—which challenge convictions and sentences imposed in state court, and therefore come to federal court only after collateral review in the state courts—in this case, the only collateral review available is collateral review in federal court.

Finally, it is improper to issue a blanket denial of a COA (or, for that matter, a blanket grant of a COA) without "undertak[ing] the individualized determination of each claim presented by petitioner." *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001).[6] In deciding whether to grant or deny a COA, the court must "consider each issue raised by [petitioner] under the standards set forth by the Supreme Court in *Slack*." *Id.* In this case, the district court's brief order denying Gabrion a COA, *see* R. 158, Order Denying COA at 1–2, PageID 6012–13, did not "provide any analysis whatsoever as to whether [petitioner] had made a 'substantial showing of the denial

---

[6] After this Court decided *Murphy*, "the Supreme Court amended Rule 11 of the Rules Governing § 2254 Cases to provide that a district judge, when entering judgment in a habeas corpus case denying relief, must issue or deny a certificate of appealability whether or not the petitioner has asked for one." *Dillingham v. Warden*, Case No. 1:13-cv-468, 2014 U.S. Dist. LEXIS 102449, at *9 (S.D. Ohio July 28, 2014). Although this amendment changed the timing of a district court's decision on whether to grant a COA, it did not negate a district court's obligation to "undertake the individualized determination of each claim presented by petitioner." *Murphy*, 263 F.3d at 467.

of a constitutional right[,]" *Murphy*, 263 F.3d at 467 (quoting 28 U.S.C. 2253(c)(2); *Slack*, 529 U.S. at 483).

The two sentences the district court spent stating that no COA should issue do not provide any analysis of any of Gabrion's eleven claims, let alone state specifically why any claims fail to meet the *Slack* standard. An order attesting that careful analysis occurred but not committing that analysis to writing does not satisfy *Murphy*'s requirement that the district court "undertake the individualized determination of each claim presented by petitioner in considering whether to grant a COA . . . ." *Murphy*, 263 F.3d at 467. However, although the district court did not conduct the required analysis, this Court does not have to remand the case to the district court as it did in *Murphy*. *See id.* at 467. Instead, this Court can determine on its own whether to issue a COA. *See* Fed. R. App. P. 22(b)(1); *Johnson v. Bell*, 605 F.3d 333, 339 (6th Cir. 2010).

Undertaking the proper analysis, this Court should determine that Gabrion has "demonstrate[d] that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484. The district court's ruling that there should be no evidentiary hearing or discovery on any issue is debatable. This Court should grant a COA on each issue and allow Gabrion to argue why he is entitled to an evidentiary hearing and discovery on each issue.

**2. The legal standard supports an evidentiary hearing.**

"In reviewing a § 2255 motion in which a factual dispute arises, 'the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims.' '[T]he burden on the petitioner in a *habeas* case for establishing an entitlement to an evidentiary hearing is relatively light.'" *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007) (quoting *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999)). "[T]he Supreme Court has reiterated that the provision of a hearing can be crucial to the function of § 2255 and that a hearing should be granted unless the motion can be 'conclusively determined either by the motion itself or by the "files and records" in the trial court.'" *MacLloyd v. United States*, 684 F. App'x 555, 559 (6th Cir. 2017) (quoting *Machibroda v. United States*, 368 U.S. 487, 494 (1962)).

In *Massaro v. United States*, 538 U.S. 500 (2003), the Supreme Court emphasized the importance of developing new evidence to support (or refute) ineffective assistance claims. The case addressed why ineffective assistance of counsel claims should be raised first in § 2255 proceedings, not on direct appeal. The Court explained that a trial record is "not developed precisely for the object of litigating or preserving the [ineffective assistance] claim and thus often incomplete or inadequate for this purpose." *Massaro*, 538 U.S. at 505. It held that, a § 2255 motion in the district court is "best suited to developing the facts necessary to

determining the adequacy of representation during an entire trial." *Id.* It also pointed out that "the § 2255 motion often will be ruled upon by the same district judge who presided at trial. The judge, having observed the earlier trial, should have an advantageous perspective for determining the effectiveness of counsel's conduct and whether any deficiencies were prejudicial." *Id.* at 506. This point underscores the *greater need* for factual development in a § 2255 case presided over by a different judge, who did not preside over the trial.

This Court has repeatedly emphasized the low burden for an evidentiary hearing in a § 2255 case. *See MacLloyd*, 684 F. App'x at 559 ("[T]he burden for receiving an evidentiary hearing under § 2255 is light."); *Pola v. United States*, 778 F.3d 525, 533 (6th Cir. 2015) ("The evidentiary hearing is mandatory unless 'the record conclusively shows that the petitioner is entitled to no relief.'"); *Valentine*, 488 F.3d at 333 ("The defendant's burden to show his right to a hearing is significantly lower than his burden to show he is entitled to § 2255 relief."); *Smith v. United States*, 348 F.3d 545, 551 (6th Cir. 2003) (quoting *Turner*, 183 F.3d at 477) ("We have observed that a Section 2255 petitioner's burden 'for establishing an entitlement to an evidentiary hearing is relatively light.'").

In *MacLloyd*, for example, "[t]he district court relied on this court's rejection of ineffective assistance claims 'that rest upon conclusory, unsupported allegations of counsel's deficient performance'" to deny the petitioner an evidentiary hearing.

*MacLloyd*, 684 F. App'x at 559. This Court reversed the denial of the evidentiary hearing, clarifying that whether the allegations were unsupported and conclusory "would be a proper inquiry for the district court to make *after* an evidentiary hearing, having considered not only the pleading and the affidavits, but the whole of the testimony." *Id.* (emphasis added).

Other courts have similarly explained that, "The law is clear that, in order to be entitled to an evidentiary hearing, a petitioner need only allege—not prove—reasonably specific, non-conclusory facts that, if true, would entitle him to relief. If the allegations *are not affirmatively contradicted by the record* and the claims *are not patently frivolous*, the district court is *required* to hold an evidentiary hearing. It is in such a hearing that the petitioner must offer proof." *Aron v. United States*, 291 F.3d 708, 715 n.6 (11th Cir. 2002) (emphasis added); *see also Armienti v. United States*, 234 F.3d 820, 823 (2d Cir. 2000) ("To prevail on his motion for a hearing, [Armienti] must establish that he has a 'plausible' claim . . . . At this preliminary stage he is not required to establish that he will necessarily succeed on the claim, and indeed, if he could presently prove that proposition, no hearing would be necessary.") (first alteration in original).

This standard differs from the standard in § 2254 cases, in which factual development occurs in the state court. *See Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (explaining that the habeas scheme leaves the state courts with primary

25

responsibility over collateral review of state convictions, and thus factual development). In a § 2255 case, factual development must occur in federal court. Denying a hearing in a § 2254 case means only trusting that a state court properly oversaw factual development. Denying a hearing in a § 2255 case means denying any opportunity for factual development of claims that can be raised only in § 2255 proceedings.

In this capital § 2255 case, the district court did not explain why, in its view, Gabrion has not met the "relatively light" burden to show that he is entitled to an evidentiary hearing. *Valentine*, 488 F.3d at 333; *see* R. 156, 10/04/18 Opinion at 39, PageID 5833 (explaining the standard for an evidentiary hearing but not applying it to Gabrion's claims); R. 156, 10/04/18 Opinion at 189, PageID 5983 (opining that all of Gabrion's claims are "meritless and/or procedurally defaulted" but not addressing the standard for an evidentiary hearing).

**3. The legal standard supports discovery.**

While an evidentiary hearing is mandatory unless the record conclusively shows that the petitioner is not entitled to relief, a district court has discretion over whether to authorize discovery. *See* R. Gov'g § 2255 Cases, R. 6(a) ("A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law."). That said, the standard for good cause in a § 2255 case is not

stringent. *See Cornell v. United States*, 472 F. App'x 352, 354 (6th Cir. 2012). "Good cause is established 'where specific allegations . . . show reason to believe that [the movant] may, if the facts are fully developed, be able to demonstrate' entitlement to relief." *Id.* (quoting *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997)) (alterations in original); *see also Bracy*, 520 U.S. at 908–10 (construing Rule 6(a) of the Rules Governing Section 2254 Cases, which is narrower than Rule 6(a) of the Rules Governing Section 2255 Cases, to hold that it was an abuse of discretion not to authorize discovery on a speculative claim because if the facts were proven they would show a violation of due process).

Denying Gabrion's requests for discovery, the district court starts from the view that there is insufficient factual support for Gabrion's claims, and relies on these perceived insufficiencies to deny Gabrion any opportunity to factually develop his claims. *See* R. 156, 10/04/18 Order at 189–97, PageID 5983–91. For example, addressing Gabrion's request to depose trial counsel, the district court reasoned that "Gabrion's claims of error by counsel are meritless on the record before the Court. Eliciting the reasons for counsel's decisions would not benefit his claims." *Id.* at 189, PageID 5983. But eliciting the reasons for counsel's decisions—such as whether they were strategic reasons or based on ignorance of the law or facts—is virtually the only way to benefit (or, indeed, undermine) his ineffective assistance claims. *See Massaro v. United States*, 538 U.S. 500, 505–06 (2003) (quoting *United*

27

*States v. Griffin*, 699 F.2d 1102, 1109 (11th Cir. 1983)) ("In a § 2255 proceeding [as opposed to direct appeal], the defendant 'has a full opportunity to prove facts establishing ineffectiveness of counsel, the government has a full opportunity to present evidence to the contrary, *the district court hears spoken words we can see only in print and sees expressions we will never see, and a factual record bearing precisely on the issue is created.*'") (emphasis added).

As another example, addressing Gabrion's request to obtain his own prison records, which could provide evidence of his mental health and competency, the district court reasoned that Gabrion's request for records about his own incarceration, "appears to be another fishing expedition." *Id.* at 195, PageID 5989. But the records are directly related to Gabrion's mental health and competency. Any argument that Gabrion's prison records could not possibly reveal any new information related to his mental health is undermined by the fact that Gabrion tried to harm himself while incarcerated, including one incident when he stabbed himself with a chicken bone. R. 103-1, Social History at 40, 4776. Also undermining this argument, Bureau of Prisons employees have provided evidence concerning their observations of the inmates' behavior while incarcerated on death row. *See, e.g.*, *United States v. Sampson*, No. 01-10384-LTS, 2017 U.S. Dist. LEXIS 129686, at *70 (Aug. 15, 2017) (BOP witness testifying about propensity for violence); *United States v. Wilson*, 170 F. Supp. 3d 347, 379 (E.D.N.Y. 2016) (prison officials' reports

of normal mental health introduced as evidence against Wilson's intellectual disability).

In *MacLloyd*, this Court held that it is inappropriate for a court to rule that a claim has insufficient factual support before holding a hearing. *See MacLloyd*, 684 F. App'x at 559. By the same token, it is also inappropriate for a court to rule that a claim has insufficient factual support before any discovery takes place, let alone as the reason for denying discovery. *See id.*; *see also Bracy*, 520 U.S. at 908–10.

**4. Gabrion has met the burdens for an evidentiary hearing and discovery—but, more importantly, he has met the burden for a COA to allow the Court to consider these issues.**

Gabrion has met the "relatively light" burden to show that he is entitled to an evidentiary hearing because the record in his case *does not* conclusively show that he is not entitled to relief on any of his claims. *Valentine*, 488 F.3d at 333. Similarly, Gabrion has met the good cause standard for the discovery he seeks by making specific allegations and explaining how the information he seeks would support his allegations. *See Bracy*, 520 U.S. at 908–10; *Cornell*, 472 F. App'x at 354. But whether Gabrion has met the relatively light burden for an evidentiary hearing or discovery is not even the relevant question at this stage, where Gabrion is seeking a COA. As discussed above, to be entitled to a COA, Gabrion is not required to establish that he will prevail on his claims; he must only "demonstrate that reasonable jurists would find the district court's assessment of the constitutional

claims debatable or wrong." *Slack*, 529 U.S. at 484. Taking the two standards together, Gabrion has established that he is entitled to a COA on whether he is entitled to an evidentiary hearing and/or discovery by showing that *reasonable jurists would debate whether he has met the relatively light burden for an evidentiary hearing or discovery*. *See Miller-El*, 537 U.S. at 338; *Bracy*, 520 U.S. at 908–10; *Valentine*, 488 F.3d at 333.

In the claims below, Gabrion discusses the facts of his case within the applicable legal standard to show he was entitled to both discovery and an evidentiary hearing.

## B. GROUNDS FOR RELIEF ALLEGED IN GABRION'S § 2255 MOTION

**1. Gabrion is entitled to a COA from Ground One of his amended 2255 motion where he alleged, *inter alia*, that new guilt and penalty phase proceedings are required because false and misleading testimony by Newaygo County prosecutor and discharged SAUSA Chrystal Roach, false testimony by other government witnesses, and false statements by prosecutors denied Gabrion a fair trial and a fair penalty phase hearing (Ground One of amended § 2255 motion).**

In Ground One of his § 2255 motion, Gabrion alleged in detail that the government presented false and misleading testimony and made false and misleading statements in its opening statement and closing argument, in violation of his Fifth, Sixth, and Eighth Amendment rights. *See Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959).

**a. Gabrion alleged false and misleading testimony by Newaygo County prosecutor Chrystal Roach.**

Gabrion alleged below that Newaygo County prosecutor Chrystal Roach testified falsely at trial. The government's theory that Gabrion manipulated the state court proceedings and then murdered Rachel Timmerman to obstruct justice by preventing her from testifying was key to the government's guilt phase case and became the bedrock of the government's penalty phase proof and argument. Roach's false and misleading testimony was critical to this theory.

Roach played many roles in this case. First, Roach was the Newaygo County prosecutor who prosecuted Gabrion on the rape case. R. 1-1, Docket Sheet, PageID 142. She was then a SAUSA in Gabrion's federal capital case until she was removed by the Justice Department for misconduct in this case. . *See* R. 100, § 2255 Mot., at 10 n.1, PageID 3896. Having been banished as counsel, she then morphed into a government witness at trial. *See, e.g.*, Trial Tr. at 1165, 1175. Gabrion's § 2255 motion made detailed allegations explaining why Roach's testimony was false and created the misleading impression that Gabrion manipulated the state court proceedings. Gabrion's allegations were enough to satisfy the standard for discovery and an evidentiary hearing. Gabrion supported his allegations with undisputed facts in the form of the state court records, surpassing the requirements for discovery and an

31

evidentiary hearing. *See, e.g.*, R. 100 Am. § 2255 Motion at 11–22, PageID 3897–3908. The district court prematurely (and incorrectly) ruled that Gabrion had failed to prove his allegations. Most relevant at this stage of the proceedings, the district court ruled that reasonable jurists could not debate whether Gabrion is entitled to discovery or an evidentiary hearing on his detailed allegations of false testimony by a prosecutor who the DOJ already determined committed misconduct in this case.

### i. The details of the rape case

A detailed review of the facts surrounding the state court rape case is necessary here to understand the impact of Roach's testimony, and why this Court should grant a COA.

On October 31, 1996, Gabrion was charged with Third Degree criminal sexual conduct (CSC) after a ten-week investigation. *See* R. 100, Am. § 2255 Motion at 11, PageID 3897. Rachel Timmerman was the complainant. Gabrion first appeared before the state district court on the CSC charge on January 21, 1997. R. 1-1, Docket Sheet, PageID 141. Chrystal Roach, the SAUSA and witness, was the elected prosecutor in Newaygo County, the county where this occurred.

The prosecution in state court was authorized to seek pretrial detention without bond pursuant to Michigan Rule of Criminal Procedure 6.106(B),[7] but did not try to invoke the court rule or mention any alleged threats by Gabrion against Ms. Timmerman. Gabrion's bond was initially set at $50,000, with a requirement that he post 10% of that amount in cash in order to be released. *See* R. 100, Am. § 2255 Motion at 11, PageID 3897; R. 1-1, Docket Sheet, PageID 141. Without posting bond, Gabrion would remain in custody pending the preliminary examination, eliminating any chance that he could interfere with Rachel Timmerman's testimony at the examination. Gabrion requested a bond reduction from $50,000 to $40,000. R. 100, Am. § 2255 Motion at 11, PageID 3897. He specifically indicated that his family could post $4,000 in cash but not $5,000. *Id.* The prosecution did not object to bond being set at $40,000. *See* R. 1-1, Docket Sheet, PageID 141. The district court set bond at $40,000 and Gabrion was released. *Id.*

The state prosecutor's decisions about pretrial release are relevant because one of the government's central themes at the federal capital murder trial was that Gabrion threatened Timmerman at the time of the CSC case and that Timmerman

---

[7] The Michigan Rules of Criminal Procedure are found in Chapter 6 of the Michigan Court Rules. The Michigan Court Rules are available at the following website: https://courts.michigan.gov/courts/michigansupremecourt/rules/pages/current-court-rules.aspx.

was convinced Gabrion would harm her if she accused him of the assault. Yet, during early proceedings in the CSC case, there is no indication that the state prosecuting attorney's office objected to Gabrion's release on bond, requested a higher bond, or mentioned anything to the court about alleged threats by Gabrion against Timmerman.

A preliminary examination in the CSC case was scheduled for January 30, 1997. R. 1-1, Docket Sheet, PageID 141. Both Gabrion and the prosecution had the right to a preliminary examination pursuant to Michigan Rule of Criminal Procedure 6.110(A). Indeed, the prosecuting attorney must consent to a defendant's waiver of the preliminary examination.[8]

There are important reasons why prosecutors, as well as defendants, have the right to conduct preliminary examinations. Such proceedings allow the prosecution to preserve testimony should a witness later becomes unavailable. In addition, if the evidence presented at a preliminary examination establishes that other crimes occurred, such as a more serious form of criminal sexual conduct, the district court has the authority to bind the defendant over to the circuit court to stand trial on those more serious charges.[9]

---

[8] *See* Mich. R. Crim. P. 6.110(A) ("The defendant may waive the preliminary examination *with the consent of the prosecuting attorney*.") (emphasis added).

[9] *See* Mich. R. Crim. P. 6.110(E) ("If, after considering the evidence, the court determines that probable cause exists to believe both that an offense not cognizable

Both Gabrion *and the prosecuting attorney's office* waived their right to a preliminary examination on January 30. R. 1-1, Docket Sheet, PageID 141. As a result of the waiver, no preliminary examination occurred on January 30 and the charge was bound over to the Newaygo County Circuit Court for further proceedings, including trial.[10]

On February 4, 1997, Gabrion was arraigned on the CSC charge in circuit court and pleaded not guilty. R. 1-1, Docket Sheet, PageID 141–42. Two changes of counsel occurred and, on March 25, 1997, Joel Townsend filed an appearance in circuit court on behalf of Gabrion. The court set a pretrial hearing for April 21, 1997. The Docket Sheet indicates that the prosecuting attorney's office asked the court to

---

by the district court [i.e. a felony] has been committed and that the defendant committed it, the court must bind the defendant over for trial. If the court finds probable cause to believe that the defendant has committed an offense cognizable by the district court [i.e. a misdemeanor], it must proceed thereafter as if the defendant initially had been charged with that offense."); *see also* Michigan Courts: Michigan Trial Courts, https://courts.michigan.gov/Courts/trialcourts/Pages/default.aspx (Michigan circuit courts handle felony criminal cases, and Michigan district courts handle misdemeanor criminal cases).

[10] *See* Mich. R. Crim. P. 6.110(A) ("Upon waiver of the preliminary examination, the court must bind the defendant over for trial on the charge set forth in the complaint or any amended complaint.").

*remove the calendar dates*. *Id.*, PageID 142. The court granted the motion and rescheduled the hearing for April 29, 1997. *Id.*[11]

On April 29, 1997, Gabrion appeared for the rescheduled pretrial hearing along with Attorney Townsend. R. 1-1, Docket Sheet, PageID 142. It is unclear who appeared on behalf of the prosecution. Townsend sought a remand to the district court for a preliminary examination. R. 1-2, 04/29/97 Tr., PageID 147. The prosecution did not seek a remand to the district court or join in the defense motion for a preliminary examination (although the prosecutor did put the request on the record, specifying that it was the defense's request, not the prosecution's). *Id.* The prosecution did not object to the request. *Id.* The court granted the defense's motion. A preliminary examination was set in the district court for June 5, 1997. R. 1-1, Docket Sheet, PageID 142; R. 1-2, 04/29/97 Tr., PageID 147.

On approximately May 30, 1997, Gabrion waived the preliminary examination scheduled for June 5. All of the documents that Gabrion and his attorney executed and filed were processed by the district and circuit courts. The prosecution did not object to Gabrion's waiver.[12] Gabrion's waiver removed the June 5 preliminary examination from the calendar and meant that the matter would be set

---

[11] The docket entry for April 1, 1997 says, "REMOVE CALENDAR DATES PER PA OFFICE NOTICE SENT FOR: 04/29/97." R. 1-1, Docket Sheet, PageID 142.
[12] *Cf.* Mich. R. Crim. P. 6.110(A) ("The defendant may waive the preliminary examination *with the consent of the prosecuting attorney*.") (emphasis added).

for a pre-trial conference at some later date. R. 100, Am. § 2255 Motion at 15, PageID 3901. At the pretrial conference, the matter would either be resolved or set for trial at a date selected by the circuit court. *Id.*

There was never a trial set for June 5, and as of Gabrion's waiver, there was nothing on the calendar for June 5, and no time scheduled for Timmerman to testify. *Id.* Gabrion would have known that nothing was set for June 5 and that Timmerman was not set to testify. *Id.* Yet at Gabrion's federal capital trial, the government told the jury that Gabrion killed Rachel Timmerman "to keep her from testifying in the upcoming rape trial." Trial Tr. 929. In the guilt phase of Gabrion's federal capital trial, the government contended that Gabrion killed Timmerman because he was no longer able to keep Timmerman from testifying by "manipulat[ing]" the state court proceedings. Trial Tr. 1682, 1717. Gabrion's alleged manipulation of the state court proceedings was critical to show Gabrion's purported motive in the murder case: to eliminate the state's primary witness when he could no longer keep her off the witness stand by manipulating the process in the state case. Trial Tr. 1682

In the penalty phase, the alleged manipulation of the state case was critical to the statutory aggravator of substantial planning and the non-statutory aggravator of obstruction of justice. The government argued the death penalty was required because, "[T]his murder is not just a murder. *It's an assault on our system of criminal*

*justice, because he never faced justice on that criminal sexual conduct charge. He successfully carried out that plan.*" Sentencing vol. 5, Tr. 608 (emphasis added).

The misconception that Gabrion had a motive to murder Timmerman before an imminent trial became a crucial thread in the fabric of the case, so much so that this Court, deciding Gabrion's direct appeal *en banc*, made the same error repeatedly in the first three sentences of the opinion: "Marvin Gabrion was scheduled to be tried in Michigan state court for a rape charge on June 5, 1997. But that trial never happened. Two days before the trial was set to begin, Gabrion abducted Rachel Timmerman – the 19-year old woman he allegedly raped . . . ." *United States v. Gabrion*, 719 F.3d 511, 515 (6th Cir. 2013) (*en banc*).

**ii. Roach gave false and misleading testimony about the rape case.**

In order to advance its theory that Gabrion manipulated the state court proceedings and then, when he could no longer do that, murdered Timmerman so she could not testify, the government presented Roach's testimony. First, Roach testified *that she felt "strongly that in cases involving assault, that prelims [i.e. preliminary examinations] should occur prior to trial" and that she had "tried to do it every time."* Trial Tr. 1175.

Contrary to Roach's testimony, Newaygo County Circuit Court records show that in the 750 or more felony complaints alleging assaultive conduct that the Newaygo County Prosecuting Attorney filed between January 1, 1996 and

December 31, 2001, the prosecution *never* filed its own motion or demand for a preliminary examination. R. 15-3, Docket Sheets, PageID 1033–1168; R. 15-4, Docket Sheets, PageID 1170–14. In Gabrion's CSC case, contrary to the policy Roach described, the prosecution never demanded a preliminary examination. R. 1-1, Docket Sheet, PageID 141–42; R. 15-1, Docket Sheet, PageID 1025–26. On January 30, 1997, the prosecution explicitly waived its right to an examination. *Id.*, Page ID 141–42. On April 29, 1997, the prosecution did not request that the matter be set for preliminary examination. And the prosecution did not object to Gabrion's second waiver of the preliminary.

Second, Roach testified that she was not satisfied with the pace at which the CSC case was proceeding, thinking that it was not moving quickly enough. Trial Tr. 1165. Roach testified that she requested a pre-trial conference in April of 1997 because she thought the case was moving too slowly. *Id.* Contrary to Roach's testimony, records show that Roach requested delay of a pretrial hearing that was *already set*. R. 1-1, Docket Sheet, PageID 142. Thus, her actions delayed the proceedings.

Roach also testified that, at the conference, she moved to have the case remanded to the district court for a preliminary examination. Trial Tr. 1165. In truth, Gabrion's attorney, not the prosecuting attorney, requested the remand for a preliminary examination. R. 1-2, 04/29/97 Tr., PageID 147.

Third, Roach educated the jury about the fact that, had she procured Timmerman's testimony at a preliminary examination, that testimony would have been available for the CSC trial even if Timmerman later became unavailable. Trial Tr. 1165. That much is true, but misleading by omission. Roach did not explain to the jury that her office could have demanded an examination and preserved Timmerman's testimony in January of 1997 when Gabrion first appeared in district court or at any other time while the case was pending.

Along with court records contradicting Roach's testimony, the government's lead investigator interviewed Judge Kevin Drake, who presided over the district court proceedings. He reviewed court records and said that he could not say that Gabrion manipulated the preliminary examination system. R. 141-1, Judge Kevin Drake Interview Report, PageID 5543 ("Mr. [sic.] Drake had been asked to recall his impressions concerning MARVIN GABRION during the proceedings. Mr. [sic.] Drake reviewed a copy of the original court file, and stated he couldn't state that Mr. Gabrion attempted to manipulate the proceedings.").

### iii. Federal prosecutors relied on Roach's false and misleading testimony about the rape case.

Despite the inconsistencies between Roach's testimony and other evidence, such as the court records and what they had been told by the presiding judge, federal prosecutors relied on Roach's testimony. They used her testimony to argue that Gabrion manipulated the CSC proceedings, prevented a preliminary examination to

40

keep Timmerman from testifying, and then murdered Timmerman. Federal prosecutors used Gabrion's alleged manipulation of the state court proceedings to establish a motive and two aggravating factors.

There can be little doubt that both federal prosecutors and Roach knew that Roach's trial testimony was false and misleading. Roach's trial testimony contradicted the government's presentation of facts at the grand jury. *See generally* R. 1-5, Grand Jury Tr., PageID 432–38; *see also generally* R. 15-5, Grand Jury Tr., PageID 1316-22. Chrystal Roach acted as a SAUSA during grand jury testimony. *See* R. 1-5, Grand Jury Tr., PageID 432. Grand jury testimony focused on the fact that there was *no* hearing or trial scheduled for June 5. *See generally* R. 1-5, Grand Jury Tr., PageID 432–438. Detective Richard Miller testified, that "by motions of the defense they were able to postpone the actual preliminary examination." R. 1-5, Grand Jury Tr. 31, PageID 433. He went on to testify that the last preliminary examination scheduled for June 5 was cancelled because of an "unexpected motion" by Gabrion's attorney. *Id.* at 54, PageID 437. He said that Gabrion would have known that he was not required to appear in court on June 5 because of the action of his attorney. *Id.* at 55, PageID 438.

Yet by the time of trial, the government had embraced the theory that Gabrion had to do something about Rachel Timmerman by June 5 in order to prevent her testimony on that date. The government argued that Gabrion killed Timmerman

because "He was going to have his trial in or after June of 1997. There was nothing else that was going to stop it." Trial Tr. 1682. They said, "This is the same guy that can manipulate the justice system in Newaygo County to stall for time until he can get his hands on his victim." Trial Tr. 1717.

### iv. Federal prosecutors expanded on Roach's false testimony in a manner that compounded the prejudice to Gabrion at both phases of the proceedings.

Roach's false testimony was no less than the lynchpin of the government's argument that Gabrion killed Timmerman in order to prevent her from testifying against him in the CSC case.

In its opening statement at the guilt phase of the trial, the government said: "You will learn that Defendant Marvin Charles Gabrion killed Rachel Timmerman . . . to keep her from testifying in the upcoming rape trial." Trial Tr. 929. In its closing argument, the government contended the timing concerning the CSC case was paramount in this scheme:

> Remember, [Roach] said had Rachel Timmerman testified in the preliminary examination, I could have used that testimony even if she never appeared again. She wasn't able to do that. *That's why the defendant was doing all this with his rape case. He was trying to delay things until Rachel Timmerman got out May 5, 1997, and he succeeded in doing that. But by May and June of 1997 he'd run out of options. He was going to have his trial in or after June of 1997. There was nothing else that was going to stop it.*

So Rachel Timmerman gets out May 5, 1997. She lives with her father, Tim Timmerman, up until the time she disappears June 3rd, 1997. So she was out less than a month before she disappeared.

Trial Tr. 1682 (emphasis added).

At the penalty phase, the government argued that the statutory aggravator of substantial planning and premeditation was established because of the proof that Gabrion "waited, he maneuvered around through the Newaygo County court justice system to keep her from testifying, biding his time until she was out so she wouldn't testify, he wouldn't be on the hook for the crime." Sentencing vol. 5 Tr. 608. The government used this concocted story to argue that Gabrion was also guilty of the nonstatutory aggravator of obstruction of justice: Gabrion killed Ms. Timmerman "for one reason and one reason only, because he did not want to be brought to justice [on the rape case]". Sentencing vol. 5 Tr. 608. The notion that Gabrion could and did manipulate an entire court system to suit his maniacal desires was a powerful argument that he could not be stopped short of execution.

The prejudice to Gabrion was overwhelming at both the guilt and penalty phases. At the guilt phase, Roach's testimony was the key to the alleged motive. No other evidence supported the alleged manipulation of the state court system. The prejudice at the penalty phase was even greater. Roach's false testimony supported two of the government's alleged aggravators. The government argued the death penalty was required because, "[T]his murder is not just a murder. *It's an assault on*

43

*our system of criminal justice, because he never faced justice on that criminal sexual conduct charge. He successfully carried out that plan.*" Sentencing vol. 5 Tr. 608 (emphasis added).

### v. Gabrion is entitled to a hearing and discovery—or, at least, it is debatable whether Gabrion is entitled to a hearing and discovery.

The district court suggests Roach's testimony is not indisputably false. The district court said that although the "evidence suggests that Gabrion, not the prosecutor, sought the remand[,] [o]n the other hand, the evidence also indicates that the prosecutor (*who may have been* Roach) initially brought the remand request to the attention of the court. Thus, in that respect, the prosecutor asked for the remand." R. 156, 10/04/18 Opinion at 44, PageID 5838 (emphasis added). The district court further speculates that "*[i]t is also possible that Roach asked for the remand by suggesting it to Gabrion's attorney before the hearing.*" R. 156, 10/04/18 Opinion at 44, PageID 5838 (emphasis added). "Accordingly," the district court concludes, "the evidence before the Court does not demonstrate that Roach's testimony is indisputably false." R. 156, 10/04/18 Opinion at 44, PageID 5838.

The district court also determines that Roach's testimony was not indisputably false because Roach testified that she *tried* to have a preliminary examination in all CSC cases, not that she was ever successful. The district court contends that "[s]he may have tried and failed every time" and "[i]n any event, even if her statements

were false, Roach's practice in other cases has little bearing on Gabrion's case." R. 156, 10/04/18 Opinion at 43, PageID 5837.

The district court relies on this reasoning to deny Gabrion's § 2255 motion outright, without an evidentiary hearing or discovery. But the district court has, at a minimum, identified precisely the kind of situation where a hearing and discovery are most necessary. Gabrion has presented a specific factual allegation that Roach presented false testimony. He pointed to specific facts that support his allegations, namely discrepancies between Roach's testimony about the CSC proceedings and the court records of those proceedings. In response, the district court hypothesized a "possible" explanation for this discrepancy—essentially that the county court records do not reflect every detail of what happened in the CSC case, so it is possible that the prosecution did initiate the remand off the record. R. 156, 10/04/18 Opinion at 44, PageID 5838.

Putting aside the plausibility of the district court's hypothesis, if the district court suspects that the Newaygo County court records do not tell the whole story, the district court should order discovery and an evidentiary hearing to determine the facts instead of speculating about a possible explanation. Moreover, the theory that Roach tried and failed to have a preliminary examination in 750 cases defies common sense in light of the prosecution's right to a preliminary examination.[13]

---

[13] *See* Mich. R. Crim. P. 6.110(A).

The district court suggests an alternative reason for denying relief on the claim: Roach's false testimony helped Gabrion's case rather than prejudiced him. Here again, the district court makes another factual assumption. The district court says that the evidence of obstruction would look even worse if Gabrion's counsel requested the remand, as the court records indicate, than if the prosecution requested it, as Roach falsely testified. R. 156, 10/04/18 Opinion at 44, PageID 5838. The district court's reasoning is that if Gabrion's counsel requested the remand, "the remand served no purpose but to delay the proceedings." *Id.* Because the district court did not allow for any factual development of the actual reasons Gabrion's counsel requested and later waived a remand, there is simply no factual support for its assertion that Gabrion's counsel's request for a remand would have "served no purpose but to delay the proceedings." R. 156, 10/04/18 Opinion at 44, PageID 5838. Some reasons that come immediately to mind are that counsel wanted to give himself time to plea bargain or prepare for trial or that he was unprepared to waive the preliminary hearing because he had only recently entered an appearance. Factual questions like the motivation for Gabrion's counsel's decisions in the Newaygo County proceedings are the proper subject of discovery and an evidentiary hearing. Moreover, even if there is some possibility that Roach's testimony could have told a story wherein Gabrion manipulated the proceedings by *requesting* the preliminary examination, the fact is that she told a story wherein Gabrion manipulated the

proceedings by *preventing* a preliminary examination. Court records contradict the story Roach actually told, and federal prosecutors relied upon Roach's false testimony to argue motive and two strong aggravating factors. The truth still matters. It cannot be discovered here without factual development and an evidentiary hearing.

Roach's testimony must be considered in light of Roach's other misconduct in this case. The DOJ removed Roach from her role as a SAUSA in this case for ethical misconduct. R. 100, Am. § 2255 Motion at 17, PageID 3903. Both this Court and the Supreme Court have held that evidence of misconduct by government officials in *other cases* constitutes good cause for discovery in federal post-conviction proceedings. In *Cornell*, 472 F. App'x at 354 "the district court abused its discretion in denying Cornell the opportunity to conduct discovery relating to" an FBI agent even though "Cornell ha[d] not alleged specific facts tending to show that [the agent] engaged in wrongdoing in [Cornell's] case." *Cornell*, 472 F. App'x at 354. Cornell "identified a notorious history of misconduct" by the agent. *Id.* "This history provide[d] reason to believe that Cornell *may* be able to demonstrate entitlement to relief if the facts are fully developed." *Id.* The court thus granted Cornell discovery. *Id.*; *see also Bracy*, 520 U.S. at 908–09 (§ 2254 case holding that evidence that a state court judge accepted bribes in other cases constituted good cause for discovery as to petitioner's theory that he was biased in petitioner's case).

47

Here, Roach undisputedly committed misconduct in this very case. If evidence of misconduct in other cases and speculation about misconduct in the case at bar was sufficient to create good cause for discovery in *Cornell* and *Bracy*, then in Gabrion's case, Roach's removal as a SAUSA in the very same case, coupled with discrepancies between her testimony and court records, create good cause for discovery.

At the very least, in light of the discrepancies between Roach's testimony and court records and Roach's removal for misconduct as a prosecutor in Gabrion's case, "reasonable jurists would find . . . debatable" the district court's determination that Gabrion did not satisfy the relatively light burden for an evidentiary hearing or the good cause standard for discovery on the question whether the government offered false and misleading testimony. *Slack*, 529 U.S. at 484; *accord Valentine*, 488 F.3d at 333; *Cornell*, 472 F. App'x at 354. Therefore, this Court should grant Gabrion's application for a COA on the issue of whether the district court should have held an evidentiary hearing and authorized discovery regarding Gabrion's claim that Roach's testimony was false and misleading.

**b. A COA is appropriate on Ground One of the amended 2255 motion where Gabrion alleged a pattern of false testimony by other government witnesses at both phases of the trial, including Gregory Leon, Linda Coleman and Nathan Brewster, all crucial government witnesses.**

Gabrion also pleaded below that there was a pattern of other government witnesses—including Gregory Leon, Linda Coleman, and Nathan Brewster—offering false and misleading testimony.

For example, Gregory Leon testified that while Gabrion was renting a room at the "Leon Christian Home," Gabrion bragged of using sophisticated surveillance equipment to rip off drug dealers, tapping someone's phone line, and stalking a woman who worked at a nearby laundromat. Sentencing vol. 1 Tr. 125–26, 129–30. But at the time that Leon claims Gabrion was living at the Leon Christian Home, the Home was not operational and Leon did not own the property associated with it. R. 15-11, Report re: Leon, PageID 1370–80; R. 15-12, Licensing Report re: Leon Christian Home, PageID 1382.

There is reason to suspect that Leon received an undisclosed deal from Roach in exchange for (potentially false) information about Gabrion. In 1997, Leon was facing charges in Newaygo County for raping his former wife. R. 100-3, Felony Information, PageID 4644–47. Her testimony described a brutal rape: Leon entered her home through an unlocked window, stuffed a rag in her mouth, and raped her while calling her his whore and saying that he could do this any time he wanted. R. 100-3, 7/13/97 Leon Tr 11–13, PageID 4660–62. Leon was initially charged as a

habitual offender based on prior felony convictions, and even without a sentencing enhancement, third degree CSC is punishable by fifteen years in prison. *See* Mich. Comp. Laws § 750.520b(2)(a). In November 1997, Leon was released from jail over the victim's objection because prosecutor Roach failed to bring him to trial within 180 days. R. 100-3, 11/17/97 Leon Tr., PageID 4693–94. In July 1998, Leon pled to a reduced charge of aggravated stalking. Aggravated stalking is punishable by up to five years. *See* Mich. Comp. Laws § 750.411i(3)(a). Leon received a 223-day, *time-served* sentence, again over the victim's objection. R. 100-3, Judgment of Sentence, PageID 4696–97.

Meanwhile, in November 1997, a week after being released from jail, Leon met with FBI agents investigating Timmerman's murder. He eventually testified against Gabrion. No deal with Leon was disclosed. The district court did not authorize discovery or an evidentiary hearing, hampering Gabrion's ability to develop further evidence about a possible deal between Leon and Roach. But Gabrion has made the specific, credible allegation that Leon and Newaygo County prosecutors had an arrangement.

Second, Linda Coleman testified by deposition that in June 1997, she saw Gabrion and two other people, including one who resembled Timmerman, at Oxford Lake in a black truck with a boat in the back. Dep. at 5, 8–9. The government used this testimony to argue that Coleman was the last person to see Timmerman alive.

50

This testimony strongly implicated Gabrion because it placed Timmerman in a car with Gabrion. However, Coleman testified falsely. In different versions of the story, Coleman gave different accounts of what car she was driving when she supposedly saw Gabrion and Timmerman near Oxford Lake. Dep. at 16, 34–35, 40. In some versions, she claimed to be in a car she did not yet own. R. 15-11, Report re: Coleman, PageID 1352–69. The trial judge expressed doubt about Coleman's testimony. Trial Tr. 1300 ("What I'm concerned about is I don't think there's a single fact that wasn't twisted, that she came out opposite on. But as an officer of the Court you're saying that she's offered for purposes of believability by this jury and you believe or you're offering her believing that she should be believed?" "Absolutely, Your Honor."). The government claimed that her story had been "thoroughly" investigated. *Id.* Contrary to its statement, the government could not have thoroughly investigated Coleman's story. Even a cursory investigation would have revealed its inconsistencies.

Third, Nathan Brewster testified that Gabrion threatened guards without provocation when they were housed together at the Calhoun County Jail. Sentencing vol. 2 Tr. 354. When he later told law enforcement that the guards did harass and provoke Gabrion, they told him not to go into it. R. 141-3, Brewster Aff. at ¶¶4–7, PageID 5547. Brewester also testified falsely about his own criminal record. *See* Sentencing vol. 3 Tr. 349; R. 100, Am. § 2255 Motion at 39, PageID 3925. Most

51

notably, the government told Brewester that they would help him with his case if he testified against Gabrion. *See* R. 141-3, Brewster Aff. at ¶3, PageID 5547. Gabrion alleged that his defense team was not informed about this arrangement. R. 100, Am. § 2255 Motion at 38, PageID 3924.

At the very least, "reasonable jurists would find . . . debatable" the district court's determination that Gabrion did not satisfy the relatively light burden for an evidentiary hearing or the good cause standard for discovery on the question whether the government offered false and misleading testimony by these three witnesses. *Slack*, 529 U.S. at 484; *accord Valentine*, 488 F.3d at 333; *Cornell*, 472 F. App'x at 354. Therefore, this Court should grant Gabrion's application for a COA on the issue of whether the district court should have held an evidentiary hearing and authorized discovery regarding Gabrion's claim that several government witnesses provided false and misleading testimony.

### c. Gabrion alleged that the government made false statements about letters from Timmerman that contradicted the conclusions contained in an FBI forensic report.

The government prosecutors—not witnesses—also made false statements to the jury in their opening statement and in closing arguments. In its opening statement, the government said that Gabrion forced Timmerman to write letters asking for the CSC charges against Gabrion to be dismissed. Trial Tr. 930–31. In its closing argument, the government said that Gabrion wrote these letters himself and

Timmerman was following Gabrion's "script."  Trial Tr. 1686. These statements contradict an FBI report prepared prior to trial, which concluded that Timmerman probably was not under duress when she wrote the letters. The FBI report points out that Timmerman's letters were "markedly different" from letters by Gabrion because whereas Timmerman's letters were consistent and coherent, when Gabrion writes letters, they "lack any type of consistency" and "there appears to be no rhyme or reason for when he says anything." R. 1-8, Law Enforcement Communication Union Report, PageID 448.

Addressing the government's statements, the district court concludes that even though the statements contradict the FBI report, they were not improper because the FBI report is merely an opinion. R. 156, 10/04/18 Opinion at 48, PageID 5842. This conclusion ignores the fact that the FBI's report, while an opinion, is an opinion reached by experts *on the prosecution team*, presumably after conducting an expert analysis using the most current scientific techniques.

The district court also surmises that "it does not seem plausible that Rachel would suddenly retract her allegations[,]" again making factual inferences without holding a hearing or authorizing discovery. R. 156, 10/04/18 Opinion at 47–48, PageID 5841–42. In fact, there could be many reasons for Timmerman to retract her allegations.

The district court erred by speculating that it was implausible for Timmerman to retract the allegations, and by minimizing the importance of the FBI report that contradicted the government's statements, without authorizing discovery or holding a hearing on the issue. At minimum, the district court's resolution of this issue— relying on factual inferences in holding that the prosecutor's statements were not improper despite FBI reports contradicting those statements instead of authorizing a hearing—is "debatable." *Slack*, 529 U.S. at 484. Therefore, this Court should grant Gabrion's application for a COA on the issue of whether the district court should have held an evidentiary hearing and authorized discovery regarding Gabrion's claim that the government made improper statements because an FBI report directly contradicted those statements.

**d. Gabrion alleged that the government made false statements about Timmerman's date of disappearance.**

The government also falsely stated in its closing argument that Timmerman was not seen alive after being (according to its characterization) lured from her father's house on June 3, except by a few individuals who saw her near Oxford Lake shortly before she was allegedly murdered there. Trial Tr. 1683. Contrary to the government's statement, friends and acquaintances reported seeing Timmerman alive, away from Oxford Lake, after June 3. *See, e.g.*, R. 15-3, Grand Jury Tr. 34, PageID 1385 (reports of seeing Timmerman after June 3); R. 15-14, News Article, PageID 1389 (Timmerman's father saying she had been seen in town after June 4).

The district court responds to this discrepancy by stating that "whether she was last seen on June 3 or June 6 makes no difference whatsoever. What matters, and what the evidence clearly established, is that Gabrion did not want Rachel to testify against him . . . ." R. 156, 10/04/18 Opinion at 49, PageID 5843.

This statement ignores the way the government presented its case. The government took pains to emphasize the precise timing of Timmerman's disappearance. To support its theory that Gabrion abducted Timmerman to prevent her from testifying against him, the government relied on the fact that at one point Timmerman was scheduled to testify in the CSC case on June 5.[14]

It is important, therefore, that several of Timmerman's friends and acquaintances, including Tina Kanady and Roxanne Vanslyke, reported seeing Timmerman after the time she left her father's house on June 3. *See, e.g.*, R. 15-3, Grand Jury Tr. 34, PageID 1385. It is also important that the government knew that several people reported seeing Timmerman after June 3. *See id.* Moreover, these people saw her in a nonthreatening atmosphere. *See, e.g.*, R. 15-15, Grand Jury Tr. 10, PageID 1393. She had additional non-presented and non-nefarious reasons for wanting to disappear—her probation was about to be revoked.

---

[14] Indeed, in a prior Sixth Circuit opinion in this case, this Court incorrectly stated that "Marvin Gabrion was scheduled to be tried in Michigan state court for a rape charge on June 5, 1997. But that trial never happened. Two days before the trial was set to begin, Gabrion abducted Rachel Timmerman . . . ." *United States v. Gabrion*, 719 F.3d 511, 515 (6th Cir. 2013) (en banc).

The district court was wrong that whether Timmerman was last seen on June 3 or June 6 "makes no difference whatsoever" because the specific date of Timmerman's disappearance was part of the government's guilt-phase case, and a key part of the government's penalty-phase theory that Gabrion methodically plotted to murder Timmerman in order to obstruct justice. At minimum, the district court's resolution of this issue is "debatable." *Slack*, 529 U.S. at 484. Therefore, this Court should grant Gabrion's application for a COA on the issue of whether the district court should have held an evidentiary hearing and authorized discovery regarding Gabrion's claim that the government made improper statements regarding the date of Timmerman's disappearance.

**e. Gabrion alleged that the government improperly restricted the testimony of Dr. Mark Cunningham.**

The government misled the jury regarding what the conditions of confinement would be for an inmate who was capitally charged but ultimately sentenced to life rather than death. The government successfully prevented Gabrion's expert, Dr. Mark Cunningham, from testifying about the full range of security procedures that the BOP could apply to Gabrion. *See* Sentencing vol. 3 Tr. 471. It further sought to discredit Cunningham as a paid expert on a "mission" to prevent the death penalty in this case and other cases. Sentencing Cunningham Tr. 26.

Misinformation regarding conditions of confinement is significant because the government identified future dangerousness as an aggravating factor in this case,

and because future dangerousness is likely the most significant issue for juries deciding whether or not to sentence an inmate to death. *See United States v. Johnson*, No. 02 C 6998, 2010 Lexis 133727, at *9–10 (N.D. Ill. Dec. 13, 2010) (citing John H. Blume, et al., *Future Dangerousness in Capital Cases: Always "At Issue"*, 86 Cornell L. Rev. 397, 404 (2001); Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?*, 98 Colum. L. Rev. 1538, 1559-60 (1998); Sally Costanzo & Mark Costanzo, *Life or Death Decisions: An Analysis of Capital Jury Decision Making Under the Special Issues Sentencing Framework*, 18 Law & Hum. Behav. 151, 160 (1994)) ("A number of studies suggest that future dangerousness is one of the most [sic.] issues, if not the most significant, for juries deciding whether or not to sentence a defendant to death."). To underscore the importance of future dangerousness, the court in *Johnson* pointed to a different case, *United States v. Jones*, in which "a jury convicted Jones of ordering the murders of federal witnesses, including one while he was incarcerated in a federal prison." *Johnson*, No. 02 C 6998, 2010 Lexis 133727, at *10. "The *Jones* jury found . . . that he was a future danger and a 'continuing and serious threat to society.'" *Id.* But most jurors "also found that: 'Any concern respecting future dangerousness of Anthony Jones is significantly reduced since the Federal Bureau of Prisons is empowered to classify a prisoner serving a life sentence without possibility of release to the highest security level federal prison, under conditions of confinement that eliminate any

reasonable probability that the prisoner will be a continuing and serious threat to society'" and "[t]he jury did not sentence Jones to death." *Id.*

Here, the district court concluded that "[i]t was not improper or unfair for the Government to raise its objection" to testimony that would have allowed Gabrion to show that he would not be dangerous if sentenced to life in prison. R. 156, 10/04/18 Opinion at 51, PageID 5845. But in light of the well-established importance of this factor—as shown by empirical studies and cases like *Jones* and *Johnson*—it was improper for the government to prevent evidence of available BOP security measures. At least, the district court's resolution of this issue is "debatable." *Slack*, 529 U.S. at 484. Therefore, this Court should grant Gabrion's application for a COA on the issue of whether the district court should have held an evidentiary hearing and authorized discovery regarding Gabrion's claim that the government improperly sought to exclude evidence about available BOP security measures that would have effectively assuaged any concern about future dangerousness.

### f. Ground One is not procedurally defaulted because Gabrion relied on facts shown outside the trial record to support the claim.

The district court concluded that Ground One was procedurally defaulted. Gabrion did not procedurally default this claim. However, even if he did, he can overcome procedural default by showing cause and prejudice. *See Bousley v. United States*, 523 U.S. 614, 622 (1998). At minimum, the question whether Ground One

was procedurally defaulted is debatable, which satisfies the standard for a COA on Ground One. *See Slack*, 529 U.S. at 484.

Gabrion did not procedurally default this claim under the exception to the procedural default rule for claims that rely on facts outside the record, especially if the claim sounds in government misconduct. *See Waley v. Johnston*, 316 U.S. 101, 104 (1942). While *Waley* has been limited to claims that cannot be addressed by direct review—and perhaps to claims involving government misconduct—*Waley* has not been overruled. *See Bousley*, 523 U.S. at 621–22 (pointing out that *Waley* is a very narrow exception, but not overruling the narrow exception); *see also Massaro*, 538 U.S. at 505–06 (explaining the importance of factual development in collateral proceedings for claims that depend on fact outside the direct appeal record). Ground One falls within *Waley*'s exception.

Gabrion can also demonstrate cause and prejudice to overcome procedural default. As to cause, Gabrion has alleged that his trial counsel was ineffective for failing to thoroughly investigate his case. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 389 (2005) ("It flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the trial courthouse, open for the asking."). A more thorough investigation would have allowed trial counsel to challenge the false testimony of government witnesses. Gabrion has also alleged that his appellate counsel was

ineffective for failing to raise meritorious arguments. *See Guidelines for Appointment & Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 1032 (2003) ("Because of the possibility that the client will be sentenced to death, counsel must be significantly more vigilant about litigating all potential issues at all levels in a capital case than in any other case."). To the extent that evidence in the record on appeal would have allowed appellate counsel to raise this claim, their failure fell below the standard of reasonably competent counsel.

As to prejudice, Roach's testimony, in particular, was crucial evidence in support of the aggravating factors of 1) obstruction of justice and 2) substantial planning and premeditation. The jury's unanimous determination that the prosecution proved the aggravating factors was necessary for it to sentence Gabrion to death. False testimony in support of these aggravating factors made it substantially more likely that Gabrion would be sentenced to death. From Roach's testimony and the government's argument, a strong case could be made that Gabrion was able to thwart an entire system of justice. It is a small leap to conclude that nothing short of execution could prevent this from reoccurring in the future. The false testimony of other government witnesses, as well as the government's false statements about both Timmerman's letters and conditions of confinement, also made it substantially more likely that Gabrion would be sentenced to death.

Therefore, at minimum, "jurists of reason would find it debatable whether the district court was correct in its procedural ruling" that Ground One is procedurally defaulted. *Slack*, 529 U.S. at 484. This Court should grant Gabrion's application for a COA on the issue of whether the district court should have held an evidentiary hearing and authorized discovery on Ground One, Gabrion's claims that government witnesses testified falsely and prosecutors themselves made false statements.

**2. Gabrion alleged that the government withheld evidence in violation of *Brady v. Maryland* in relation to the testimony of Gregory Leon, Nathan Brewster, and Lloyd Westcomb (Ground Six of amended § 2255 motion).**

In Ground Six of his § 2255 motion, Gabrion alleges that the government withheld material, exculpatory evidence in violation of his Fifth, Sixth, and Eighth Amendment rights. *See Brady v. Maryland*, 373 U.S. 83 (1963). *Brady* requires the government to disclose evidence that is favorable to the defendant and material to either guilt or punishment. *Id*. at 87. Exculpatory evidence includes information that could be used to impeach government witnesses, such as deals between witnesses and prosecutors, and witnesses' criminal histories. *See United States v. Bagley*, 473 U.S. 667, 678 (1985). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at 682.

The government failed to disclose material evidence about its witnesses. Specifically, the government failed to disclose significant impeachment evidence concerning Gregory Leon, such as his complete and accurate criminal history and the deal that Roach may have reached with him resulting in a 233-day time-served sentence for gagging and brutally raping his ex-wife. R. 100-3, Judgment of Sentence, PageID 4696–97. The government also failed to disclose an agreement that federal prosecutors reached with Nathan Brewster to help him hire a private investigator. *See* R. 141-3, Brewster Aff. at ¶3, PageID 5547. The government failed to disclose information regarding the competency of witness Lloyd Westcomb. And the government failed to disclose evidence that FBI hair analysts routinely overstated their results, even though an FBI hair analyst testified about the microscopic hair analysis conducted in Gabrion's case. *See* Spencer S. Hsu, *FBI admits flaws in hair analysis over decades*, Wash. Post (Apr. 18, 2015), https://www.washingtonpost.com/local/crime/fbi-overstated-forensic-hair-matches-in-nearly-all-criminal-trials-for decades/2015/04/18 /39c8d8c6-e515-11e4-b510962fcfabc310_story.html?utm_term=.7f9cba5a36d5 ("The Justice Department and FBI have formally acknowledged that nearly every examiner in an elite FBI forensic unit gave flawed testimony in almost all trials in which they offered evidence against criminal defendants over more than a two-

decade period before 2000. . . . The cases include those of 32 defendants sentenced to death.").

The district court determined that none of the suppressed evidence was material. The conclusion that none of this evidence is material is premature because the district court reached this conclusion without allowing Gabrion to develop or contextualize this evidence through discovery or an evidentiary hearing. The district court could only properly evaluate the materiality of evidence undermining the credibility of five separate witnesses through an evidentiary hearing. *See Giglio v. United States*, 405 U.S. 150, 154 (1972) (defining material evidence as evidence that could "in any reasonable likelihood have affected the judgment of the jury"); *also cf. MacLloyd*, 684 F. App'x at 562 ("Considering the precedent in favor of granting a hearing, [petitioner's] specific allegations, and the light burden necessary to receive an evidentiary hearing" and holding that a hearing was necessary); *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004) ("[E]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone . . . may cumulatively produce a trial setting that is fundamentally unfair."). At least, the district court's resolution of this issue is "debatable." *Slack*, 529 U.S. at 484. Therefore, this Court should grant Gabrion's application for a COA on the issue of whether the district court should have held an evidentiary hearing and authorized discovery regarding Gabrion's *Brady* claim.

**3. Gabrion alleged that he received Ineffective Assistance of Counsel at the penalty phase based upon numerous errors and omissions by trial counsel (Grounds Four and Eight of amended § 2255 motion).**

In violation of his Fifth, Sixth, and Eighth Amendment rights, Gabrion received ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 690–92 (1984). The ineffective assistance of Gabrion's counsel affected every phase of the case—from the investigation though the penalty phase, post-trial, and even on direct appeal—and is alleged in Grounds Three, Four, Seven, Eight, and Ten of his § 2255 motion.

**a. Legal standard for ineffective assistance of counsel claims**

Gabrion's counsel provided ineffective assistance at the penalty phase of his case. Ineffective assistance of counsel claims are typically governed by the familiar two-part standard from *Strickland v. Washington*. To prove ineffective assistance, a petitioner must show that counsel performed below an objective standard of reasonableness, and that counsel's deficient performance prejudiced him. *See Strickland*, 466 U.S. at 690–92.

A petitioner in a death penalty case can prove that counsel performed below an objective standard of reasonableness at the penalty phase by showing that counsel failed to conduct an adequate mitigation investigation. *See Wiggins v. Smith*, 539 U.S. 510, 524–27 (2003) (quoting *ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* 11.4.1(C), (1989)).

64

In addition, conceding an aggravating factor can constitute deficient performance, at least when coupled with "present[ing] a beggarly mitigation case." *Hooks v. Workman*, 689 F.3d 1148, 1206 (10th Cir. 2012) ("We recognize that conceding a continuing-threat aggravator is not necessarily deficient performance and may even help build credibility with the jury. But it is particularly unreasonable when, as here, counsel presents a beggarly mitigation case and, worse, reinforces the conceded aggravator both by failing to challenge the government's case in aggravation (impeachable though it was) and by characterizing the mitigation evidence, as well as his client, as 'scar[y].'") (modification in original) (citation omitted); *see also Marshall v. Hendricks*, 307 F.3d 36, 100 & n.45 (3d Cir. 2002) (holding that counsel was ineffective in the sentencing phase in part because he told the jury that it had already found the aggravating factor, rather than instructing it to deliberate again about whether the prosecutor had established the aggravating factor beyond a reasonable doubt); *also cf. United States v. Cronic*, 466 U.S. 648, 656 (1984) ("The right to the effective assistance of counsel is . . . the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing.").

A petitioner in a death penalty case proves prejudice at the sentencing phase by showing that, had counsel performed reasonably, "there is a reasonable probability that at least one juror would have struck a different balance" and voted

for life rather than death. *Wiggins*, 539 U.S. at 537. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" and "a defendant *need not show* that counsel's deficient conduct *more likely than not* altered the outcome in the case" to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694–95 (emphasis added).

These are, of course, the standards for *proving* an ineffective assistance of counsel claim—not the standards for showing the right to a hearing on ineffective assistance. "The defendant's burden to show his right to a hearing is significantly lower than his burden to show he is entitled to § 2255 relief." *Valentine*, 488 F.3d at 333; *accord Pola*, 778 F.3d at 532–33.

This distinction is critical. The district court appears to misunderstand the required showing for an evidentiary hearing on an ineffective assistance claim. The district court quotes a Seventh Circuit case which states that "self-serving speculation will not sustain an ineffective assistance claim." R. 156, 10/04/18 Opinion at 108, PageID 5902 (quoting *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991)). This statement misses the point. *Ashimi* was decided on direct appeal. *Ashimi*, 932 F.3d at 648. In the opinion, the Seventh Circuit specifically points out that it cannot adequately assess the ineffective assistance claim because there has been no hearing, explaining, "[t]o complicate matters, Ashimi makes his claim on direct appeal and, therefore, without benefit of a hearing on this issue. At

66

the very least, then, he faces even more of an uphill fight. As a court of appeals does not hear evidence, our only source of information is the trial record." *Id.* The Seventh Circuit makes its observation about self-serving speculation in this context, saying, "*evidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness* or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *Id.* at 650 (emphasis added).

The Seventh Circuit did not offer a reason to deny an evidentiary hearing on an ineffective assistance of counsel claim. It explained the importance of an evidentiary hearing on an ineffective assistance of counsel claim. *Id.* Rather than supporting the district court's position, *Ashimi* favors holding a hearing on ineffective assistance in collateral proceedings. *Id.*; *see also Massaro*, 538 U.S. at 505–06 (quoting *Griffin*, 699 F.2d at 1109) ("In a § 2255 proceeding [as opposed to direct appeal], the defendant 'has a full opportunity to prove facts establishing ineffectiveness of counsel, the government has a full opportunity to present evidence to the contrary, the district court hears spoken words we can see only in print and sees expressions we will never see, and a factual record bearing precisely on the issue is created.'").

The district court cites an out-of-circuit direct appeal to support denying an evidentiary hearing in a collateral proceeding, but this Court's cases make clear that

a hearing is appropriate to vet even speculative claims of ineffective assistance in collateral proceedings. *See Mason v. Mitchell*, 320 F.3d 604, 620–21 (6th Cir. 2003) (applying the significantly more onerous standard for a hearing in § 2254 cases and holding, "[b]ecause the record as it now stands reflects disputes about defense counsel's performance with respect to the sentencing phase of Mason's trial, we remand the case to the district court for an evidentiary hearing on this issue."); *see also, e.g.*, *Cornell*, 472 F. App'x at 354; *MacLloyd*, 684 F. App'x at 559. Whether a petitioner can *prove* his (potentially initially speculative) ineffective assistance of counsel claims "would be a proper inquiry for the district court to make after an evidentiary hearing, having considered not only the pleading and the affidavits, but the whole of the testimony." *MacLloyd*, 684 F. App'x at 559.

Moreover, at this stage in the case, the question is not even whether Gabrion is entitled to a hearing or discovery on his ineffective assistance of counsel claims, but whether he is entitled to a COA on the issue of whether he is entitled to a hearing and discovery on his ineffective assistance claims. To satisfy this standard, Gabrion must show that reasonable jurists would debate whether he has satisfied the standard for a hearing or discovery on his ineffective assistance claims. *See Slack*, 529 U.S. at 484; *Valentine*, 488 F.3d at 333.

**b. Gabrion alleged that trial counsel, *inter alia*, committed an egregious and prejudicial error by stating that Gabrion was guilty of the aggravating factor of obstruction of justice, and failed to oversee a proper penalty-phase investigation.**

As alleged in Gabrion's § 2255 motion, the ineffective assistance of Gabrion's counsel during the penalty phase includes:

- failing to prepare a multi-generational family history;

- failing to direct and oversee a proper penalty-phase investigation and secure a thorough social history;

- failing to obtain records supporting mitigation;

- failing to select appropriate experts and failing to prepare the experts they did select;

- stating during the penalty-phase opening statement that Gabrion was guilty of the aggravating factor of obstruction of justice (and thereby also indicating that he was guilty of the aggravating factor of substantial planning and premeditation);

- failing to secure adequate funding to prepare for the penalty phase;

- failing to object to introduction of irrelevant, unreliable, and prejudicial evidence;

- failing to move to suppress evidence used at the penalty phase;

- failing to investigate and present evidence to counter the government's evidence of future dangerousness and present evidence of positive evaluations;

- failing to take appropriate actions in dealing with the aftermath of Gabrion punching counsel during the penalty phase;

- failing to present evidence that Gabrion required a payee for his SSI benefits, which demonstrated his psychological deficits;

- failing to investigate and present evidence of numerous head injuries;

- failing to protect Gabrion's right to be present at crucial stages of the proceedings;

- failing to correct the government's theory, introduced to show Gabrion's sophistication, that Gabrion established a 501(c)(3), when in fact counsel had assisted Gabrion in establishing the organization, undercutting the argument as to Gabrion's level of sophistication;

- failing to appropriately cross-examine penalty-phase witness Jason Cross;

- failing to adequately investigate the government's penalty-phase case;

- failing to make objections to the government's misconduct during closing argument;

- failing to object to the procedure for replacing a juror who could not participate in the penalty phase; and

- failing to challenge the constitutionality of the Federal Death Penalty Act (FDPA) on its face, because the rules of evidence do not apply at the penalty phase, and as-applied, because it is applied in a racially biased manner.

Of these errors, perhaps the most egregious were stating that Gabrion was guilty of the aggravating factor of obstruction of justice and failing to oversee a proper penalty-phase investigation.

**c. Gabrion alleged that trial counsel failed to challenge the obstruction of justice aggravator despite the existence of strong evidence showing that the aggravator was not proven, and Gabrion has alleged that counsel's performance was so deficient that they actually conceded the presence of the unproven aggravator.**

Counsel's statement that Gabrion was guilty of the aggravating factor of obstruction of justice relieved the government from being required to prove it beyond a reasonable doubt. But more importantly, there was easily available evidence to successfully contest that Timmerman's murder was an obstruction of justice. Gabrion's § 2255 motion describes a number of facts that could create reasonable doubt as to the government's theory that Gabrion plotted to murder Timmerman to prevent to her from testifying in the CSC case, including evidence showing that Roach's testimony about the CSC case was false and misleading.

Rather than holding the government to the high bar for proving aggravating factors set by the FDPA, Gabrion's counsel told the jury that his client murdered Timmerman to obstruct justice. Sentencing vol. 1 Tr. 44. In so doing, counsel not only explicitly conceded the aggravating factor of obstruction of justice, but also implicitly conceded the aggravating factor of substantial planning and premeditation.

According to the district court, counsel conceded aggravating factors to focus on mitigating factors instead. The district court concludes that "it was not unreasonable for counsel to concede this issue as part of a strategic decision to focus on more promising avenues, like the mitigating factors." R. 156, 10/04/18 Opinion at 131, PageID 5925. There is no evidentiary support for this conclusion. It is also premature because "[t]he Supreme Court has held in several cases that the habeas court's commission is not to invent strategic reasons or accept any strategy counsel could have followed, without regard to what actually happened[.]" *Marcrum v. Luebbers*, 509 F.3d 489, 502 (8th Cir. 2007) (citing *Rompilla v. Beard*, 545 U.S. 374, 395-96 (2005) (O'Connor, J., concurring); *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003); *Kimmelman v. Morrison*, 477 U.S. 365, 377 (1986)). It is contrary to the evidence because counsel presented a "beggarly" mitigation case that had its genesis in a woefully deficient mitigation investigation that did not comply with prevailing professional norms. The "beggarly" mitigation case undermines the district court's

conclusion that counsel made a strategic choice to focus its efforts on presenting a persuasive mitigation case. *Hooks*, 689 F.3d at 1206. The strategy upon which the court relies simply has no basis in evidence.

**d. Gabrion alleged that trial counsel failed to oversee an adequate mitigation investigation by not obtaining sufficient funding or staff to perform the investigation.**

Many sources explain the prevailing professional norms for a mitigation investigation in a capital case, norms with which Gabrion's trial counsel did not comply. *See, e.g.*, *Guidelines for Appointment & Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 1024 (2003) (hereinafter cited as *2003 Guidelines*). The Supreme Court has frequently referred to the ABA Guidelines in assessing ineffective assistance of counsel claims, and "long ha[s] referred [to these ABA Standards] as 'guides to determining what is reasonable.'" *Rompilla v.*, 545 U.S. at 387 (second alteration in original) (quoting *Wiggins*, 539 U.S. at 524); *cf. Padilla v. Kentucky*, 559 U.S. 356, 367 (2010) (non-capital case explaining, "[w]e long have recognized that '[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . . .' Although they are 'only guides,' and not 'inexorable commands,' these standards may be valuable measures of the prevailing professional norms of effective representation. . . .") (internal citations omitted). This Court has recognized that the ABA Guidelines can express the prevailing professional norms for cases

tried prior to their publication because they "merely represent a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases." *Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2002).[15]

Gabrion also submitted the affidavit of Russell Stetler, the National Mitigation Coordinator for the federal death penalty projects, which "summarize[s] the prevailing professional norms in the investigation of mitigation evidence at the time of Gabrion's prosecution and trial (1999-2002)." R. 103-4, Stetler Aff. at ¶1, PageID 4891. Along with explaining the prevailing norms, Stetler's affidavit discusses his qualifications to opine on this issue. *Id.* at ¶13, PageID 4898–99.

Supreme Court cases, relying on the ABA Guidelines, specifically emphasize the importance of a *thorough* life history investigation. In *Wiggins v. Smith*, for example, trial counsel conducted some mitigation investigation. *See Wiggins*, 539 U.S. at 518. However, counsel failed to pursue leads that reasonable counsel would have pursued. *Id.* at 533–34. In failing to pursue these leads, they missed "powerful" mitigation evidence, such as deprivation, physical abuse, and sexual molestation during Wiggins's childhood. *Id.* at 534–35. The Supreme Court held that trial counsel's mitigation investigation fell below objective professional standards.

---

[15] To the extent there is any real question about what the prevailing norms were at the time of trial, a hearing was required.

In *Rompilla v. Beard*, Rompilla's trial attorneys presented testimony of five family members, including Rompilla's son who testified that he loved his father and would visit him in prison. *See Rompilla*, 545 U.S. at 378. Indeed, the Supreme Court noted that "[t]his is not a case in which defense counsel simply ignored their obligation to find mitigating evidence, and their workload as busy public defenders did not keep them from making a number of efforts, including interviews with Rompilla and some members of his family, and examinations of reports by three mental health experts who gave opinions at the guilt phase." *Id.* at 381. The Supreme Court nevertheless found that trial counsel failed to conduct a sufficiently thorough mitigation case, and observed that "[w]hen new counsel entered the case to raise Rompilla's postconviction claims . . . they identified a number of likely avenues the trial lawyers could fruitfully have followed in building a mitigation case." *Id.* at 382. Counsel's obligations in this regard are so important that even lack of cooperation from the client or his family does not relieve counsel of the obligation to conduct a thorough mitigation investigation. *Id.* at 381.

Prevailing professional norms not only dictate that "competent defense counsel have a duty to conduct life-history investigations," they also point out that lawyers "generally lack the skill to conduct the investigations themselves. Moreover, even if lawyers had the training, skills, and patience, they do not have the time to conduct a thorough mitigation investigation because of the other work that is

75

demanded of them in representing a capital client." Stetler Aff. at ¶20, PageID 4905 (internal citations omitted). "Competent capital counsel have long retained a 'mitigation specialist' to complete a detailed, multigenerational social history to highlight the complexity of the client's life and identify multiple risk factors and mitigation themes." *Id.* "[A]s of 1998, the work of mitigation specialists is 'part of the existing "standard of care" in a federal death penalty case.'" *Id.* at ¶20, PageID 4906.

Investigations by mitigation specialists must be thorough. In *Wiggins* and *Rompilla*, for example, the Supreme Court found that trial counsel's less-than-thorough mitigation investigation constituted ineffective assistance, even though counsel in both cases had conducted some investigation and presented some mitigation evidence, and even though in *Rompilla* the client did not cooperate with counsel's efforts to uncover mitigation evidence. *See Rompilla*, 545 U.S. at 381–82, 390; *Wiggins*, 539 U.S. at 518, 536; *see also Sears v. Upton*, 561 U.S. 945, 948 (2010); *Porter v. McCollum*, 558 U.S. 30, 33 (2009).

As in *Wiggins* and *Rompilla*, Gabrion's trial counsel conducted some mitigation investigation and presented some mitigation evidence. But counsel did not conduct a mitigation investigation that met the prevailing professional norms summarized in the ABA's Guidelines, cases like *Wiggins* and *Rompilla*, and Stetler's Affidavit. This is not a close question.

The mitigation specialist retained by Gabrion's trial counsel, James Crates, prepared a ten-page, double spaced "Abridged Social History." In the ten-page Abridged Social History, Crates acknowledges that he was unable to develop much mitigation evidence, pointing to lack of cooperation from Gabrion and his family. Crates writes that, "Marvin had been extremely reluctant to discuss psychosocial history issues" and "family history has been equally difficult to uncover. This combined with Marvin's somewhat nomadic lifestyle . . . have made compilation of this social history problematical." R. 100-5, Abridged Social History at 10, PageID 4713. Crates, apparently recognizing that he had not collected a sufficient amount of evidence, also writes, "The research is ongoing. Additional relevant information, especially relevant to Marvin'[s] mental disorders and brain injuries will be provided as it is discovered." *Id.*

Yet, despite the mitigation specialist acknowledging that he needed to provide additional information, and promising to do so, he never actually did. The Abridged Social History quoted above was the *only* social history ever prepared by the trial team, and it was never supplemented. R. 100-5, Crates Aff. at ¶6, PageID 4702–03.

The prevailing norms of capital defense do not—and in the early-2000s did not—allow a defense team to shirk the duty to compile relevant mitigation evidence just because compiling such evidence is difficult. *See, e.g.*, *Rompilla*, 545 U.S. at 381–82, 390. There is no doubt that developing mitigation evidence is difficult. Even

if it were not obvious that discussing issues such as childhood sexual abuse would be difficult, the *2003 Guidelines* specifically warn: "Counsel should bear in mind that much of the information that must be elicited for the sentencing phase investigation is very personal and may be extremely difficult for the client to discuss. . . . Obtaining such information typically requires overcoming considerable barriers, such as shame, denial, and repression, as well as other mental or emotional impairments from which the client may suffer." *2003 Guidelines* at 1024; *accord Rompilla*, 545 U.S. at 381.

> Stetler's affidavit also makes this point, explaining,

> it is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socioeconomic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members. These inquiries invade the darkest, and most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed. Only with time can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions. In my professional opinion, an experienced mitigation specialist requires, at minimum, hundreds of hours to complete an adequate social history — even working under intense time pressure. One nationally recognized authority in mitigation investigation, Lee Norton, writing in 1992, stressed the cyclical nature of the work and estimated that hundreds of hours will typically be required.

R. 103-4, Stetler Aff. at ¶¶31–32, Page ID 4913–14.

In line with these general observations, the mitigation specialists on Gabrion's § 2255 team, who fifteen years later conducted a far more through mitigation investigation, report that Gabrion's "family members feel great shame about their

past. It was only after Marvin's current lawyers, mitigation specialists, and investigators spent many hours building relationships of trust with his family that they were willing to reveal a number of vitally important details about Marvin's life and environment." R. 103-1, Social History at 1, PageID 4737.

In short, "The investigation needed to expand beyond Gabrion's immediate family to identify friends, neighbors, aunts, uncles, cousins, teachers, classmates, and co-workers who could provide insights into the family's dysfunction, Marvin's poor academic performance in spite of high intellectual potential, and every aspect of parental maltreatment and neglect." R. 103-4, Stetler Aff. at ¶148, PageID 4984. Specifically, "[n]umerous 'red flags' should have prompted specific areas of investigation: the mother's 'nervous breakdown,' the parents' promiscuity and interpersonal violence, familial alcoholism and substance abuse, and the medical neglect of Marvin in childhood." *Id.* And "[a]ll the etiologies of potential brain damage needed to be investigated thoroughly: not just the traumatic head injuries, but the childhood fever, abuse of alcohol, inhalants and street drugs, and potential exposure *in utero* and in early childhood to neurotoxins." *Id.*

The more thorough mitigation investigation conducted by Gabrion's post-conviction team revealed information that trial counsel's investigation should have uncovered. For example, post-conviction mitigation specialists learned that the Gabrion home in Round Lake was stark. R. 103-1, Social History at 10, PageID

79

4746. It had an outhouse. *Id.* From their home in Round Lake, the family moved to White Cloud. That house was filthy. *Id.* at 11, PageID 4747. Friends now describe the stench and the filth and the plates of long abandoned food frequently strewn around the house. *Id.* at 12, PageID 4748. Gabrion had no choice but to became accustomed to this environment.

People recall that Gabrion wore shoes that were too big for him and split down the back. *Id.* at 11, PageID 4747. His clothes were ill-fitting and ragged; his socks had holes in them. *Id.* Other children noticed and made fun of him. *Id.*

Gabrion's family members physically abused him, and each other. Gabrion's father, Marvin Sr., physically abused Gabrion, including beating his head against a wall. *Id.* at 9, PageID 4745. Gabrion's mother, Elaine, physically abused Gabrion. *Id.* at 10, PageID 4746. Marvin Sr. physically abused Elaine. *Id.* at 10, PageID 4746. And Gabrion's brothers, who were physically imposing, physically attacked him on a number of occasions. *Id.* at 9–10, PageID 4745–46. Once, his two brothers held him down and tried to smash his head with a large rock. *Id.* at 10, 4746. When Marvin was twelve, his brother Michael shot at him with a gun. *Id.*

This was not just sibling rivalry. Gabrion's parents and siblings encouraged his brothers' violence toward him. When Gabrion was four, his family forced him to box with his older brother, gathering around and urging the boys to fight each

other for the sake of inflicting harm and, and enjoying the violence. *Id.* at 9, PageID 4745.

The social history in this case shows that Gabrion was not nurtured in any known way. There is no indication that Gabrion had anywhere to turn for help from the squalid surroundings and the impact of continual bullying. It seems that he managed life as best he could. The lack of maternal comfort was especially obvious. Gabrion's mother left the family home and children several times to be with men with whom she was having affairs. *Id.* at 3, PageID 4739. She did not hide this from her children. Family friends report that Elaine had inappropriate sexual boundaries, including reports of a sexual relationship with her son, David; possible sexual liaisons with David's friends; and reports of sex with a boyfriend of one of her older daughters. *Id.* at 7–8, PageID 4743–44.

Gabrion not only observed his mother's inappropriate sexual boundaries, but also suffered or observed sexual abuse as a child. Gabrion and his brother Mike spent time alone with an older neighbor, who brought them to his house under the auspices of having them help rake the yard. *Id.* at 2, PageID 4738. While they were there, the neighbor molested one or both of the boys. At some point, one of the boys ran out in order to get help. *Id.* When a friend arrived to help, the older neighbor was in bed with the other boy. *Id.* The friend explained that the boy who had run for help was aware that his brother was being molested and was probably also molested. *Id.*

Gabrion's mother told him that the abuse was nothing and he should not think about it or tell anyone about it. *Id.* at 3, PageID 4739.

Elaine was a thief and taught her sons to steal. She encouraged criminal conduct. *Id.* at 15–16, PageID 4751–52.

Gabrion's parents treated him differently than his siblings. Marvin Sr. told Gabrion and others on a regular basis that Gabrion was not his son. Marvin Sr. gave Gabrion the impression that he was a lesser person than his siblings. *Id.* at 10, PageID 4746. When finances were tight, Marvin Sr. suggested selling Gabrion. *Id.* Gabrion knew this because his father talked about it openly. *Id.* Gabrion's parents gave his siblings better quality clothes than Gabrion. *Id.* at 9–10, PageID 4745–46. His brothers not only beat Gabrion, they constantly heaped emotional abuse on him as well. *Id.* at 10, PageID 4746. His parents' actions added to the emotional abuse.

Gabrion comes from a family where mental illness and substance abuse are common. At least four generations in Gabrion's family have been substantially impacted by mental illness and substance abuse. R. 103-1, Social History at 43, PageID 4779. Several members have received treatment and hospitalization for diagnosable mental illnesses throughout the years. *Id.* Several have also faced legal consequences for their substance abuse. *Id.* Many of Mr. Gabrion's close relatives have been diagnosed with Bipolar Disorder, Schizophrenia, or Major Depressive Disorder. Some of these relatives have required inpatient mental health

commitments. At least one has committed suicide; a couple others attempted suicide. The social history prepared by Gabrion's § 2255 team details the history of mental illness and substance abuse in Gabrion's family. *See id.* at 43–146, PageID 4779–4882.

As just a few examples, Gabrion's mother was treated for a "nervous breakdown" when Gabrion was between seven and nine years old. *Id.* at 53, PageID 4789. Marvin's paternal step-grandfather Vern Gabrion abused alcohol. Many in the family thought Vern sexually abused his step-daughters, Gabrion's aunts. *Id.* at 135, PageID 4871. Gabrion's sister Gloria was molested and receives treatment from a psychiatrist and psychologist. *Id.* at 54–55, PageID 4790–91. His sister Yvonne suffers from depression. She refuses to take medication and instead treats herself with health foods. *Id.* at 55, PageID 4791. Gabrion's brother David takes antidepressant and antipsychotic medication. *Id.* at 55–56, PageID 4791–92. Both of Gabrion's brothers have a history of substance abuse. *Id.* Four of Gabrion's nieces and nephews have substance abuse problems. *Id.* at 57–59, PageID 4793–95.

This family history is relevant because understanding a person's family history is necessary to making a proper diagnosis. "A family history of bipolar disorder is one of the strongest and most consistent risk factors for bipolar disorders. There is an average 10-fold increased risk among adult relatives of individuals with bipolar I and bipolar II disorders." American Psychiatric Association, *Diagnostic*

*and Statistical Manual of Mental Disorders* 130 (5th ed. 2013) (DSM-5). "Schizophrenia and bipolar disorder likely share a genetic origin, reflected in familial co-aggregation of schizophrenia and bipolar disorder." *Id.* at 130.

Experts have recognized this important point in reviewing capital cases. For example, in Richard Stitt's federal capital trial, Dr. Ryan (the same Dr. Ryan who testified here) testified that Mr. Stitt met the criteria for psychopathy. Dr. Ryan based his trial diagnosis on documents pertaining to the defendant and his history provided by the government, his clinical interview of Mr. Stitt and two psychological instruments he administered. Years later, during Mr. Stitt's habeas proceedings, Dr. Ryan was provided with information about Mr. Stitt's chaotic upbringing, and "most significantly, that acute mental illness has been diagnosed in Mr. Stitt's mother and at least one (and possibly two) of her siblings." *See* R. 160-2, Affidavit of Dr. Thomas V. Ryan at ¶ 14, PageID 6052. Dr. Ryan opined that all the information about Mr. Stitt's background would have been "important for [his] evaluation", and in particular the information about Mr. Stitt's familial history of major mental illness would have been "very helpful" because of the genetic component of bipolar and other mood disorders. *Id.* at ¶ 15, PageID 6052. "With an awareness of Mr. Stitt's reportedly remarkable family history of bipolar disorder, his behavior could be cast in a dramatically different light." *Id.* at ¶ 16, PageID 6052–53.

The investigation by Gabrion's § 2255 team revealed an "astonishing number of motor-vehicle accidents and accidents and head injuries, beginning around the time of his high-school graduation." R. 103-1, Social History at 20–28, PageID 4756–59. Gabrion suffered at least seventeen head injuries. *Id.*, PageID 4756–59. These injuries are corroborated by medical records, police reports, or individuals other than Gabrion. *Id.*, PageID 4756–64. For example, siblings recall a car accident in 1971, employment records note a car accident in 1976, ambulance records document a car accident in 1992, and a family friend recalls hitting Gabrion on the head with a baseball bat. *Id.*, PageID 4756–64. Medical records also note the problems brought on by these injuries, such as, "Severe challenges of attention, stream of awareness, concentration, and investment in sustained ideational activity which compromises basic functional abilities." *Id.* at 25, PageID 4761 (quoting Hope Network medical records).

Gabrion did not begin to have behavior problems or run-ins with law enforcement until around the time of his high school graduation. *Id.* at 29, PageID 4765. This is when Gabrion suffered one of his first serious head injuries. Mental illness commonly manifests in early adulthood. People observed a dramatic change in Gabrion's personality around this time. Contemporaneous medical records detail the dramatic cognitive and behavioral impairments Gabrion was experiencing, and also showed that he was not able to manage his medication because he lacked a

stable and supportive place to live. *Id.* at 23–27, PageID 4760–63. Medical records also reveal Gabrion's responsiveness to medication, when he took it. R. 120-1, Pine Rest Christian Hospital Records, PageID 5317–18. His doctor referred him to Newaygo County Community Mental Health and provided the number for various homeless shelters. R. 103, Social History at 26–27, PageID 4762–63. Gabrion was lost, without support, and careening toward problems.

While incarcerated, Gabrion harmed himself several times. He has tried to hang himself at least twice, and once he was found lying on the floor of his cell with a chicken bone protruding from his arm. R. 103, Social History at 40, PageID 4776.

Despite the mitigation evidence that was available, and despite the fact that the mitigation specialist retained by Gabrion's trial attorney simply pointed to the difficulty of acquiring this evidence and prepared a brief, incomplete report, the district court opines that the mitigation investigation was adequate because "Gabrion's counsel started preparing his mitigation case well in advance of trial," collected some records, and "also presented more than one witness in support of mitigation." R. 156, 10/04/18 Opinion at 116, 118, PageID 5910, 5912. However, the district court's conclusion that this was sufficient is refuted by cases such as *Rompilla* and *Wiggins*, which held that a less-than-thorough mitigation investigation can constitute deficient performance.

The district court also contends that trial counsel "did not fail to discover any comparable mitigating evidence" including "mistreatment by his parents[.]" *Id.* at 116, PageID 5910. However, the abridged social history and the weak evidence presented at the penalty phase of Gabrion's trial compared to the powerful mitigation evidence uncovered by post-conviction counsel refutes the district court's assertion.

Gabrion's trial counsel's inadequate mitigation investigation constituted deficient performance. *See Rompilla*, 545 U.S. at 381–82, 390; *Wiggins*, 539 U.S. at 518, 536. In conjunction with the deficient mitigation investigation, conceding aggravating factors constituted deficient performance, as well. *See Hooks*, 689, F.3d at 1206.[16]

### e. Gabrion alleged that he suffered prejudice from trial counsel's concession of aggravating factors and failure to investigate mitigation evidence because powerful mitigation evidence exists and mitigation evidence matters to juries.

As to prejudice, Gabrion's counsel's statement that his client killed Timmerman to obstruct justice and failure to oversee an adequate mitigation investigation prejudiced Gabrion because, but for counsel's errors, "there is a reasonable probability that at least one juror would have struck a different balance"

---

[16] To the extent that the district court may have thought that obtaining mitigation evidence in this case required more effort than the prevailing professional norms demanded of counsel, the district court should have held an evidentiary hearing to determine precisely what the trial team did and did not do as part of its mitigation investigation, and whether their efforts satisfied prevailing professional norms of capital representation.

and voted for a sentence of life rather than death. *Wiggins*, 539 U.S. at 537. Even without an evidentiary hearing, it is clear that the kind of mitigation evidence that Gabrion's post-conviction counsel uncovered is comparable to the mitigation evidence that post-conviction counsel uncovered in *Wiggins* and *Rompilla*, and in both of those cases the Supreme Court found not only deficient performance but also prejudice. *See Rompilla*, 545 U.S. at 393; *Wiggins*, 539 U.S. at 534–35.

In assessing whether adversarial testing and the newly uncovered, powerful mitigation evidence would have convinced at least one juror to strike a different balance and vote for life, it is worth keeping in mind that death sentences are exceedingly rare—that is, convincing one juror to vote for life is not an overly tall order, even in cases with serious aggravators.

Juries deciding federal death cases have overwhelmingly voted for life: "In those federal cases where juries have been asked to decide on the death penalty, they have opted for life imprisonment about twice as often as death sentences." Mark Berman, *The Justice Dept. is seeking its first federal death sentences under Sessions and expects more to follow*, Wash. Post (Jan. 9, 2018), https://www.washingtonpost.com/news/post-nation/wp/2018/01/09/the-justice-department-is-seeking-its-first-federal-death-sentences-under-sessions-and-expects-more-to-follow/?utm_term=.232e170c717e. As of February 2017, "[i]n cases in which juries actually reached the point of choosing between life and death,

they imposed 151 (65%) life sentences and 83 (35%) death sentences. Of these 83 sentences of death, 4 defendants received a death sentence twice in the same case: one at his first trial and a second time in a retrial or resentencing proceedings after the original conviction or death sentence had been overturned." *Disposition of Federal Cases Since Reinstatement of Federal Death Penalty in 1988*, Death Penalty Information Center (DPIC), https://deathpenaltyinfo.org/federal-death-penalty#PrisonerList. These figures do not include, for example, the fourteen defendants who were acquitted of the capital charge, the two defendants declared innocent by the government, the cases resolved by plea, or the cases where the government withdrew its request for the death penalty before or during trial. *Id.*

Lest the Court think that the crime Gabrion was convicted of is somehow qualitatively different from the crimes for which juries decided that life imprisonment was an appropriate sentence, the case of Jessie Con-ui serves as a helpful example. Con-ui was found guilty of murdering a federal prison guard. *See* Joe Dolinsky, *Jury spares Jessie Con-ui's life for federal prison guard's murder*, Wilkes Barre Times Leader (July 10, 2017), https://www.timesleader.com/news/local/667029/jury-spares-jessie-con-uis-life-for-federal-prison-guards-murder. When he committed this murder, Con-ui was serving a life sentence for a 2002 gang-related murder in Arizona. *Id.* The murder of the federal prison guard was brutal, and jurors saw a video of the attack:

"[P]rosecutors allege Con-ui is shown kicking Williams to the bottom of the stairs. They then believe he stabbed him with two homemade shanks more than 200 times, kicked him 11 times, and stomped his face, head and neck." Brian Sheehan, *Con-ui trial begins with graphic video*, Fox 56 (June 5, 2017), https://fox56.com/news/local/con-ui-trial-begins-with-graphic-video. "Prosecutors said Con-ui, angered about an earlier search of his cell, cut his hand during the killing and stopped the attack to walk over to a shower and clean the wound before wrapping it in his shirt and continuing the attack. They said he later paused to chew a piece of gum he took from the dying guard's pocket." Associated Press, *Juror: Panel split 11-1 favoring execution in guard's murder* (July 11, 2017), https://www.foxnews.com/us/juror-panel-split-11-1-favoring-execution-in-guards-murder. After watching this video—but after also hearing a constitutionally adequate mitigation case—the jury sentenced Con-ui to life. *See* Joe Dolinsky, *Jury spares Jessie Con-ui's life for federal prison guard's murder*, Wilkes Barre Times Leader (July 10, 2017), https://www.timesleader.com/news/local/667029/jury-spares-jessie-con-uis-life-for-federal-prison-guards-murder; Associated Press, *Juror: Panel split 11-1 favoring execution in guard's murder* (July 11, 2017), https://www.foxnews.com/us/juror-panel-split-11-1-favoring-execution-in-guards-murder.

The Con-ui case is not an aberration. A few additional examples underscore the willingness of federal juries to sentence defendants to life rather than death, even for aggravated crimes:

- In *United States v. Larry Lujan*, D.N.M., No. 05-924, the defendant was convicted of the kidnapping murder of a sixteen-year-old potential federal witness in a drug case. The victim was forced to perform oral sex, beaten, and nearly decapitated with a meat cleaver. The defendant in that case was also linked by DNA evidence to a prior murder of another couple.

- In *United States v. Steven Northington*, E.D. Pa., No. 2:07-CR-00550-RBS, the defendant was convicted of murdering six people by arson. The fire was set to retaliate against a federal informant. Among the victims were four children, ages fifteen, twelve, ten, and one.

- In *United States v. Oscar Grande and Israel Cisneros*, E.D. Va., No. 04-CR-83, the defendants, members of the MS-13 street gang, were convicted of the stabbing murder of a pregnant seventeen-year-old, who was targeted because she was a former member of the gang who had become a federal informant.

- In *United States v. Coleman Johnson*. W.D. Va., No. 3:00CR00026, the defendant was convicted of using a pipe bomb to kill his eight-months-pregnant ex-girlfriend to avoid the child support he would have to pay.

- In *United States v. Chevy Kehoe*, E.D. Ark., No. 97-243, the defendant was convicted of murdering a family of three, including an eight-year-old girl, in furtherance of a white supremacist racketeering enterprise. The defendant disposed of the bodies by dumping them in a swamp.

- In *United States v. Thomas Pitera*, E.D.N.Y., No. 90-0424 (RR), the defendant was a contract killer for the Mafia convicted of six murders, several of which involved torturing the victims, dismembering their bodies, and burying them in a deserted marsh on Staten Island.

- In *United States v. Steven Green*, W.D. Ky., No. 5:06-CR-00019-TBR, the defendant was convicted of murdering a family of four, including two children, and raping and murdering their daughter.

- In *United States v. Michael Antonio Natson*, M.D. Ga., No. 4:05-CR-00021-CDL-GMF, the defendant was convicted of murdering a pregnant twenty-three-year-old university student. The defendant was a U.S. Air Force military police officer, and the victim's skeletal remains were found by hunters on a remote part of Fort Benning, Georgia.

- In *United States v. John Richard Mayhew*, S.D. Ohio, CR No. 02 03-16, the defendant was convicted of murdering his ex-wife, her boyfriend, and the defendant's own eighteen-year-old daughter, with whom the defendant had an incestuous relationship.

Many of these defendants in the federal capital cases listed above were convicted of killing multiple people, some of the cases involved killing children, and some involved killing potential witnesses or retaliating against informants. These examples of federal capital cases resulting in life sentences, particularly when considered in combination with the low rate of death sentences in federal capital cases, reveal that jurors are willing to consider and impose life sentences in highly aggravated cases. Given these examples, it is reasonable to think that at least one juror who heard the mitigating evidence that Gabrion's trial counsel failed to uncover would have struck a different balance and voted for life—even if the jurors believed that Gabrion murdered Timmerman as part of an obstruction plan, and especially if Gabrion's trial counsel had used the available evidence to question the government's presentation of aggravating factors.

All of which is another way of saying that mitigation matters. The responsibility to ensure that the defense team carries out its duties and provides constitutionally adequate representation, including mitigation, belongs to counsel, even if mitigation specialists and other specially skilled members of the defense team

must carry out much of the work. *See 2003 Guidelines* at 1002. In this case, counsel failed to carry out this responsibility, and counsel's deficient performance prejudiced Gabrion.

Gabrion is entitled to a hearing to show his counsel's deficient performance and prejudice, *see MacLloyd*, 684 F. App'x at 562, or at the very least a COA to argue that he is entitled to a hearing to show his counsel's deficient performance and prejudice, *see Slack*, 529 U.S. at 484. Moreover, counsel's failure to oversee an adequate mitigation investigation and statement that his client killed Timmerman to obstruct justice were not the only penalty-phase errors, just two of the more egregious examples of errors during the penalty phase, which best exemplify that Gabrion was entitled to discovery and a hearing on the issue of ineffective assistance. Therefore, this Court should grant Gabrion's application for a COA on the issue of whether the district court should have held an evidentiary hearing and authorized discovery regarding Gabrion's claim of ineffective assistance of counsel at the penalty phase.

### 4. Gabrion alleged that he was incompetent to stand trial (Ground Five of amended § 2255 motion)

Gabrion was incompetent to stand trial, he is incompetent now, and he has never had an adversarial competency hearing. Gabrion's claims about his competency are both substantive and procedural. *See Barnett v. Hargett*, 174 F.3d 1128, 1133–34 (10th Cir. 1999) ("Competency claims are based either upon

94

substantive due process or procedural due process, although sometimes there is overlap. A competency claim based upon substantive due process involves a defendant's constitutional right not to be tried while incompetent. . . . A competency claim based upon procedural due process involves a defendant's constitutional right, once a bona fide doubt has been raised as to competency, to an adequate state procedure to insure that he is in fact competent to stand trial. A defendant's irrational behavior, demeanor at trial, and prior medical opinion may create that bona fide doubt."). Substantively, in Ground Five of his § 2255 motion, Gabrion alleges that he was incompetent to stand trial, and, in his *Motion for Hearing to Determine Mental Competence*, alleges he is presently incompetent. Procedurally, in Ground 3.A of his § 2255 motion, he alleges trial counsel was ineffective for waiving a competency hearing, and in his *Motion for Hearing to Determine Mental Competence*, points out that he has never had an adversarial competency hearing. Failing to hold a competency hearing and holding a trial and these proceedings despite Gabrion's incompetence violate Gabrion's Fifth, Sixth, and Eighth Amendment rights. *See Godinez v. Moran*, 509 U.S. 389, 396 (1993); *Pate v. Robinson*, 383 U.S. 375, 378 (1966).

The facts discussed here are relevant to all three of Gabrion's claims dealing with competency—his incompetence to stand trial, his present incompetence, and

trial counsel's ineffective assistance for failing to, among other errors, adequately investigate and address competency issues.

"Questions about Gabrion's competence arose early in the proceedings of his criminal case." R. 156, 10/04/18 Opinion at 66, PageID 5860. Prior to trial, the district court twice ordered competency evaluations *sua sponte* because of Gabrion's bizarre behavior. The court expressed concern about whether Gabrion was capable of making rational decisions. Gabrion spoke to a government doctor about his "interest in going to the 'death chamber' in order to bring attention to the plight of missing children." R. 142-10, Fallis Report at 13, PageID 5669.

As early as the death penalty authorization process,[17] counsel complained of "difficulty communicating with Mr. Gabrion," a refrain that has always haunted this case. Throughout the case, trial counsel consistently complained that, "we have had exceptional difficulty communicating with [Gabrion], exceptional difficulty obtaining information from him, and exceptional difficulty in visiting with him." Counsel alleged he had more difficulties communicating with Gabrion than any other client in twenty years of criminal defense practice. Counsel's request for a competency examination was based, in part, upon his own expert's conclusion that Gabrion was incompetent, though also malingering. *Cf.* Richard Rogers et al.,

---

[17] For an explanation of the authorization process, *see* United States Department of Justice Manual § 9-10.000.

96

*Clinical Assessment of Malingering and Deception* at 67 (Richard Rogers ed., 3d ed. 2008) (hereinafter Rogers) ("The finding that an inmate patient has malingered one or more symptoms of psychosis does not rule out the presence of true mental disorders.").

Trial counsel said Gabrion engaged in bizarre and paranoid behavior. And indeed, during trial, Gabrion slept with his head on the table during parts of the case. The district court and defense lawyers struggled to keep Gabrion from talking loudly, burping, and making other loud noises. Against the advice of counsel and his own best interest, Gabrion testified in narrative form during the guilt phase. 03/01/02 Conference in Chambers Tr. 3. He told the jury he had "no choice but to offend some of you, as I am the speaker of the truth." Gabrion Testimony at Trial Tr. 5. He noted that he was trying to stay "within decent boundaries" but then rambled off into irrelevant tangents. *Id.* at 7.

On the first day of the penalty phase, in front of the jury, Gabrion punched his lawyer in the face. Gabrion insisted on testifying during the penalty phase against the advice of counsel. 03/14/02 Conference in Chambers Tr. 2. In a hearing prior to that testimony, Gabrion inexplicably expressed a preference to go straight to cross examination without any direct examination. Sentencing vol. 4 Tr. 563.

Under questioning by the district court, Gabrion was wholly unable to explain the definition of "truth," though he repeatedly expressed a desire to testify in order

to "get the truth out." Sentencing vol. 4 Tr. 563–64. Gabrion claimed that his lawyers wanted to put him away so he could not "get the truth out about abortion, you know, the fact that everybody's murdering off all these boys because they're too hard to raise through abortion." Gabrion Sentencing Testimony Tr. 16.

For no apparent rational reason, Gabrion also chose to allocute, again against the advice of his counsel and his own best interests. He said he would prefer to stand at the podium, not sit at counsel table, because "I have one lung. It's hard for me to breathe properly sitting to speak." Sentencing vol. 5 at 587. He then went on a rant regarding his daughter who "was murdered by abortion basically to feed the greedy, corrupt American legal and economic community, which you [apparently, the jury] are part of." Allocution Tr. at 2. He claimed he had been incarcerated for four years by the "evil beast" that murdered his daughter whose name he said was Azla. *Id.* at 2–3. He accused the jury of being half-filled with "bloody-handed pro-choice supporters." *Id.* at 3. Gabrion wrapped it up by again expressing ambivalence about his sentence and telling the jury not to worry about what happened to him because he would be "fine." He also said, "After September 11th I really don't care if I live or die, period. I've been in very much depression over what happened to our nation and I really don't care, period, okay?" *Id.* at 4.

Not all of Gabrion's unusual conduct during the trial was in the jury's presence. When he was returned to the courtroom following his banishment for

punching his lawyer, he said he did not have a clear memory of what had occurred that day. Sentencing vol. 2 Tr. 302. He asked for permission to speak, and then told the Court: "I am sorry to be represented by evil shysters in a kangaroo court in a prostitute evil nation that murders its babies by abortion. And I'll be quiet because I'm being forced to just as if I was in Nazi Germany. Thank you." *Id.* at 303.

Mental health professionals found Gabrion did not suffer from a mental disease or defect, saying that he was malingering. A government mental health professional correctly defined malingering as the "intentional production of false or grossly exaggerated physical or psychological symptoms. *Such production of symptoms is motivated by external incentives, such as avoiding prosecution in this case.*" R. 142-10, Fallis Report at 15, PageID 5670 (emphasis added).

It is appropriate to question prior evaluators' conclusion that Gabrion was malingering. Experts recognize not only that malingering is very difficult to identify, but that "[f]eigned and genuine symptoms are often present in the same individuals." Rogers at 39, 49, 51. There are "a variety of reasons" individuals feign or exaggerate symptoms, many of which are not reprobate. Even assuming – which counsel do not – that the malingering findings at trial were correct, "[c]linical evaluation of mental disorders should continue even in the presence of malingering and deception." *Id.* at 50.

It is difficult to attribute any rationality to Gabrion's conduct, and it does not seem that it could have been designed to avoid conviction or the death penalty. At least, his conduct during the trial—calling the jury "bloody-handed pro-choice supporters," sleeping, burping, and telling the jury he did not care what sentence he got—was not conduct normally designed to avoid prosecution or the death penalty. *See, e.g.*, Allocution at 2–4.

Because it is very difficult to maintain feigned symptoms over time, Rogers at 62-63, the persistence of Gabrion's symptoms some seventeen years after his conviction is itself evidence that he suffers real impairment. The fact that Gabrion's bizarre behavior continues to the present day sheds new light on his behavior at the time of trial—if not proving that he was not malingering, at least raising questions as to the accuracy of the malingering diagnosis.

And Gabrion exhibited severe signs of mental illness, unabated, for decades prior to Timmerman's death. Witnesses described conduct from years before that could be described as obnoxious but also is symptomatic of mental illness. A number of witnesses described his severe mood swings. A government witness testified he referred to Gabrion as "crazy Marv." Sentencing vol. 1 Tr. 131. Gabrion falsely told people, including his family who knew better, that he had been in Vietnam and the CIA. 03/14/02 Sentencing Excerpt Tr. 25, 40. He falsely told a former classmate that

her husband was a narc. R. 103-1, Social History at 32, PageID 4768. As an adult, Gabrion repeatedly put his hands in freshly poured concrete after being told to stop.

Gabrion's pattern of refusing to cooperate with his own attorneys' efforts to evaluate his competence is also reason to question the conclusion that he was malingering incompetence. For example, he refused to meet with his trial attorneys prior to his competency evaluation, and has willingly met with government experts while refusing to meet with experts sent by his attorneys. In addition, Dr. Fallis's report concluded that Gabrion was malingering, but also noted that he had sent letters to the judge seeking to be found competent. R. 142-10, Fallis Report at 14–15, PageID 5669–70.

Gabrion's continued insistence that he is competent is also reason to question evaluators' conclusion that he was malingering incompetence. *See, e.g.*, R. 114, Pro Se Motion Against Competency Hearing and Representation by Foster, Cleary and Graham, Page ID 5045–48 (handwritten, pro se filing).

Even if Gabrion was in fact malingering, none of the evaluators were confronted with questions about whether malingering could coexist with mental illness, whether they considered that possibility here, and to what extent that comorbid diagnosis might be at play here.

"[T]he standard for competence to stand trial is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of

rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" *Godinez,* 509 U.S. at 396 (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)). There is ample reason to be concerned that Gabrion did not have sufficient ability to consult with his lawyers or a rational understanding of the proceedings against him—not least that his lawyers have consistently reported that he cannot consult with them.

Contrary to the conclusion of the district court, *see* R. 156, 10/04/18 Opinion at 171, PageID 5965, this evidence is sufficient to show that Gabrion is entitled to discovery and an evidentiary hearing on whether he was tried while incompetent. *See MacLloyd*, 684 F. App'x at 562. At least, the district court's resolution of this issue is "debatable." *Slack*, 529 U.S. at 484. Therefore, this Court should grant Gabrion's application for a COA on the issue of whether the district court should have held an evidentiary hearing and authorized discovery regarding Gabrion's incompetence to stand trial.

### 5. Gabrion alleged that he is presently incompetent (Motion for Hearing to Determine Mental Competence, R. 101)

Gabrion is presently incompetent. In addition to the evidence of Gabrion's incompetence at the time of trial, because "[a]ll prisoners are at risk of deteriorations in their mental state[,]" *Panetti v. Quarterman*, 551 U.S. 930, 943 (2007), "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused

unable to meet the standards of competence to stand trial[,]" *Drope v. Missouri*, 420 U.S. 162, 181 (1975).

Prior competency findings were made more than fifteen years ago. In the time since, Gabrion has been imprisoned on Federal Death Row, in solitary confinement, under conditions that are acknowledged to contribute to mental health deterioration. *See United States v. Fell*, 224 F. Supp. 3d 327, 347 (D. Vt. 2016) ("It is clear to the court that the process of holding prisoners for indefinite terms extending into decades in solitary confinement is highly damaging."); *see also id.* at 346 (describing conditions on Federal Death Row and concluding, "[t]he most troubling result which appears in Dr. Haney's research is the effect of long-term isolation of the type imposed upon death row prisoners"). The lapse of time since the previous determinations is reason alone to revisit Gabrion's competency. Counsel's review of Gabrion's mental health history has revealed other reasons, including the incomplete medical history provided to previous evaluators and the incomplete social history available to previous evaluators, including widespread mental illness among family. *See* R. 120, Reply to Response to Motion for Hearing to Determine Mental Competence, at 5–6, PageID 5309–10. In addition, as discussed above, it is appropriate to question prior evaluators' conclusion that Gabrion was malingering.

In *Ryan v. Gonzales*, 133 S. Ct. 696 (2013), the Supreme Court recognized a district court's authority to grant a stay when an incompetent defendant's assistance

is required during habeas proceedings and there is a likelihood that competency can be restored. *Gonzales*, 133 S. Ct. at 708. The Court also implicitly recognized that the necessity for a stay would be more likely in proceedings like this one, under § 2255.

*Gonzales* involved two Petitioners, Gonzales and Carter, challenging state court convictions in federal court under § 2254. Section 2254 proceedings are the second round of post-conviction proceedings for those tried and sentenced in state court. As a result, the proceedings are largely record-based, and review is deferential. *See* 18 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 101 (2011). In contrast, in § 2255 proceedings, the first and only round of collateral review, courts exercise independent judgment on issues and evidence not previously raised. *See* 28 U.S.C. § 2255(b). *Cf. United States v. Pruitt*, 156 F.3d 638, 646 (6th Cir. 1998) (differentiating federal direct appeal and § 2255 proceedings).

The Court noted in *Gonzales* that, in addressing stays in § 2254 proceedings, it was addressing the "outer limits" of district court discretion to issue a stay based on the petitioner's competency. *See Gonzales*, 133 S. Ct. at 708. The limits it set were grounded in the distinction between § 2254 and § 2255. The Court observed that, "[g]iven the backward-looking, record-based nature of most federal habeas proceedings, counsel can generally provide effective representation to a habeas petitioner regardless of the petitioner's competence." 133 S. Ct. at 704; *see also id.*

at 705 ("Attorneys are quite capable of reviewing the state-court record, identifying legal errors, and marshaling relevant arguments, even without their clients' assistance.").

Gonzales's and Carter's claims show how § 2254 cases constitute the outer limits of discretion to issue competency stays. In the case of Petitioner Gonzales, the Court held that all of his claims were record-based. *See* 133 S. Ct. at 708. Because no extra-record evidence would be admissible, a stay was not warranted. *See id.* In the case of Petitioner Carter, the Court held that three of the four claims at issue were record-based and, like Gonzales's claims, did not warrant a stay. *See id.* at 708–09. The Court granted a limited remand for determination of whether one of Carter's claims warranted further development. *See id.* at 709. The Court acknowledged that if the claim warranted further factual development, a temporary stay could be required. *See id.*

Section 2255 cases, which do not raise primarily backward-looking, record-based claims, are not in the "outer limits" of the district court's discretion to grant a stay. Because § 2255 is the first and only round of collateral review, Gabrion's case is not record-based. Whereas Petitioners Gonzales and Carter would have factually developed their claims in state collateral review, Gabrion can only factually develop his claims in § 2255 proceedings. Even after state collateral review, the Supreme Court acknowledged that one of Carter's § 2254 claims potentially required further

development. As § 2255 is the first and only opportunity for factual development of collateral claims, most of Gabrion's claims require factual development. In particular, Gabrion's assistance is required in investigating his family and social history, his counsel's ineffective assistance at trial and on appeal, and the facts surrounding his capital conviction and alleged prior bad acts.

Competent death-row prisoners can – and have – played a critical role in habeas actions, in assuring both the procedural fairness and factual accuracy of the proceedings. The Supreme Court's decision in *Gonzales* accepts this, holding that a stay is warranted for incompetence if "the petitioner's claim may substantially benefit from the petitioner's assistance." 133 S. Ct. at 709.

Under 18 U.S.C. § 4241 – which *Gonzales* suggests should govern here, *see* 133 S. Ct. at 706 n.11 – the Court "shall" hold a hearing to determine the defendant's competency if there is "reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." This is not a high threshold. *See United States v. Abernathy*, 2009 WL 982794, at *4 (E.D. Mich. 2009) (describing standard as "liberal"). Virtually any evidence calling into question the petitioner's ability to understand or assist in the proceedings due to a mental disease or defect will suffice. *See United States v. Jackson*, 179 F. App'x 921, 931-32 (6th

Cir. 2006) (citing numerous examples, including mere representations by counsel, that have been held sufficient).

The district court states, "Gabrion's present counsel have not offered any evidence to suggest that his current condition is any different from what it was at the time of trial, or even at the time of Gabrion's appeal, when the Court of Appeals rejected his request for yet another competency evaluation."[18] R. 156, 10/04/18 Opinion at 199, PageID 5993. But in his Brief in Support of Motion for a Hearing to Determine Mental Competence, Gabrion detailed numerous facts showing why his competency *at minimum* should be the subject of an adversarial hearing. *See* R. 102, Brief in Support of Motion for Hearing to Determine Mental Competence at 8–9, PageID 4724–25. And Gabrion explained that he would present expert testimony establishing present incompetence. *Id.* at 11, PageID 4727.

Perhaps most importantly, Gabrion made specific and detailed requests for discovery to further address questions of Gabrion's competency. *See, e.g.*, R. 120 (Reply to Response to Motion for Hearing to Determine Mental Competence) at 9–10, PageID 5313–14 (summarizing Gabrion's requests for discovery as to competency). While holding that "Gabrion's present counsel have not offered any evidence to suggest that his current condition is any different from what it was at the

---

[18] In a catch-22 of sorts, the Court refused to sign an order authorizing Gabrion's mental health expert to see him even though he had seen him previously and travel arrangements had been made and paid for by the Southern District of Indiana.

time of trial," R. 156, 10/04/18 Opinion at 199, PageID 5993, the district court also denied Gabrion's requests to conduct discovery to develop precisely the evidence the district court demands.

In addition, because of the ineffective assistance of his prior counsel, Gabrion has never had an adversarial competency hearing. No one who determined that Gabrion was competent has ever been cross-examined. The district court was wrong to rely too heavily on previous assessments of Gabrion's competency, rather than allow discovery and consider new evidence such as the testimony of the expert proffered by § 2255 counsel.

The evidence is sufficient to show that Gabrion is entitled to discovery and a hearing on the issue of his present competency. *See Pate*, 383 U.S. at 385. At least, the district court's resolution of this issue is "debatable." *Slack*, 529 U.S. at 484. Therefore, this Court should grant Gabrion's application for a COA on the issue of whether the district court should have held a competency hearing and allowed discovery about Gabrion's present competence.

**6. Gabrion alleged that trial counsel was ineffective at the guilt phase, in part, by failing to appropriately deal with competency issues, failing to obtain funding, failing to investigate the government's case, and failing to retain investigative services (Ground Three of amended § 2255 motion).**

Trial counsel provided ineffective assistance during the guilt phase of the case, for errors including failing to appropriately deal with competency issues. The ineffective assistance of trial counsel during the guilt phase includes:

- failing to fully present competency concerns and waiving competency hearings;

- failing to take steps to ensure that Gabrion was properly medicated;

- failing to investigate the government's case;

- failing to retain adequate investigative assistance;

- failing to secure adequate funding;

- failing to seek continuances to subject the government's case to meaningful adversarial testing;

- failing to move for the judge's disqualification when counsel could not secure adequate funding;

- failing to object to or properly rebut government's improper opening statement;

- failing to rebut the government's false and misleading evidence with readily available evidence;

109

- failing to challenge the government's claim about when Rachel Timmerman disappeared;

- failing to present evidence from FBI analysts that rebutted government testimony;

- failing to use readily available evidence to show that Roach gave false and misleading testimony;

- failing to present readily available, credible evidence of other suspects;

- failing to object to the trial court's decision to excuse a juror for sleeping;    failing to thoroughly investigate the cause of death and object to a prejudicial closing argument about the cause of death;

- failing to retain a defense pathologist to assist in cross-examination and the preparation of evidence;

- failing to impeach or contradict two prosecution witnesses (Westcomb and Coleman);

- failing to move to withdraw after attorney-client relationship broke down;failing to present evidence undermining the government's alleged timeline and directly contradicting a crucial aspect of the government's case;

- and failing to present evidence from two witnesses who spotted an alleged co-conspirator/victim after he was supposedly killed.

110

This COA Application focuses on two errors as examples of counsel's deficiencies: waiving the right to a competency hearing, and failing to retain adequate investigative assistance or adequately investigate or test the government's case.

**a. Gabrion alleged that trial counsel was ineffective by failing to participate in an adversarial competency hearing despite the existence of strong evidence that Gabrion was incompetent.**

Gabrion has never had an adversarial competency hearing. This is despite the fact that, as discussed above, "[q]uestions about Gabrion's competence arose early in the proceedings of his criminal case," R. 156, 10/04/18 Opinion at 66, PageID 5860, and trial counsel consistently complained about their inability to communicate with Gabrion.

Despite his bizarre behavior, and their own concerns about Gabrion's competency, trial counsel waived the right to a competency hearing. Counsel also did not adequately investigate Gabrion's incompetency; for example, counsel failed to present a complete personal and family history to aid mental health professionals' competency examinations. Failing to present a complete personal and family history was particularly inexcusable because there was a question as to whether Gabrion was malingering, and historical documents are often the key to determining whether symptoms are evidence of genuine mental illness or malingering. *See* Rogers at 62 ("The clinician should consider any information that will assist in supporting or

111

refuting the alleged symptoms, such as prior treatment records, insurance records, police reports, and interviews with close friends or family members."); *see also id.* at 67 ("To confidently conclude that an individual is malingering psychotic symptoms, the clinician . . . must review data from multiple sources."). This is especially true in the case of criminal defendants. *See id.* at 64 ("Prior to evaluating a defendant, the clinician should be equipped with as much background information as possible.").

The district court concludes that trial counsel did not perform deficiently by failing to ensure that Gabrion received a competency hearing where the testimony of competency evaluators could be adversarially tested. R. 156, 10/04/18 at 80, PageID 5874. In reaching this conclusion, the district court, like Gabrion's trial counsel, appears to ignore the importance of adversarial hearings and cross-examination. *See, e.g.*, *United States v. Salerno*, 505 U.S. 317, 328 (1992) ("[C]ross examination is the principal means of undermining the credibility of a witness whose testimony is false or inaccurate."). The district court and trial counsel also ignore the importance of competency hearings specifically. When a defendant's competency is at issue, a competency hearing is crucial to vindicating the right to a fair trial. *See Pate v. Robinson*, 383 U.S. 375, 385 (1966) ("We believe that the evidence introduced on Robinson's behalf entitled him to a hearing on this issue [of

competence to stand trial]. The court's failure to make such inquiry thus deprived Robinson of his constitutional right to a fair trial.").

As to counsel's failure to investigate competency, the district court also opines that "[i]nformation about [Gabrion's] background and family history of mental illness cannot possibly be more enlightening than direct assessment of his actual mental state." R. 156, 10/04/18 Opinion at 79, PageID 5873. But this statement is directly contradicted by experts, who recommend reviewing precisely the material the district court says is unenlightening. *See* Rogers at 64.

The district court further concludes that trial counsel did not perform deficiently because "it is clear from [Gabrion's] attorneys' requests to keep the competency reports confidential that they intentionally avoided a hearing in order to prevent potentially damaging information from falling into the hands of the Government. That was a reasonable, strategic decision to which this Court must defer."

Not only is that not a strategic decision to which the district court *must* defer, but that is not even a strategic decision to which the district court *may* defer without first hearing from trial counsel about whether that was indeed their strategy. The district court has not done this. "The Supreme Court has held in several cases that the habeas court's commission is not to invent strategic reasons or accept any strategy counsel could have followed, without regard to what actually happened[.]"

113

*Marcrum v. Luebbers*, 509 F.3d 489, 502 (8th Cir. 2007) (citing *Rompilla v. Beard*, 545 U.S. 374, 395-96 (2005) (O'Connor, J., concurring); *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003); *Kimmelman v. Morrison*, 477 U.S. 365, 377 (1986)); *accord Hamblin v. Mitchell*, 354 F.3d 482, 491–92 (6th Cir. 2003) (reversing a district court's rejection of an ineffective assistance of counsel claim, in part because defense counsel did not actually assert the reason for not investigating that the district court relied on as justification, and specifically noting that "because the district court did not hold an evidentiary hearing or allow any discovery, many details of why counsel failed to investigate are not known") This Court has also generally emphasized the importance of an evidentiary hearing to evaluate claims of ineffective assistance of counsel. *See Valentine*, 488 F.3d at 332–33; *MacLloyd*, 684 F. App'x at 559.

That counsel requested to keep the reports confidential does not, on its own, reveal why counsel decided to waive the right to a competency hearing. That counsel requested to keep the reports confidential is evidence that, having decided not to subject the competency question to adversarial testing, counsel was disinclined to share the reports with the government. But it is not necessarily evidence that keeping the reports from the government is what motivated the decision to waive the hearing in the first instance. Without an evidentiary hearing, the Court cannot presume trial counsel's decisions were based in this particular strategy or, for that matter, any

strategy. And, in any event, by the time of trial, counsel opted to raise a mental health penalty defense, which rendered these reports discoverable by the government.

The possibility of prejudice from trial counsel's error is straightforward: If trial counsel had conducted a proper investigation into Gabrion's competence and gone forward with a competency hearing, the district court would have determined that Gabrion was incompetent to stand trial. Or at least, there is a "reasonable probability" that the district court would have determined that Gabrion was incompetent to stand trial, i.e. "sufficient to undermine confidence" in the determination that Gabrion was competent. *Strickland*, 466 U.S. at 694.

At minimum, it is debatable whether Gabrion has met his relatively low burden for an evidentiary hearing and discovery on whether counsel's performance in handling questions of Gabrion's competence was deficient and whether the deficient performance prejudiced Gabrion. At this stage, what is known is that Gabrion demonstrated a pattern of bizarre behavior that caused nearly everyone involved in his case to question his competency at some point; that several competency evaluations were conducted and that they came to conflicting results; and that, despite everyone's concerns about Gabrion's competency, trial counsel waived the right to an adversarial competency hearing. This evidence is sufficient to show that Gabrion is entitled to discovery and an evidentiary hearing on the issue of whether his trial counsel provided ineffective assistance as to Gabrion's competence

115

to stand trial. *See MacLloyd*, 684 F. App'x at 562. At least, the district court's resolution of this issue is "debatable." *Slack*, 529 U.S. at 484.

**b. Gabrion alleged that trial counsel was ineffective by failing to retain adequate investigative assistance or adequately investigate or test the government's case**

Gabrion's trial counsel also failed to retain adequate investigative assistance or adequately investigate or test the government's case. As with the mitigation investigation, the requirements for a fact investigation into a client's guilt or innocence in a capital cases are robust. *See 2003 Guidelines* at 1018–20. Like a mitigation specialist, a fact investigator is a mandatory part of the defense team. *Id.* at 958. The need for experts is also "particularly acute in death penalty cases." *Id.* at 955. "The prosecution commits vast resources to its effort to prove the defendant guilty of capital murder. The defense must both subject the prosecution's evidence to searching scrutiny and build an affirmative case of its own. . . . Analyzing and interpreting such evidence is impossible without consulting experts—whether pathologists, serologists, microanalysts, DNA analysts, ballistics specialists, translators, or others." *Id.* "[J]urisdictions must ensure that the defendant has access to necessary investigative and expert services if the defendant cannot afford them." *Id.* at 960.

Despite the clear mandate to conduct a thorough investigation and work with experts, Gabrion's trial counsel did neither. Trial counsel did not retain key experts,

such as a pathologist, to help them prepare for Gabrion's guilt-phase defense, even though the government had experts in pathology, hair analysis, chemistry, forensic entomology, fingerprints, DNA—even paint, locks, and concrete blocks. This is precisely the situation the ABA's *2003 Guidelines* deem unacceptable. The government enlisted all manner of experts to help make its case. Gabrion's counsel did not even retain a pathologist. *See 2003 Guidelines* at 955. Gabrion included with his § 2255 motion the affidavit of forensic pathologist Dr. Spitz, which explains how a pathologist would have helped the defense test the government's case at trial. R. 103-5, Spitz Aff., PageID 4988–90. Specifically, Dr. Spitz opined it was not possible to say whether Timmerman was alive when she was placed in Oxford Lake. Id. at ¶7, PageID 4989. The government argued she was and offered graphic and disturbing testimony about the fear she confronted as she drowned. But if she was already dead when she was put in the lake, this powerful testimony would be irrelevant. More importantly, this defense could have credibly contended the government was unable to prove beyond a reasonable doubt that she was killed on federal land, thus negating not just the death penalty but the entire basis for federal jurisdiction.

The fact investigation was also inadequate. Gabrion had lived and worked in every region of the country. The government's case posited that Gabrion had murdered four additional people, including Robert Allen, Wayne Davis because he

was a witness in the CSC case, John Weeks because he was a witness in this case, and Timmerman's daughter Shannon VerHage, whose death the government was not able to officially confirm. Yet Gabrion's counsel retained a single fact investigator. Even the work of this sole investigator was hampered by funding issues. The investigator was not paid and did no work for the first ten months of 2000.

The district court concludes that Gabrion was not prejudiced, even by the complete lack of fact investigation taking place during ten critical months of trial preparation. The district court acknowledges that the investigator did no work for ten months, stating, "Gabrion notes that the investigator primarily responsible for researching issues related to the guilt phase of the case, Patricia Hubbard, was not paid and did not perform significant work for a period of 10 months in 2000." R. 156, 10/04/18 Opinion at 85, PageID 5879. But, the district court says, "Gabrion does not indicate how this impaired his case or what evidence she failed to discover. Thus, Gabrion has not shown that he was prejudiced by the lack of additional investigative assistance or investigative opinion." *Id.*

This statement is, frankly, incredible—without authorizing discovery or a hearing to allow further development of the evidence that might have been available, the district court asserts that having no investigator working on a capital case for almost a year prior to the trial could not have prejudiced Gabrion, despite the fact that the standards for providing adequate capital defense plainly mandate the

retention of at least one fact investigator and a thorough investigation of the case. *See 2003 Guidelines* at 958 ("The assistance of an investigator who has received specialized training is indispensable to discovering and developing the facts that must be unearthed at trial or in post-conviction proceedings. . . . [T]he prevailing national standard of practice forbids counsel from shouldering primary responsibility for the investigation. . . . As a result, an investigator should be part of the defense team at every stage of a capital proceeding.").

Gabrion's allegation that trial counsel did not submit the government's case to meaningful adversarial testing—that counsel failed to oversee a thorough investigation of the facts and failed to retain the necessary experts to assist with the defense—is sufficient to show that Gabrion is entitled to discovery and an evidentiary hearing on the issue of whether his trial counsel provided ineffective assistance by failing to investigate and meaningfully challenge the government's case. *See MacLloyd*, 684 F. App'x at 562. At least, the district court's resolution of this issue is "debatable." *Slack*, 529 U.S. at 484. Therefore, this Court should grant Gabrion's application for a COA on the issue of whether the district court should have held an evidentiary hearing and authorized discovery regarding Gabrion's claim of ineffective assistance of counsel at the guilt phase.

**7. Gabrion alleged that he was deprived of representation by conflict-free counsel where one of the attorneys who assisted and met with him represented a key government witness who testified against Gabrion (Ground Two of amended § 2255 motion).**

In addition to the ineffective assistance he received in the guilt and sentencing phases of his case, Gabrion's right to conflict-free counsel was violated because an attorney who represented a witness against him also participated in his defense.

Then-Federal Defender Christopher Yates represented Joseph Lunsford in a federal criminal case for making threats against the President of the United States. Yates also represented Lunsford when Lunsford was interviewed by the government about Gabrion and when Lunsford testified against Gabrion to the grand jury.

Yates became involved in Gabrion's case after Gabrion was federally indicted. Although Yates did not appear in court or sign pleadings on behalf of Gabrion, Yates consulted with Gabrion's lawyers regarding motions strategy, *personally visited Gabrion to consult with him about his case,* and was involved in the search for Gabrion's social security disability records. *See., e.g.*, R. 16-5, Letter from Stebbins to Yates re: Gabrion, PageID 1518–19 (explaining the motions Stebbins would like Yates to assist with). Yates, through an affidavit, denies that he represented Gabrion. Gov. Ex. J., Yates Aff., PageID 5292–94. He does acknowledge that he visited Gabrion to discuss the case and encourage him to cooperate with his attorneys, and provided research assistance to Gabrion's attorneys, and consulted with them about the case. *Id.* at ¶¶7, 8, PageID 5293–94.

At trial, Lunsford testified that while he was incarcerated with Gabrion, he saw Gabrion masturbate to a photo of baby Shannon (Timmerman's daughter who the government alleged Gabrion killed). His testimony was perhaps the most graphic and disturbing penalty phase evidence. Lunsford recanted this testimony. R. 100-4, Decl. of Lunsford at ¶6, PageID 4700. He signed a declaration stating that his testimony that he saw Gabrion masturbating to a photo of baby Shannon was not true. *Id.*[19] He said Yates suggested this fact to him. *Id.* He also stated that at the time of trial he wanted to recant and be kept off the witness stand, but Yates told him that if he did back out he would face a harsher sentence. *Id.* at ¶7, PageID 4700. Yates denies Lunsford's accusation that he suggested any false facts. Gov. Ex J., Yates Aff. at ¶9, PageID 5294.

The district court denied Gabrion's claim because "there is no evidence that Yates actually represented Gabrion." R. 156, 10/04/18 Opinion at 60, PageID 5854. The district court also concluded that "[e]ven if Yates did represent Gabrion in some

---

[19] Gabrion's § 2255 counsel filed a motion to have counsel appointed for Lunsford because he was recanting sworn testimony, but the district court denied the motion, stating, "The Court is aware of no authority under which it can appoint counsel to a third party, in these or any other
circumstances, and Movant has offered none." R. 72, Order, PageID 2631. The Court's statement that it is not aware of authority to appoint counsel to a third party (who has recanted sworn testimony) is perplexing. *See* 18 U.S.C. § 3006A. The Court's statement is particularly perplexing because this very witness was represented by counsel—Yates—at trial-level proceedings in this very case.

informal way, Gabrion's claim would fail because Gabrion has not shown that Yates' conflict adversely affected the performance of Gabrion's appointed counsel." *Id.* at 61, PageID 5855.

Although the district court appears to say that it is obvious that an attorney is not subject to conflict-of-interest rules if his name does not appear on the pleadings in one of the cases, representation is not obviously synonymous with signing pleadings or appearing in court. Indeed, ethics resources made available by the Michigan Bar acknowledge that "[a]lthough the Michigan Rules of Professional Conduct (MRPC) are replete with usage of the word 'client', it is a term that is undefined, which means that it has been left to case law to sort out what constitutes a 'client' and, more particularly, what establishes a client-lawyer relationship." Dawn M. Evans, *How to Identify and Avoid Conflicts of Interest* (Feb. 2011), https://www.michbar.org/file/opinions/ethics/articles/conflictsofinterest.pdf. And ABA guidance about providing limited-scope representation indicates that although conflict-of-interest rules are relaxed for lawyers providing limited-scope representation, the rules still apply if the lawyer knows about the conflict. *See* American Bar Association, *Handbook on Limited Scope Legal Assistance* at 96, https://www.americanbar.org/content/dam/aba/administrative/legal_aid_indigent_ defendants/ls_sclaid_handbook_on_limited_scope_legal_assistance.authcheckdam. pdf. There is at least a factual question about whether Yates represented Gabrion.

The district court is correct that to prevail on a claim that he was denied his Sixth Amendment right to conflict-free counsel, a habeas petitioner must generally "establish that the conflict of interest adversely affected his counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 174 (2002); *accord Strickland*, 466 U.S. at 692. But the district court is not correct that Gabrion has not made the necessary showing. Gabrion has specifically alleged that Yates's involvement negatively impacted his representation because conflict-free counsel would have uncovered Lunsford's proposed perjury and taken steps to prevent it.

Gabrion has also noted other problems in Yates's representation, such as the fact that Gabrion's social security disability records have never been found. Yates represented Gabrion on the social security fraud case. Those records were critical to Gabrion's penalty phase in the capital case because at the time of the homicide Gabrion was receiving disability for mental health reasons and a payee had been ordered, presumably because Gabrion was unable to oversee his own finances.

These specific allegations are sufficient to warrant an evidentiary hearing and discovery on the issue of whether Gabrion's Sixth Amendment rights were violated because he was represented by conflicted counsel. *See MacLloyd*, 684 F. App'x at 562. At least, the district court's resolution of this issue is "debatable." *Slack*, 529 U.S. at 484. Therefore, this Court should grant Gabrion's application for a COA on the issue of whether the district court should have held an evidentiary hearing and

123

authorized discovery regarding Gabrion's claim that his right to conflict-free counsel was denied.

**8. Gabrion alleged that trial counsel was ineffective post-trial where counsel failed to properly present the claim that the jury foreperson lied during voir dire (Ground Ten of amended § 2255 motion).**

Trial counsel's ineffectiveness continued post-trial. Counsel failed to properly plead post-trial error based on the jury foreman's admission after the trial that, through his reading about the case prior to trial, he had already determined that Gabrion was "off the wall" before the trial started.

After the trial, the jury foreman stated in a newspaper interview that "'I read your paper religiously. I knew [Gabrion] was off the wall before the trial." Gabrion's trial counsel filed a motion for a new trial based on this statement, asking for an evidentiary hearing to determine what effect the news had on the jury foreman. But the trial judge denied the motion and request for a hearing because in its view the juror's statements were not inconsistent with his statements during voir dire.

The trial judge denied this motion in part because counsel failed to present it in the appropriate manner. Counsel should have pointed out that the juror's statement to the newspaper meant that the juror had lied during voir dire. During voir dire, the juror said that he had not yet formed an opinion of the case. In the newspaper interview after the trial, the juror said that prior to trial he had already formed the opinion that Gabrion was "off the wall."

124

The district court opined that this claim is meritless because the jury foreman's "statement that he 'knew [Gabrion] was off the wall' before trial does not express an opinion about the case." R. 156, 10/04/18 Opinion at 184, PageID 5978. The assessment that an opinion that the defendant was off the wall is not an opinion about a case is at least "debatable." *Slack*, 529 U.S. at 484. Or, at minimum, it is debatable whether the district court should have held an evidentiary hearing or allowed discovery to determine what the foreman meant by "off the wall," what information he read that supported that conclusion, and whether the jury foreman's statement that he had formed the opinion that Gabrion was off the wall meant that he had formed an opinion about the case. Therefore, this Court should grant Gabrion's application for a COA on the issue of whether the district court should have held an evidentiary hearing and authorized discovery regarding Gabrion's claim of ineffective assistance of counsel for trial counsel's inadequate presentation of its post-trial motion regarding the jury foreman.

**9. Gabrion alleged that he was deprived of effective assistance by appellate counsel where counsel failed to raise a meritorious claim on appeal (Ground Seven of amended § 2255 motion).**

Gabrion alleged that he received ineffective assistance of counsel on appeal. Professional norms required both trial and appellate counsel to evaluate each piece of evidence offered by the government at the guilt phase and sentencing hearing. Gabrion alleged that this process did not occur at either the trial or appellate level.

125

First, prior to trial, Gabrion challenged the warrantless search that resulted in the seizure of evidence admitted at trial, including specific concrete blocks. 12/14/01 Suppression Hearing Tr. at 6. These blocks were a crucial part of the government's case against Gabrion. Trial counsel argued that the search of the property violated the Fourth Amendment because the police searched the curtilage of Gabrion's property without a warrant. The Court denied the motion, finding that the "cinder blocks" were in plain view. 12/14/01 Suppression Hearing Tr. at 65, 73. Appellate counsel did not raise any issue relating to the motion. However, the record indicates that the motion was well taken, as factual findings supporting the Court's ruling were clearly erroneous. The issue should have been raised on appeal. The suppression of the cinder blocks would have dramatically altered the government's case at trial, likely changing the outcome of the proceeding.

Second, trial counsel moved unsuccessfully before sentencing to limit evidence relating to future dangerousness to Gabrion's conduct that might occur in a BOP setting, since the only sentencing options were death and life in the BOP without the possibility of release. For example, the government introduced evidence seeking to show that Gabrion killed Robert Allen, Wayne Davis and John Weeks. These claims were not included in any government notice. The allegations were not subjected to any pre-trial reliability analysis by the court. The fact that these men disappeared and had some alleged connection to Gabrion was irrelevant to the

126

question of future dangerousness in prison. The uncontrolled "bad acts" evidence went well beyond the speculation that Mr. Gabrion killed Allen, Davis and Weeks. The government offered evidence showing that Gabrion committed arsons or attempted arsons. This evidence consisted of pure speculation and hearsay by witnesses such as Wilma Babcock. Several witnesses testified that Gabrion had been inappropriate to them. Some testified that he was sexually inappropriate. None of these witnesses offered evidence that was relevant to one of the aggravators in this case.

Appellate counsel failed to specifically identify which evidence was irrelevant to future dangerousness in the BOP. Because no designation was made, the appellate court declined to evaluate the argument. These arguments were meritorious. Appellate counsel's failure to specifically identify the evidence prevented review of these meritorious arguments.

Third, appellate counsel failed raise appropriate challenges to the FDPA.

The district court concludes that not raising these issues did not constitute ineffective assistance because selecting a few arguments to focus on is a hallmark of appellate advocacy. R. 156, 10/04/18 Opinion at 176, PageID 5970. But in death penalty cases, the calculus is different. "Because of the possibility that the client will be sentenced to death, counsel must be significantly more vigilant about litigating

all potential issues at all levels in a capital case than in any other case." *2003 Guidelines* at 1032.

By identifying meritorious claims that appellate counsel did not raise, Gabrion met his burdens for discovery and an evidentiary hearing on the ineffective assistance of appellate counsel. *See MacLloyd*, 684 F. App'x at 562. At least, the district court's resolution of this issue is "debatable." *Slack*, 529 U.S. at 484. Therefore, this Court should grant Gabrion's application for a COA on the issue of whether the district court should have held an evidentiary hearing and authorized discovery regarding Gabrion's claim of ineffective assistance of appellate counsel.

**10. Gabrion alleged that the government failed to include necessary charges in the indictment (Ground Nine of amended § 2255 motion).**

In contravention of the Fifth, Sixth, Eighth, and Fourteenth Amendments, the indictment in Gabrion's case made no mention of the federal death penalty and did not charge all of the aggravating factors relied upon by the government during the penalty phase. In addition, the Court of Appeals erred when it determined that the requirement to weigh all aggravating factors against all mitigating factors (the outweighs determination) was not an element that needed to be proven to the jury beyond a reasonable doubt.

The Supreme Court has made clear that "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Ring v. Arizona*, 536

U.S. 584, 600 (2002) (*quoting Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999)); *see also Apprendi v. New Jersey*, 530 U.S. 466 (2000). *Ring* affirmed that "[c]apital defendants, no less than noncapital defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589.

In direct contravention of these principles, the government's indictment failed to mention the government's pursuit of the death penalty or allege any of the aggravating factors which the government claimed made Gabrion eligible for a death sentence. Moreover, because one of the FDPA's "specific findings authorizing the imposition of the sentence of death," *Hurst*, 136 S. Ct. at 621, is the finding that "all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death," § 3593(e), this finding must be made by a jury beyond a reasonable doubt, but the jury was not instructed to as to the appropriate standard of review in this case.

The district court's resolution of this claim misstates the law and this Court's prior holding. The district court states, "Gabrion also contends that the Court of Appeals erred when it decided that the aggravating factors were not elements of the offense that needed to be proven beyond a reasonable doubt. This is another issue that cannot be relitigated." R. 156, 10/04/18 Opinion, at 183, PageID 5977. First of all, this statement is incorrect. This Court did not decide that aggravating factors

need not to be proven beyond a reasonable doubt. Second, if this Court had stated that the aggravating factors do not need to be proven beyond a reasonable doubt, that would have been erroneous, based on both the plain text of the FDPA and Supreme Court precedent. *See* 18 U.S.C. § 3593(c) ("The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt."); § 3593(d) ("If no aggravating factor set forth in section 3592 is found to exist, the court shall impose a sentence other than death authorized by law."); *accord Jones v. United States*, 527 U.S. 373, 376–77 (1999).

The district court's resolution of this issue is most certainly "debatable" because the district court plainly misstates the law. *Slack*, 529 U.S. at 484. In fact, by making such an obvious misstatement, the district court effectively failed to resolve this issue at all. Therefore, this Court should grant Gabrion's application for a COA on the government's failure to include the necessary charges in the indictment and the standard of proof for the determination.

**11. Gabrion alleged that executing him would violate the Eighth Amendment because he suffers from a severe mental illness (Ground Eleven of amended § 2255 motion)**

Executing Gabrion would violate the Eighth Amendment because he suffers from a chronic and severe mental illness and organic brain impairments. The district

court denied this claim, but its resolution of the issue is at least "debatable." *Slack*, 529 U.S. at 484. In fact, it is being actively debated.

Many voices have recently called for an end to the death penalty for individuals suffering from mental illness. A number of judges have expressed their opposition to the death penalty for individuals with severe mental illness. *See Missouri ex rel. Strong v. Griffith*, 462 S.W.3d 732, 739 (Mo. 2015) (Teitelman, J., dissenting) ("I would hold that the reasoning in *Ford v. Wainwright*, 477 U.S. 399 (1986), *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Roper v. Simmons*, 543 U.S. 551 (2005), applies to individuals who, like Mr. Strong, were severely mentally ill at the time the offense was committed."); *Corcoran v. State*, 774 N.E.2d 495, 502–03 (Ind. 2002) (Rucker, J., dissenting) ("I do not believe a sentence of death is appropriate for a person suffering a severe mental illness."); *State v. Nelson*, 803 A.2d 1, 41 (N.J. 2002) (Zazzali, J., concurring) ("The State's legitimate penological interests that purportedly are served by the death penalty are unconstitutionally diminished if the State executes such a mentally ill and psychologically disturbed person. In defendant's case, it is constitutionally inadequate for a jury to consider her severe mental illness as merely a mitigating factor to be weighed among other aggravating and mitigating factors."); *State v. Scott*, 748 N.E.2d 11, 20 (Ohio 2001) (Pfeifer, J., dissenting) ("I believe that executing a convict with a severe mental illness is a cruel and unusual punishment.").

In 2006, the ABA issued a resolution against the death penalty for severely mentally ill individuals. *See* ABA Task Force on Mental Disability and the Death Penalty, *Recommendation & Report on the Death Penalty & Persons with Mental Disabilities*, 30 Mental & Physical Disability L. Rep. 668, 670 (Aug. 2006)). The ABA resolution notes that other organizations, including the American Psychiatric Association, the American Psychological Association, and the National Alliance on Mental Illness have called for ending the death penalty for individuals who suffer from severe mental illness. *See id.*

On June 5, 2019, the Ohio House "voted overwhelmingly to take the death penalty off the table when offenders demonstrate they suffered from a 'serious mental illness' at the time of the crime." Jim Provance, *Ohio House votes to eliminate death penalty for those with 'serious mental illness'*, Toledo Blade (June 5, 2019), https://www.toledoblade.com/local/politics/2019/06/05/ohio-house-dont-execute-severely-mentally-ill/stories/20190605129. Ohio is one of ten states to consider such a bill in 2019. *See* DPIC, *Ohio House Passes Bill to Bar the Death Penalty for Defendants with Serious Mental Illness*, https://deathpenaltyinfo.org/node/7419; *see also* Jessie Balmert, *Should those with serious mental illnesses be exempt from the death penalty in Ohio?*, Cincinnati.com (Dec. 3, 2018), https://www.cincinnati.com/story/news/politics/2018/12/03/some-ohio-lawmakers-want-exempt-mentally-ill-execution-prosecutors-disagree

/2117920002/ ("If Ohio is going to execute convicted murderers, it shouldn't execute individuals with serious mental illnesses, a bipartisan group of lawmakers says."); Rebecca Beitsch, *Should states ban the death penalty for people with severe mental illness?*, PBS (Apr. 17, 2017), https://www.pbs.org/newshour/nation/states-ban-death-penalty-people-severe-mental-illness/.

Polling reveals that 66% of Americans oppose the death penalty for those with severe mental illness. *See* ABA Death Penalty Due Process Review Project, *Severe Mental Illness and the Death Penalty* (2016), https://www.americanbar.org/content/dam/aba/images/crsj/DPDPRP/SevereMental IllnessandtheDeathPenalty_WhitePaper.pdf (hereinafter 2016 ABA Rep't). An even greater number— 72%—say they oppose the death penalty for those with severe mental illness once they hear how it would work in practice. *See id*; *see also* Frank R. Baumgartner & Betsy Neill, *Does the death penalty target people who are mentally ill? We checked.*, *Wash. Post.* (Apr. 3, 2017), https://www.washingtonpost.com/news/monkey-cage/wp/2017/04/03/does-the-death-penalty-target-people-who-are-mentally-ill-we-checked/?utm_term= .eddb6f4a160b ("Most Americans oppose the death penalty for the mentally ill, a category that ranges from mild to severe. But our research suggests that the death penalty actually targets those who have mental illnesses.").

It should be no surprise that so many people oppose the death penalty for severely mentally ill individuals because "the [Supreme] Court's reasoning in *Atkins* and *Roper* can be applied virtually word-for-word to defendants with severe mental illness." Aurélie Tabuteau Mangels, *Should Individuals with Severe Mental Illness Continue to be Eligible for the Death Penalty?*, Crim. Just. Mag. (Fall 2017), https://www.americanbar.org/content/dam/aba/publications/criminal_justice_maga zine/v32/cj_fall17_MANGELS.authcheckdam.pdf; *accord Griffith*, 462 S.W.3d at 739 (I would hold that the reasoning in *Ford v. Wainwright*, 477 U.S. 399 (1986), *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Roper v. Simmons*, 543 U.S. 551 (2005), applies to individuals who . . . were severely mentally ill at the time the offense was committed.").

*Atkins* held, "[b]ecause of their disabilities in areas of reasoning, judgment, and control of their impulses [intellectually disabled persons] do not act with the level of moral culpability that characterizes the most serious adult criminal conduct. Moreover, their impairments can jeopardize the reliability and fairness of capital proceedings against mentally retarded defendants." *Atkins*, 536 U.S. at 306. As many sources have noted, these same characteristics lessen the extent of moral culpability and jeopardize procedural protections of severely mentally ill individuals as well those with intellectual disabilities. *See, e.g.*, 2016 ABA Rep't at 2–3. Or, as one psychiatrist discussing mentally ill individuals put it, "If these people aren't seeing

the world for what it truly is, if they can't concentrate and think things through, if they're so delusional or depressed their thinking isn't reality-based anymore, they should not be held to the same standard[.]" *See* Rebecca Beitsch, *Should states ban the death penalty for people with severe mental illness?*, PBS (Apr. 17, 2017), https://www.pbs.org/newshour/nation/states-ban-death-penalty-people-severe-mental-illness/ (quoting Megan Testa, a psychiatrist who helped draft the Ohio bill to prohibit the death penalty for individuals with serious mental illness).

In addition to denying the legal claim that individuals with severe mental illness should not be subject to the death penalty, the district court also stated that even if execution of severely mentally ill individuals were prohibited, Gabrion would not fall into that category, noting prior mental health evaluations. *See* R. 156, 10/04/18 Opinion at 186–87, PageID 5980–81. But Gabrion's previous evaluations have focused primarily on his competency, which is not perfectly synonymous with mental illness: "A person can have a severe mental illness and yet still possess the necessary attributes to be considered legally competent to stand trial. While mental illness often plays a role in a court's determination of a defendant's competence to stand trial and can be a factor in the competency determination, '[a] defendant's history of mental illness does not render the defendant mentally incompetent per se.'" 2016 ABA Rep't at 19 (quoting Haleigh Reisman, *Competency of the Mentally Ill and Intellectually Disabled in the Courts*, 11 J. Health & Biomedical L. 199, 212

(2015)) (alteration in original). And, moreover, Gabrion has alleged that his prior attorneys' handling of these evaluations constituted ineffective assistance of counsel, and Gabrion's current counsel has requested an additional competency hearing, but been denied. *See infra*; *see also* R. 101, Mot. for Hearing to Determine Mental Competence; R. 156, 10/04/18 10/04/18 Opinion at 197–98, PageID 5991–92.

Finally, as to the issue of procedural default, even if Gabrion did procedurally default this claim, and even if he cannot show cause and prejudice (which he likely can, given the ineffective performance of his prior attorneys), the Court should still consider the claim under the "miscarriage of justice" standard. In *Sawyer v. Whitley*, 505 U.S. 333 (1992), the Supreme Court explained that a petitioner in a capital case satisfies the "miscarriage of justice" standard when the petitioner is "innocent of death" or "no reasonable juror would have found him eligible for the death penalty." *Sawyer*, 505 U.S. at 339-41, 350. If sentencing severely mentally ill individuals to death is unconstitutional, then a severely mentally ill individual would necessarily be ineligible for the death penalty and, per *Sawyer*, "innocent of death." Gabrion has presented evidence of mental illness and evidence that his trial counsel was ineffective for failing to fully develop the evidence as to his mental health. At the very least, Gabrion should be evaluated for severe mental illness to determine whether he would be "innocent of death" if it were unconstitutional to apply the death penalty to severely mentally ill individuals.

136

Therefore, the district court should have at least allowed discovery and an evidentiary hearing on issues related to Gabrion's mental health and the constitutionality of executing severely mentally ill individuals. *See MacLloyd*, 684 F. App'x at 562. At least, the district court's resolution of this issue is "debatable"— as evidenced by the fact that this issue is actively being debated. *Slack*, 529 U.S. at 484. Therefore, this Court should grant Gabrion's application for a COA on the issue of whether it is constitutional to execute a severely mentally ill individual, and whether Gabrion is a severely mentally ill individual.

**12. The cumulative effect of these errors deprived Gabrion of a constitutionally adequate trial and sentencing hearing.**

Finally, in evaluating the errors in Gabrion's trial (as well as in the pre-trial investigation and post-trial), the district court failed to take into account the combined impact of the errors. Sixth Circuit law requires a court to consider the cumulative impact of errors in a § 2255 case. *See, e.g.*, *Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004); *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004). Although this Court has held that the cumulative impact of errors cannot be a basis for relief in cases proceeding under § 2254 because the Supreme Court has not clearly established this law, *see Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005), this holding is not applicable to § 2255 cases like this one, *see Campbell*, 364 F.3d at 736 (§ 2255 case "acknowledg[ing] that trial-level errors that would be considered harmless when viewed in isolation of each other might, when considered

cumulatively, require reversal of a conviction."); *see also Trujillo*, 376 F.3d at 614

("[E]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone . . . may cumulatively produce a trial setting that is fundamentally unfair.").[20]

In contrast to a § 2254 case, in this § 2255 case, circuit precedent required the district court to consider the cumulative impact of errors. *See Campbell*, 364 F.3d at 736. The reason for this distinction is that in a § 2254 case, this Court can grant relief only if a state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). By contrast, in a § 2255 case, relief is warranted if "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was

---

[20] *Also cf. Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006) ("Petitioner alleges that the cumulative effect of the errors at trial rendered his trial fundamentally unfair in violation of due process. If this were an issue of first impression in this Circuit, we might be inclined to agree. The Supreme Court has repeatedly stated that fundamentally unfair trials violate due process, and common sense dictates that cumulative errors can render trials fundamentally unfair. Additionally, the Supreme Court has expressly cumulated prejudice from distinct errors under the Due Process Clause. Nonetheless, the law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue. No matter how misguided this case law may be, it binds us.") (internal citations omitted); *Hooks v. Workman*, 689 F.3d 1148, 1194 n.24 (10th Cir. 2012) ("[T]here is a split in the circuits on whether the need to conduct a cumulative-error analysis is clearly established federal law under § 2254(d)(1).").

without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."

This is another way of saying that the principles of comity and federalism which are important in § 2254 cases challenging *state* convictions, are not relevant in § 2255 cases challenging *federal* convictions. *See Terry Williams v. Taylor*, 529 U.S. 362, 382 (2000) (opinion of Stevens, J.) (quoting *Lind v. Murphy*, 96 F.3d 856, 869 (7th Cir. 1996) (en banc), *rev'd on other* grounds, 521 U.S. 320 (1996)) ("It [§ 2254] does not, however, purport to limit the federal courts' independent interpretive authority with respect to federal questions."); *Jones v. United States*, 689 F.3d 621, 624 n.2 (6th Cir. 2012) (noting that comity and federalism concerns do not necessarily apply in § 2255 cases as they do to § 2254 cases); *Velez Scott v. United States*, 890 F.3d 1239, 1257 (11th Cir. 2018) (quoting *McCleskey v. Zant*, 499 U.S. 467, 491 (1991)) (citing *Bousley v. United States*, 523 U.S. 614, 620-21 (1998)) ("Important differences between § 2254 and § 2255 do exist. Among others, § 2254 vindicates the concerns of comity and federalism by restricting when federal courts can reopen state criminal convictions, while § 2255, which deals with federal criminal convictions, does not. Nor is the interest of finality exactly the same for § 2254 and § 2255 claims. 'Finality has special importance in the context of a federal attack on a state conviction.' And separation-of-powers considerations drive § 2255 claims."); *cf. Michael Williams v. Taylor*, 529 U.S. 420, 435–36 (2000) (explaining

the importance of comity and finality in § 2254 cases). Moreover, as the Supreme Court has recognized, "the public legitimacy of our justice system relies on procedures . . . that 'provide opportunities for error correction.'" *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1908 (2018) (quoting Bowers & Robinson, *Perceptions of Fairness and Justice: The Shared Aims and Occasional Conflicts of Legitimacy and Moral Credibility*, 47 Wake Forest L. Rev. 211, 215–16 (2012)). Whereas federal courts hearing § 2254 cases may rely on the availability of state post-conviction procedures for correcting trial errors, in a § 2255 case, the federal court hearing the § 2255 is the only venue available for correcting errors that were not apparent from the record on appeal.

When the Supreme Court has not made a definitive statement on an issue, circuit precedent determines whether relief is available in § 2255 cases. The Supreme Court has not made a definitive statement on this issue—it has not held that courts should not consider the cumulative impact of errors on collateral review, it just has not (per circuit precedent) clearly established that courts must consider the cumulative impact of errors in § 2254 cases. The binding law of this circuit, as established in cases not proceeding under § 2254, is that the prejudicial effect of cumulative errors can be grounds to vacate a conviction or sentence. *See Campbell*, 364 F.3d at 736 (§ 2255 case holding "that trial-level errors that would be considered harmless when viewed in isolation of each other might, when considered

cumulatively, require reversal of a conviction"); *United States v. Parker*, 997 F.2d 219, 221 (6th Cir. 1993) (direct appeal reversing federal criminal conviction because of cumulative effect of errors); *Walker v. Engle*, 703 F.2d 959, 968 (6th Cir. 1983) (pre-AEDPA habeas case granting relief because of cumulative effect of errors); *Eberhardt v. Bordenkircher*, 605 F.2d 275, 279 (6th Cir. 1979) (same).

The district court did not comply with circuit precedent requiring it to assess the cumulative impact of errors. In analyzing nearly every claim raised in Gabrion's § 2255 motion, the district court opined that the individual claim, standing alone, did not impact the overall case against Gabrion. The district court concludes, for example, that "there is no possibility that any falsehood in Roach's statement could have affected the jury's decision[,]" R. 156, 10/04/18 Opinion at 44, PageID 5838; that "there is no reasonable possibility that" any of Gabrion's counsel's errors at the guilt stage "would have been reasonably likely to have affected the outcome of his proceedings[,]" R. 156, 10/04/18 Opinion at 104, PageID 5898; and that although Leon's testimony "provided some support for the aggravating factors" "Leon's entire testimony was immaterial[,]" R. 156, 10/04/18 Opinion at 52, PageID 5846. In these instances, the district court concludes that the individual error did not matter because other evidence proved the same point. But in reaching these conclusions, the district court assumes that none of the other evidence was tainted by error. By evaluating each error in isolation, and considering how it fits into the overall trial

141

with the assumption that no other errors occurred, the district court evaluates Gabrion's claims incorrectly.

At least when deciding whether to grant a hearing or discovery, the district court should have considered the combined impact that all of the alleged errors would have on a trial, even if the possibility that each error actually occurred is speculative. *Cf. Bracy*, 520 U.S. at 905, 909 (holding that discovery can be warranted even on a speculative claim of error). That is not to say that none of the errors alone deprived Gabrion of his constitutional rights—only that the combined impact of multiple errors was particularly egregious, and the district court erred by failing to consider the combined impact.

Accordingly, the district court erred by failing to take into account the cumulative impact of errors. Instead of repeating the district court's error, this Court should consider not only the isolated impact of, say, Roach's misleading testimony, or Gabrion's attorney's statement that his client obstructed justice, or Gabrion's attorney's failure to adequately investigate mitigating factors, or the fact that one of the jurors admitted to having made up his mind that Gabrion was "off the wall" prior to trial. The Court should also consider the combined impact of Roach's false testimony, Gabrion's attorney's assertion that two aggravating factors were satisfied, and Gabrion's attorney's failure to present all mitigating evidence on a juror who showed up to trial having prejudged Gabrion based on what he read in the

newspaper. More specifically, in deciding whether to grant a COA, this court should consider whether Gabrion can "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong" in light of the fact that the district court did not consider the cumulative impact of the errors at Gabrion's trial. *Slack*, 529 U.S. at 484. Or, at the very least, this court should grant Gabrion a COA on the issue of whether the district court should have considered the cumulative impact of errors.

## IV. CONCLUSION

The district court denied Gabrion's § 2255 motion outright, ruling that Gabrion was not even entitled to a hearing or any discovery. The district court also denied Gabrion a COA, ruling that its decision to deny Gabrion any relief, including a hearing or discovery, was not even debatable.

To satisfy the standard for a COA, a petitioner does not need to demonstrate that he is ultimately entitled to relief. *Miller-El*, 537 U.S. at 337. Instead, a petitioner must "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484. This Court should grant Gabrion's application for a COA in full, to allow Gabrion to at least argue that he is entitled to an evidentiary hearing and discovery on each of his claims.

If this Court denies a COA, it will mean that Gabrion received virtually no legal process in his § 2255 case despite credible claims of government misconduct,

ineffective assistance of counsel, and incompetence, among other issues. Because this is a § 2255 case—not a §2254 case coming to federal court after factual development in state courts—§ 2255 proceedings are the only opportunity Gabrion has to litigate these claims. If this Court does not grant a COA, no court will have ever seriously considered any of Gabrion's detailed and credible allegations of error in his federal death penalty trial.

Gabrion requests this Court to grant a Certificate of Appealability in order to address the following issues, as well as any additional issues that the Court deems appropriate:

1. Gabrion's allegation, in Ground One of his § 2255 motion, that he was denied a fair trial and a fair and reliable sentencing hearing because the government presented critical evidence that was false or misleading in violation of the Fifth, Sixth, and Eighth Amendments to the Constitution of the United States as interpreted and applied in, inter alia, *Giglio v. United States*, 405 U.S. 105 (1972) and *Napue v. Illinois*, 360 U.S. 264 (1959). This allegation includes:

- Gabrion's allegation that he was prejudiced in part because the jury sentenced him to death after receiving incorrect information about Michigan law relating to the procedure for preliminary examinations, incorrect information about the Newaygo County court procedures for examinations, and false factual information about how Chrystal Roach handled the CSC

144

case against Gabrion and where Gabrion alleged that correct information would have directly contradicted the government's theory of Gabrion's motive to kill Timmerman and would have contradicted the statutory aggravating factor alleging that Gabrion committed the murder after substantial planning.

- Gabrion's allegation that Roach gave false testimony in support of the government's theories at both the guilt and penalty phases of the trial, and that Roach's story was part of a pattern of one of many falsehoods presented by the government and witnesses which have been discovered.

- Gabrion's allegation that Roach testified falsely concerning the facts underlying the government's primary theory of motive for Timmerman's murder and that false testimony was never corrected, and further alleged that he was prejudiced by the false testimony at the guilt phase because of its importance to motive, and he was prejudiced at the penalty phase because truthful testimony would have undermined the government's proof on a crucial statutory aggravating factors.

- Gabrion's claim that the government explicitly and falsely told the jury that Gabrion "forced" Timmerman to write letters that its own examiners had concluded were written by Timmerman, that she was not under extreme duress when she penned the letters, and they were not dictated by Gabrion.

145

- Gabrion's claim that the government falsely claimed that Timmerman disappeared on June 3rd never to be seen alive again when the government knew Timmerman had been seen by numerous friends and acquaintances in the area after that date.

- Gabrion's claim that the government misled the jury regarding the BOP's ability to impose all necessary conditions of confinement to protect the public from Gabrion and that the BOP had the power to impose the strictest security measures for lengthy periods of time against a number of inmates in order to provide adequate protection.

- Gabrion's claim that there was a pervasive pattern throughout trial of government witnesses testifying in a false and/or misleading fashion.

2. Gabrion's allegation, in Ground Six of his § 2255 motion, that his rights under the Fifth, Sixth, and Eighth Amendments were violated by the government's suppression of and/or failure to disclose evidence which was exculpatory and material in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and where he claimed that this failure by the government prejudiced Gabrion in that, but for the government's actions, there is a reasonable probability of a different verdict at the guilt and penalty phases of Gabrion's trial.

3A. Gabrion's allegation, in Ground Four of his § 2255 motion, that trial counsel's conduct throughout the sentencing process, through both acts and omissions,

individually and cumulatively, fell below the prevailing professional norms of reasonably competent counsel which served to prejudice Gabrion in violation of the Fifth, Sixth and Eighth Amendments as described in *Strickland v. Washington*, 474 U.S. 52 (1984) and applied in cases such as *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); and *Kimmelman v. Morrison*, 477 U.S. 365 (1986) because counsel failed to investigate, evaluate, prepare and present a constitutionally adequate defense at the penalty phase of Gabrion's capital trial and a reasonable probability exists that the presentation of an adequate defense would have changed the outcome at sentencing. This allegation includes:

- Trial counsel failed to prepare and present a multi-generational history of Mr. Gabrion's family.

- Trial counsel failed to direct and oversee a proper investigation into the penalty phase presentation and failed to secure a thorough social history that met minimal constitutional standards.

- Trial counsel failed to obtain records supporting mitigation.

- Trial counsel failed to select appropriate experts, provide the experts they did select with appropriate information to render reliable opinions, and failed to properly prepare the experts called at trial.

- Trial counsel admitted was ineffective in admitting during their opening statement at the penalty phase that Mr. Gabrion was guilty of a specific

147

non-statutory aggravating factor (No. 4) by murdering Rachel Timmerman in order to obstruct justice because she had accused him of criminal sexual conduct.

- Trial counsel failed to secure adequate funding to prepare for the penalty phase of the trial.

- Trial counsel failed to object to the introduction of irrelevant, unreliable and prejudicial evidence at the sentencing hearing. Appellate counsel was ineffective in failing to identify for the Court of Appeals the evidence that was not relevant to future dangerousness in a BOP facility, thereby preventing the Court from deciding the underlying issue.

- Trial counsel failed to move to suppress evidence used at the penalty phase that was seized in violation of Gabrion's 4th Amendment rights.

- Trial counsel failed to investigate, prepare, and present admissible evidence that would have countered the government's evidence of future dangerousness.

- Trial counsel's conduct dealing with the aftermath of Gabrion's assault on trial counsel fell below the prevailing professional norms of reasonably competent counsel and prejudiced Gabrion.

- Trial counsel failed to present evidence indicating that Gabrion required a payee for his SSI benefits.

- Trial counsel failed to fully investigate and present to their experts, independent evidence showing that Gabrion had several significant head injuries that were unaccounted for in Gabrion's psychological evaluation.

- Trial counsel failed to protect Gabrion's right to be present at crucial stages of the proceedings when counsel did not insist that Gabrion be involved in discussions with the Court and when counsel failed to pursue Gabrion's wish to be present during the testimony of some 25 witnesses in aggravation.

- Trial counsel failed to correct the government's theory that Mr. Gabrion established a section 501(c)(3) entity when defense counsel was instrumental in the process.

- Trial counsel failed to cross-examine Jason Cross, a critical penalty phase witness for the government, regarding his psychological history and failed to investigate the question of whether Cross was to receive consideration for his testimony.

- Trial counsel failed to conduct a thorough and proper investigation of the witnesses and themes presented by the government in the penalty phase. These omissions by counsel included failures of basic investigation, failure to adequately cross examine witnesses, and failure to request discovery necessary to properly defend Mr. Gabrion's life.

- Trial counsel failed to make objections to the government's misconduct during closing argument. This conduct fell below the prevailing professional norms of reasonably competent counsel and allowed the government to persist in its misconduct. Reasonable counsel objects when the prosecutor steps outside the lines of fair play. Counsel's failures also prevented any meaningful review of this claim on direct appeal.

- Trial and appellate counsel failed to properly handle the situation when a guilt phase juror was unable to participate in the penalty phase, the jury should have been dismissed and a new jury empaneled. No other option was allowed by the relevant statute. Trial counsel failed to object to the procedure used. Appellate counsel failed to raise the issue on appeal.

- Trial counsel failed to challenge the facial constitutionality of the FDPA because the Act provides that the rules of evidence do not apply.

- Gabrion was prejudiced by the cumulative effects of the individual acts and omissions of counsel such that but for those acts and omissions Mr. Gabrion would have received a sentence less than death.

3B. Gabrion's allegation, in Ground Eight of his § 2255 motion, that he was denied due process of law, equal protection of the law, the right to be free of cruel and unusual punishment, and effective assistance of counsel because the federal death penalty, as administered, is disproportionately and unconstitutionally applied

according to the race of the victim, and trial and appellate counsel made no objection based on these grounds.

4. Gabrion's allegation, in Ground Five of his § 2255 Motion, that he was tried and sentenced while incompetent.

5. Gabrion's allegation, in his Motion for a Hearing to Determine Mental Competence and Brief in Support of Motion for a Hearing to Determine Mental Competence, that he is presently incompetent.

6. Gabrion's allegation, in Ground Three of his § 2255 motion, that he was denied effective assistance of counsel at the guilt phase because trial counsel's conduct, through both acts and omissions, both individually and cumulative, fell below the prevailing professional norms of reasonably competent counsel, which served to prejudice Gabrion in violation of the Fifth, Sixth, and Eighth Amendments as interpreted in *Strickland v. Washington*, 474 U.S. 52 (1984), where Gabrion alleged that counsel failed to investigate, prepare and present a constitutionally adequate defense at the guilt phase of Gabrion's capital trial, including, in part, the allegation of the following specific facts:

- Trial counsel was ineffective in the investigation and presentation of issues relating to Gabrion's competence to stand trial where counsel failed to investigate Gabrion's family and personal history, failed to fully present competency concerns and repeatedly waived competency hearings at

151

which experts opining that Gabrion was competent could have been cross-examined. Gabrion alleged that he was prejudiced when the failure to comply with the norms of reasonably competent counsel resulted in the conviction and imposition of a death sentence without a fair examination of his competence at any stage of the proceedings.

- Gabrion was not evaluated and treated for needed medications, despite his many psychological issues and clear evidence of brain damage. Trial counsel was ineffective in failing to take steps to guarantee that Mr. Gabrion was properly medicated during trial, or that Mr. Gabrion's medication did not hinder in any way his ability to understand the proceedings, behave appropriately or assist counsel. Mr. Gabrion was prejudiced because reasonable competent counsel in a capital proceeding would have taken steps to guarantee that Mr. Gabrion was properly medicated.

- Trial counsel failed to investigate and test the government's case.

- Trial counsel failed to retain adequate investigative assistance and seek appropriate continuances for the purpose of preparing appropriate defenses at the guilt phase and to subject the government's case to meaningful adversarial testing.

- Trial counsel failed to move for the disqualification of the District Court when trial counsel could not secure adequate funding to prepare the case.

- Trial counsel failed to object to the government's improper opening and failed to present evidence either directly or through cross examination to rebut the false impression left by the government's misleading argument.

- Trial counsel failed to object to the government presentation of false and misleading evidence regarding Rachel Timmerman's lack of motive to disappear which trial counsel failed to rebut with readily available evidence, including in part, the fact that Ms. Timmerman had been ordered from her father's home to a group home, and that Ms. Timmerman took a change of clothes with her and said that she would be "gone for a few days" despite the government's theory that she left only for a dinner date.

- Trial counsel failed to challenge the government's claim that Ms. Timmerman disappeared on June 3, 1997 never to be seen alive again when readily available evidence existed establishing, in part, that Ms. Timmerman was seen in a number of locations in the days that immediately followed the alleged abduction.

- Trial counsel failed to present evidence that FBI analysts concluded Mr. Gabrion had nothing to do with letters allegedly sent by Ms. Timmerman

153

after her death; that Ms. Timmerman was not coerced to write the letters and Mr. Gabrion did not dictate the content of the letters to her.

- Trial counsel failed to contradict the government's theory of motive in part by failing to use readily available evidence to show that Chrystal Roach gave false testimony supporting the theory and by failing to investigate other available information that showed Roach lied.

- Trial counsel failed to present credible evidence of other suspects, including David Gabrion and Eddie Start, despite readily available evidence.

- Trial counsel was ineffective for failing to object to the court's decision to excuse a juror for sleeping, at trial and on appeal, where the Court relied on the lack of an objection to find that any challenge was waived.

- Trial counsel failed to thoroughly investigate Rachel Timmerman's cause of death and failed to object to prejudicial closing argument about same.

- Trial counsel failed to seek and retain a defense pathologist to assist in cross-examination and the preparation of defense evidence.

- Trial counsel failed to impeach a key prosecution witness with his reputation for truthfulness.

- Trial counsel failed to move to withdraw before the start of trial for a number of reasons, including physical contact between counsel and Mr. Gabrion.

- Trial counsel failed to present evidence establishing that Mr. Gabrion was at a campground on June 25, 1997 with two women and a baby in a stroller, directly contradicting a crucial aspect of the government's case.

- Trial counsel failed to investigate and present evidence that would have cast doubt on the John Weeks' aspect of the case.

- Trial counsel was ineffective in failing to impeach Linda Coleman with the testimony of Walter Hamilton.

7. Gabrion's allegation, in Ground Two of his § 2255 motion, that he was denied his Fifth, Sixth and Eighth Amendment rights to conflict free counsel when the attorney for key government witnesses Joseph Lunsford assisted Gabrion's trial counsel in the preparation of his case.

8.     Gabrion's allegation, in Ground Ten of his § 2255 motion, that trial counsel failed to properly plead post-trial error based on the Jury Foreman's admission that he knew from reading the newspaper that Gabrion was "off the wall before trial", after testifying during voir dire that he had no opinion about the case.

9.     Gabrion's allegation, in Ground Seven of his § 2255 motion, that appellate counsel failed to raise or effectively argue claims which are of record.

10.     Gabrion's allegation, in Ground Nine of his § 2255 motion, that, under the Fifth, Sixth, and Eighth Amendments, his rights were violated by the government's failure to include necessary charges in the indictment.

11.     Gabrion's allegation, in Ground Eleven of his § 2255 motion, that, due to Gabrion's chronic and severe mental illness and organic brain impairments, his execution would violate the Eighth Amendment.

12.     The district court failing to consider the cumulative effect of errors, contrary to the legal standards.

13.     The district court denying an evidentiary hearing, contrary to the legal standards.

14.  The district court denying discovery, contrary to the legal standards.


**Date:  June 17, 2019**                    **Respectfully submitted,**

By:  /s/ *Monica Foster*                    By:  /s/ *Joseph M. Cleary*
        Monica Foster                               Joseph M. Cleary
        Attorney for Petitioner-Appellant           Attorney for Petitioner-Appellant
Business Address:                           Business Address:
        Indiana Federal Community                   Indiana Federal Community
        Defenders, Inc.                             Defenders, Inc.
        111 Monument Circle, Suite 3200             111 Monument Circle, Suite 3200
        Indianapolis, Indiana 46204                 Indianapolis, Indiana 46204
        Telephone: (317) 383-3520                   Telephone: (317) 383-3520
        Monica_Foster@fd.org                        Joe_Cleary@fd.org


By:  /s/ *Victoria B. Casanova*             By:  /s/ *Scott Graham*
        Victoria B. Casanova                        Scott Graham
        Attorney for Petitioner-Appellant           Attorney for Petitioner-Appellant
Business Address:                           Business Address:
        Indiana Federal Community                   SCOTT GRAHAM PLLC
        Defenders, Inc.                             1911 West Centre Avenue, Suite C
        111 Monument Circle, Suite 3200             Portage, Michigan 49024
        Indianapolis, Indiana 46204                 Telephone: (269) 327-0585
        Telephone: (317) 383-3520                   sgraham@scottgahampllc.com
        Victoria_Casanova@fd.org

## CERTIFICATE OF SERVICE

Undersigned counsel certifies that he filed the Application for a Certificate of Appealability through the Court's CM/ECF electronic system on June 17, 2019.  See Fed. R. App. P. 25(d)(1)(B); 6 Cir. R. 25(f)(2).  Notice of this filing will be sent through the CM/ECF system to all parties indicated on the electronic filing receipt, namely Assistant United States Attorney Jennifer L. McManus and Assistant United States Attorney Timothy P. VerHey.  Parties may access this filing through the CM/ECF system.

Date:  June 17, 2019 By:  /s/ *Scott Graham*
Scott Graham
Attorney for Petitioner-Appellant
Business Address:
SCOTT GRAHAM PLLC
1911 West Centre Avenue, Suite C
Portage, Michigan 49024
Telephone: (269) 327-0585
Email: sgraham@scottgrahampllc.com