UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

MARVIN CHARLES GABRION, II,

    Petitioner-Appellant,

    v.

UNITED STATES OF AMERICA,

    Respondent-Appellee.

_____/

No. 18-2382

DEATH PENALTY CASE

## RESPONSE OF THE UNITED STATES TO
## APPLICATION FOR A CERTIFICATE OF APPEALABILITY

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................1

BACKGROUND ..................................................................................................8

    1.    Evidence of Gabrion's guilt ....................................................8

    2.    Penalty-phase evidence.........................................................17

    3.    Direct appeal .........................................................................32

    4.    Section 2255 proceedings .....................................................35

STANDARD    ........................................................................................36

CLAIMS    ........................................................................................43

    1.    "False" testimony claim (§ 2255 Ground One) .....................43

        a.    Chrystal Roach............................................................44

        b.    Leon, Coleman, and Brewster ....................................54

        c.    The FBI forensic report...............................................58

        d.    Statements about when Rachel disappeared ..............62

        e.    "Restriction" of Dr. Cunningham's testimony .............63

    2.    *Brady* claim (§ 2255 Ground Six)..........................................66

    3.    Ineffective assistance of counsel at sentencing claim (§ 2255 Ground Four)............................................................74

    4.    Gabrion's competency at trial claim (§ 2255 Ground Five).............................................................88

    5.    Gabrion's current competency claim ....................................92

    6.    Ineffective assistance of counsel at trial claim (§ 2255 Ground Three) .........................................................98

7. Claim alleging violation of right to conflict-free counsel (§ 2255 Ground Two) .......................................................... 103

8. Claim alleging ineffective assistance of counsel relating to juror's post-trial statements (§ 2255 Ground Ten) ............. 112

9. Ineffective assistance of appellate counsel claim (§ 2255 Ground Seven.) ...................................................... 113

10. *Ring* claim (§ 2255 Ground Nine) ..................................... 118

11. Eighth Amendment claim (§ 2255 Ground Eleven) ........... 120

12. Cumulative error claim ................................................... 123

13. Discovery ......................................................................... 125

14. Evidentiary hearing ........................................................ 133

CONCLUSION ............................................................................. 137

# INTRODUCTION

The district court's decision denying Marvin Gabrion's motion to vacate his sentence is not reasonably debatable because Gabrion has not identified any constitutional errors, individually or cumulatively, that, if corrected, would make a difference in the outcome of his case.

Gabrion murdered Rachel Timmerman after he raped her and was worried he might have to go to jail for it. He bound her with duct tape and chained cement blocks to her body to ensure she would drown, a terrifying way to die. He almost certainly also killed her infant daughter, Shannon, and three others. He assaults and terrorizes almost everyone he encounters—neighbors, acquaintances, prison guards, his own lawyers. The jury found him guilty because, as this Court said on direct appeal four times, the evidence of his guilt was "overwhelming." *United States v. Gabrion*, 648 F.3d 307, 317, 337, 338 & 345 n.16 (6th Cir. 2011) (panel op.). It imposed the death penalty because "[t]he government's case for aggravation was overwhelming." 719 F.3d 511, 525 (6th Cir. 2013) (en banc).

Many of Gabrion's claims attack the performance of his trial attorneys. These claims fall flat because he was afforded not merely effective,

but excellent, assistance of counsel. His trial team included two experienced attorneys (one, a capital case pioneer, the other a veteran criminal trial attorney) and a mitigation specialist who spent at least 1,000 hours on his case, beginning more than two years before the trial. They engaged investigators. They hired experts. They had Gabrion's competency evaluated repeatedly (though to no avail, as every expert who examined him said he was both competent and malingering). They were given resources—three-quarters of a million dollars, well above the average. In short, as this Court noted on appeal, "defense counsel showed great dedication to Gabrion, even after he punched one of them in the face." 648 F.3d at 336; 719 F.3d at 535 (adopting panel's disposition of claim).

The Court should deny Gabrion's application for a certificate of appealability because he has not demonstrated that reasonable jurists would find the district court's resolution of any of his § 2255 claims debatable.

*****

Gabrion's application contains a lengthy introduction (pp.1-16) that raises myriad challenges to the district court's handling of his § 2255 motion. For the most part, this response addresses assertions material to

2

whether a COA should issue as to any substantive claim in the sections that follow below. But a few comments merit brief response here:

- Gabrion asserts he has had "no opportunity to test the reliability of his conviction and death sentence in any other court." (COA Appl. at 1.)[1] This is untrue. Direct appeal, not habeas, "is the primary avenue for review of a conviction or sentence, and death penalty cases are no exception." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). This case has had eleven years of direct appellate review and over three years of post-conviction review.

- Gabrion asserts that the district court acted "severely and unfairly" by not permitting discovery and conducting a hearing, as would be "near automatic" in a civil suit for money damages. (COA Appl. at 2.) But this is not a civil case in the pretrial discovery phase; this is a post-conviction proceeding that follows a criminal jury trial and direct appeal. Neither discovery nor a hearing are automatically afforded. *Thomas v. United States*, 849 F.3d 669, 680 (6th Cir.), *reh'g*

---

[1] Page number references to Gabrion's application for a certificate of appealability refer to the internal pages at the bottom of the page.

*denied* (Apr. 27, 2017), *cert. denied*, 138 S. Ct. 261 (2017). The district court denied discovery and declined to conduct a hearing because Gabrion did not satisfy the applicable standards (*id.*): he did not establish good cause for discovery or identify any material factual dispute requiring a hearing.

- Gabrion suggests that his competence at trial was unexplored. ("Gabrion's competence has never been the subject of an adversarial hearing." COA Appl. at 3.) But it was exhaustively explored. Five experts, in three separate examinations, found him to be competent and a malingerer (three additional experts would later agree). Gabrion never explains how, in these circumstances, belaboring the competency findings in a hearing would have benefited him.

- Gabrion chastises the district court for "refus[ing] to even authorize a psychiatrist to visit" him in prison (COA Appl. at 12); but the district court said it had previously authorized the psychiatrist to visit

with Gabrion and authorized another psychiatrist to visit him before that. (Op., PageID.5997.)[2] Yet another visit was denied because no reason was supplied to support the request. (*Id.*)

- There are no issues of prosecutorial misconduct in this case, let alone any "disturbing" ones (COA Appl. at 3). Gabrion's post-conviction counsel have combed the record to find inconsistencies or inaccuracies in testimony, argument, and evidence, but they have not identified any indisputably false statement or misleading evidence that was material to the jury's decision finding him guilty or to its decision imposing the death sentence.

- Gabrion assails the integrity of the judge who presided over his trial and, initially, over the Section 2255 proceedings. (COA Appl. at 8-9.) But a different judge decided his motion. Recusal was unwarranted, but due to the trial judge's retirement, Gabrion got what he wanted: a different judge. There is no requirement that the judge who decides the motion personally meet with post-conviction counsel. (COA Appl. at 10 n.4.) Chief Judge Jonker ruled on numerous

_____

[2] The district court's opinion, at R.156 of the civil docket, W.D. Mich. No. 1:15-cv-447, is referenced as "Op., PageID___."

motions and carefully analyzed all of Gabrion's claims in a 206-page opinion. He did not give the matter short shrift.

- As discussed further below, the district court did not speculate impermissibly when it denied Gabrion's claim that Newaygo County Prosecutor Chrystal Roach testified falsely. (COA Appl. at 13-14.) The court found that Gabrion had not established that the testimony was indisputably false; but the court went on to emphasize that even if Gabrion were able to show through discovery and/or a hearing that it was false, it was "plainly immaterial." (PageID.5838.) This is dispositive because the habeas statute does not require a hearing if "the motion and the files and records of the case conclusively shows that the petitioner is entitled to no relief." 28 U.S.C. § 2255(b). The cases Gabrion cites (at 14) recognize this. *E.g., Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007) ("[a]n evidentiary hearing is required *unless* the record conclusively shows that the petitioner is entitled to no relief") (quoting *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)) (emphasis

added). Here, as in every other instance in which Gabrion attempted to conjure up a factual dispute, the court found that *even if the facts were as Gabrion claimed*, he was not entitled to relief.

- Likewise, the district court did not "invent" strategic reasons to justify counsel's decision to concede in the penalty phase that Gabrion murdered Rachel to obstruct justice. (COA Appl. at 14.) As discussed below, and as this Court previously found, the evidence of Gabrion's guilt—and of his attempt to obstruct justice in doing so—was overwhelming. The basis for the concession is thus evident from the record, unlike in the cases Gabrion cites (COA Appl. at 14). *See, e.g., Kimmelman v. Morrison*, 477 U.S. 365 (1986) (reason why counsel failed to file a timely motion to suppress bedsheet in a rape case was not evident from the record). In any case, here, as in *Marcum v. Luebbers*, 509 F.3d 489, 502 (8th Cir. 2007) (COA Appl. at 14), counsel's handling of the issue did not result in prejudice: there is no reasonable probability that the jury would have declined to impose the death penalty if counsel had contested the obstruction factor, *even if the facts are as Gabrion claims* (i.e., Roach lied about minor procedural details).

## BACKGROUND

In its opinion, the district court exhaustively set forth the factual background in this matter, including the voluminous evidence of Gabrion's guilt and the aggravating factors. The government incorporates by reference the district court's factual summary, and the facts in its response to Gabrion's § 2255 motion. (CivR.119: Gov't Resp., PageID.5064-5104.) A summary recap of the evidence presented at trial, and the issues resolved on appeal, is set forth here. Additional facts are included in each substantive section.

### 1. Evidence of Gabrion's guilt

**Physical evidence.** Gabrion was indicted for murdering Rachel Timmerman after her body was discovered in July 1997 in Oxford Lake, Michigan, federal property within the Manistee National Forest. Physical evidence linked Gabrion to the murder: Rachel's body was found chained to two cinderblocks secured by two padlocks. (R.588: Tr. IV, 998, 1002, 1008.)[3] The blocks were indistinguishable from blocks found at

---

[3] "R.__" refers to docket entries in the criminal case, W.D. Mich. No. 1:99-cr-76. Due to the age of the case, Page ID numbers are not readily available for many of these documents. "CivR.__" refers to docket entries in the civil case, W.D. Mich. No.15-cv-447. This response adopts the district court's citation conventions. *See* Op. at n.1, PageID.5796.

Gabrion's house. (*Id.* at 1027-31; R.591:Tr. VII, 1493-1511.) Paint and adhesive on the blocks attached to Rachel's body was chemically indistinguishable from that on blocks found on Gabrion's property. Spray paint in cans found at Gabrion's house was chemically indistinguishable from the paint on the blocks on Rachel's body. (R.588: Tr. IV, 1043-45; R.591: 1557-67.) Keys found at Gabrion's house fit the padlocks used to attach the blocks to Rachel's body. (R.588: Tr. IV, 1032-38, 1040-42.) This physical evidence comprised the bulk of the circumstantial case, which the Court described in the panel opinion as "overwhelming" proof of Gabrion's guilt. *Gabrion II*, 648 F.3d at 317.

**Motive.** The government presented evidence that Gabrion killed Rachel because she had accused him of rape and the matter was proceeding to trial. This took several forms:

- **Gabrion's threats.** Witnesses testified that Rachel was reluctant to report the rape because Gabrion had threatened to kill her if she did. (R.473: 2/26/02 Tr. 17; R.471: 2/27/02 Tr. 34; Tr. 1218-19.) He also said he would kill her baby daughter, Shannon, and make her watch. (R.589: Tr. V, 1219.)

- **The letters.** After Rachel left her home for the last time in June 1997, Rachel's father, the prosecutor, and the judge presiding over the rape case received letters purportedly written by her retracting the rape allegations and stating that she had moved to Arkansas with a man named Delbert, whom none of her family or friends had heard of, to start a new life. (R.589: Tr. V, 1238-40, 1168-69; Gov't Exs. 62, 64-66; R.472: 2/25/02 Tr. 13-19.)[4] The letters came in the same envelopes imprinted with a holographic NASA spaceship stamp that Gabrion used in his own correspondence. (R.589: Tr. V, 1245-46, 1255-57; Gov't Exs. 67-69.) All but one of the letters were mailed June 14 or later—after Rachel was likely already dead. (R.459: 2/26/02 Tr. 16.)

- **Gabrion's testimony.** Gabrion testified at trial that Rachel died because she was going to be witness: "I think what you did is you forced her to testify in a case against a person lying

---

[4] A few months earlier, Gabrion had expressed interest in buying a car, referring to himself as "Lance" (a name he periodically used as an alias), and advising the seller that he wanted a car that could make it to Arkansas. (R.590: Tr. VI, 1437-38.)

in a case which forced her to become a victim to a crime"; "she kept talking and talking and talking to the police." (R.464, 3/1/02 Tr. 68, 73.)

- **Timing.** Rachel was seen alive for the last time on or about June 3, a few days after a hearing that would have preserved her testimony in the rape case was adjourned. Evidence suggested Gabrion delayed court proceedings until he could get access to her. Rachel filed the rape complaint on October 31, 1996; Gabrion first appeared on January 21, 1997. Rachel was in jail from January 8 to May 5, 1997. Gabrion twice changed lawyers; he waived a preliminary examination, and, when one was scheduled anyway for June 5, he waived it again.

- **Gabrion's additional threats.** In the interim, from Rachel's release on May 5, to her disappearance June 3, Rachel was terrified: she called the sheriff's office twice after encountering Gabrion, hysterical, to establish "a trail" in case Gabrion followed through with his threat to kill her. (R.589: Tr. V, 1207-10.) On Memorial Day, she went to a friend's house, shut the blinds and curtains and began pacing, telling her friend

11

that Gabrion had raped her, the court case was coming up, and he was going to kill her for it. (*Id.* at 1224-27.)

**Other physical and testimonial evidence.** Witnesses and other evidence placed Gabrion on the scene with Rachel near where her body was found, and connected him to a boat he likely used to drown her.

- **Gabrion on the scene.** Witnesses saw Gabrion with Rachel at the shore of Oxford Lake in June 1997, a few weeks before her body was found in it. They were in a black pickup truck with a boat in the back end. (R.670: Coleman Dep. 5-16; R.591: Tr. VII, 1575-82 (Kirk).) Gabrion, "glaring like he was mad," nearly ran a husband and wife off the two-track road to Oxford Lake. (R.590: Tr. VI, 1306-09, 1320, 1329-33.)

- **Gabrion with the boat.** During the predawn hours of June 6, 1997, Gabrion was observed at his home unloading a boat from a pickup truck. Once it was out, he removed blocks and chains from the boat, rinsed it out, and used a grinder on it, before reloading the blocks and chain and driving the boat away in his truck. (R.590: Tr. VI, 1406-15.) Later, neighbors

and a passerby remembered that Gabrion had a small aluminum fishing boat for sale with its registration numbers ground off. (R.471: 2/27/02 Tr. 57; R.590: Tr. VI, 1398, 1426-28, 1432-35.) When asked why the numbers had been removed, Gabrion said, "it's none of your fucking business." (R.590: Tr. VI, 1428-29, 1434.)

- **Evidence at Gabrion's campsite.** Witnesses camping on Little Manistee River testified that in early June 1997, Gabrion had introduced himself as "Lance," told them a story about where he was camping with his family that they later realized was a lie, and asked them to keep his aluminum fishing boat for him. (R.589: Tr. V, 1196-1204; R.590: Tr. VI, 1445, 1448, 1451-52.) The evening of June 6, Gabrion showed up with bruises and scratches on his face, with patches of hair missing, and delivered the boat. (R.590: Tr. VI, 1451-53; R.588: Tr. IV, 1053-54.) At Gabrion's actual campsite at Hungerford Lake, approximately 6.5 miles from the scene of the murder, police found chain, duct tape, bolt cutters, and, in the campfire pit, a package of silicone baby nipples and a woman's

hair clip, similar to the kind Rachel wore. (R.588: Tr. IV, 997, 1098-1108; R.472: 2/25/02 Tr. 9.)

**Gabrion's flight and capture.** After Rachel disappeared, Gabrion began keeping his distance from Michigan and using false identities.

- He contacted a real estate broker to sell his Altona store, advising that he was unavailable to meet, but mailing the broker a key in an envelope with a holographic imprinted stamp with a "NASA/space ship" design. (R.589: Tr. V, 1244-46; Gov't Ex. 69.) In July, Gabrion's mother asked his brother David to "remove some items" from the store. (R.589: Tr. V, 1258.) David had just been released from jail, where he had received two letters from Gabrion in envelopes with the same "NASA/spaceship" design. (*Id.* at 1255-57; Gov't Exs. 67 & 68.) Gabrion knew he was wanted for questioning (R.471: 2/27/02 Tr. 17-21), but he stayed away from Michigan.

- Before Labor Day in 1997, Gabrion concocted a ruse to obtain personal identification information from a man named Robert Strevels: he placed an ad for a carpenter, "interviewed" Strevels for the position, then told Strevels he was not needed.

(R.590: Tr. VI, 1462-66.) He used Strevels' information to obtain a driver's license in Strevels's name. (*Id.* at 1467.)

- Gabrion identified himself as Robert Strevels to a man he encountered in West Virginia. Gabrion, sporting a new beard, asked about buying property in a remote area up a creek. He said his wife had died in a carjacking and he wanted to get away from it all. (R.591: Tr. VII, 1545-47.)

- In October 1997, Gabrion was finally arrested in New York, where he was using a post office box in the name of Robert Allen, and carrying the Robert Strevels false identification. (R.591: Tr. VII, 1476-78.) An FBI agent served a subpoena for hair samples on Gabrion the following week, when Gabrion had a full head of hair. (*Id.* at 1480-81.) But analysts initially could not compare a pubic hair found in Rachel's jeans with Gabrion because after his arrest and receipt of the subpoena, he shaved all the hair off his body. (R.591: Tr. VII, 1536-39.)

**Gabrion's admissions.** Several witnesses testified about inculpatory admissions Gabrion made.

15

- In June 1997, he told his nephew if he were to kill someone, he would wrap them in chicken wire and chains with bricks and put them in a muddy lake. (R.471: 2/27/02 Tr. 41-42.)

- That same month, Gabrion told a friend, "it is not hard to get rid of somebody; you just weigh them down and throw 'em in the lake." (*Id.* at 14.)

- Gabrion told Lloyd Westcomb, a paranoid schizophrenic who takes medication and has known Gabrion since childhood, that he "got rid of" his girlfriend "permanently" by binding her with chains and blocks and throwing her over a boat. (R.590: Tr. VI, 1354-55.) Westcomb relayed this to his mother, who testified via deposition. (*Id.* at 1354-55; R.669: K. Westcomb Dep. 7-10.)

- While in jail awaiting trial, Gabrion offered a fellow inmate $500 to buy land on Oxford Lake so the property would be private, not federal, land. He gave the inmate a hand-drawn map of Oxford Lake that had markings showing "Body Found 1 of 3." (R.589: Tr. V, 1276-85; Gov't Ex. 70.)

- In March 2001, Gabrion talked to a reporter, drew another map of the lake, and said the baby items found at the campsite were for his dog. (R.589: Tr. VI, 1292.) He wanted the reporter to help him determine the boundary lines of Oxford Lake between the private and federal property. (*Id.* at 1296-97.)

- Gabrion told an inmate he killed Rachel because she screamed rape and he "had to take care of business." (R.594: S. Tr. II, 355-56.) He also said there was another body in the lake. (*Id.*)

## 2. Penalty-phase evidence

Fifty-eight witnesses testified for the government in the penalty phase.[5] The evidence was the subject of pretrial motion practice and hearings; the defense succeeded in limiting some of it. The government agreed that its evidence relating to the statutory aggravating factors that Gabrion killed Rachel after substantial planning and premeditation, and

---

[5] The statutory aggravating factors were: (1) Gabrion murdered Rachel in an especially heinous, cruel and depraved manner; and (2) Gabrion murdered Rachel after substantial planning and premeditation. The non-statutory aggravating factors alleged were: (1) Gabrion is likely to be dangerous in the future; (2) Rachel was a unique and individual human being whose loss has and will impact her family; (3) Gabrion caused the disappearance or death of eleven month-old Shannon VerHage (Rachel's baby); and (4) Gabrion murdered Rachel to obstruct justice and retaliate against her in regard to another offense. (R.220: Am. Notice.)

in a heinous manner, would be limited to evidence admitted in the guilt phase as to the manner of her death (except that the government intended to (and did) recall the forensic pathologist to testify that death by drowning is a drawn-out process, accompanied by panic, pain, and fear). (R.385: 1/11/02 Hr'g Tr., 86-88; R.593: S. Tr. I, 58-64.) The court excluded grand jury testimony that Gabrion had said he hated Rachel and planned to drown her, where the witness had died by the time of the trial. (R.395: 1/25/02 Op. at 14.) The government agreed to call only five victim impact witnesses. The government proved the obstruction of justice aggravating factor through the motive evidence presented in the guilt phase—that Gabrion killed Rachel to prevent her from testifying against him in the rape case and in retaliation for reporting it.

Prior to trial, the government provided the defense with a 13-page outline identifying all penalty phase witnesses and summarizing their anticipated testimony. (R.385: 1/11/02 Hr'g Tr., 83-85; R.652: 8/10/05 Mot.; R.653-1: Br.; R.653-2: 12/18/01 Letter.)[6] Much of the evidence supporting the non-statutory aggravating factor that Gabrion was

---

[6] This letter was not made part of the formal record, but Gabrion's trial counsel acknowledged receiving it on the record, and stated that the letter, and an in-person meeting to discuss the anticipated evidence,

responsible for the death of Rachel's infant daughter, Shannon VerHage, was also largely established in the guilt phase by the fact that the baby disappeared with Rachel. But several witnesses also testified in the penalty phase that Gabrion admitted he killed Shannon because he did not know what to do with her. (R.593: S. Tr. I, 150-53 (Cross); 197-98 (Love); R.594: S. Tr. II, 313 (Lunsford).) The government also offered evidence that Gabrion remained a danger to the community.

**Evidence of Gabrion's assaults and threats.**

- **Sexual assaults of women and girls.** Without consent, Gabrion grabbed a woman's breasts and crotch (R.593: S. Tr. I, 106-13 (Goller)); climbed into bed with a woman (*id.* at 113-23 (McGraw)), and peeped on and grabbed a 12-year-old girl's "private parts" (*id.* at 132-50 (Niewek).)

- **Assaults on his neighbors.** Gabrion once pulled a neighbor off his lawnmower and attacked him; he took another neighbor's dog, who ended up dead, and threatened to kill him and

---

effectively rendered moot a discovery motion they had filed. (R.385: 1/11/02 Hr'g Tr., 83-84.) Thus, though Gabrion says the claims that he killed Robert Allen, Wayne Davis, and John Weeks "were not included in any government notice" (e.g., COA Appl. at 126), that must refer to formal, filed notice, as he had actual notice a month before the trial began.

"dust the bitch," referring to the neighbor's wife (R.593: S. Tr. I, 93-99, 100-03 (Bacons); R.594: S. Tr. II, 241-46 (Cass).) Two neighbors had their homes intentionally set on fire after conflicts with Gabrion. (R.593: S. Tr. I, 71-75, 85-87; 93-99.) Gabrion once threatened to kill people after being asked to leave a neighbor's party, and shortly thereafter, rifle shots were fired from the direction of Gabrion's home. (R.593: S. Tr. I, 174-79, 186-89.) On another occasion, a neighbor noticed Gabrion aiming a rifle at her from his upstairs window as she helped her child climb into the back seat of the family car. (R.594: S. Tr. II, 287-91.)

- **Assaults on others living in his community.** During a card game with the Lilly family, Gabrion beat and kicked Dennis Lilly; punched his wife in the face, grabbed her by the hair and slammed her head onto the floor three times; beat their ten year-old son; and threw the family dog against the wall. (R.593: S. Tr. I, 209-24). Thomas Niewieck rented an apartment to Gabrion; after Gabrion assaulted his stepdaughter, he told Gabrion he was being thrown out. Gabrion

grabbed a knife and threatened Niewieck and his wife with it, saying he would kill them, that he'd throw Niewick in the river and no one would find his body. (R.593: S. Tr. I, 132-50.)

**Evidence linking Gabrion to the disappearance of others.**

- **Robert Allen**, a homeless man, disappeared in 1996. Gabrion assumed his identity and arranged for his social security disability benefits to be deposited into a bank account he controlled. In 1998, Gabrion was convicted of wrongfully misappropriating Allen's benefits. (R.594: S. Tr. II, 441-54.)

- **Wayne Davis**, a witness in the rape case (R.594: S. Tr. II, 390-92, 418), went missing after Gabrion was released on bond. Davis had asked Darlene Lazo to give him a ride to court on February 13, 1997, so he could plead guilty to a drunk driving charge. He expected to serve 90 days in jail and bought cigarettes and puzzles to keep him occupied there. (*Id.* at 397-98.) Lazo saw Davis and Gabrion together at Davis's home on February 12; Davis never mentioned any plans about leaving the state. (*Id.* at 399, 419.) When she arrived to take Davis to

the courthouse, he was gone. On the door was a note purportedly from Davis stating that he had gone to California because he was scared to go to jail. Lazo did not believe it. (*Id.* at 399-401.) Lazo noticed that even though it was winter, the army jacket Davis always wore was still in his home. (*Id.* at 404-05.) The following month, Gabrion brought Davis's property (with the serial numbers scratched off) to a consignment shop to sell it. (R.594: S. Tr. II, 391-94, 406-12, 412-17.)[7]

- **John Weeks** occasionally worked for Gabrion. In May or June 1997, Gabrion asked him to call a woman named Rachel to set him up, and Weeks did so. (R.594: S. Tr. II, 423-27.) Campers saw Weeks with Gabrion on June 5, the day before he showed up with bruises and scratches on his face and asked them to store his boat. (R.588: Tr. IV, 1053-55; R.590: Tr. VI, 1451-52.) On June 22, Weeks told his girlfriend he was going on a "dope run" to Texas with Gabrion and would be gone a week to ten days. (*Id.* at 427.) Gabrion confirmed the trip, but

---

[7] After the trial, Davis's body was found in a lake located near Gabrion's family home.

claimed it was to pick up Christian books. (*Id.* at 429.) About two weeks later, Gabrion resurfaced and told Weeks's girlfriend that he had dropped Weeks off in Arizona. No one has seen Weeks since June 22, 1997. (*Id.* at 420-31, 435-37.)

**Evidence of Gabrion's dangerousness in custody.**

- Gabrion was caught with weapons in his cell, including metal shards and razors. (R.594: S. Tr. II, 324-29, 377-80.) He also hid nail clippers, which can be used to unlock handcuffs. (*Id.* at 307-09.)

- Gabrion, who has Hepatitis C, threw urine and feces at prison employees and started a fire in his cell. (*Id.* at 310-13.) He also made a fake gun from bars of soap. (*Id.* at 367-72, 385-89.)

- Gabrion attempted to bribe jail trustees to open cell doors for him. (R.594: S. Tr. II, 336-41.) He also posed as the Clerk of the U.S. District Court and attempted to arrange his own prison transfer. (*Id.* at 293; R.593: S. Tr. I, 91.)

- Gabrion talked about escaping many times. (R.594: Sent. Tr. II, 35-54.) He tried to kick the metal sheeting in his cell to loosen it to make a weapon, and he kept chicken bones to

make shanks (weapons). (*Id.*) He made threatening remarks about female guards, saying he would kill them. (*Id.*)

**Mental health evidence.** One of the defense's principal penalty phase arguments was that Gabrion suffered from mental health issues, perhaps resulting from head injuries, and this mitigated his culpability. Gabrion's mental health was the subject of intense scrutiny from the beginning of the case. He was assessed three times for competency; on each occasion, he was deemed competent. (R.268: 5/8/00 E. Fallis, FMC Fort Worth Psychological Evaluation (sealed) ("Fallis Report"); R.476: 6/18/01 C. Frank, Henry Ford Behavioral Center (sealed) ("Frank Report"); R.314: 10/22/01 DeMier, FMC Springfield Psychological Evaluation (sealed) ("DeMier Report").) Each examiner also determined that Gabrion was feigning or "malingering" mental illness. (R.268: Fallis Report, at 17; R.476: Frank Report, at 8; R.314: DeMier Report, at 19.) During the penalty phase, additional witnesses testified about Gabrion's mental health.

- **Scharre.** Dr. Douglas Scharre testified for the defense. Based only on a review of records, Scharre testified that Gabrion suffered from frontal lobe dysfunction and Geschwind Syndrome, possibly resulting from motor vehicle accidents. (R.539:

3/13/02 Tr. 9, 12-13.) He said the syndromes are characterized by poor planning and disorganization, hypergraphia (repetitive writing), and hyperreligiosity. (*Id.* at 23, 29-31.) Scharre testified that Gabrion was not malingering (*id.* at 68-74, 79-80), and one side of Gabrion's brain was darker than the other on a PET scan. (*Id.* at 39). Gabrion's CAT scans were normal, which Scharre said supported his opinion that a head injury, rather than a structural lesion, caused the PET asymmetry. (*Id.* at 41-45.) Scharre admitted the only evidence he had of any accident was Gabrion's self-report of a 1992 car accident. (*Id.* at 52-55.)[8]

- **Jackson.** Dr. Newton Jackson also testified for the defense. He reviewed records and interviewed Gabrion three times. (R.541: 3/14/02 Tr. 6-10, 13.) He concluded that Gabrion was delusional, his behaviors were consistent with a possible mental illness (*id.* at 8), and he suffered from psychological deficits

---

[8] During its rebuttal, the government presented evidence that Gabrion staged the 1992 car accident in an effort to obtain insurance money. See CivR.119, Gov't Resp. to § 2255 Mot., PageID.5094 (discussing testimony of Scott Vanderveen, R.543, 3/14/02 Tr. 4-18.)

(*id.* at 29) though he did not view Gabrion as "mentally ill" (*id.*). Jackson nonetheless concluded that several adverse influences on Gabrion during his developmental years may have had "a serious adverse effect upon him as a functioning individual." (*Id.* at 17.) These included a childhood illness resulting in hospitalization and surgery, parental abandonment and neglect, substance abuse by Gabrion and his parents, family dysfunction and abuse, and auto accidents. (*Id.* at 15-19.) Based on all of this, Jackson determined that Gabrion suffered from "a number of disorders" which, while not "coalesce[ing] together to arrive . . . at a single diagnosis" reflected that Gabrion had features of several personality disorders: histrionic, antisocial, and narcissistic. (*Id.* at 24-26.) He saw some evidence of malingering, but he did not think it explained all of Gabrion's presentation. (*Id.* at 11-13, 29.) Gabrion thwarted Jackson's attempts to conduct a thorough examination by refusing to cooperate in the third interview and refusing to participate in testing. (*Id.* at 13-16.)

- **Dr. David Griesemer**, a neurologist, testified during the government's penalty phase rebuttal. Griesemer testified that he reviewed Gabrion's medical records to determine if he had any neurological impairment. (R.544: 3/14/02 Tr. 6.) Griesemer reviewed the PET, CAT, and EEG records and found no evidence of brain injury. (*Id.* at 9.) Griesemer testified that in automobile accidents, victims tend to experience acceleration-deceleration injuries where the head jerks forward and back. There would be evidence of contusions or blood on the brain if that occurred, and Gabrion's 1992 CAT scan taken at the time of the purported accident did not show any such injury. (*Id.* at 15-17.) Griesemer testified that a PET scan is not a diagnostic tool used to evaluate brain injury, and Gabrion's PET scan did not show trauma. (*Id.* at 20, 36.) He concluded that Gabrion's testing as severely-impaired in functioning was not explained by traumatic brain injury. Gabrion showed complex functioning in obtaining false identification, banking transactions, and the planning of the murder. (*Id.* at 11-12, 22-24.)

- **Dr. Thomas Ryan,** a clinical psychologist, reviewed records, interviewed and tested Gabrion. (R.546: 3/15/02 Tr. 2-7.) Ryan found Gabrion to be a malingerer. He testified that if Gabrion had suffered a traumatic brain injury, he would have started with a severe impairment which would have improved over time, but Gabrion's purported illness had actually worsened. Gabrion's tests showed him to be severely impaired; however, his real-life activities showed that he has a much higher level of functioning. The testing data made no clinical sense when compared to Gabrion's everyday behavior. (*Id.* at 10-22.)

- **Dr. Gregory Saathoff**, a psychiatrist, also interviewed Gabrion. Saathoff testified that he was a consultant to maximum security prisons and had interviewed hundreds of prisoners. (R.546: 3/15/02 Tr. 28.) He reviewed records and interviewed Gabrion. (*Id.* at 30-33.) Saathoff stated that he had examined the same CAT and PET scans as Scharre had, and disagreed that they showed any indication of brain injury. (*Id.* at 34.) Saathoff also disagreed that Gabrion suffered from frontal lobe injury or Geschwind Syndrome. For example,

Saathoff stated that Gabrion's claim that the FBI had moved Rachel Timmerman's body was not an example of "confabulation" but was a shrewd recognition that he could defeat a federal conviction if he could persuade the jury that she had been killed at the north end of Oxford Lake, which was private property. (*Id.* at 45-48.) He also disagreed that Gabrion's writings were proof of a brain injury, as some of his writings were coherent, particularly when Gabrion needed services from the jail. This indicated malingering. (*Id.* at 52-58.)

**Other mitigating evidence.** The defense called several additional witnesses during the penalty phase.[9] The overall defense mitigation strategy was evident from defense counsel's opening statement—in light of Gabrion's outbursts, inflammatory testimony, and other conduct such as punching his own attorney in the face, all in front of the jury, and the volume of the anticipated aggravating evidence, the defense had little choice but to acknowledge that Gabrion was not "a good person." (R.593: S. Tr. I, 46.) Defense counsel attempted to persuade the jury to choose a

---

[9] The defense also filed many motions, which succeeded in limiting some of the government's proofs. See CivR.119, Gov't Resp., PageID.5085-88.

life sentence over death by presenting the evidence noted above relating to Gabrion's mental health, and evidence relating to his childhood, including his difficult upbringing, his relatively normal behavior through high school, his substance abuse, and his car accidents, which the defense suggested, aided by expert testimony, might have affected his brain functioning. See CivR.119, Gov't Resp., PageID.5092-93. They also presented witness testimony about BOP's ability to house Gabrion securely and thereby minimize any future dangerousness. (R.574: 3/13/02 Tr. 3-5.)

Gabrion also testified—against his counsel's repeated advice—stating, among other things, that his childhood was no worse than that of the average poor white man in Northern Michigan, that he had acted as Robert Allen's personal representative, that he had set up a charitable trust for missing children, that he'd used another identity in California, and that Rachel had said her father abused her, stating, "[s]ome of them people really don't have the right to feel grief of like, but I mean, if it was my daughter, I would certainly feel some damn grief too." (R.542: 3/14/02 Tr. 17-18.)

The jury deliberated for two days before returning its penalty phase decision. They unanimously found all the statutory and non-statutory aggravating factors beyond a reasonable doubt. (R.526: Verdict Form, at 1-5.) They also found mitigating factors proven. All twelve jurors found as a mitigating factor that Gabrion "has features of several personality disorders, including histrionic personality disorder, narcissistic personality disorder, and borderline personality disorder." (*Id.* at 7.) All twelve also found that Gabrion "grew up in an impoverished and violent environment, and was the victim of abandonment, neglect, and emotional, psychological and physical abuse as a child" and "was not a disciplinary problem in school and does not have any history of criminal conduct before the age of 23." (*Id.* at 6.) Nine found that Gabrion's "abuse of drugs, alcohol and chemical inhalants contributed to his criminal conduct." (*Id.* at 7.) Some jurors found other mitigating factors; all twelve wrote in an additional factor, that the loss of his life would be significant to his family. Ultimately, the jury found the aggravating factors outweighed the mitigating factors so as to warrant a sentence of death. (*Id.* at 9.)

### 3. Direct appeal

Gabrion was appointed new counsel on appeal, who raised over 20 issues. The appeal lasted over eleven years because of the scrutiny given to his claims: first, the panel identified six questions relating to the district court's subject matter jurisdiction over the case. This necessitated a remand for further evidentiary development; ultimately, the panel issued a divided opinion finding jurisdiction. *United States v. Gabrion*, 517 F.3d 839 (6th Cir. 2008) (*Gabrion I*). Gabrion's appellate counsel sought rehearing en banc and certiorari, but those petitions were denied. *United States v. Gabrion*, Nos. 02-1386/1461/1570 (6th Cir. Aug. 26, 2008); *Gabrion v. United States*, 129 S. Ct. 1905 (2009).

The panel solicited supplemental briefing, heard argument, and, in a divided opinion, rejected all of Gabrion's claims except three. *United States v. Gabrion*, 648 F.3d 307 (6th Cir. 2011) (*Gabrion II*). The majority determined that the death penalty should be vacated on two grounds, and said it was "troubled" by what it perceived as uneven treatment of pro-death penalty and anti-death penalty jurors during voir dire, but declined to reach the issue. *Id.* at 324, 328, 344-45.

One of the claims the panel rejected was that Gabrion was incompetent to stand trial. 648 F.3d at 318. The panel noted that nine mental health experts had evaluated Gabrion, all of whom except one (Dr. Scharre, who did not examine him) had found that he was malingering mental illness, and agreed that the records demonstrated that Gabrion "knew what he was doing." *Id.* at 320. The panel also rejected Gabrion's claim that the government violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by not disclosing a Department of Justice report concerning the conduct of Chrystal Roach, the Michigan prosecutor who had handled the rape case against Gabrion and briefly served as a Special Assistant U.S. Attorney in pretrial proceedings, stating that Roach's testimony as a fact witness at the trial related to "peripheral and uncontested facts;" therefore, the panel "confidently . . . believe[d]" that the absence of the report "did not affect the result of the guilt phase of the trial." *Id.* at 336. And the panel rejected claims challenging the admission of evidence of unadjudicated acts during the penalty phase; the constitutionality of the Federal Death Penalty Act; the indictment's failure to allege statutory aggravating factors; the district court's handling of a statement by the jury foreperson that he knew Gabrion was "off the

wall" prior to trial, and its refusal to include prison regulations in the jury instructions.

The Court reheard the case en banc and issued an opinion affirming Gabrion's conviction and reinstating the death sentence. *United States v. Gabrion*, 719 F.3d 511 (6th Cir. 2013) (*Gabrion III*). The Court also rejected Gabrion's claim that the district court had treated pro- and anti-death penalty jurors differently, rejected three arguments Gabrion said the panel had overlooked (including that the Court should order a determination of his competency for purposes of his appeal), and adopted the panel's reasoning rejecting all of Gabrion's other claims. *Id.* at 535.

In addressing Gabrion's many arguments on direct appeal, the panel summarized the circumstantial evidence of Gabrion's guilt, which it characterized as "overwhelming." *Gabrion II*, 648 F.3d at 317. The panel stated three additional times that the evidence of Gabrion's guilt was "overwhelming." *Id.* at 337, 338, 345 n.16. In the en banc opinion, the Court also characterized the "government's case for aggravation" as "overwhelming." *Gabrion III*, 719 F.3d at 525. "Gabrion killed Timmerman in an undisputedly horrific manner, killed her infant daughter, likely killed three other people who either witnessed his crimes or whose

death was otherwise useful to him, and terrorized countless people who crossed his path." *Id.*

**4. Section 2255 proceedings**

In April 2015, Gabrion filed a motion to vacate his sentence under 28 U.S.C. § 2255 (CivR.1; CivR.15, PageID.885 (redacted motion)), and in January 2016, the government filed a response (CivR.42, PageID.1976). Gabrion thereafter filed various motions, including motions for discovery, for an evidentiary hearing, to stay the period for amendment as of right, and for a status conference.

The district court conducted a motion hearing and ultimately denied the motions seeking discovery and a hearing without prejudice. (CivR.75: Tr., PageID.2638; CivR.75: Order, PageID.2633.) The matter was later reassigned to Chief Judge Robert J. Jonker due to the trial judge's retirement. Judge Jonker permitted Gabrion to file an amended § 2255 motion, denied his renewed motions for discovery and a hearing without prejudice as premature. (CivR.99: Order, PageID.3884; CivR.100: Am. § 2255 Mot., PageID.3887.)

The government filed a response to the amended § 2255 motion (CivR.119, PageID.5057), Gabrion filed a reply (CivR.141, PageID.5380),

and the district court issued a 206-page opinion denying the motion, denying various other motions Gabrion had filed, and denying a certificate of appealability as to all issues raised in Gabrion's motion (CivR.156: Op., PageID.5795; CivR.157: Order, PageID.6011; CivR.158: Order, PageID.6012; CivR.159, Judgment, PageID.6014).

## STANDARD

There is no "absolute entitlement to appeal" a district court's decision denying a habeas corpus petition. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). To appeal the denial of a § 2255 motion, the petitioner must obtain a "Certificate of Appealability" (COA) from the district court or this Court. 28 U.S.C. § 2253(c)(1)(B). This is jurisdictional. *Gonzalez v. Thaler,* 565 U.S. 134, 142-43 (2012). A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

This requires the petitioner to show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (citing *Barefoot* 463 U.S. at 893 &

36

n.4). "To meet *Slack*'s standard, it is not enough for a petitioner to allege claims that are arguably constitutional; those claims must also be arguably valid or meritorious." *Dufresne v. Palmers*, 876 F.3d 248, 254 (6th Cir. 2017). Thus, while the *Slack* determination "is not coextensive with a merits analysis[,]" *Buck v. Davis*, 137 S. Ct. 759, 773 (2017), the petitioner must at least present claims that are *arguably* meritorious. And, though in capital cases, courts should err on the side of caution for claims with arguable merit, "there is nothing to suggest that *Slack* does not apply with equal force in capital cases." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001).

"Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack,* 529 U.S. at 484. "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows … that jurists of reason would find it debatable whether the petition states a

valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* (emphasis added). "Section 2253 mandates that both showings be made before the court of appeals may entertain the appeal." *Id.* at 485. "Each component of the § 2253(c) showing is part of a threshold inquiry, and a court may find that it can dispose of the application in a fair and prompt manner if it proceeds first to resolve the issue whose answer is more apparent from the record and arguments." *Id.*

The petitioner must satisfy the § 2253(c) requirements as to each and every issue he seeks to raise on appeal. *See* § 2253(c)(3) ("[t]he certificate of appealability … shall indicate which specific issue or issues satisfy the showing required by [28 U.S.C. § 2253(c)(2)])." *See also Gonzalez,* 565 U.S. 134 (holding that COA must identify the constitutional issue involved). Blanket COAs are prohibited, even in death penalty cases. *See Porterfield,* 258 F.3d at 487. The reviewing court must review each of the issues sought to be appealed, and make a determination as to which (if any) satisfy the requirements of § 2253(c). *See Murphy v. Ohio,* 263 F.3d 466, 467 (6th Cir. 2001).

Gabrion incorrectly suggests that the district court failed to make a proper COA determination, alleging that the court failed to "provide any analysis of any of Gabrion's eleven claims, let alone state specifically why any claims fail to meet the *Slack* standard." (COA Appl. at 22.) That is not true. The district court exhaustively analyzed Gabrion's claims in a 206-page opinion. Then, in a separate order, the court denied a COA as to each of Gabrion's claims, explicitly referencing the standard in *Slack*, and noting that this Court has disapproved of blanket denials. (CivR.158: Order, PageID.6012, citing *Murphy*, 263 F.3d at 467). The court said that it had "carefully considered the issues" and found "that reasonable jurists could not find that [its] dismissal of Gabrion's claims was debatable or wrong." (*Id.* at PageID.6012-13.) Echoing this Court's findings on direct appeal, the district court observed that there was "overwhelming evidence supporting the jury's verdict at the guilt and penalty phases of the trial," and said that it was "satisfied that Gabrion received the assistance to which he is entitled under the Sixth Amendment and that there is no constitutional or other reason to set aside his conviction or sentence." (*Id.* at PageID.6012-13.) Thus, the court concluded that even though this is a

death penalty case, it "discern[ed] no basis for granting a certificate of appealability." (*Id.* at PageID.6013.)

The district court was not required to do more. This Court has held that where, as here, the district court has engaged in a thorough analysis of the petitioner's claims, it is "not necessary for the court to reassess each claim prior to denying a COA." *Brown v. United States,* No. 16-2457, 2017 WL 4863173, at *3 (6th Cir. 2017). The court may rely on "the reasoning in its opinion denying (petitioner's) § 2255 motion" in declining to grant a COA. *Hawkins v. Rivard,* No. 16-1406, 2016 WL 6775952, at *2 (6th Cir. 2016). *See also Layne v. Stewart,* No. 17-1389, 2017 WL 4857574, at *2 (6th Cir. 2017) (rejecting defendant's argument that the district court had failed to conduct a proper COA analysis because "the district court's opinion provided sufficient analysis … to indicate it had made an individual determination of [petitioner's] claims"). This Court has noted that "because the district court is already deeply familiar with the claims raised by petitioner, it is in a far better position from an institutional perspective than this court to determine which claims should be certified for appeal." *Porterfield,* 258 F.3d at 487. In making its own COA determination, however, this Court is "not limited to grounds expressly

addressed by the court whose decision is under review." *Tharpe v. Sulli-van,* 138 S. Ct. 545, 546 (2018).

While criticizing the district court, Gabrion himself takes a "blanket" approach, seeking a COA as to "each of the issues raised in his amended § 2255 motion." (COA Appl. at 16.) He suggests that a COA should issue merely because it is a capital case. But "the nature of a capital case is not of itself sufficient to warrant the issuance of a COA." *United States v. Bernard,* 762 F.3d 467, 471 (5th Cir. 2014). As noted above, like any other habeas petitioner, a death penalty defendant must satisfy the requirements for a COA as to each issue he wishes to appeal. *Porterfield,* 258 F.3d at 487. In fact, "the central purpose of the Antiterrorism and Effective Death Penalty Act—partially codified at § 2255—[was] 'to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases.'" *United States v. Caro,* 733 F. App'x 651, 653 (4th Cir. 2018) (quoting *Woodford v. Garceau,* 538 U.S. 202, 206 (2003)). COAs have been denied in numerous federal death penalty cases. *See, e.g., United States v. Vialva,* 904 F.3d 356, 363 (5th Cir. 2018); *Bernard,* 762 F.3d at 467; *United States v. Fields,* 761 F.3d 443, 484 (5th Cir.

2014); *United States v. Bourgeois,* 537 F. App'x 604, 665 (5th Cir. 2013);

*United States v. Hall,* 455 F.3d 508, 524 (5th Cir. 2006).

For the reasons stated below, Gabrion has not shown that reasona-ble jurists would find the district court's disposition of his claims debatable. Accordingly, his request for a COA should be denied.

# CLAIMS

## 1. "False" testimony claim (§ 2255 Ground One)

No reasonable jurist could debate the correctness of the district court's conclusion that Gabrion failed to identify any false, material, testimony or other evidence, or any false or misleading statements by prosecutors to the jury, and that these claims are defaulted, in any event.

*Allegedly "false" testimony*

Gabrion claimed in Ground One that the government presented or failed to correct false testimony, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972). Gabrion does not dispute that the district court, in evaluating the claim, correctly identified the elements of such a claim: as to each alleged false statement, Gabrion was required to show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. (Op., PageID.5835.) A statement is material if it "could in any reasonable likelihood have affected the judgment of the jury." (*Id.*, quoting *Brooks v. Tennessee*, 626 F.3d 878, 895 (6th Cir. 2010).)

Gabrion failed to identify any "indisputably false" testimony, as is required, *Abdus–Samad v. Bell,* 420 F.3d 614, 626 (6th Cir. 2005).

43

Gabrion assails the district court's "speculation" in identifying the many reasonable explanations for the minor inconsistencies or omissions that Gabrion identified. The district court's observations are all correct: despite having spent years trying to unearth information that would cast doubt on the truthfulness of the testimony presented against him, Gabrion has failed to identify a single indisputably false statement. More importantly, though, the testimony that Gabrion challenged as allegedly false is immaterial to the jury's finding of guilt and to its decision to impose the death sentence. The district court so found, and no reasonable jurist would find its assessment debatable.

### a. Chrystal Roach

Gabrion devotes significant space in his COA application to the testimony of Chrystal Roach, the Newyago County prosecuting attorney in charge of Rachel's rape case against Gabrion, which he contends was false and misleading. As the district court noted, however, this Court has observed that Roach's testimony was "peripheral"; "far from critical in establishing Gabrion's guilt." *Gabrion II*, 648 F.3d at 337. The district court was also correct that there was "ample evidence of substantial planning and premeditation apart from Roach's testimony" and

"considerable" other evidence supporting the obstruction of justice aggravating factor. (Op., PageID.5839.) This is fatal to Gabrion's claim, as the knowing use of false or perjured testimony constitutes a denial of due process only "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)).

**Roach's role.** Gabrion asserts that Roach "played many roles in this case." (COA Appl. at 31.) This is an exaggeration. Roach testified briefly as a fact witness because she was the prosecutor who handled the rape case against Gabrion. She was also initially appointed a Special Assistant United States Attorney (SAUSA) for the investigation and prosecution of the federal murder case. Her SAUSA status ended well before the trial began.[10]

---

[10] After the indictment issued, Roach made statements at a June 1999 press conference that the defense deemed inappropriate. The Department of Justice's Office of Professional Responsibility investigated and issued a report finding that Roach did not violate the Michigan Rules of Professional Conduct or the United States Attorney's Manual, but did violate federal regulations prohibiting improper public comment on pending cases. After *in camera* review, the district court found that the report did not need to be disclosed, and on direct appeal this Court held that the report was not material and therefore its non-disclosure did not entitle

Roach's testimony at the trial was limited; her direct examination accounts for only ten of over 2,500 transcript pages. (R. 589: Tr. V, 1161-71.) She testified to receipt of the letter purportedly from Rachel retracting the rape allegations and to the progress of the rape case against Gabrion through the state court system. Roach testified that she issued a complaint and warrant against Gabrion in August 1996, and that Gabrion was arraigned on the charge on January 21, 1997. (*Id.* at 1161.) She testified that preliminary examinations at which Rachel would have testified were scheduled but never occurred. (*Id.* at 1161-66, 1146-51.) She also testified Gabrion twice switched attorneys, which caused delay. (*Id.* at 1164.) It was the government's theory at trial that Gabrion attempted to delay the progress of the case until he could get access to Rachel, who was in jail from January 8 to May 5, 1997. As evidence of this, the government pointed to: Gabrion's decision to change lawyers twice; his decision to waive a preliminary examination twice; the fact that

---

Gabrion to a new trial. *Gabrion II*, 648 F.3d at 337 (as Roach's testimony was "peripheral" and the evidence of Gabrion's guilt "simply overwhelming," there was "almost no chance that the result of the guilt-phase proceedings would have been different had Gabrion received the report").

the rape case had not progressed from the time he first appeared in January to June 1997; evidence that Gabrion, in fact, threatened Rachel on her release from jail; and evidence that Gabrion was responsible for sending the letters in June 1997, following Rachel's disappearance, that purported to exonerate him. (R.592: Tr. VIII, 1680-88 (Gov't closing).)

In his Section 2255 motion, Gabrion contended that this entire narrative was "false" because, he said, Roach made two false statements.

**Testimony about preliminary examinations in assault cases.** Roach testified on cross-examination that she felt "strongly that in cases involving assault, that prelims [preliminary examinations] should occur prior to trial" and that she "tried to do it every time." (R.589: Tr. V, 1175.) Gabrion contends that this was "false" because he says some records he obtained from the Newaygo County Court show that Roach did not insist on preliminary examinations in all assault cases. The government explained that there were many reasons why these records fell far short of establishing that Roach's testimony was "actually perjured," *Coe*, 161 F.3d at 343 (CivR.119: Gov't Resp., PageID.5117-18), let alone that the prosecution knew it to be so. The district court agreed that the records failed to establish that Roach's testimony was "indisputably false." (Op.,

PageID.5837.) More importantly, the court said, "even if her statements were false, Roach's practice in other cases has little bearing on Gabrion's case." (*Id.*) This is plainly correct, and not subject to reasonable debate.

**Testimony about who requested a remand.** Gabrion's other "smoking gun" purportedly false statement by Roach was her testimony that she had moved to have the rape case remanded to district court for a preliminary examination. This was false, Gabrion contends, because a transcript of the proceeding indicates that it was Gabrion's attorney who requested the remand, not Roach. Again, as to this issue, the government explained why the transcript did not establish that Roach's testimony was perjorious (CivR.119: Gov't Resp., PageID.5119-20), let alone that the government knew it to be so. The district court agreed that the transcript did not demonstrate that Roach's testimony was indisputably false. (Op., PageID.5838.) But the district court went on to say that "any falsehood in Roach's statement is plainly immaterial because it actually benefitted Gabrion." (*Id.*) If it was actually Gabrion who, after requesting a preliminary examination, again withdrew the request, that would support the government's theory that his conduct was driven by a desire to manipulate and delay the proceedings. (*Id.*) Gabrion has no answer to

this. The court's conclusion that this allegedly false statement is immaterial is therefore not subject to reasonable debate.[11]

**No discovery or hearing is required to resolve this claim.** The district court's conclusion that the testimony of Roach that Gabrion challenges is immaterial to the jury's guilt and penalty phase determinations, and that no additional discovery or hearing on the issue is warranted, is not subject to reasonable debate. As set forth above, Gabrion failed to identify any indisputably false statement, and he failed to establish just cause for further inquiry into the two minor issues he highlighted. The testimony is not material to guilt—there was abundant other evidence of Gabrion's motive (see *supra* pp. 9-12), and, more broadly, of his guilt (see *supra* pp. 8-17). He literally had the key to the locks on the chains that bound Rachel's body. (R.588: Tr. IV, 1032-42.) This was not a close case as to guilt.

The testimony was also not material to the substantial planning or obstruction aggravating factors. Gabrion's claim that "[n]o other evidence

---

[11] Gabrion also contends that Roach's testimony was "misleading by omission" because she "did not explain to the jury that her office could have demanded an examination" (COA Appl. at 40), but that is not true. Roach acknowledged that the prosecution had as much right to a preliminary examination as the defense. (R.589: Tr. V, 1175.)

supported the alleged manipulation of the state court system" (COA Appl. 43) is incorrect. It is undisputed that Gabrion changed lawyers three times; that he demanded then waived his right to a preliminary examination twice; that as a result of these delays, the case stood in the same position in June 1997 (nearly a year after the August 1996 rape) as it was four months earlier, in February 1997; that in the interim, Rachel repeatedly said she was terrified because Gabrion had threatened to kill her for reporting the rape; that Rachel disappeared before the rape trial proceeded further, and her body was found, chained with blocks like those found at Gabrion's house and weighted with locks to which he held the keys, around the time letters "exonerating" him of the rape started to appear. The government did not "concoct" a "story" that Gabrion manipulated the court proceedings to facilitate getting access to Rachel: the evidence supported this inference. It was reasonable and appropriate argument supported by much evidence besides the isolated bits of Roach's testimony that Gabrion has extracted.

Gabrion's reliance on *Cornell v. United States*, 472 F. App'x 352 (6th Cir. 2012) (per curiam) (COA Appl. at 51), is misplaced. In *Cornell*, the Court articulated the established standard for obtaining discovery in a

habeas matter: "Good cause is established where specific allegations ... show reason to believe that [the movant] may, if the facts are fully developed, be able to demonstrate entitlement to relief." *Id.* at 354 (6th Cir. 2013) (quoting *Bracy v. Gramley*, 520 U.S. 899, 908-99 (1997), in turn, quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)). The Court held that the district court had abused its discretion by not permitting discovery where the defendant had identified a "notorious history of misconduct" by a DEA agent who had testified at his trial. 472 F. App'x at 354 (citing *United States v. Henderson*, No. 1:07–CR–68, 2010 WL 3075079, at *2 (N.D. Ohio 2010)). As detailed in *Henderson*, the agent had been the subject of numerous adverse credibility findings, including in an Eleventh Circuit opinion, two district court opinions, and a U.S. Attorney's Office review of police department practices. 2010 WL 3075079, at *2. This warranted further discovery, notwithstanding the defendant's failure to "allege[] specific facts tending to show that [the agent] engaged in wrongdoing in [that] case," because this "notorious history of misconduct" might have been a basis for impeachment that could have affected the outcome of the case. *Id.* Not so, here. As this Court found on direct appeal, and as

the district court reiterated, Roach's testimony was peripheral to the jury's guilty verdict and sentencing decision.

In fact, *Cornell* supports denial of a certificate here. The district court in *Cornell* granted a certificate of appealability as to the denial of discovery and denial of his claims pertaining to *that* agent (Lucas). His motion had also alleged prosecutorial misconduct and ineffective assistance of counsel claims pertaining to the allegedly false testimony of a second agent (Clayton). The district court limited its certificate of appealability to the Lucas-related claims and this Court declined to expand it. *Cornell*, 472 F. App'x at 353-54. The Court found that the claims related to Clayton fell short of meeting the *Slack* standard because the defendant had merely raised "inconsistencies between Clayton's trial testimony and his earlier statement or the informant's testimony," which were "insufficient to demonstrate that the government knowingly used false testimony." Sixth Cir. No. 09-4362, Doc. 24-1, 1/12/11 Order, at 2 (citing *Rosencrantz v. Lafler*, 568 F.3d 577, 586-87 (6th Cir. 2009), and *United States v. Scarborough*, 43 F.3d 1021, 1026 (6th Cir. 1994)). Because "reasonable jurists could not disagree with the district court's conclusion that Cornell's claim that the government knowingly presented false testimony

with respect to Agent Clayton is without merit" the Court declined to expand the certificate. *Id.* at 2. Gabrion's claims related to Roach's testimony are more akin to the Clayton claims than to the Lucas claims.

As this Court recently explained, although a § 2255 movant "does not carry the burden to demonstrate what specific evidence might be obtained through discovery . . ., he must demonstrate that there is reason to believe that, if the facts were fully developed through discovery, he would be entitled to relief." *Poulsen v. United States*, 717 F. App'x 509, 518 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 1450 (2018). Discovery is properly denied where the movant "cannot show, even if the facts were fully developed through discovery," that his claim has merit. *Id.* Likewise, an evidentiary hearing is needed only if "there is a *material* factual disagreement that could be resolved at an evidentiary hearing." *Id.* (quoting *Pola v. United States*, 778 F.3d 525, 534 (6th Cir. 2015), but adding emphasis). As set forth more fully below (at pp. 125-37), these standards apply in capital cases as in any other. Gabrion has not met them.

### b. Leon, Coleman, and Brewster

The district court also found that the supposedly "false testimony" of three witnesses, Greg Leon, Linda Coleman, and Nathan Brewster, was neither false nor material, and its finding is not debatable.

**Greg Leon** testified in the penalty phase that he rented a room to Gabrion from April to October 1995 at Leon Christian Home, a homeless shelter his family operated, and Gabrion exhibited some concerning behavior, such as bragging about owning surveillance equipment, tapping a phone line, and stalking a girl. (R.593: S. Tr. I, 123.) Gabrion claimed this testimony was false because he found a corporate record indicating that the shelter automatically dissolved October 1, 1994. As the government pointed out, however, that record showed nothing other than that, as of October 1, 1994, the shelter lost its legal status as a corporation as a result of its failure to file annual reports for three years. (CivR.119: Gov't Resp., PageID.5134.) It did not indicate that the home "was not operational and Leon did not own the property associated with it." (COA Appl. at 49.) In fact, public real estate records show the opposite: Leon continued to own the property until October 1995. (*Id.*, citing Ex. C, quitclaim deeds, PageID.2186-88.)

More importantly, as the district court found, "Leon's entire testimony was immaterial." (Op., PageID.5846.) "Many other witnesses testified about Gabrion's absurd statements, his inappropriate behavior toward women, and his ability to engage in sophisticated conduct." (*Id.* at PageID.5846-47.) This is plainly correct and Gabrion's application has no answer to it. There is no reasonable likelihood that the result of the penalty phase would have been different without Leon's testimony. So it also does not matter whether there was an "undisclosed deal" for his testimony—though Gabrion has failed to demonstrate that there is reason to suspect one. Leon's receipt of a 223-day "time served" sentence for aggravating stalking *three years before* he testified at Gabrion's trial (COA Appl. at 49-50) does not suffice. Gabrion never explains why Leon would have an incentive to commit perjury when no charges were pending at the time he testified. The issue is a red herring and Gabrion has not demonstrated good cause for discovery or a material factual dispute that requires a hearing.

**Linda Coleman** testified by deposition during the guilt phase that in June 1997, she saw Gabrion and two others, one who resembled Rachel, at Oxford Lake in a truck with a boat in the back. (R.670: Dep. at 5,

8-9.) Gabrion alleges that Coleman provided "false" testimony because she supposedly could not have been in the car she said she was in at the time. For many reasons, Gabrion has not demonstrated that Coleman's testimony about the car was false (see CivR.119, Gov't Resp., PageID.5132-33), but as the district court aptly noted, "[a]ny falsehood in this aspect of Coleman's testimony is utterly immaterial." (Op., PageID.5845.) Coleman was impeached on the fact that she had given different accounts as to which car she had been in (Dep. at 33-34), and acknowledged she "[did not] remember" a lot of the episode (*id.* at 35), which had occurred five years earlier. And her daughter, Kathy Kirk, corroborated the relevant aspects of her testimony—that she saw Gabrion there in a black pickup truck, with Rachel (and another man), near Oxford Lake, in June 1997, with a boat. (R.591: Tr. VII, 1575-79.) There is no reasonable likelihood that the jury would have found Gabrion not guilty if it learned that Coleman was in a different vehicle.

**Nathan Brewster**, who shared a cell with Gabrion at one point, testified about various matters, including that Gabrion threatened guards and was not provoked to do so. Gabrion submitted an affidavit from Brewster retracting the assertion that Gabrion was unprovoked,

and stating that he had been promised the assistance of a private investigator if he testified against Gabrion. The district court assumed that the statements in Brewster's affidavit were true—and that the government knew it—but deemed them not to be material. After all, as the district court observed, numerous witnesses testified about Gabrion's hostility toward guards at the various jails where he had been confined (not just at Calhoun County, where he and Brewster were housed). Gabrion carved a fake gun from soap and hid a razor blade at Newaygo County Jail; he started a fire in his cell and threw feces and urine (knowing he was afflicted with Hepatitis C) at corrections officers at Milan Federal Penitentiary. (Op., PageID.5848-49, citing S. Tr. II, 311-12, 374-82.) And numerous witnesses testified about his "proclivity for violence and blatant disregard for human life" in other settings, often unprovoked. (*Id.* at PageID.5848, citing testimony.)

Against this evidence, whether Gabrion was provoked by certain of the guards at one jail is plainly immaterial. So, too, is information about the additional crimes that Brewster committed—the jury knew that Brewster had been convicted of felony murder, first-degree criminal sexual assault, and arson, arising from his conduct in having sex with a

child, killing the child, and setting fire to a house to cover it up. (S. Tr. II, 349.) As the district court noted, Brewster wasn't asked to list all of his convictions, so he did not testify "falsely" by omitting other, less serious convictions. (Op., PageID.5849.) But it wouldn't have mattered, given what he did list, and given the relative insignificance of his testimony. The same is true of the alleged "promise" by the government to help him hire a private investigator. As the district court found (*id.*), even if such a promise was made (which it was not), it does not render any of Brewster's testimony false.

In short, the district court correctly found that Gabrion had failed to identify any improper statements by the government, or any material, false testimony by any witness. (Op., PageID.5849.) Given the "overwhelming evidence supporting guilt and the aggravating factors" (*id.*), no reasonable jurist could find otherwise.

*Allegedly false or misleading statements by the government*

### c. The FBI forensic report

Gabrion argues that the government made false or misleading statements when it told the jury in opening and closing arguments that Gabrion "made" or "forced" Rachel to write the letters retracting the rape

allegations. These were the letters sent to the prosecutor and judge in the rape case, and to Rachel's dad, describing a preposterous version of events that matched Gabrion's own earlier account, which arrived in Gabrion's signature envelopes around the time Rachel's body was floating to the surface of Oxford Lake. A report generated early in the investigation by FBI communications examiners said Rachel was "probably" not under "extreme" duress when she wrote the letters, and that, based on review of other Gabrion writings, which they perceived as lacking a coherent structure, Gabrion "probably" did not "dictate" the letters to her. (CivR.1: Mot. Ex. 1.8, PageID.1332.)

To be clear, the government disclosed the FBI report to the defense before trial. As the court noted, and Gabrion does not dispute, this is a claim of prosecutorial misconduct, not of false testimony, so Gabrion would have to show that the government's comments were improper and flagrant. (Op., PageID.5841, citing *United States v. Galloway*, 316 F.3d 624, 632 (6th Cir. 2003), and *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994)).[12] No reasonable juror would debate that the district

---

[12] The district court noted that even non-flagrant, improper remarks may warrant reversal if the proof of the defendant's guilt is not overwhelming, the defense objected, and the trial judge did not cure the impropriety.

court was correct that the government did nothing improper when it argued that Gabrion, rather than Rachel, was responsible for the contents of the letters. The prosecutor was not bound by a qualified opinion that Gabrion "probably" did not "dictate" the letters, and that Rachel "probably" was not under "extreme" duress when she wrote them. Gabrion does not address the district court's reasoning that the communications examiners had limited information, and that the basis of their equivocal opinion—that Gabrion's letters typically lacked a coherent structure— was contradicted by the testimony of Gabrion's own trial expert, Dr. Scharre, that he saw "plenty of good coherent writing and purposeful writing" by Gabrion. (Op., PageID.5842, citing Scharre S. Tr. 61.)

Moreover, given the abundant other evidence that Gabrion did force her to write the letters (whether causing her "extreme" duress at the moment of writing or not)—the fact that they were packaged up in his signature envelopes, the timing, the contents of the retraction, which mirrored Gabrion's own prior statements but were highly improbable, the references to a "Christian" man (even though Rachel was not known to

---

(Op., PageID.5841, citing *Carroll*, 26 F.3d at 1385). Here, however, there was no defense objection, and, as the Court already has found, evidence of Gabrion's guilt was overwhelming.

refer to people's religious affiliations, but Gabrion was), and the reference to a mysterious man named "Delbert" whom no one in Rachel's family had ever heard of—prosecutors had ample basis for their arguments to the jury. *See* CivR.119 Gov't Resp. PageID.5125-27.

As with every other claim, Gabrion says he was wrongfully denied discovery and a hearing on this issue—but he never explains what he might discover, or what the district court might decide as a factual matter—that would make a difference. He *has*, and *had*, the report. It does nothing to advance his cause in the face of the overwhelming evidence that A) he did force Rachel to write the letters, and B) he did kill her. Nothing about the methodology underlying the equivocal opinion in the report would change that—indeed, the examiners themselves did not view their opinion as exonerating: they gleaned from the correspondence that Gabrion had probably justified Rachel's death to himself but he had been unable to justify taking Rachel's daughter's life. (Report, Agent Kives, summarizing examiners' findings.) Reasonable jurists would not disagree that the district court acted within its discretion in not permitting discovery or conducting a hearing on this issue.

**d. Statements about when Rachel disappeared**

Gabrion argues that the government "falsely" stated in closing argument that Rachel was not seen alive after she left her dad's house on June 3, except when Linda Coleman and her daughter saw her (or someone who looked like her) with Gabrion near Oxford Lake around the time he murdered her.

The district court was correct that this claim lacks legal merit because it made no difference at all in the outcome of the trial whether Rachel was last seen on June 3 or June 6. (Op., PageID.5843.) Nothing about the government's case or argument to the jury hinged on any notion that Rachel was killed or not seen again on June 3, 4, or 5; in fact, it was the government's theory that Gabrion probably killed her on or about June 6 (e.g., R.592: Tr. VIII, 1691-92, Gov't closing), the date witnesses saw him grinding serial numbers off a boat and loading chain and blocks into a boat, later that evening, appearing with scratches on his face and a hunk of hair torn off his head and wearing gloves, leaving a boat with campers, around the time he was seen by Coleman and her daughter with someone looking like Rachel. The June 5 date played a bit role in the narrative—that was the date the preliminary examination was supposed

to be held in the rape case—but, as the district court noted (Op., PageID.5843), by the time Rachel left her dad's house on June 3, it had already been canceled. The government's argument was that "by May and June of 1997 he'd run out of options. He was going to have his trial *in or after June of 1997*." This was the argument, and it did not depend on the exact date on which Rachel was last seen.[13]

### e. "Restriction" of Dr. Cunningham's testimony

Gabrion argued that the government "misled" the jury about the conditions of confinement that would apply to Gabrion if the jury did not

---

[13] Gabrion did not show that any false statement was made by the government—the last "positive" date that the police could confirm she was seen was June 3, when she left her dad's house. *See* CivR.119: Gov't Resp., PageID.5128 (citing Det. Miller grand jury testimony, PageID.1385.) Although some witnesses "may" have seen her a day or two later, no one gave clear, unequivocal, reliable testimony to that effect. See Op., PageID.5843 (summarizing testimony). Many other pieces of evidence corroborated the government's general timeline. For example, the first letter in one of Gabrion's signature NASA logo envelopes, purportedly from Rachel, to her dad, advising that she had suddenly decided to take a vacation (even though she had told him before she left June 3 that she would see him later that night), was postmarked June 4, 1997. The forensic pathologist testified that by the time Rachel's body was found on July 7, she had been dead for "some three to four weeks" based on her body's decomposition. (R.459: 2/26/02 Tr. at 15-16.) In short, all of the evidence was consistent with the government's argument: that Rachel was last seen by her family on June 3, when she left her dad's house, and she was murdered shortly thereafter.

impose the death penalty by "prevent[ing]" Gabrion's expert, Dr. Mark Cunningham, from testifying about the full range of BOP's security procedures. (COA Appl. at 56.) He also faulted the government for probing Cunningham's potential bias by pointing out that he was a paid expert. (*Id.*) As the district court observed (Op., PageID.5845), however, the court, not the government, determined what evidence was permitted. And the government, like any party, has the right to cross-examine a witness and explore potential biases that may bear on the witness's testimony.

Gabrion has attempted to frame his claim this way because the foundation of his claim—that Cunningham's testimony was unduly restricted—has already been litigated and rejected. He cannot raise it again. *DuPont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996) ("A § 2255 motion may not be used to relitigate an issue that was raised on appeal absent highly exceptional circumstances") (internal citations and quotation marks omitted).

Cunningham testified at the trial that there are a range of classifications in which an inmate can be held in the BOP, but "a federal capital inmate will not drop below a U.S. penitentiary level" because that is

"what the regulations call for." (R.574: 3/13/02 S. Tr. 8.) Gabrion's attorney asked Cunningham what "[t]he regulations say" about "a capitally charged defendant who gets a life sentence," but the government objected to the witness testifying about the contents of a law or regulation. (*Id.*) The court directed counsel to rephrase the question because it called for a legal response (*id.*), and thereafter, Cunningham testified about the security levels and security measures in the BOP for dangerous inmates, without expressly referring to the content of the regulations. The court also sustained the government's objection to Gabrion's request to have the text of the various regulations made part of the jury instructions.

This Court found no error in the court's ruling, stating that, despite the government's objection, "Cunningham was allowed to testify as to the different security levels for inmates, as well as the monitoring of inmate communications, confinement, and visitation for those inmates considered dangerous." *Gabrion II*, 648 F.3d at 353. The district court noted this in its opinion (PageID.5844-45), and that this Court found that "Gabrion's defense was not impaired by the refusal to give the instruction" (*id.*). Gabrion does not address this, but merely reiterates that

future dangerousness is an important factor and realleges that the government "prevent[ed]" evidence of available security measures. (COA Appl. at 58.)[14] Merely rehashing the same arguments presented to the district court does not establish entitlement to a certificate of appealability. Reasonable jurists would not find debatable the district court's rejection of this claim—the foundation of which this Court has already rejected.

### 2. *Brady* claim (§ 2255 Ground Six)

Gabrion also packaged his claims involving government witnesses Greg Leon and Nathan Brewster as *Brady* claims, and added that the government violated *Brady* by failing to disclose information relating to

---

[14] Gabrion cites *United States v. Johnson*, No. 02 C 6998, 2010 U.S. Dist. LEXIS 133727 (N.D. Ill. Dec. 13, 2010), but the district court distinguished that case (in the context of addressing Gabrion's ineffective assistance of counsel claim premised on counsel's handling of the BOP security measures issue). As the court explained, "Gabrion's case is not like *Johnson*. Cunningham's testimony did not leave the jury with the mistaken impression that Gabrion would be incarcerated in the general prison population immediately upon his arrival in federal prison, or that the BOP has no authority to confine Gabrion to more restrictive conditions based solely on his offenses outside of prison." (PageID.5937.)

the competency of another witness, Lloyd Westcomb, and general information that FBI hair analysts routinely overstated their results. The district court correctly found these claims are devoid of legal merit.

*Brady v. Maryland*, 373 U.S. 83 (1963), requires the government to disclose evidence that is favorable to the defendant and material to either guilt or punishment. *Id.* at 87. To establish a *Brady* violation, Gabrion was required to: (1) identify evidence that was "favorable" to him, either because it was "exculpatory," or because it was "impeaching"; (2) demonstrate that the government willfully or inadvertently suppressed the evidence; and (3) show that the evidence was "material," meaning "prejudice must have ensued" from its suppression. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). A defendant is prejudiced only "if there is a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* "Speculative and conclusory" *Brady* claims do not trigger the need for an evidentiary hearing in habeas proceedings. *See, e.g., Thomas v. United States*, 849 F.3d 669, 681 (6th

Cir.) ("Beyond mere speculation, Thomas provides no evidence that the Government withheld evidence that it was obligated to disclose. Bald assertions and conclusory allegations do not provide sufficient ground to warrant requiring the government to respond to discovery or to require an evidentiary hearing."), *reh'g denied,* (Apr. 27, 2017), *cert. denied,* 138 S. Ct. 261 (2017).

No reasonable jurist would debate the district court's conclusion that Gabrion failed to identify any favorable, material evidence withheld by the government.

**Greg Leon.** Gabrion argued that the government failed to disclose impeachment evidence, such as his complete criminal history and the deal that Roach "may have reached with him" years before he testified against Gabrion. The district court correctly found that Gabrion's idle speculation about an undisclosed deal was implausible on its face and his allegation about Leon being subject to a pending case at the time he testified was unfounded. (Op., PageID.5966-67.) A *Brady* claim may not be sustained on the basis of an "inference" that an undisclosed deal must have been made. *See, e.g., Thomas*, 849 F.3d at 680. Moreover, as set forth above, and as the district court found, Leon's testimony was not

material to Gabrion's conviction or sentence. Accordingly, no COA is warranted on this issue.

**Nathan Brewster.** Gabrion argued that the government failed to disclose the alleged "promise" to help Brewster hire a private investigator. The district court found that, even assuming this is true (which it is not), the impeachment would not have had an impact on the proceedings: first, its impeachment value was marginal, at best, since Brewster admitted that he was testifying in the hope that it would benefit his sentence (Op., PageID.5967, citing S. Tr. II, 361); and second, there was ample other evidence of Gabrion's guilt, motive, involvement in baby Shannon's death or disappearance, and his dangerous conduct in prison (*id.* at PageID.5967-68). No reasonable jurist could conclude otherwise.

**Lloyd Westcomb.** This Court already considered and rejected Gabrion's agument that the government violated *Brady* by not disclosing witness Lloyd Westcomb's competency evaluation. *Gabrion II*, 648 F.3d at 351-52. This issue cannot be relitigated. *E.g., DuPont*, 76 F.3d at 110. The district court recognized this (PageID.5969), and Gabrion identifies no basis on which a reasonable jurist could debate it.

**Forensic hair analysis.** Citing 2015 news articles, Gabrion also argues that a COA should issue on his claim that the government violated *Brady* by failing to disclose that FBI hair analysts generally overstate test results. (COA Appl. at 62.) The district court correctly characterized this claim as "conclusory" since Gabrion failed to establish that any member of the prosecution team was aware of these allegedly flawed practices at the time, or that the FBI analyst in Gabrion's case falsified or exaggerated any findings in Gabrion's case. (Op., PageID.5968.)

Moreover, no reasonable jurist would debate the correctness of the district court's finding that the hair analysis evidence in this case was not material to the finding of guilt. Other evidence separately demonstrated that Gabrion killed Rachel at the lake by drowning her in it: two eyewitnesses saw him with Rachel on the shore of Oxford Lake after her disappearance and before her body was discovered; her body was found with duct tape over her eyes and mouth and with her hands chained behind her back, secured by padlocks, and Gabrion's statements to others that he killed Rachel in this manner. (Op., PageID.5968.)

The district court correctly characterized the hair evidence as a side issue: Government Exhibit 25 was a piece of duct tape found on the road

near Oxford Lake. An FBI hair examiner testified that attached to it were hairs that bore the same microscopic characteristics as Rachel's hair. (R.591: Tr. VII, 1539-40.) And the court recognized that the duct tape played a minor role in the case.[15] During closing argument, the government said Exhibit 25 was consistent with the conclusion that Rachel was murdered at that location because it could have been a piece of duct tape Gabrion had discarded because it folded up on itself before he could use it. The pivotal proof of the location of the murder was the eyewitness testimony, the manner in which the body was bound, and Gabrion's admissions. (*Id.* at 1749-50.)[16]

The district court properly concluded that even if everything Gabrion alleges were true, the hair evidence was so minor that he is not

---

[15] Gabrion's attorneys were able to establish that none of the duct tape associated with the murder matched any duct tape linked to Gabrion. (R.591: Tr. VII, 1570.)

[16] Gabrion tried to use hair analysis evidence to his advantage. For example, the investigation determined that a hair was found inside the jeans Rachel was wearing at the time of her death. The defense called an FBI lab examiner to establish that DNA relating to the hair revealed that it did not match Rachel or Gabrion, a point it emphasized in closing. (R.592: Tr. VIII, 1669-70, 1738-39.) The defense also cross-examined the government's hair expert and got him to admit that he found no hair or fiber evidence linking Rachel to Gabrion's campsite, residence, or vehicle. (R.591: Tr. VII, 1541-43.) Challenging the validity of hair analysis evidence would have been at cross-purposes with this defense strategy.

entitled to discovery or a hearing because it was not material. Gabrion does not rebut this analysis but merely claims that it is premature to draw such conclusions. (COA Appl. at 63). But that approach is inconsistent with *Valentine*, 488 F.3d at 333, and *MacLloyd v. United States*, 684 F. App'x 555, 559 (6th Cir. 2017). The alleged government misconduct has to relate to a *material* matter before the defendant is entitled to discovery or a hearing. No reasonable jurists could look at this record and debate it the district court's conclusion that the hair analysis testimony was not material.

*Procedural default*

Gabrion does not dispute that he failed to raise the issues in Ground One at trial or on appeal. Before the district court, he argued that his default should be excused because his appellate counsel was ineffective. The district court correctly observed that this did not give rise to cause, since Gabrion had failed to demonstrate that any of these claims were "clearly stronger" than the two dozen or so issues his appellate counsel did raise (two of which were initially successful in persuading the panel to reverse the death sentence). (Op., PageID.5834.) In his COA application, Gabrion pivots to a new argument: that his claims rely on

evidence outside the record, which purportedly relieves him from comply-ing with the procedural default rule. (COA Appl. at 59.) This is incorrect for at least two reasons. First, some of the claims in this ground for relief rely exclusively on documents or information that Gabrion had at the time of trial and could have made part of the record. For example, it is undisputed that Gabrion's counsel had the FBI forensic report.

Second, the "exception" for claims founded on information outside the record is not as broad as Gabrion contends. Gabrion is correct that in 1942—before the Supreme Court's modern habeas jurisprudence and AEDPA—the Court held in a *per curiam* opinion that a defendant could raise a claim that his guilty plea was coerced because the facts underly-ing the claim and their effect on the record were "*dehors* the record. . . ." *Waley v. Johnston*, 316 U.S. 101 (1942). As Gabrion acknowledges (COA Appl. at 59), however, by 1998, the Court appeared to view *Waley* as lim-ited to its facts: "an exception for a claim that a plea of guilty had been coerced by threats made by a Government agent when the facts were 'de-hors the record and their effect on the judgment was not open to consideration and review on appeal.'" *Bousley v. United States*, 523 U.S. 614, 621-22 (1998). Those are not the facts here, just as they weren't in

*Bousley*. Some courts view the *Waley* "exception" as "simply a species of 'cause' where the factual or legal basis for a claim was not reasonably available to counsel." *United States v. Plaza-Uzeta*, 2010 WL 6826540, at *4, n.3 (D. Ariz. Nov. 18, 2010), *report and recommendation adopted*, 2011 WL 2600486 (D. Ariz. June 30, 2011) (quoting *Murray*, 477 U.S. at 488). Other courts have expressed uncertainty as to the scope of *Waley*'s continuing vitality. *See, e.g., United States v. Chalan*, 438 F. App'x 710, 712 (10th Cir. 2011) (referencing *Bousley*'s articulation of the *Waley* exception, and stating, "[o]ur circuit has not explicitly considered the interaction between *Murray* and *Bousley*."). Applying the *Waley* "exception" here, where the defense either had or could have obtained the records at the time of trial, would swallow the procedural default rule.

In any event, here, as in *Chalan*, the certificate of appealability may alternatively be denied on the straightforward basis that Gabrion has failed to establish that reasonable jurists would debate the correctness of the district court's ruling denying the claim on the merits.

### 3. Ineffective assistance of counsel at sentencing claim (§ 2255 Ground Four)

As the district court explained, Gabrion's counsel conducted an extensive mitigation investigation in this case, and he has not identified

any substantially different mitigating evidence that could have changed the outcome of the proceedings. (Op., PageID.5898-5918.) The district court extensively analyzed each of Gabrion's voluminous claims, concluding that the years-long mitigation investigation conducted by a mitigation specialist who spent at least 1,000 hours on it, overseen by experienced capital attorney David Stebbins, who had written an article about the importance of conducting a thorough mitigation investigation cited in the ABA Guidelines then in effect,[17] was not deficient, and that Gabrion had not demonstrated prejudice. This is plainly correct. Gabrion repeatedly suggests that his counsel must have been ineffective because 15 years later, with the benefit of time and hindsight, post-conviction counsel discovered more evidence of his background similar to what was presented at trial. But that is not the standard, as the district court recognized: the question is not whether more could have been discovered, but whether the investigation that counsel did was reasonable. (*E.g.*, *id.* at PageID.5917, citing *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009).)

---

[17] *See* Stebbins and Kenny, *Zen and the Art of Mitigation Presentation, or, the Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, The Champion (Aug 1986), reprinted in California Death Penalty Defense Manual, Vol. 11, p. 87H-37 et seq. (1987 Supp.) cited in 1989 ABA Guidelines, Guideline 11.8.6 n.4. (CivR.119-2, PageID.5295.)

This case is like *United States v. Fields*, 761 F.3d 443 (5th Cir. 2014), where the defendant's post-conviction counsel found more, but similar, mitigating evidence than what was presented at trial. The district court found that insufficient to establish ineffective assistance of counsel—without holding a hearing or granting discovery—and the Fifth Circuit denied a certificate of appealability, stating that the lengthier, "multi-generational" social history may have offered "more detail about each category of mitigation evidence" but "reasonable jurists would not disagree with the district court's determination that the new evidence . . . [was] not materially different from that presented at trial." *Id.* at 458.

Here, as in *Fields*, post-conviction counsel have come up with *more* information about Gabrion and his family, but nothing that is materially different from what Gabrion's counsel did present, and nothing that would change a juror's vote. Gabrion cites the fact that some of his extended family members have varying degrees of mental health issues, that he had an impoverished and dysfunctional childhood, and that people have mentioned that he's had head injuries over the years. All this and more was presented at his trial: 13 witnesses testified for the defense during the penalty phase, including experts. As this Court observed,

"Gabrion presented numerous mitigation witnesses, including four mental health experts. . . . [T]he mitigation evidence was designed to demonstrate Gabrion's poor upbringing, lack of appreciation for the wrongfulness of his conduct, and the existence of mental health issues due to injuries sustained in car accidents. . . ." *Gabrion II*, 648 F.3d at 341-42.

This extensive presentation had an effect: for example, 12 jurors found both that Gabrion did not have disciplinary problems in school or criminal conduct before age 23, and that he grew up "in an impoverished and violent environment, and was the victim of abandonment, neglect, and emotional, psychological and physical abuse as a child." (R.526: Penalty Phase Verdict Form, at 6.) And all 12 jurors found that Gabrion "has features of several personality disorders, including histrionic personality disorder, narcissistic personality disorder, and borderline personality disorder." (*Id.* at 7.) Nine jurors found as a mitigating factor that Gabrion's "abuse of drugs, alcohol and chemical inhalants contributed to his criminal conduct." (*Id.*) Post-conviction counsel's social history, while lengthy, adds nothing material to the mix, as the district court found. (Op., PageID.5916.)

In seeking a COA on this issue, Gabrion presses three main points.

**First**, he says the district court misunderstood the required showing for an evidentiary hearing on an ineffective assistance claim because, among other cases, the court cited *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991), for the proposition that speculation will not sustain an ineffective assistance claim. (COA Appl. at 66.) The district court did not misunderstand anything. Although *Ashimi* was a direct appeal case, the Seventh Circuit's point that idle speculation about, for example, what a putative witness would say under oath, will not sustain an ineffective assistance claim, applies with equal force where the claim is presented in a collateral motion: "[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness *or an affidavit*." 932 F.2d at 650 (emphasis added). That is, where the basis of the claim is that someone will testify about something bearing on the defendant's case, courts require that the petitioner present an affidavit from that person or other indication that the person will testify in accordance with the defendant's speculation.

Indeed, it is the law in this Circuit (and every other circuit) that a convicted defendant seeking habeas relief must make a threshold showing beyond mere speculation or conclusory, unsupported allegations to warrant an evidentiary hearing. *See, e.g., Thomas v. United States*, 849 F.3d 669, 681 (6th Cir. 2017) ("Bald assertions and conclusory allegations do not provide sufficient ground ... to require an evidentiary hearing.") (citing *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001)). To be sure, the burden borne by a § 2255 petitioner to obtain an evidentiary hearing is not especially onerous. *See Smith v. United States,* 348 F.3d 545, 551 (6th Cir.2003). But there must be some basis to believe that, if held, the petitioner could establish entitlement to relief.

Moreover, the court referenced *Ashimi* and the other cases in the specific context of discussing Gabrion's unsupported assertions that the eight experts who examined Gabrion at the time of trial and said he was not mentally ill would have changed their minds if presented with the information in post-conviction counsel's social history. Gabrion did not present a single affidavit from a mental health professional stating that Gabrion is or was mentally ill. With eight opinions on one side, and zero

on the other, there was nothing for the court to hold a hearing on, and no good cause to warrant discovery.

On this point, also, *Fields* is instructive. There, the defendant "speculate[d] that brain damage may have occurred due to his upbringing and attempted suicides." 761 F.3d at 461. But the defense expert at trial did not find any suggestion of congenital or acquired brain damage, and defense counsel relied on the expert. In that circumstance, the Fifth Circuit found, "jurists of reason would not debate the district court's conclusion that counsels' performance was not unreasonable." *Id.* Likewise, Gabrion's speculation that he might have brain damage or suffer from unspecified mental illness(es), contradicting the opinions of eight experts who examined him at the time of his trial—is insufficient to establish either deficient performance by his counsel or prejudice, or cause to explore the issue further via discovery or a hearing.

Gabrion's reliance on *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003) (COA Appl. at 67-68) is unavailing. First, *Mason* was a divided opinion; as the dissent observed, the Supreme Court, in reversing a decision of this Court, had "made abundantly clear the extremely high standard that must be met for counsel's representation in the penalty

phase to be considered constitutionally inadequate." 320 F.3d at 643 (Boggs, J., dissenting in part, discussing *Bell v. Cone*, 535 U.S. 685 (2002), in which the Court rejected an ineffective assistance claim even though defense counsel did not present a single witness to present mitigating evidence). It reiterated this in *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam), when it held that this Court had erred in applying the 2003 ABA Guidelines as "inexorable commands" to determine whether counsel performed deficiently when they were not yet in effect and were intended, at best, to be mere guides as to the prevailing norms.

Further, in *Mason*, there appeared to be a factual dispute as to whether defense counsel could have presented more mitigating evidence *that might have made a difference in the outcome*—"defense counsel apparently never interviewed anyone, including Mason himself, about possible mitigating aspects of Mason's background, even though various family members were ready and willing to discuss his life history." 320 F.3d at 622. That is not remotely comparable to this case—where a mitigation specialist spent at least 1,000 hours doing just that—and defense counsel presented a detailed mitigation case with lay and expert testimony. Indeed, the mitigation specialist that post-conviction counsel

retained in *Mason* to demonstrate what a thorough investigation would have uncovered, James Crates, *id.* at 622 n.12, is the mitigation specialist who conducted the mitigation investigation in Gabrion's case. Most importantly, the district court's key holding is that, regardless of whether Gabrion could find an as-yet-unidentified expert to offer an as-yet-unidentified mental illness diagnosis, there is no reasonable probability that a juror would have come to a different conclusion about his sentence, given the overwhelming aggravating evidence. (Op., PageID.5904.)

**Second**, Gabrion says the district court unreasonably rejected his argument that it was ineffective for Gabrion's trial attorneys to concede the obstruction of justice factor. But the court's conclusion here is not subject to reasonable debate. The jury found Gabrion guilty, and the motive for the murder was that Gabrion did not want Rachel to testify against him. The guilty verdict was unsurprising because the evidence—both of guilt and motive—was overwhelming. It is actually hard to see how a strategic decision by Gabrion's trial attorneys *not* to concede that factor, and invite the government to pile on during the sentencing phase,

would have been effective. As the district court observed, it was "abundantly clear that Gabrion killed Rachel to avoid prosecution for the rape charge." (Op., PageID.5925.)

**Third**, Gabrion says his attorneys performed deficiently—and he was prejudiced thereby—because they put on only a "beggarly" mitigation case. (COA Appl. at 65, 72, citing *Hooks v. Workman*, 689 F.3d 1148, 1206 (10th Cir. 2012).) But this case is nothing like *Hooks*. There, the defense called only three witnesses in the penalty phase—the defendant's mother, his sister, and an unprepared expert. He asked only four questions of the sister, and barely more of the mother. *Id.* at 1202-03. The expert, ostensibly called to opine that the defendant lacked the mental capacity to carry off a cold-blooded, premeditated murder, was manifestly unprepared, as he admitted on cross-examination that he had not read the police reports, listened to the defendant's tape-recorded confession, or seen any photos from the case. *Id.* at 1203. Indeed, the expert did more damage than good, describing the defendant as "violent" and "crazy." *Id.* Defense counsel apparently failed to explore "readily available evidence" that would have revealed that the defendant suffered from enduring

83

mental-health problems arising from birth trauma and other head injuries that cause organic brain damage, as diagnosed by a mental health expert. *Id.* at 1205. Thus, that mitigation case was "beggarly."

This mitigation case was not. As noted above, Gabrion's trial counsel presented evidence in all the categories he now lists. His COA application focuses mostly on family dysfunction, highlighting things like "[h]is clothes were ill-fitting and ragged" and his mother was neglectful. (COA Appl. at 80.) But Gabrion's trial attorneys put on witnesses who established that his childhood was difficult—and it worked, as all twelve jurors found that he grew up "in an impoverished and violent environment, and was the victim of abandonment, neglect, and emotional, psychological and physical abuse as a child." (R.526: Penalty Phase Verdict Form, at 6.)

Thus, this case is not anything like *Wiggins v. Smith*, 539 U.S. 510, 537 (2003), or *Rompilla v. Beard*, 545 U.S. 374 (2005) (COA Appl. at 76), cases that the district court correctly distinguished, along with several others. (Op., PageID.5910-11.) In *Wiggins*, the district court explained, defense counsel relied exclusively on a presentence report and social service records and did not conduct any investigation, and therefore failed

to discover or present any evidence of the defendant's dysfunctional social and family history, including repeated physical and sexual abuse he suffered. (*Id.*, citing *Wiggins*, 539 U.S. at 523.) And in *Rompilla*, the district court explained, defense counsel failed to examine a readily available file of the defendant's prior conviction for rape (even though he knew it would be used as an aggravating factor), and therefore failed to discover records pointing to the defendant's mental illness, his low cognitive functioning, and alcohol abuse, which might have countered a benign impression of his upbringing and mental capacity. (*Id.* at PageID.5911, citing *Rompilla*, 545 U.S. at 389-91.) As the district court concluded, those cases are inapposite because here, Gabrion's counsel did conduct an extensive mitigation investigation and "presented evidence of virtually all the mitigating factors mentioned in *Rompilla*, including alcohol abuse, parental abandonment, psychological deficits, and the possibility of brain damage." (*Id.* at PageID.5911.)

Once again, this case is like *Van Hook*.[18] There, the Supreme Court held that this Court erred in holding that counsel rendered deficient performance by conducting a mitigation investigation but "failing to find more." 558 U.S. at 11. The claim there was similar to Gabrion's: "What his counsel did discover, the argument goes, gave them 'reason to suspect that much worse details existed,' and that suspicion should have prompted them to interview other family members—his stepsister, two uncles, and two aunts—as well as a psychiatrist who once treated his mother, all of whom 'could have helped his counsel narrate the true story of Van Hook's childhood experiences.'" *Id.* (quoting court of appeals opinion, 560 F.3d at 528). "But[,]" the Court cautioned, "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." *Id.* "[G]iven all the evidence that they unearthed from those closest to Van Hook's upbringing and the experts who reviewed his history, it was not unreasonable for his counsel not to identify and interview every other living family member. . . ." *Id. See also Caudill v.*

---

[18] Although *Van Hook* is a § 2254 case, the Court held that, "[e]ven without the [AEDPA]'s added layer of deference to state-court judgments," the petitioner was not entitled to collateral relief. 558 U.S. at 7.

*Conover*, 881 F.3d 454, 462 (6th Cir. 2018) ("[Caudill's] lawyer had no constitutional obligation to identify and interview distant relatives, former childhood neighbors, past boyfriends, and acquaintances who would provide similar information. It was reasonable for her lawyer to assume that those closest to Caudill—her immediate family—would have the most detailed information about her life, and would provide the most compelling testimony as a result.") After all, the *Van Hook* Court observed, "[t]his is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face." *Id.* (contrasting *Wiggins* and *Rompilla*). The district court correctly found that Gabrion has not demonstrated any deficiency in counsel's performance—and no amount of discovery or testimony at a hearing would establish otherwise.

Finally—but most importantly—here, as in *Van Hook*, "even if . . . counsel performed deficiently by failing to dig deeper, [Gabrion] suffered no prejudice as a result." 558 U.S. at 12. As the district court observed, "[t]o establish prejudice, in this context, [Gabrion] must 'point to evidence that differ[s] in a substantial way—in strength and subject matter—from

87

the evidence actually presented at sentencing.'" (Op., PageID.5918, quoting *Caudill*, 881 F.3d at 464) (internal citation omitted). *See also Fields*, 761 F.3d at 458 (reasonable jurists would not disagree with district court's finding that additional evidence of defendant's "poverty, neglect, abuse, trauma, and history of incarceration, as well as social history records and interviews of additional family members" and his "[m]ental illness and family history of mental illness" would not have changed the outcome of the proceedings, given "severe" aggravating factors and that the newly identified evidence was not "materially different" from what was presented).

In sum, Gabrion is correct that "[t]his is not a close question" (COA Appl. at 76), but it runs in the other direction: Gabrion's trial attorneys were effective in the penalty phase, and no reasonable jurist could find the question debatable.

### 4. Gabrion's competency at trial claim (§ 2255 Ground Five)

Gabrion also argues that reasonable jurists would debate whether the district court was correct when it found he was competent at trial. (COA Appl. at 94).

As discussed above, Gabrion was examined three times for competency; on each occasion, he was deemed competent. (R.268: Fallis Report; R.476: Frank Report; R.314: DeMier Report.) The magistrate judge and the district court issued orders so finding on two occasions. (R.89: 7/7/00 Op. Finding Def. Competent; R.90: Order; R.353: 12/14/2001 Order Finding Def. Competent to Stand Trial.) And each examiner also determined that Gabrion was feigning or "malingering" mental illness. (R.268: Fallis Report, 17; R.476: Frank Report, 8; R.314: DeMier Report, 19.)

Although it was initially contemplated that the examining mental health professionals would be "present and available to testify" at a hearing following the third examination, which was conducted at defense counsel's request (R.304: 8/9/01 Hr'g re Def. Counsel's Mot. for Competency Eval., 14-15), the parties ultimately stipulated that if called to testify, the examining psychologist, Dr. DeMier, would testify consistently with his report. (R.384: 12/14/01 Hr'g re Def.'s Mots., 2.) The defense explained that they had continuing concerns, but they were not challenging the competency finding because they had "no evidence to support a determination at this time that he may be incompetent." (*Id.* at 5-6.)

The consensus that Gabrion was competent and not mentally ill—despite having features of several mental disorders—was reinforced during the penalty phase. As noted in the background section above, six additional witnesses testified about Gabrion's mental health during the penalty phase: defense experts Douglas Scharre and Newton Jackson; Martin Waalkes, the psychologist who treated Gabrion at Hope Network after the 1992 auto "accident" that he likely faked; and government experts Griesemer, Ryan, and Saathoff.

Of these nine experts, this Court observed on direct appeal, only one testified "that Gabrion was not malingering, not consciously faking insanity in an effort to disrupt the proceedings." *Gabrion II*, 648 F.3d at 320 & n.3. That was Dr. Scharre, who never actually examined Gabrion, and whose opinions were significantly called into doubt by the rebuttal testimony. The en banc Court took this issue up again, and again rejected the claim that Gabrion was incompetent to stand trial. It also rejected the claim that Gabrion had become incompetent during the appellate stage of the case, labeling that claim simply "a rehash of his argument that he was incompetent to stand trial." *Gabrion III*, 719 F.3d at 534.

Undeterred, Gabrion pressed the same argument before the district court. He relied on the trial proceedings and did not present any new information such as a new psychological evaluation or expert opinion on previous evaluations. The district court noted the absence of new mental health information and examined in detail the evaluations performed before trial—three competency evaluations, involving examination by five separate mental health professionals. In addition, the district court reviewed the conclusions of the additional experts who examined Gabrion to address sentencing considerations. (Op., PageID.5861-70.) Not one concluded that Gabrion was incompetent, although many concluded that he was faking mental illness. The district court concluded, "like the evidence of Gabrion's guilt, the evidence of Gabrion's competence to stand trial is exceedingly strong." (*Id.* at PageID.5871.)

The district court additionally noted that the complex nature of the crime itself was strong evidence of his competency, as was Gabrion's sophisticated arguments against federal jurisdiction. As a result of all this, the district court reached the same conclusion as this Court: all available information indicates that Gabrion was unwilling, rather than unable, to assist his counsel. (Op., PageID.5993.) The court went on to consider

whether granting a stay to allow Gabrion mental health treatment would be beneficial, and concluded that nothing in Gabrion's treatment history suggested that any therapy would change his current behavior. (*Id.* at PageID.5994-95.) Significantly, as the district court observed

Reasonable jurists could not find the district court's conclusion debatable. Although the full Court has heard this issue on appeal, to date not a single judge has found any merit to the claim that Gabrion was incompetent or that his counsel acted unreasonably by not insisting that the court conduct a contested competency hearing at which there was no contrary evidence to present. Reasonable jurists could not debate the district court's wisdom when it reached the same conclusion when Gabrion rehashed the issue in his Section 2255 motion.

### 5. Gabrion's current competency claim

Nearly two years after they filed the § 2255 motion in Gabrion's case, Gabrion's counsel asked the district court to stay all proceedings and conduct a competency hearing. They claimed they could produce expert testimony that Gabrion was unable to assist them, but they declined to provide an affidavit or other proof to support that claim. (CivR.101: Mot. for Hr'g to Det. Mental Comp., PageID.4714; CivR.102: Br.,

PageID.4717.) The district court denied the motion because Gabrion's counsel had not identified (A) any change in Gabrion's behavior from that which he exhibited at trial, when he was found to be a malingerer (and not mentally ill); or (B) any claim that would substantially benefit from Gabrion's assistance. (Op., PageID.5991-96.)

Without citing a single case supporting a right to competency proceedings during § 2255 proceedings or a single expert's opinion suggesting that he is mentally ill, Gabrion seeks a certificate of appealability on this issue. (COA Appl. at 102-08.) Gabrion concedes that the district court correctly looked to *Ryan v. Gonzales*, 568 U.S. 57 (2013), for guidance in addressing his motion. (COA Appl. at 103-05.) Though *Ryan* involved a request for a stay and competency hearing in the context of a state prisoner's petition to vacate his sentence under 28 U.S.C. § 2254, it is nonetheless instructive. In *Ryan*, the Supreme Court rejected the notion that there exists a statutory right to competency during habeas proceedings: neither 18 U.S.C. § 3599(a)(2), which governs the appointment of counsel for indigent defendants seeking to set aside a death sentence under Section 2254 or 2255, nor 18 U.S.C. § 4241, which governs competency proceedings in criminal cases, establishes such a right. Nor

is there a "constitutional concern[,]" since a defendant's right to be competent to stand trial derives from the Due Process Clause, and "there is no due process right to collateral review at all." *Id.* at 66 (citation omitted). "[G]iven the backward-looking, record-based nature of most federal habeas proceedings, counsel can generally provide effective representation to a habeas petitioner regardless of the petitioner's competence." *Id.* at 68. Nonetheless, a district court has inherent discretionary authority to issue stays as a docket-management matter. *Id.* at 73-74.

The Court addressed the "outer limits' of that discretion, holding that: (1) a stay is unwarranted if the petitioner's claims are record-based or "resolvable as a matter of law," irrespective of the petitioner's competence, *id.* at 74; and (2) a stay may be warranted if the petitioner presents any claims that "could substantially benefit from the petitioner's assistance," but the court "should take into account the likelihood that the petitioner will regain competence in the foreseeable future." *Id.* at 76-77. A stay is "inappropriate" where "there is no reasonable hope of competence" because, given the risk that 'capital petitioners might deliberately engage in dilatory tactics to prolong their incarceration and avoid execution of the sentence of death[,]'" indefinite stays would frustrate defense

94

of a "presumptively valid judgment." *Id.* at 76-77 (quoting *Rhines v. Weber*, 544 U.S. 269, 277-78 (2005)).

The Court should not certify this issue for appeal. First, as set forth above, an issue may be certified for appeal "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court made plain in *Ryan* that there is no constitutional (or statutory) right to a stay or competency hearing in federal habeas proceedings; the district court's discretionary exercise of its inherent authority to manage its docket is not appealable.[19]

Second, the district court's decision was correct and not subject to reasonable debate, as Gabrion has not identified any basis to establish

---

[19] Other protections are in place to ensure that an incompetent person is not executed. The Supreme Court has held that the Eighth Amendment prohibits the government from carrying out a sentence of death on a prisoner who is insane. *Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986). This prohibition applies despite a prisoner's earlier competency to be held responsible for committing a crime and to be tried for it. *Panetti v. Quarterman*, 551 U.S. 930, 934 (2007). The FDPA also has a provision addressing competency at the time of execution. 18 U.S.C. § 3596(c) ("A sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person."). Though they should be raised before the eleventh-hour, *Ford* claims are not ripe until execution is imminent. *Bedford v. Bobby*, 645 F.3d 372, 376 (6th Cir. 2011).

that he may be presently incompetent or any claims that would "substantially benefit" from his assistance. As a general rule, a district court is not obligated to revisit competency, even when the defendant exhibits bizarre or "outlandish" conduct, unless it is presented with qualitatively different evidence. *Carter v. Bogan*, 900 F.3d 754 (6th Cir. 2018) (citing *Franklin v. Bradshaw*, 695 F.3d 439, 450 (6th Cir. 2012)).[20] As the district court explained (PageID.5992-95), Gabrion's post-conviction counsel did not identify any behavior different from that which he exhibited at the time of trial and determined to be the result of malingering mental illness, not actual mental illness. Indeed, counsel did not identify any specific form of mental illness that might be at issue, or any reason to think that it was treatable, as required for a stay.

And the court was also correct that, in any event, counsel did not establish that any of Gabrion's claims would "substantially benefit" from

---

[20] *Bogan* is a later iteration of one of the cases that was before the Supreme Court in *Ryan*. The Supreme Court held in *Ryan* that three of Bogan's claims had been adjudicated on the merits in state postconviction proceedings but it was uncertain whether a fourth claim had been exhausted. On remand, the district court denied Bogan's § 2255 motion and issued a COA as to three claims, including one concerning the petitioner's competency at trial. *Bogan* addresses those claims; this Court denied the petitioner's application to expand the COA and request to order a competency evaluation and a limited stay. 900 F.3d at 767.

his assistance. Although *Ryan* involved § 2254 proceedings, rather than § 2255 proceedings, its reasoning applies equally to claims presented in a § 2255 proceeding that are "resolvable as a matter of law"—since there is no constitutional or statutory right to competency in federal habeas proceedings, a stay of proceedings to facilitate a competency evaluation can only be justified if the petitioner's assistance is needed. Gabrion's post-conviction counsel make only a cursory assertion of necessity— "Gabrion's assistance is required in investigating his family and social history, his counsel's ineffective assistance at trial and on appeal, and the facts surrounding his capital conviction and alleged prior bad acts." (COA Appl. at 106.)

As the district court stated, however, post-conviction counsel managed to put together a 167-page "social history" without Gabrion's assistance, and his ineffective assistance claims lack legal merit. (Op., PageID.5995-96.) Post-conviction counsel represented to the district court (Judge Bell) that they had a file exceeding 100,000 pages: they had "secured and reviewed trial counsel's files and many of the expert files," had "interviewed trial counsel, direct appeal counsel, the mitigation investigator, the fact investigator, and a plethora of the witnesses called

and not called at trial" and consulted their own experts. (CivR.75, PageID.2642.) In these circumstances, Gabrion's post-conviction counsel failed to identify any claims that would substantially benefit from Gabrion's assistance.

### 6. Ineffective assistance of counsel at trial claim (§ 2255 Ground Three)

Gabrion lists 18 ways in which his trial attorneys allegedly were ineffective in the guilt phase, but only develops an argument as to two of them (COA Appl. at 109.) The Court should only consider those two, as it does not generally address undeveloped claims in a litigant's brief, *e.g., United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009), a rule that courts apply in capital cases, *e.g., Trevino v. Johnson*, 168 F.3d 173, 181 n.3 (5th Cir. 1999). In any case, the district court's conclusions as to the rest of the ineffective assistance at trial issues were manifestly correct, given the overwhelming evidence of Gabrion's guilt and his consequent inability to demonstrate prejudice.

No reasonable jurist would debate the correctness of the district court's conclusions as to the two issues Gabrion does brief, either. First, Gabrion alleges his attorneys were ineffective for waiving the right to an adversarial competency hearing. But, as discussed above (pp. 88-92), and

as the district court observed, "the evidence of Gabrion's competence to stand trial is exceedingly strong." (Op., PageID.5871.) The court also discussed this Court's opinion on direct appeal holding that the district court did not err by declining to conduct an adversarial competency hearing, given that the psychiatric and mental health records in the case established that "Gabrion knew what he was doing"—he was "malingering," or "faking incompetence in order to disrupt the trial." (PageID.5870-71, citing *Gabrion II*, 648 F.3d at 320.)

No speculation was required for the district court to conclude that the decision to forgo an adversarial hearing was a strategic decision. The reports were explicit and unequivocal. Dr. Fallis, for instance, noted how Gabrion turned on and off his bizarre behavior, depending on the person with whom he was interacting and whether the interaction was part of the evaluation; that Gabrion told her he knew what he was charged with, what the consequences were, and what role his counsel, the judge, and the prosecutor played in the trial; and that Gabrion had been tried in federal court in March 1998 for his theft of Robert Allen's benefits. Dr. Fallis proved prophetic, stating: "He may prove a disruptive defendant in the courtroom given his investment in the façade of appearing mentally

ill. He should be held accountable for any inappropriate behavior in the courtroom." (R.268: Fallis Report, at 13-14.) Dr. Frank said Gabrion appeared to be "blatantly attempting to manipulate the court to evade criminal prosecution . . . . He can cooperate with the court but is choosing not to do so." (R.476: Frank Report, at 8.) Dr. DeMier agreed: "He has no mental illnesses which would preclude his ability to understand the nature and potential consequences of the charges against him. Additionally, he has the ability to assist properly in his defense should he choose to do so." (R.314: DeMier Report, at 21.)

Against this, the defense, despite having the opportunity to hire experts and have Gabrion evaluated, had nothing to present. (R.384: 12/14/01 Hr'g re Def.'s Mots., 5-6.) Indeed, Gabrion's post-conviction counsel, having interviewed Gabrion's trial attorneys and reviewed all of their files, have not identified any opinion from anyone who actually examined Gabrion that he was incompetent. Cross-examination of witnesses is often important, but whether to do so, given all the circumstances, is a quintessentially strategic decision. *See, e.g., United States v. Shelton*, No. 18-5434, __ F. App'x __, 2019 WL 3937597, at *5 (6th Cir. Aug. 20, 2019) ("This Court has previously found trial counsel's decision

to entirely refrain from cross-examining a witness 'virtually unchallenge-able' because, in trial counsel's strategic view, it 'would simply focus additional attention' on unfavorable testimony.") (citing *Moss v. Hof-bauer*, 286 F.3d 851, 864 (6th Cir. 2002)) (citation omitted).

Trial counsel are presumed to have acted reasonably and made decisions for sound strategic reasons. *Strickland v. Washington*, 466 U.S. 668, 689 (1984); *Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996). And Gabrion's post-conviction counsel have not demonstrated how cross-examination would possibly have established that he was incompetent. His citation to a single article about how malingering and mental illness can co-exist (COA Appl. at 96-97) does not transform this into a reasonably debatable issue, given that nothing in (or outside of) the record indicates that Gabrion was or is suffering from any mental illness that renders him incompetent. Courts have denied COAs in similar circumstances in capital cases even where post-conviction counsel has presented more—such as an indication from one of the original experts that it was at least "possible" that if he had had additional information, he might have concluded that the defendant was incompetent. *See Butler v. Davis*, 745 F. App'x 528, 533 (5th Cir. 2018) (finding that "jurists of reason would

not debate that [expert's] later equivocation about [the defendant's] competency does not satisfy the prejudice standard"). Gabrion has not even provided an equivocal opinion from any expert that he was ever, or is currently, incompetent. No COA should issue as to this claim.

Gabrion also seeks a COA on the issue of whether his trial attorneys failed to conduct an adequate guilt-phase investigation, focusing on the fact that the defense did not call a forensic pathologist to contest the testimony of Dr. Cohle, who performed the autopsy on Rachel and offered an opinion about how she died. He claims this fell below acceptable standards of advocacy and therefore the standard set by *Strickland*. (COA Appl. at 116-17.)

A COA is unwarranted on this issue because no jurist of reason would find debatable the district court's rejection of this argument based on lack of prejudice. Gabrion faulted his trial team for not retaining a forensic pathologist and proffered the affidavit of Dr. Spitz, a pathologist who would have said it is not possible to say whether Timmerman was alive when she was placed in Oxford Lake. (COA Appl. at 121.) The district court found no prejudice under *Strickland* because, during cross-examination, defense counsel "caused Dr. Cohle to concede that he could

not 'rule out that [Rachel] was asphyxiated … at some other time and then dumped into the lake.'" (Op., PageID.5883.)

The district court's decision was correct and not reasonably debatable. The court accurately summarized how the defense was able to make the pathologist concede that Rachel's killer could have asphyxiated her before dumping the body in Oxford Lake. (R.459: 2/26/02 Tr. 35.) Further, the defense knew it would be able to obtain this concession, and made that a centerpiece of its opening statement: "There is nothing from Dr. Cohle's testimony that you can take that she drowned, and . . . that is what the evidence in the case will show." (R.588: Tr. IV, 937.) The defense emphasized this concession again during closing argument. (R.592: Tr. VIII, 1739-42.) Since the government's own expert conceded this point, Gabrion's attorney, a seasoned advocate, knew that he had won and wisely did not risk losing ground by revisiting it with a defense expert. He therefore did not perform deficiently and, in any case, not calling an expert to say the same thing did not prejudice Gabrion.

### 7. Claim alleging violation of right to conflict-free counsel (§ 2255 Ground Two)

Gabrion contends that he was denied his constitutional right to conflict-free counsel because Christopher Yates, then the Federal Public

103

Defender, represented a sentencing witness who testified against Gabrion, and also allegedly participated in Gabrion's defense. The district court correctly rejected this claim without a hearing or further discovery because Yates did not represent Gabrion and Gabrion has not demonstrated (and cannot demonstrate) any actual prejudice arising from his tangential involvement in managing the case.

In 1997, Yates, then a newly-appointed Assistant Federal Public Defender for the Western District of Michigan, was assigned to represent Joseph Lunsford. Lunsford was charged with making threats against the President. In October 1997, while Lunsford's case was pending, Gabrion was charged with social security fraud in connection with the disappearance of Robert Allen. He was also under investigation at that time for Rachel's disappearance. CJA-appointed counsel represented Gabrion in the fraud case.

In March 1998, before Gabrion was indicted in the murder case, Yates represented Lunsford at a proffer interview with federal investigators. Lunsford had been incarcerated with Gabrion at the Newaygo County Jail, and provided information about incriminating statements

Gabrion had made. He also said that Gabrion had a photo of baby Shannon in his cell, and that he had observed Gabrion masturbating while looking at the photo. Yates also represented Lunsford on appeal.

After Gabrion was convicted in the fraud case, he requested new counsel on appeal, and Yates was assigned to handle it. In September 1998, Yates was promoted to Federal Public Defender, and one of his responsibilities in that role was to provide assistance to CJA panel attorneys.

In March 1999, Yates represented Lunsford when Lunsford testified before the grand jury investigating Rachel's death. Gabrion was indicted for her murder in June. At his initial appearance, Gabrion was represented by Paul Mitchell, a CJA panel attorney who had been appointed that day to represent Gabrion. (R.599: Arr. Tr., PageID.3925.) But Gabrion told the court, "I really wanted to talk to my current attorney (Mr. Yates) about this case." (*Id.* at PageID.3927.) Yates was still representing Gabrion in the appeal of his social security case at that time. The court told Gabrion that Yates "informed the Court that he will not be able to represent you because of a conflict of interest." (*Id.* at

PageID.3928.) Mitchell and Stebbins represented Gabrion throughout the remainder of his murder case.

At various times, Gabrion complained to the court about his counsel and about how slowly the case was proceeding. In a February 2001 letter to Gabrion, Judge Bell responded that the delay was not counsel's fault. "I have known Mr. Paul Mitchell, your attorney, for several years and I have observed him in many trials. He is a very good lawyer and a fine person…. I have also spoken with the Federal Public Defender, Christopher Yates, and asked him to assist Mr. Mitchell. You will find Mr. Yates, in addition to being a fine lawyer, also an individual of unquestioned integrity." (R.16-6, PageID.1522.) In April 2001, Stebbins followed up with a letter to Yates requesting assistance on various motions, including a motion challenging the death penalty, the aggravating circumstances the government intended to rely on in seeking the death penalty, jurisdiction, and discovery issues. (CivR.16-5, PageID.1518-19.)

In his § 2255 motion, Gabrion alleged that Yates offered to write motions and perform research. He also offered advice on where Gabrion should be housed and on how counsel should approach Judge Bell on scheduling matters. (CivR.100: Am. § 2255 Mot., PageID.3927.) He also

claims that Mitchell consulted Yates about whether to appeal the court's decision on the jurisdictional issue, and that Stebbins involved Yates in the search for Gabrion's social security records. (*Id.*) He claims that Yates visited with him personally and "consulted with him about his case." (*Id.*)

In response to these allegations, Yates (now a state circuit court judge) filed an affidavit stating: "In my role as Federal Defender, Judge Bell asked me to review and provide input into the defense fee and expense requests …. Judge Bell also asked me, in my role as Federal Defender, to assist as a conduit between Mr. Gabrion and his attorneys in an effort to facilitate communication and assuage any concerns Mr. Gabrion had arising from his relationship with his attorneys." (CivR. 119-1: Yates Aff., ¶ 6, PageID.5293.) "Because I had developed a good relationship with Mr. Gabrion as part of my representation of him during his social security appeal, I continued to visit with him from time to time." (*Id.* at ¶ 7, PageID.5293.) "In my role as Federal Defender, I provided research assistance to Mr. Gabrion's lawyers, as I regularly did for Criminal Justice Act (CJA) panel attorneys. I did not direct any strategy or sign any pleading in the murder case. I simply conducted legal research regarding the theory of federal jurisdiction over Mr. Gabrion based upon

the location of his alleged crime." (*Id.* at ¶ 8, PageID.5294.) "Although I spoke to Paul Mitchell and David Stebbins generally about the case in my role as Federal Defender, I was not present at defense strategy meetings, and I never appeared on Mr. Gabrion's behalf in court." (*Id.* at ¶ 5, PageID.5293.) Attorney Yates stated that he "never represented Mr. Gabrion in connection with his murder case." (*Id.* at ¶ 4, PageID.5293.) "Everyone, including Judge Bell, Mr. Gabrion, and his attorneys, Mr. Stebbins and Mr. Mitchell, was aware that I had a potential conflict of interest due to my representation of Mr. Lunsford, and therefore I was not going to represent Mr. Gabrion in the murder case." (*Id.*) Yates was never a counsel of record for Gabrion in the murder case.

Following Gabrion's conviction in the murder case, Joseph Lunsford was one of the 58 witnesses the government called in the penalty phase. Lunsford testified that Gabrion said "they were never going to find" baby Shannon. (R.594: Sent. Tr. II at 316.) He also testified that one night he was walking by Gabrion's jail cell and he saw Gabrion "masturbating to the picture of the baby, Shannon." (*Id.* at 318.) Lunsford said he had not been promised any time off his sentence for his testimony. (*Id.* at 320.)

Attorney Mitchell cross-examined Lunsford about his prior crimes for indecent exposure and threatening the president, about whether he had received any promises or benefit for his testimony, and about a letter that Gabrion had written the governor saying that Lunsford had threatened to kill the governor. (*Id.* at 320-21, 322-23.) Lunsford's testimony covered only 11 of over 1,000 penalty phase transcript pages. He was not a "primary" penalty phase witness. (CivR.100: Am. § 2255 Mot., PageID.3927).

In 2016, more than 14 years after Lunsford's testimony in the penalty phase, Gabrion's post-conviction counsel filed a declaration from Lunsford partially recanting his testimony at the penalty phase. (CivR. 100-4, Lunsford Decl., ¶ 6, PageID.4700.) Lunsford claimed that his testimony about Gabrion masturbating to a photo of baby Shannon was not true, and that Yates had suggested it. (*Id.*) He further claimed that when he attempted to back out of testifying, Yates told him it was too late. (*Id.* at ¶ 7.) Yates states that these allegations are "completely false." (CivR.119-1: Yates Aff., ¶ 9, PageID.5294.)

The district court denied Gabrion's conflict of interest claim because "there is no evidence that Yates actually represented Gabrion" in the

murder case. (Op., PageID.5854.) The court noted that Yates had provided an affidavit asserting that he did not represent Gabrion or provide legal advice to him, and though Gabrion was "in a position to know whether that is true," he did not "offer any facts or evidence to rebut Yates' assertions." (*Id.*, PageID.5855.)

Moreover, the court found, because it is undisputed that Yates was not counsel of record and did not appear in court on Gabrion's behalf in the murder case, his involvement, even if as described by Gabrion, did not give rise to a conflict claim because the right to effective assistance of counsel "only applies to the 'lawyer who is representing the criminal defendant or otherwise appearing on the defendant's behalf in the case.'" (Op., PageID.5854, quoting *United States v. Martini*, 31 F.3d 781, 782 (9th Cir. 1994) (citing *Stoia v. United States*, 22 F.3d 766, 768 (7th Cir. 1994)).) "It does not apply to 'every lawyer a criminal defendant consults about his case.'" (*Id.*, quoting *Santosuosso v. United States*, No. 95-3146, 1996 WL 15631, at *3 (6th Cir. Jan. 16, 1996) (citing *Martini*, 31 F.3d at 782).) "Thus," the court held, "even if Gabrion or his attorneys received advice and assistance from Yates, Gabrion's claim is without merit because the attorneys appointed to represent him did not have a conflict of

110

interest. Mitchell and Stebbins were responsible for Gabrion's representation, not Yates." (*Id.,* PageID.5855.) This is correct and not reasonably debatable. *See, e.g., Stoia,* 22 F.3d at 769 (noting in dicta that the right to effective assistance of counsel "does not extend to those cases where a non-appearing attorney . . . gives a defendant legal advice even though he has not been retained by the defendant to help prepare his defense").

Significantly, the district court also found that Gabrion failed to show prejudice: "Even if Yates did represent Gabrion in some informal way, Gabrion's claim would fail because Gabrion has not shown that Yates' conflict adversely affected the performance of Gabrion's appointed counsel." (*Id.,* PageID.5855.) In an attempt to show prejudice, Gabrion claims that "conflict-free counsel would have uncovered Lunsford's proposed perjury and taken steps to prevent it" (Doc. 19: COA Appl. at 123), but that presumes that Lunsford committed perjury during the penalty phase, and is completely speculative and conclusory. "[A]ffidavits by witnesses recanting their trial testimony are to be looked upon with extreme suspicion." *United States v. Willis,* 257 F.3d 636, 645 (6th Cir. 2001). This Court has held that "'[e]ven if accepted, a post-trial recantation is generally not sufficient to grant habeas relief absent constitutional error."

111

*Welsh v. Lafler,* 444 F. App'x 844, 850 (6th Cir. 2011). Conclusory allegations are not sufficient to show prejudice. *Cross v. Stovall*, 238 F. App'x 32, 39-40 (6th Cir. 2007). Even if Gabrion's allegations about Lunsford are correct, Gabrion failed to show a reasonable probability that the outcome of the penalty phase would have been different.

The district court also found that "Gabrion has not established that he is entitled to further discovery or an evidentiary hearing regarding this claim. He has not given the Court reason to believe that, if the facts are more fully developed through discovery, he will be able to show that he is entitled to relief." (*Id.,* PageID.5858.) Gabrion's conflict of interest claim failed as a matter of law, and there was no need for an evidentiary hearing or discovery. No reasonable jurist would find the district court's disposition of the issue debatable.

### 8. Claim alleging ineffective assistance of counsel relating to juror's post-trial statements (§ 2255 Ground Ten)

After Gabrion's trial, the jury foreman was reported as having told a newspaper reporter, "I read your paper religiously. I knew [Gabrion] was off the wall before the trial." (R.548: Supp. to Def.'s Mot. for New Trial, Attachment.) Gabrion's trial counsel raised the issue in their motion for a new trial and demanded an evidentiary hearing; the district

court denied the request, finding that none of the statements attributed to the juror were inconsistent with his statements to the court. (R.572: 4/24/02 Op. 7.) This Court found no error in the ruling, noting that the juror had disclosed his exposure to media reports during voir dire, and "indicated that he was capable of setting aside what he had gleaned from media reports and would decide the case based entirely on information presented in the courtroom." *Gabrion II*, 648 F.3d at 350-51.

Gabrion argued in his § 2255 motion that his trial counsel was ineffective for not presenting the issue in more "simple" terms—that the juror's statement conflicted with his representation that he had not formed an opinion about the case. The district court rejected that argument because the statements do not conflict and thus even if the issue had been framed in the manner Gabrion advocates, it would have been to no avail. (PageID.5978.) This is not subject to reasonable debate.

### 9. Ineffective assistance of appellate counsel claim (§ 2255 Ground Seven.)

Gabrion's counsel raised over 20 issues on appeal, obtaining a remand for development of the record relating to jurisdiction (which led to a divided panel opinion), and vacatur of the death penalty by the panel. Their efforts were not merely effective, but extraordinary—even though

Gabrion physically attacked one of them, just as he attacked one of his trial attorneys. (Sixth Cir. No. 02-1386, 6/5/09 Pro Se Mot. & Br., Doc. 367, Incident Report, Attached at 2 (reporting incident in which Gabrion "jump[ed] on the table and tackled the attorney to the floor" while yelling, "I will fucking kill her" and causing guard to suffer a cut to his left hand from Gabrion's "homemade weapon identified as an ink pen").)

Gabrion seeks a certificate of appealability as to three issues, but the district court was correct to deny relief on these grounds. As the court observed, since "winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy[,]" *Smith v. Murray*, 477 U.S. 527, 536 (1986) (citation omitted), counsel's judgment is "presumed to be effective unless the ignored issues are clearly stronger than those presented[,]" *Sullivan v. United States*, 587 F. App'x 935, 944 (6th Cir. 2014). (Op., PageID.5970.)

First, Gabrion argues that appellate counsel should have raised on appeal the district court's denial of his motion to suppress cinder blocks that were in plain view at his house. (COA Appl. at 126.) The district court rejected this claim, noting that Gabrion had not even argued, let alone demonstrated, that (1) this issue was clearly stronger than the 20-

plus issues counsel raised on appeal; or (2) the district court's factual finding that the blocks were located in an open field (and thus, not entitled to Fourth Amendment protection), rather than in the home's curtilage, was clearly erroneous. (Op., PageID.5970-71.) In the COA application, Gabrion claims the motion was "well taken" and that Judge Bell's factual findings were "clearly erroneous" (COA Appl. at 126), but he does not say, as to either point, why. Nor does he point to anything in the record (or outside of it) that would establish those points. And, finally, he does not address the district court's assertion that Gabrion failed to address Judge Bell's alternative reasoning that the officers had a right to be on his property because they were executing an arrest warrant. (Op., PageID.5971, citing 12/14/01 Hr'g Tr. at 70-71.) Gabrion has not identified a debatable issue here.

Second, Gabrion argues that his appellate counsel was ineffective for failing to identify with greater specificity which penalty phase evidence was irrelevant. The district court correctly rejected this argument because Gabrion's post-conviction counsel also did not identify which evidence that, if challenged in a particularized fashion, would have caused the court of appeals to reverse and order a new sentencing proceeding.

(Op., PageID.5972.) Gabrion cannot do so *now*, in seeking a certificate of appealability. In any event, the few categories of evidence that Gabrion now highlights would not have been fruitful ones to challenge on appeal. Gabrion was afforded actual notice as to all of the government's anticipated penalty phase evidence, including evidence tending to show that he was responsible for the disappearances of Robert Allen, Wayne Davis, and John Weeks (COA Appl. at 126). (R.385: 1/11/02 Hr'g Tr., 83-85; R.652: 8/10/05 Mot.; R.653-1: Br.; R.653-2: 12/18/01 Letter.) The evidence was subject to the adversarial testing of a trial and is relevant to Gabrion's future dangerousness—inside or outside of a cell. The evidence regarding Gabrion's commission and attempted commission of arsons (COA Appl. at 127) was also relevant to his future dangerousness, given that a) Gabrion was an escape risk;[21] and b) Gabrion set fire to his jail cell at least once. (R.594: S. Tr. II, 310-13.) Likewise, Gabrion's assaultive and sexually inappropriate conduct bore on his future dangerousness,

---

[21] As noted earlier, while in a custodial setting, Gabrion was caught with weapons in his cell, including metal shards and razors; hid nail clippers, which can be used to unlock handcuffs; made a fake gun from bars of soap; attempted to bribe jail trustees to open cell doors; posed as the Clerk of the U.S. District Court and attempted to arrange a prison transfer; talked about escaping; tried to kick the metal sheeting in his cell to loosen it to make a weapon, and kept chicken bones to make weapons.

given his risk of escape and the threat he represented to prison guards and others likely to come into contact with him.

Third, Gabrion continues to say his appellate counsel was ineffective for failing to raise "appropriate challenges to the FDPA." (COA Appl. at 127.) As the district court noted, Gabrion did not specify what challenges were not made that should have been—his trial counsel *did* challenge aspects of the FDPA—for example, they argued that the FDPA is unconstitutional because it permits the presentation of information that is not admissible under the Federal Rules of Evidence. *Gabrion II*, 648 F.3d at 345. As the district court found, to the extent Gabrion is referring to the argument that the FDPA is unconstitutional as applied to him because the victim was white, as the district court observed, such a claim would have been devoid of legal merit because there was no basis to assert that the decision-makers in his case acted with discriminatory purpose. (Op., PageID.5973-76.)

Gabrion's citation to the 2003 ABA Guidelines for the proposition that "counsel must be significantly more vigilant about litigating all potential issues at all levels in a capital case than in any other case" (COA Appl. at 128) does not transform this issue into a reasonably debatable

one. Appellate counsel raised over 20 issues on appeal—this reflects vigilance. And the ABA Guidelines do not alter the *Strickland* standard, *Van Hook*, 558 U.S. at 8; Gabrion cannot establish either deficient performance or prejudice, as required by *Strickland*, without demonstrating that appellate counsel failed to raise issues that were "clearly stronger than those presented." *Sullivan,* 587 F. App'x at 944. The district court's finding that Gabrion has not identified any such issues is accurate and not subject to reasonable debate.

## 10. *Ring* claim (§ 2255 Ground Nine)

Gabrion's original § 2255 motion asserted the same argument premised on *Ring v. Arizona,* 536 U.S. 584 (2002), that he advanced on direct appeal: "the government failed to mention its pursuit of the death penalty or allege any of the aggravating factors which the government claimed justified Mr. Gabrion's death in the indictment." (R.15: § 2255 Mot., PageID.1017.) In his amended motion, he repeated this claim, and added that this Court "erred when it found (en banc) the weighing factor to the FDPA was not an element of the offense that must be proven beyond a reasonable doubt to the satisfaction of all jurors." (CivR.100: Am. § 2255 Mot., PageID.4041.) The district court was undeniably correct that

the first claim, that the indictment was ineffective for failing to allege the statutory aggravating factors that elevated the maximum punishment to death, was already litigated and resolved by this Court on appeal and therefore it cannot be relitigated. (Op., PageID.5976-77, citing *Gabrion II*, 648 F.3d at 329-30.)

As to the second, whether the "weighing" of the aggravating factors against the mitigating factors is an "element" of the offense that must be proved to the jury beyond a reasonable doubt, that claim also was litigated and rejected by this Court, in the en banc opinion. *Gabrion III*, 719 F.3d at 532-33. This is obviously what the district court meant when it rejected "another issue that cannot be relitigated" and cited these pages of the Court's *en banc* opinion. (Op., PageID.5977.) The district court slightly misstated the issue as "Gabrion also contends that the Court of Appeals erred when it decided that *the aggravating factors* were not elements . . . ." (*id.*) as opposed to "erred when it found the *weighing factor to the FDPA* was not an element . . . ." This is a minor and inconsequential misstatement, as it is obvious from the context of the opinion that the court was referencing this Court's rejection of the notion that the weighing process is an element. The district court did not misstate the law.

119

Nor does Gabrion's selective quotation of *Hurst v. Florida*, 136 S. Ct. 616 (2016) (COA Appl. at 129), render the issue debatable. In *Hurst*, the Court found that Florida's death penalty scheme ran afoul of *Ring* because a judge makes an "independent determination that aggravators existed"—the jury makes a sentence recommendation, but it "does not make specific factual findings with regard to the existence of mitigating or aggravating circumstances and its reasoning is not binding on the trial judge." *Id.* at 622. This is in contrast with the FDPA, which requires the jury to find the aggravating factors that elevate the maximum penalty to death beyond a reasonable doubt, as Gabrion acknowledges. (COA Appl. at 130, citing 18 U.S.C. § 3593(c).) Accordingly, *Hurst* does not render the district court's decision on this issue debatable.

## 11.   Eighth Amendment claim (§ 2255 Ground Eleven)

The district court's conclusion that Gabrion's Eighth Amendment claim is procedurally defaulted and without legal merit (Op., PageID.5850) is not reasonably debatable.

First, Gabrion has not "identified a consensus against the execution of criminally responsible individuals who may suffer from mental illness, 'as expressed . . . by the enactments of legislatures that have addressed

120

the question.'" (Op., PageID.5979, quoting *Roper v. Simmons*, 543 U.S. 551, 564 (2005).) This case is therefore unlike *Roper* or *Atkins v. Virginia*, 536 U.S. 304 (2002). The district court explained why the sources Gabrion cited—an ABA task force and the National Alliance of the Mentally Ill— were not representative of the broader public. Gabrion's citation to an Ohio bill that has only passed in the House, and a handful of articles and dissenting opinions in state cases (COA Appl. at 131-34) does not turn this into a debatable issue. The district court noted that courts have not extended *Atkins* and *Roper* to defendants with a mental illness, citing *State v. Kleypas*, 305 Kan. 224, 335-37, 382 P.3d 373 (2016). (Op., PageID.5982.) Gabrion has not cited a single majority opinion or enacted law that does.

Second, as the district court observed, even if Gabrion had established that there exists such a consensus, he has not established any reason to believe he has suffered from, or currently suffers from, the kind of severe mental illness that would disqualify a person from execution even under the ABA standard for which he advocates. Even that standard limits a mental illness exemption to individuals with a "severe" mental disorder or disability accompanied by specified impairments.

121

(Op., PageID.5980.) Gabrion has not identified any particular mental illness, let alone one that places him within the ambit of the exemption.

Finally, Gabrion does not dispute that this issue is procedurally defaulted, and he has not established cause and prejudice or actual innocence to excuse the default. His assertion—for the first time in his COA application—that he "likely" could establish cause and prejudice based on the allegedly ineffective performance of his attorneys, is too late and meritless because, for the reasons set forth elsewhere in this response, Gabrion's trial and appellate attorneys rendered effective assistance as to competency and as to all other issues. Gabrion's citation to the "miscarriage of justice" exception in *Sawyer v. Whitley*, 505 U.S. 333 (1992) (COA Appl. at 136), is also unavailing. In *Sawyer*, the Court emphasized that the exception is "narrow" and "must focus on those elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error." *Id.* at 347. Gabrion's argument does not bear on the aggravating factors that made his crime death-eligible.

## 12. Cumulative error claim

Gabrion claims the district court failed to consider the cumulative effect of the errors at his trial, but Gabrion never asked it to. Gabrion asked the district court to consider the cumulative errors *of his counsel*— during the guilt, penalty, and appeal phases of his case. (§ 2255 Grounds 3V, 4U, and 7.) And the district court did so. (Op., PageID.5897, PageID.5964, and PageID.5973.) Gabrion did not otherwise ask the court to consider cumulative error.

In any case, and assuming cumulative error is a basis for relief under Section 2255,[22] there were no errors that, in combination, would merit habeas relief. "[T]he possibility of cumulative error is often acknowledged but practically never found persuasive." *United States v.*

---

[22] Gabrion correctly observes that in this Circuit, the cumulative impact of errors cannot be a basis for relief in § 2254 cases. *See, e.g., Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006) ("[T]he law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue."); *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) ("[W]e have held that, post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief."). In *Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004), a § 2255 case, the Court "acknowledged that trial-level errors that would be considered harmless when viewed in isolation of each other might, when considered cumulatively, require reversal of a conviction." But *Campbell* relied on a direct appeal case, *United States v. Parker*, 997 F.2d 219, 221 (6th Cir. 1993).

*Delgado*, 672 F.3d 320, 344 (5th Cir. 2012). "Under cumulative-error analysis, 'a defendant must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair.'" *United States v. Warman*, 578 F.3d 320, 349 (6th Cir. 2009). "A cumulative-error analysis should evaluate only the effect of matter[s] determined to be in error, not the cumulative effect of non-errors." *United States v. Conteh*, 234 F. App'x 374, 389 (6th Cir. 2007).

This holds equally true in capital cases: where "the district court rejects the petitioner's claim because it determines that '[n]o error was committed during' either the guilt or penalty phase of the trial, there is no basis for finding cumulative error." *United States v. Fields*, 761 F.3d 443, 483 (5th Cir. 2014), *as revised* (Sept. 2, 2014) (quoting *Stephens*, 571 F.3d at 411). In *Fields*, the Fifth Circuit "conclude[d] that reasonable jurists would not debate the district court's holding, because Fields fails to establish that the district court committed any error; like the petitioner in *Stephens*, Fields's cumulative error argument 'essentially summarizes the other issues raised on appeal.'" *Id.* That is just what Gabrion does here. He suggests the district court found errors, citing instances where the court pointed out that challenged testimony (e.g., from Roach and

Leon, COA Appl. at 141) was immaterial. But materiality is an element of the claimed error—the determination that the testimony was not material is a finding of no error. There are no errors to cumulate. Even if the findings could be characterized as harmless errors, if aggregated, reasonable jurists could not find that they deprived Gabrion of a fundamentally fair trial. As in *Fields*, this Court should deny a COA on this issue.

### 13. Discovery

Gabrion also seeks a blanket COA permitting him to appeal the district court's decision denying his discovery requests. (COA Appl. at 22.) Gabrion does not assert or demonstrate that denial of discovery infringed any constitutional right; nor does he establish that jurists of reason would find the district court's decision debatable. He must make both showings to obtain a COA on this procedural issue. *Slack*, 529 U.S. at 484. To show that the district court's decision was debatable, Gabrion must show that reasonable jurists would debate whether the district court abused its discretion in denying his discovery requests. *See Buck*, 137 S. Ct. at 777 (where standard of review on merits appeal is abuse of discretion, "the COA question is … whether a reasonable jurist could conclude that the District Court abused its discretion"); *Sparks v. Davis*, 756

F. App'x 397, 402 (5th Cir. 2018) (applying abuse of discretion standard to request for COA as to discovery issue). *See also Cornell v. United States*, 472 F. App'x 352, 354 (6th Cir. 2012) (articulating abuse-of-discretion standard for denial of discovery under Rule 6(a), citing *Cornwell v. Bradshaw*, 559 F.3d 398, 410 (6th Cir. 2009)).

Gabrion cannot make that showing because the court acted within its discretion. Gabrion sought voluminous, wide-ranging discovery, without satisfying the standards for obtaining discovery in habeas proceedings. "There is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). "[T]he Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded…." *Wardius v. Oregon,* 412 U.S. 470, 474 (1973). Similarly, there is no constitutional right to discovery on collateral review. Indeed, there is no constitutional right to collateral review at all. *United States v. MacCollom*, 426 U.S. 317, 323 (1976) (Due Process clause "does not establish any right to an appeal … and certainly does not establish any right to collaterally attack a final judgment of conviction") (plurality opinion). Thus, "[h]abeas petitioners have no right to automatic

126

discovery." *Johnson v. Mitchell,* 585 F.3d 923, 934 (6th Cir. 2009) (quoting *Stanford v. Parker,* 266 F.3d 442, 460 (6th Cir. 2001)). *See also Bracy v. Gramley,* 520 U.S. 899, 904 (1997) ("a habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course"). This is no less true in capital cases. *See Stanford,* 266 F.3d at 460 (affirming denial of discovery in capital habeas case). *See also District Attorney's Office for Third Judicial Dist. v. Osborne,* 557 U.S. 52, 61-62, 72 (2009) (prisoner did not have a constitutional right to obtain post-conviction access to DNA evidence); *Jackson v. Clarke,* 351 F. App'x 172 (9th Cir. 2009) (prisoner failed to state a due process claim relating to denial of post-conviction discovery) (citing *Osborne*).

Discovery in § 2255 cases is governed by Rule 6 of the Rules Governing Section 2255 Proceedings. Rule 6(a) provides in relevant part that "[a] judge *may*, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." (Emphasis added.) To demonstrate "good cause," the petitioner must provide "'*specific allegations* … [that] show reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is confined illegally and

127

is therefore, *entitled to relief ....*'" *Lynott v. Story,* 929 F.2d 228, 232 (6th Cir. 1991) (quoting *Harris v. Nelson,* 394 U.S. 286, 300 (1969), emphasis in original). "The burden of demonstrating the materiality of the information requested is on the moving party." *Williams v. Bagley,* 380 F.3d 932, 974 (6th Cir. 2004) (quoting *Stanford,* 266 F.3d at 460). "Rule 6 does not 'sanction fishing expeditions based on a petitioner's conclusory allegations.'" *Id.* (quoting *Rector v. Johnson,* 120 F.3d 551, 562 (5th Cir. 1997)). *See also Fields*, 761 F.3d at 478 (same).[23]

Reasonable jurists would not find it debatable that the district court acted within its discretion in denying Gabrion's requests. After the government filed its response to Gabrion's original § 2255 motion, Gabrion filed several motions for discovery. The first included 24 requests for documents, directed to more than a dozen parties, including the U.S. Attorney's Office; FBI; BOP; the district court; U.S. Probation; the Federal Defender's Office; the Newaygo County Court, its probation department, and prosecutor's office; and every institution that had

---

[23] "Because Rule 6 of the Rules Governing § 2254 Cases is nearly identical to Rule 6 of the Rules Governing § 2255 Cases, and both use the same "good cause" standard, courts have looked to cases interpreting the former when applying the latter." *Fields*, 761 F.3d at 479 (citing *Lafuente v. United States*, 617 F.3d 944, 947 (7th Cir. 2010)).

housed Gabrion since 1997. (CivR.51: Discovery Mot., PageID.2528; CivR.51-1: Br., PageID.2530-39.) The second sought to take depositions of more than a dozen people. (CivR.58: Mot. for Oral Depositions, PageID.2563; CivR.59: Br., PageID.2565-77.) Gabrion also requested a stay of at least six months "to permit a reasonable period of discovery" and to permit an "amendment of right" to his § 2255 motion within 21 days of the close of discovery. (CivR.56: Mot. for Stay, PageID.2547.) The government objected, arguing that the requests were speculative attempts to develop new bases for challenging the judgment, and that all of Gabrion's § 2255 claims failed as a matter of law. (CivR.61: Gov't Resp., PageID.2579.)

The court held a hearing on Gabrion's discovery motions, which it began by observing, "it's been almost 14 years to the day that we were last here in this courtroom on this (case)." (CivR.75: Hr'g Tr., PageID.2639.) Gabrion's post-conviction counsel argued that they had to "reinvestigate" the entire case, "as if nothing had been done." (*Id.* at PageID.2641.) Counsel said their file exceeded 100,000 pages, and that they had "secured and reviewed trial counsel's files and many of the expert files." (*Id.*) She said they had "interviewed trial counsel, direct

appeal counsel, the mitigation investigator, the fact investigator, and a plethora of the witnesses called and not called at trial" and consulted their own experts. (*Id.* at PageID.2642.) The justification given for deposing these same people was that depositions "would streamline courtroom proceedings," though no hearing had been requested or granted yet. (*Id.* at PageID.2651-52.)

On September 20, 2016, the court denied Gabrion's discovery motions without prejudice, stating that it would first review Gabrion's claims and the government's responses thereto, and then take up the question of discovery: "If, after such review, the Court finds that the allegations made by Movant give reason to believe that additional factual development of a particular issue could entitle him to relief, then the Court will permit discovery on that issue." (CivR.74: Order, PageID.2633, PageID.2635.) The court also denied the request to stay the period for amending the § 2255 motion as a matter of right. (*Id.* at PageID.2636.)

After the matter was reassigned to Judge Jonker and the government filed its response to the amended § 2255 motion, Gabrion filed a "Motion for Scheduling Order" which, among other things, sought reconsideration of his request for discovery. (CivR.121: Mot. for Scheduling

130

Order, PageID.5319.) He again argued the need for a "comprehensive re-investigation of both the guilt and penalty phases," and asserted, "[i]t is highly likely discovery will reveal additional facts to support claims raised by movant." (CivR.121-1: Mem., PageID.5326, 5339.)

Judge Jonker denied the motion without prejudice, stating that the court could not "fairly make a call on discovery until it weighs the substantive issues already briefed." (CivR.125: Order, PageID.5353.) The court explained: "It may be that the Court will conclude no discovery is needed. It may be the Court will see a need for wide open discovery. Or the Court may see the need for limited, targeted discovery." (*Id.*) But the court thought it should proceed "in normal Section 2255 fashion, and not . . . open the door to discovery before assessing the legal merits of what is at issue." (*Id.*) Ultimately, in its opinion denying Gabrion's amended § 2255 motion, Judge Jonker determined that no discovery was needed. As to each request, the court found that Gabrion had not shown good cause to warrant further discovery. (*Id.* at 5983-91.)

This Court should deny a COA as to the district court's discovery ruling. As discussed above, no reasonable jurist could find debatable the district court's conclusion that each of Gabrion's claims is without merit,

and cannot succeed in establishing a constitutional violation, even with further factual development. Therefore, he has not shown good cause for any of his discovery requests. Gabrion approached discovery in this case as though it was a civil case governed by the broad federal civil discovery rules, Fed. R. Civ. P. 26, et al., rather than a § 2255 motion governed by the limited discovery permitted under Rule 6(a). His requests were over-broad, part of his effort to conduct a "complete re-investigation" of his case. "Such a broad-ranging preliminary inquiry is neither necessary nor appropriate in the context of a habeas corpus proceeding." *Harris v. Nelson,* 394 U.S. 286, 297 (1969). Rule 6(a) does not authorize such a general inquiry or "fishing expedition." *See United States v. Webster,* 392 F.3d 787, 802 (5th Cir. 2004) (denying COA as to denial of discovery in capital § 2255 case because petitioner was trying "to use the habeas corpus discovery mechanism to explore his case 'in search of its existence'"). This Court "will not find that a district court erred by denying a fishing expedition masquerading as discovery." *Stanford,* 266 F.3d at 460.

No reasonable jurist would debate the correctness of the district court's ruling that Gabrion failed to show "good cause" as to how his discovery requests were material or necessary to his claims. *See Fields,* 761

F.3d at 483 (denying COA on discovery issue in capital case because reasonable jurists would not dispute that "the record and … motion are adequate to dispose of each of (the defendant's) claims"); *United States v. Hall,* 455 F.3d 508, 523 (5th Cir. 2006) (denying COA on discovery issue in capital case because defendant "has not raised any contested fact issues" warranting discovery). Given Gabrion's overbroad discovery requests, the extensive information his § 2255 counsel had already obtained, the poor justification for deposing persons his counsel had already interviewed, the lack of good cause shown for his other requests, and the lack of need for discovery because his claims were denied as a matter of law, no reasonable jurist would debate whether the district court acted within its discretion in denying Gabrion's discovery requests. Accordingly, no COA should be granted on this issue. *See Webster*, 392 F.3d at 802 (denying COA as to discovery issue in federal death penalty case where petitioner "merely claims error in the denial of discovery and lists the … grounds for relief on which he seeks to engage in discovery").

### 14.   **Evidentiary hearing**

Gabrion also seeks blanket authorization to appeal the district court's decision denying his request for an evidentiary hearing as to each

of his amended § 2255 claims. (COA Appl. at 143.) While his motion for leave to file an amended § 2255 motion was pending, Gabrion filed a motion for leave to file an oversize motion for an evidentiary hearing. (CivR.89: Mot. for Leave, PageID.3805.) After the amended § 2255 motion was filed, Judge Jonker denied the motion, noting that the request for a hearing was premature, as "Rule 8 of the Rules Governing Section 2255 Proceedings provides that the Court must review the answer by the Respondent and the records of the proceedings to determine whether an evidentiary hearing is warranted." (CivR.99: Order, PageID.3885.) The court said that, in accordance with Rule 8, it would wait until the government filed its response to determine if a hearing was warranted. (*Id.*) In its subsequent opinion denying Gabrion's amended § 2255 motion, the court said Gabrion was not entitled to an evidentiary hearing because the record "conclusively demonstrate[d] that he is not entitled to relief." (Op., PageID.5795, 6000.)

This is a proper basis on which to deny a hearing—Section 2255(b) provides that a "prompt" hearing should be granted "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." *See also Arredondo v. United States,* 178 F.3d 778,

134

782 (6th Cir. 1999). Further, "no hearing is required if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Id.* And, significantly, a hearing is required only as to *material* issues of fact. *Poulsen v. United States,* 717 F. App'x 509, 518 (6th Cir. 2017) (emphasis in original).

The cases Gabrion cites (COA Appl. at 23-26) are not to the contrary. For example, in *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999), the Court acknowledged that a habeas petitioner's burden for establishing an entitlement to an evidentiary hearing is "relatively light" but agreed with the district court's determination that a hearing was unnecessary where the petitioner's affidavit merely proclaimed his innocence and "contain[ed] nothing to indicate that his counsel's performance was constitutionally infirm." This is equally true in a capital case: if the record and the motion are adequate to dispose of each of the petitioner's claims, an evidentiary hearing is unnecessary. *See, e.g., Fields*, 761 F.3d at 483 (denying COA as to denial of evidentiary hearing in federal death penalty case).

Denial of an evidentiary hearing is reviewed for abuse of discretion. *Pola v. United States,* 778 F.3d 525, 532 (6th Cir. 2015) (citing *Arredondo,* 178 F.3d at 782). Therefore, the standard for obtaining a COA for denial of an evidentiary hearing is whether "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," and whether reasonable jurists would debate whether the district court abused its discretion in denying an evidentiary hearing. *Buck,* 137 S. Ct. at 777. *See also Murphy v. Davis,* 732 F. App'x 249, 262 and n.6 (5th Cir. 2018) ("we conclude that reasonable jurists could not debate whether the district court abused its discretion by denying an evidentiary hearing").

As with his discovery issue, Gabrion fails to assert, let alone make a "substantial showing of," the denial of a constitutional right regarding an evidentiary hearing. He merely argues that the district court's denial of his request for a hearing was "contrary to the legal standards." (COA Appl. at 156.) Further, as explained above, reasonable jurists could not find debatable the district court's conclusion that Gabrion's claims lack legal merit and do not require the court to resolve any disputed, material issue of fact. Accordingly, reasonable jurists would not find debatable

that the district court acted within its discretion in declining to conduct an evidentiary hearing. Therefore, no COA should be granted on this issue.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court deny Gabrion's application for a certificate of appealability

Respectfully submitted,

ANDREW BYERLY BIRGE
United States Attorney

Dated: November 25, 2019

/s/ Jennifer L. McManus
JENNIFER L. McMANUS
TIMOTHY P. VERHEY
Assistant United States Attorneys
P.O. Box 208
Grand Rapids, MI 49501-0208
(616) 456-2404

On response:
John C. Bruha