# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT
## * * * * * * * * * *

| | |
|---|---|
| MARVIN CHARLES GABRION, II, | ) |
| | ) **DEATH PENALTY CASE** |
| Petitioner - Appellant, | ) |
| | ) Case No. 18-2382 |
| v. | ) |
| | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent - Appellee. | ) |

## PETITIONER'S REPLY TO RESPONSE OF THE UNITED STATES TO APPLICATION FOR A CERTIFICATE OF APPEALABILITY

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II. COA STANDARD ..................................................................................................2

III. ARGUMENT............................................................................................................5

    A.  Gabrion's claim as to Roach's false and misleading testimony
        is at least debatable...................................................................................5

    B.  Gabrion's *Brady* claims are at least debatable ....................................12

    C.  Gabrion's guilt-phase and penalty-phase ineffective assistance of
        counsel claims are at least debatable.....................................................15

        1.  Guilt Phase Ineffective Assistance of Counsel .........................16

        2.  Penalty Phase Ineffective Assistance of Counsel ......................19

    D.  Gabrion's conflicted counsel claim is at least debatable ....................22

    E.  Gabrion's incompetence claims are at least debatable.........................27

IV. CONCLUSION.......................................................................................................32

CERTIFICATE OF SERVICE ...............................................................................33

## I.   INTRODUCTION

Marvin Gabrion's § 2255 motion is the first capital § 2255 before this Court in the modern death penalty era. The government mischaracterizes Gabrion's argument as "suggest[ing] that a COA should issue merely because it is a capital case." Response 41. However, Gabrion seeks only the process this Court has previously mandated for petitioners in *non-capital* § 2255s. *See, e.g.*, *Martin v. United States*, 889 F.3d 827, 832 (6th Cir. 2018). Moreover, the government selectively (and misleadingly) quotes a Fifth Circuit case that says "the nature of a capital case is not of itself sufficient to warrant the issuance of a COA." Response 41 (quoting *United States v. Bernard*, 762 F.3d 467, 471 (5th Cir. 2014)). The government, however, omits the second part of that sentence: "in a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor." *Bernard*, 762 F.3d at 471 (quoting *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005) (alterations omitted)).

Any doubts should be resolved in Gabrion's favor because this is a capital case, and if this Court denies Gabrion's request for a COA, the path will be cleared for Gabrion to be executed without full review of claims as to trial-related errors that he could not have raised on direct appeal. This would be far less process than is provided to prisoners sentenced to death in state court, where collateral review is available in both state and federal court. And allowing this truncated review would

violate the requirements of § 2255. *See, e.g.*, *Martin*, 889 F.3d at 832. Because Gabrion raises substantial claims of constitutional error, because the district court failed to provide an evidentiary hearing and adequate process to resolve those claims, and because collateral and appellate review are particularly important in a capital case to ensure that constitutional error did not impact the jury's decision to sentence Gabrion to death, this Court should grant a COA and review the claims on which Gabrion has sought a COA.

In this Reply, Gabrion will explain why nothing in the government's Response shows that he does not meet the lenient COA standard, and specifically will address the government's arguments on the following claims: the false and misleading testimony of Chrystal Roach; the evidence suppressed in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); ineffective assistance of counsel at the guilt phase and at the penalty phase; the denial of conflict-free counsel; and Gabrion's incompetence currently and at the time of trial. As to all other claims, the government's Response requires no additional reply from Gabrion, and Gabrion relies on his COA Application with regard to those claims.

## II. COA STANDARD

The government argues that "where, as here, the district court has engaged in a thorough analysis of the petitioner's claims, it is 'not necessary for the court to reassess each claim prior to denying a COA.'" Response 40 (citation omitted). The

government's claim that the district court sufficiently considered whether to grant a COA is wrong; the district court's merits review cannot substitute for analysis of whether a COA should be granted. The COA analysis requires a wholly different, more lenient, standard.

The cases the government cites in defense of the district court's lack of separate COA analysis—*Brown*, *Hawkins*, and *Layne*—are all unpublished orders, not binding precedent. Response 40. The binding cases of this Court explain that in deciding whether to issue a COA, the district court must "undertake the individualized determination of each claim presented by petitioner" pursuant to the *Miller-El*/*Slack* COA standard. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001).

Emphasizing the importance of actually applying the COA standard, in *Murphy*, this Court criticized a district court for "fail[ing] to *provide* any analysis whatsoever as to whether Murphy had made a 'substantial showing of the denial of a constitutional right.'" *Id.* (emphasis added) (quoting 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483 (2000)). *Murphy*'s requirement that a court "provide" analysis makes clear that "undertak[ing] the individualized determination of each claim" means committing the analysis to writing. *Murphy*, 263 F.3d at 467. In this case, regardless of whatever COA analysis the district court may have performed behind the scenes, it did not commit its thinking to writing or provide any analysis to the parties or this Court.

3

The government's argument also directly contradicts the Supreme Court's holding that "[t]he COA inquiry . . . is not coextensive with a merits analysis." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017). Whether to grant a COA "should be decided without 'full consideration of the factual or legal bases adduced in support of the claims.'" *Id.* (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)). Similar to *Murphy*'s requirement that the court provide its analysis, the Supreme Court has emphasized that it is not enough for a court to state that it is applying the correct standard. *Buck*, 137 S. Ct. at 773. The court's opinion must actually show how it is applying the COA standard. In *Buck*, the Supreme Court criticized the court of appeals because the court "phrased its determination in proper terms—that jurists of reason would not debate that Buck should be denied relief—but it reached that conclusion only after essentially deciding the case on the merits." *Id.* (reversing *Buck v. Stephens*, 623 F. App'x 668 (5th Cir. 2015)).

The district court's error in this case was similar to the Fifth Circuit's error in *Buck*. The district court relied on the reasoning in its opinion denying Gabrion's § 2255 Motion to also deny a COA but provided no COA analysis. In conducting its COA analysis, this Court should not repeat the district court's error. Rather than deciding whether Gabrion will prevail on the merits, this Court must consider whether his claims are debatable, a much lower bar.

## III. ARGUMENT

### A. Gabrion's claim as to Roach's false and misleading testimony is at least debatable.

At Gabrion's federal capital trial, the prosecution used Newaygo County Prosecutor Chrystal Roach's misleading testimony to argue that Gabrion had a unique ability to manipulate the Newaygo County court system until he could eliminate Rachel Timmerman—which bolstered its case that Gabrion was a dangerous mastermind, among the worst of the worst, and deserving of the death penalty. But county court records submitted with Gabrion's § 2255 motion, including hundreds of docket sheets and a transcript of proceedings, show that Roach testified falsely. The Newaygo County case against Gabrion proceeded like any other, which means that it proceeded very differently than Roach described.

In its opinion, the district court found that Roach did not really testify falsely. The district court's conclusions are directly contradicted by the Newaygo County court records and are based on speculation that ignores the content of these records. No lesser authority than the actual judge of the state case—Newaygo County Judge Kevin Drake—reviewed the original court file and said that he could not say that Gabrion manipulated the proceedings. R. 141-1, Judge Drake Interview Report, PageID 5543.

The district court's factual findings are belied by the uncontradicted evidence Gabrion submitted with his § 2255 motion. Although the district court

denied relief without a hearing or discovery, the district court's opinion actually makes clear that, at minimum, there are many factual disputes surrounding Roach's testimony.

For example, at trial, Roach testified that she "tried" to have a preliminary examination "every time" "in cases involving assault" because she "fe[lt] strongly that in cases involving assault, that prelims should occur prior to trial." Trial Tr. 1175. Her account supported the government's theory that Gabrion had prevented the prosecution from conducting an examination, which would have preserved Rachel Timmerman's testimony so that it could be used later against Gabrion. The government argued that because Gabrion had succeeded in preventing Rachel Timmerman from testifying at a preliminary examination, he had strong motive to kill her once she was released from jail.

Roach's purported personal policy was crucial here: she was the elected prosecutor in an office of two attorneys, and if she indeed had a preliminary examination in every case but Gabrion's, that would have strongly implied that Gabrion was uniquely capable of thwarting the prosecutors' strategy.

However, Gabrion's § 2255 motion established that Newaygo County prosecutors had *never* filed a motion for a preliminary examination in the more than 750 felony assault complaints filed between January 1, 1996, and December 31, 2001, the years surrounding Gabrion's state court prosecution. R. 15-3, Docket

6

Sheets, PageID 1033-168; R. 15-4, Docket Sheets, PageID 1170-314.[1] The factual

discrepancy is obvious: Roach said *always* when the facts showed the correct term

was *never*. The records flatly contradict Roach's testimony. At minimum, this

dispute should have been resolved through discovery and an evidentiary hearing.

The district court rationalized that Roach "*did not specify* what she meant by

'tried.' . . . She *may have* tried and failed every time." R. 156, 10/04/18 Opinion

43, PageID 5837 (emphasis added). It is patently implausible that the state court

denied such a motion 750 times because Michigan statutes and court rules gave

Roach's office an absolute right to an examination in any felony case. *See* Mich.

Comp. Laws § 766.1; Mich. R. Crim. P. 6.110(A). But more importantly, *none* of

the 750 docket sheets show Roach's office moving for a preliminary examination.

R. 15-3, Docket Sheets, PageID 1033-168; R. 15-4, Docket Sheets, PageID 1170-

314.

In sum, the records Gabrion submitted directly contradict Roach's statement

that she "tried" to have a preliminary examination "every time." Trial Tr. 1175; R.

156, 10/04/18 Opinion 43, PageID 5837. Moreover, if there is any possibility that

Roach was not testifying falsely, the best way to find out what Roach meant when

she said she "tried" would be to put Roach on the record and question her about all

---

[1] Docket sheets are also an attachment to the Amended § 2255 Motion. *See generally* R. 100-1 through 100-3.

of the evidence that undermines her credibility. Gabrion cannot do so without discovery and a hearing.

As another example, at trial, Roach also testified that she moved to have the rape case against Gabrion remanded to the Newaygo County district court for a preliminary examination. Trial Tr. 1165. However, Gabrion's § 2255 motion established that Gabrion's attorney, not the prosecutor, requested the remand for the preliminary examination. R. 1-2, 04/29/97 Tr., PageID 147. The district court reasoned that "an *unidentified prosecutor (possibly Roach)* expressed the government's 'understanding' that Gabrion wished to remand the matter for a preliminary examination." R. 156, 10/04/18 Opinion 43, PageID 5837 (emphasis added). And the district court added that, "the evidence also indicates that *the prosecutor (who may have been Roach) initially brought the remand request to the attention of the court*. Thus, in that respect, the prosecutor asked for the remand. It *is also possible* that Roach asked for the remand by suggesting it to Gabrion's attorney before the hearing." *Id.* at 44, PageID 5838 (emphasis added).

The district court again relies on sheer speculation, rather than acknowledging the evidence or, at the least, authorizing the discovery and hearing necessary to resolve any factual disputes. The best way to find out whether the unidentified prosecutor was Roach, whether she suggested a remand to Gabrion's attorney, and whether this shows that she did not testify falsely, would be to put

Roach on the record. Again, Gabrion cannot do that without the court authorizing discovery and a hearing.

The government's Response largely reiterates the district court's opinion—repeating, for example, the assertion that Roach's practice in other cases has little bearing on Gabrion's case. Response 48 (citing R. 156, 10/04/18 Opinion 43, PageID 5837). The government adds that it is undisputed that Gabrion changed lawyers, that he demanded then waived a preliminary examination, and that the case stalled for four months. Response 50.

The government's assertions to this Court do not address Gabrion's actual claims—they do not disprove that Roach's testimony contradicts state court records; they do not establish the absence of factual disputes or unanswered questions about Roach's testimony; they do not address the undisputed fact that Roach's office could have conducted an examination in the case, but simply chose not to; and they do not explain why Roach testified about her practice in other cases if it was irrelevant to Gabrion's case.

Roach's testimony *was* relevant to Gabrion's case, because it created the false impression that Gabrion, unique among Newaygo County defendants, was able to successfully manipulate the court system. The notion that Gabrion had the unique ability to "maneuver[] around through the Newaygo County court justice system," Sentencing vol. 5 Tr. 608, supported the argument that Gabrion was

among the worst of the worst offenders who deserved the death penalty, *cf. Roper v. Simmons*, 543 U.S. 551, 568 (2005) ("Capital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'") (internal citation omitted). Roach's testimony specifically supported two aggravating factors that the government argued made Gabrion eligible for and deserving of the death penalty—substantial planning and premeditation, and obstruction of justice. As such, the district court's inference that "any falsehood in Roach's testimony is plainly immaterial because it actually benefitted Gabrion" rings hollow. R. 156, 10/04/18 Opinion 44, PageID 5838; *see also* Response 48-49 (repeating the district court's argument).

The supposition that Roach's testimony benefited Gabrion ignores the way the government presented and argued its case at trial. Specifically, in closing argument in the guilt phase, the government, relying on Roach's misleading testimony, argued that Gabrion alone prevented a preliminary examination. The government said, "and instead of having a preliminary examination, which is when Rachel Timmerman would have had her side of the story placed under oath, instead of doing that, the defendant waived that and it went over to circuit court." Trial Tr. 1681.

Likewise, in its closing argument at the penalty phase, the government, again relying on Roach's misleading testimony, argued, "He waited, he maneuvered around through the Newaygo County court justice system to keep her from testifying, biding his time until she was out so she wouldn't testify, he wouldn't be on the hook for this crime." Sentencing vol. 5 Tr. 608. The government continued, "It's an assault on our system of criminal justice, because he never faced justice on that criminal sexual assault charge. He successfully carried out that plan. That aggravating factor has been proven beyond any doubt." Sentencing vol. 5 Tr. 608-09. The allegation that Gabrion maneuvered through the Newaygo County court was based solely on Roach's false testimony. Thus, the government's closing arguments for a conviction and death sentence show that the testimony did not "benefit" Gabrion.

In short, the government is unable to offer any convincing argument that it is not at least debatable whether Gabrion is entitled to discovery or a hearing on this issue. The standards for discovery and a hearing are both relatively light: "Good cause" for discovery "is established 'where specific allegations . . . show reason to believe that [the movant] may, if the facts are fully developed, be able to demonstrate' entitlement to relief." *Cornell v. United States*, 472 F. App'x 352, 354 (6th Cir. 2012) (quoting *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997)) (alterations in original). "An evidentiary hearing 'is required unless the record

conclusively shows that the petitioner is entitled to no relief.'" *Martin*, 889 F.3d at 832 (quoting *Campbell v. United States*, 686 F.3d 353, 357 (6th Cir. 2012)). "[W]hen presented with factual allegations, 'a district court may only forego a hearing where "the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact."'" *Id.* (quoting *MacLloyd v. United States*, 684 F. App'x 555, 559 (6th Cir. 2017)).

Given the relatively light standards, reasonable jurists could find that there is good cause for discovery. Reasonable jurists could also find, taking everything Gabrion alleged as true, that the record does not conclusively show that Gabrion is not entitled to relief. Accordingly, whether the district court should have authorized discovery or held a hearing as to this claim is debatable, and Gabrion is entitled to a COA.

**B.**     **Gabrion's *Brady* claims are at least debatable.**

The district court erred by not granting an evidentiary hearing and discovery on Gabrion's *Brady* claims. The government's Response states that "[a] *Brady* claim may not be sustained on the basis of an 'inference.'" Response 68 (citing *Thomas v. United States*, 849 F.3d 669, 680 (6th Cir. 2017)). This echoes the district court's denial of Gabrion's claims based on its conclusion that his claims

were "unsupported" and "conclusory." R. 156, 10/04/18 Opinion 173-74, PageID 5967-68.

Regardless of whether a *Brady* claim can be *sustained* on the basis of an inference, "when presented with factual allegations," "[a]n *evidentiary hearing* 'is *required* unless the record conclusively shows that the petitioner is entitled to no relief.'" *Martin*, 889 F.3d at 832 (quoting *Campbell*, 686 F.3d at 357) (emphasis added). And, prior to a hearing, a record does not have to contain full support for the allegations. *See MacLloyd*, 684 F. App'x at 559. Whether allegations are conclusory and unsupported "would be a proper inquiry for the district court to make *after* an evidentiary hearing, having considered not only the pleading and the affidavits, but the whole of the testimony." *Id.* (emphasis added).

Similarly, when a § 2255 movant makes specific *Brady* allegations, he is entitled to discovery to allow him to establish that his claim should be sustained. *See Cornell*, 472 F. App'x at 354. Good cause for discovery "is established 'where specific allegations . . . show reason to believe that [the movant] may, if the facts are fully developed, be able to demonstrate' entitlement to relief." *Id.* (quoting *Bracy*, 520 U.S. at 908-09) (alterations in original).

Gabrion made specific allegations that the government withheld evidence— specifically, that the government withheld impeachment material about Gregory Leon, an agreement with Nathan Brewster, information regarding the competency

of Lloyd Westcomb, and information that FBI hair analysts routinely overstated their results. These allegations were not contradicted by the record, and the allegations offered reason to believe that Gabrion would be entitled to relief if the facts were fully developed. The government's argument that a *Brady* claim may not be sustained on the basis of an inference (like the district court's assertion that Gabrion's claims are unsupported and conclusory) is premature, because Gabrion has never had the opportunity to fully develop the facts or present testimony on his *Brady* claim.

The government generally responds to Gabrion's argument that he should have discovery and a hearing by contending that "this is not a civil case in the pretrial discovery phase; this is a post-conviction proceeding that follows a criminal jury trial and direct appeal." Response 3. However, this Court has recognized that "[t]he record from [a § 2255 movant's] underlying criminal case is unlikely to conclusively show whether he is entitled to relief because [his] allegations relate largely to 'purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light.'" *Martin*, 889 F.3d at 833 (quoting *Machibroda v. United States*, 368 U.S. 487, 494-95 (1962)) (citing *MacLloyd*, 684 F. App'x at 561). This recognition is particularly true of a *Brady* claim, because a *Brady* claim involves evidence that was suppressed and, therefore, *by definition*, was not part of the underlying criminal case. *See generally*

14

*Brady*, 373 U.S. 83 (addressing a motion "based on the newly discovered evidence that had been suppressed by the prosecution").

Accordingly, reasonable jurists could debate whether Gabrion was entitled to an evidentiary hearing and discovery on the specific allegations he made that the government withheld evidence in violation of *Brady*.

**C.      Gabrion's guilt-phase and penalty-phase ineffective assistance of counsel claims are at least debatable.**

The district court erred by denying Gabrion's claims of ineffective assistance of counsel ("IAC") without a hearing or discovery when the record did not conclusively show that Gabrion was not entitled to relief and that Gabrion had not established good cause for discovery on his IAC claims.

In *Martin*, this Court held that the district court abused its discretion when it denied a hearing on Martin's IAC claim. 889 F.3d at 832. *Martin* recognized that, by their nature, IAC claims nearly always involve evidence outside the record. *Id.*; *see also Massaro v. United States*, 538 U.S. 500, 504-05 (2003) (finding that a § 2255 motion is a preferable vehicle for bringing IAC claims because "[w]hen an ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose."). Martin's § 2255 motion contained factual allegations related to his trial attorneys' ineffective assistance of counsel.

This Court noted the difficulty in deciding such claims on the trial court record: "What Martin and his attorneys said or did not say during his sentencing hearing does not and cannot definitively establish what they did or did not say weeks earlier in the time leading up to the filing of Martin's 60(b) motion." *Id.* at 833-34. Gabrion's IAC claims, like his other claims, depend on "purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light." *Machibroda*, 368 U.S. at 494-95; *see also MacLloyd*, 684 F. App'x at 561.

### 1. Guilt Phase Ineffective Assistance of Counsel

First, in Gabrion's COA Application, he explains in more detail two of counsel's most egregious guilt-phase errors. COA Application 111-19. The Government argues that the Court should consider only these two errors. Response 98. This is incorrect. The question for the Court at this stage is whether the district court's resolution of the claim is debatable. The most egregious errors best exemplify that the district court's resolution of the guilt-phase IAC claim is debatable. Gabrion's COA Application has presented information to allow this Court to determine that the district court was wrong in finding that Gabrion was not entitled to a COA on this issue. *See Buck*, 137 S. Ct. at 773 (Whether to grant a

COA "should be decided without 'full consideration of the factual or legal bases adduced in support of the claims.'") (quoting *Miller-El*, 537 U.S. at 336).

The government's response to Gabrion's specific examples also falls short. With regard to Gabrion's claim that trial counsel was ineffective for failing to request an adversarial competency hearing, the government argues that "[n]o speculation was required for the district court to conclude that the decision to forgo an adversarial hearing was a strategic decision" because the court-ordered reports concluded that Gabrion was competent. Response 99. The government also speculates that Gabrion's trial counsel had nothing to present at an adversarial hearing. Response 100. Nothing in the record supports this conjecture.

Furthermore, as Gabrion has alleged, if trial counsel in fact had nothing to present, any such lack of information was due to the inadequacy of the investigation regarding Gabrion's mental health and family history of mental illness. R. 100, Am. § 2255 Mot. 43-45, PageID 3929-31; R. 102, Br. in Support of Mot. to Determine Mental Competence 13, PageID 4729. *Cf. Williams v. Taylor*, 529 U.S. 362, 396 (2000) (finding ineffectiveness claim meritorious when counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision because counsel "did not fulfill their obligation to conduct a thorough investigation of the defendant's background.") Trial counsel's failure to properly investigate is particularly

17

troublesome where their own experience with Gabrion had led them to conclude that Gabrion was incompetent. *See* R. 100, Am. § 2555 Mot. 45-51, PageID 3931-37.

Moreover, while the decision to forgo cross-examination may sometimes be a strategic decision, that rationale would not apply here. Any adversarial competency hearing would have been in front of the judge, who would not decide whether Gabrion would receive the death penalty. *See* 18 U.S.C. § 4241(d); 18 U.S.C. §§ 3593-94. Because the jury would not have been present at a competency hearing, there was no concern about exposing the jury to or focusing the jury's attention on potentially unfavorable testimony. This failure, like the other failures of trial counsel, cannot be presumed to be strategic without any evidence and without providing Gabrion the opportunity for a hearing during which trial counsel can be questioned. As such, Gabrion is entitled to a hearing and discovery on this question as well.

In its Response to Gabrion's argument that trial counsel was ineffective because they failed to retain adequate investigative assistance or adequately investigate or test the case, the government addresses only Gabrion's example of trial counsel's failure to retain a forensic pathologist. Response 102-03. However, Gabrion also raised trial counsel's failings regarding expert witnesses broadly and the inadequacy of the fact investigation. COA App. 109-10, 116-19.

Given this Court's precedent that makes clear the importance of a hearing when facts outside the record could provide answers, a COA is warranted on this claim. Reasonable jurists could find, taking everything Gabrion has alleged as true, that the record does not conclusively show that Gabrion is not entitled to relief.[2]

## 2. Penalty Phase Ineffective Assistance of Counsel

In its Response, the government focuses on Gabrion's underlying claim of ineffective assistance of counsel rather than address the actual question before this Court: Could reasonable jurists debate whether the district court's denial of Gabrion's claim without a hearing or discovery on the issue was incorrect? Given the failings of trial counsel at the penalty phase, resolving this claim without a hearing or discovery was error or at least debatable.

---

[2] Gabrion need not have provided affidavits to the district court to obtain a hearing on this claim. Gabrion's § 2255 motion did not rely on the "[b]ald assertions and conclusory allegations" that this Court has found do not "provide sufficient ground . . . to require an evidentiary hearing." *Thomas*, 849 F.3d at 681 (finding that a hearing was unwarranted in a case where the allegations were unsupported by affidavits and moreover were disproven by Government affidavits). Although it twice sought extensions of time to file attorney affidavits, R. 19, Mot. for Extension, PageID 1743; R. 27, Mot. for Extension, PageID 1895-96, the government has not provided an affidavit that disputes Gabrion's IAC claims, which distinguishes this case from *Thomas*. *See also Martin*, 889 F.3d at 832 (holding that Martin was entitled to an evidentiary hearing where he presented factual allegations to support his IAC claim that were not contradicted by the record or inherently incredible) (quotation and citation omitted); *MacLloyd*, 684 F. App'x at 561-62 (noting that this Court has previously found that the burden for receiving an evidentiary hearing has been met relying just on the record and the defendant's declaration supporting his claim).

Both the government and the district court assume that certain decisions by trial counsel were strategic, but "[t]he Supreme Court has held in several cases that the habeas court's commission is not to invent strategic reasons or accept any strategy counsel could have followed, without regard to what actually happened." *Marcrum v. Luebbers*, 509 F.3d 489, 502 (8th Cir. 2007) (citing *Rompilla v. Beard*, 545 U.S. 374, 395-96 (2005) (O'Connor, J., concurring); *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003); *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986)). Moreover, making such an assumption without holding a hearing flies in the face of this Court's precedent. *See, e.g.*, *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007) ("In reviewing a § 2255 motion . . . [a]n evidentiary hearing is required unless the record conclusively shows that the petitioner is entitled to no relief.") (alteration in original) (quotations and citations omitted). It is particularly unreasonable in a case as complex and voluminous as Gabrion's.

Further, with regard to the merits of Gabrion's claim, the government's Response points to the fact that either nine or twelve jurors found the existence of certain mitigating factors as evidence of the trial counsel's effectiveness at the penalty phase. Response 77. However, the government's argument ignores key facts.

Notably, Gabrion's § 2255 Motion laid out evidence of mitigating factors that trial counsel did not sufficiently investigate or present. These failures were

reflected in the jury's penalty phase verdict findings. Specifically, not a single juror found that "Defendant has suffered traumatic brain injuries which have led to neurological impairments, including Geschwind syndrome." Trial Docket R. 526, Penalty Phase Special Verdict Form 7. However, new evidence set forth as part of Gabrion's § 2255 proceedings reveals that Gabrion suffered 17 motor-vehicle crashes and head injuries. R. 103-1, Social History 20-28, PageID 4756-4764. It is well known that multiple brain injuries, even mild ones, can cause serious deficits. *See* Centers for Disease Control and Prevention, Traumatic Brain Injury & Concussion, https://www.cdc.gov/traumaticbraininjury/outcomes.html (last visited Jan. 30, 2020).

Likewise, no juror found that "Defendant suffers from a brain dysfunction which has impaired his ability to control his conduct and to function in the absence of strong support and guidance." *Id.* Nor did even one juror find that "Defendant committed the offense under severe mental or emotional disturbance." *Id.*

Further, only three jurors found that "Defendant was not provided with the necessary parental guidance as an adolescent which prevented him from acquiring the necessary social skills and maturity to deal with adult situations and traumas." *Id.* at 6. Six jurors found that "Defendant's upbringing, early family life, and childhood contributed to his adult psychological deficits and criminal conduct." *Id.* at 6. Section 2255 counsel has uncovered evidence that would have supported

jurors finding the existence of all these mitigating factors. *See generally* R. 103-1, Social History, PageID 4733-883.

Moreover, these numbers indicate the number of jurors who found that the mitigating factor had been proven by a preponderance of the evidence. Consistent with *McKoy v. North Carolina*, 494 U.S. 433 (1990), jurors in Gabrion's case were told that they could consider particular mitigating factors they personally found. Jurors who did not find particular mitigating factors did not include them in their sentencing decision. Because so many jurors did not find the existence of factors that critical new evidence supports, the jury's findings reveal that the newly uncovered mitigation information set forth in Gabrion's § 2255 motion could have led to a "reasonable probability that at least one juror would have struck a different balance" and voted for a sentence of life. *Wiggins*, 539 U.S. at 537. As such, whether trial counsel's failure to obtain and develop evidence related to these factors could have been prejudicial should not have been decided without a hearing and discovery on the issue of ineffective assistance of counsel at the penalty phase.

### D.    Gabrion's conflicted counsel claim is at least debatable.

The district court, relying on insufficient information and ignoring a clear factual dispute, erred by not granting an evidentiary hearing and discovery on Gabrion's claim that he was denied his right to conflict-free counsel when Christopher Yates, the attorney for government witness Joseph Lunsford,

participated in Gabrion's defense. In its Response, the government simply parrots the district court's findings and reasoning rather than advancing an argument on this issue.

The district court found that "there is no evidence that Yates actually represented Gabrion," R. 156, 10/04/18 Opinion 60, PageID 5854, and that "Gabrion has not presented any evidence indicating that he and Yates established an attorney-client relationship," *id.* at 61, PageID 5855. Further, the district court found that "[e]ven if Yates did represent Gabrion in some informal way, Gabrion's claim would fail because Gabrion has not shown that Yates's conflict adversely affected the performance of Gabrion's appointed counsel." *Id.* at 61, PageID 5855.

The government, like the district court, faults Gabrion for failing to establish that he and Yates had an attorney-client relationship or show an adverse effect. Response 104. However, it is the district court's refusal to allow discovery or a hearing that prevented Gabrion from fully developing such evidence. Gabrion was entitled to discovery because he made specific allegations and explained how the information he sought would support his allegations. *See Bracy*, 520 U.S. at 908-10; *Cornell*, 472 F. App'x at 354. Likewise, he was entitled to an evidentiary hearing, as an evidentiary hearing "is required unless the record conclusively shows that the petitioner is entitled to no relief." *Campbell*, 686 F.3d at 357. Here, the record was not sufficiently developed to allow any such conclusions.

First, the extent of Yates's full involvement in Gabrion's defense is not apparent from the record. However, Gabrion has made allegations, supported by the record, that clearly demonstrate Yates was much more than an uninterested bystander. The record shows he engaged in certain legal activities throughout the case. Though his affidavit indicates that, in his view, he "never represented Mr. Gabrion in connection with his murder case," R. 119-1, Yates Aff. 2, PageID 5293, he did speak with defense trial counsel generally about the case in his role as Federal Defender; he provided research assistance, including researching whether federal jurisdiction over the crime existed, *id.* at 3, PageID 5294; and he visited Gabrion to discuss the case and encourage him to cooperate with his attorneys, *id.* at 2, PageID 5293. The full extent of Yates's involvement in Gabrion's case cannot be determined by only the affidavit (which was secured by the government), but Gabrion was not afforded the opportunity to depose Yates or other people who participated in Gabrion's defense at trial. Nor was Gabrion permitted to cross-examine Yates or other witnesses whose testimony could provide facts that would allow the district court to make an informed decision rather than one based on speculation and a paucity of information.

Further, by denying an evidentiary hearing and discovery, the district court prevented Gabrion from developing his allegations of prejudice. As Gabrion argued, Yates had represented Gabrion in an appeal from Gabrion's conviction for

24

social security fraud. R. 119-1, Yates Aff. 1, PageID 5292. In his motion, Gabrion alleged that he asked for Yates's assistance in locating Gabrion's social security records, which Gabrion asserted were critical to the penalty phase because they would show that at the time of the homicide, Gabrion was receiving disability for mental health reasons and he was so disabled that a payee had been ordered. [3] R. 100, Am. § 2255 Mot. 41, 125, PageID 3927, 4011. Neither trial counsel nor § 2255 counsel have located these records even though they would be powerful evidence to rebut the government's theory at trial that Gabrion was malingering mental illness. Yates's affidavit does not mention these records. *See generally* R. 119-1, Yates Aff. Neither the district court nor the government's Response to the COA addresses Gabrion's argument as to the potential import of these records— which were never found.

Additionally, the government's Response fails to address the clear factual dispute that exists between Lunsford's affidavit and Yates's affidavit. The Government points to *United States v. Willis*, 257 F.3d 636 (6th Cir. 2001), in which this Court cautions that "affidavits by witnesses recanting their trial

---

[3] The importance of these records cannot be overstated. *See, e.g.*, *Webster v. Daniels*, 784 F.3d 1123, 1146 (7th Cir. 2015) (en banc) (ordering hearing in federal death penalty case to determine whether Webster's Social Security records were newly discovered evidence that would demonstrate that he was categorically ineligible for the death penalty). Gabrion specifically and unsuccessfully requested that the district court order discovery related to these records. R. 67, Am. Br. for Discovery 7-8, PageID 2610-11. Gabrion also unsuccessfully sought to depose Yates. R. 59, Br. in Support of Mot. to Conduct Deps. at 10-11, PageID 2574-75.

testimony are to be looked upon with extreme suspicion." *Id.* at 345 (internal quotation marks omitted). Of course, another key principle is that the testimony of a cooperating witness, such as Lunsford, is to be viewed with caution. *See, e.g.*, *United States v. Hynes*, 467 F.3d 951, 971 (6th Cir. 2006); Sixth Circuit Pattern Criminal Jury Instructions § 7.07 (2019). These competing principles illustrate why a credibility determination should have been made only after a hearing, not based on affidavits alone.

Here, the affidavits directly contradict each other. Lunsford avers that Yates suggested that Lunsford testify that he saw Gabrion masturbate in front of a photo of baby Shannon. R. 100-4, Lunsford Aff., PageID 4700. According to Lunsford, he attempted to recant his testimony before trial but was told by Yates that it was too late and that he would have to serve his entire state sentence before serving his federal sentence if he decided to back out. *Id.* Yates denies Lunsford's allegations, calling them "completely false." R. 119-1, Yates Aff. 3, PageID 5294. Yates claims that he did not direct or suggest how Lunsford should testify against Gabrion, nor did he encourage Lunsford to testify falsely. R. 119-1, Yates Aff. 3, PageID 5294. The district court erred in resolving this obvious factual dispute without holding a hearing. *See Turner*, 183 F.3d at 477 ("Where there is a factual

26

dispute, the *habeas* court must hold an evidentiary hearing to determine the truth of the petitioner's claims.")[4]

Accordingly, a COA is warranted on this claim because reasonable jurists could find, taking everything Gabrion has alleged as true, that the record does not conclusively show that Gabrion is not entitled to relief.

### E.  Gabrion's incompetence claims are at least debatable.

The district court erred by denying any hearing or discovery as to Gabrion's incompetence at the time or trial or his present incompetence. The district court denied a hearing and discovery despite evidence to suggest that Gabrion did not and does not have the capacity to understand the proceedings against him. The government asserts that Gabrion "did not present any new information, such as a new psychological evaluation or expert opinion on previous evaluations" and observes that "[t]he district court noted the absence of new mental health information." Response 91. The government's assertion is incorrect; counsel did provide additional information in support of its request. The government's

---

[4] The government also points to this Court's unpublished opinion in *Welsh v. Lafler*, 444 F. App'x 844 (6th Cir. 2011), in which the Court states, "[e]ven if accepted, a post-trial recantation is generally not sufficient to grant habeas relief absent constitutional error." *Id.* at 850 (alteration in original). At this stage of the proceedings, Gabrion is not asking the court to grant habeas relief. He is merely asking the Court to grant a COA as to whether the district court erred by denying him a hearing and discovery on this issue. A hearing and discovery would likely produce additional information beyond a post-trial recantation.

27

argument also ignores that the district court prevented Gabrion from accessing information relevant to his mental health.

Gabrion has never had an adversarial competency hearing, despite questions about his mental status arising early and often throughout the proceedings against him. As outlined in Gabrion's COA Application, Gabrion behaved bizarrely during the trial proceedings; he continues to behave bizarrely today; and his § 2255 counsel uncovered evidence that he started behaving bizarrely long before the trial. *See* COA Application 96-101.

Gabrion's current lawyers represented to the district court that Gabrion cannot consult with them about his case. *See* COA Application 102; *see generally* R. 101, Mot. for Hearing to Determine Mental Competence. Gabrion's current lawyers also uncovered information about Gabrion's family history of mental illness and bizarre behavior years before trial, which were apparently inaccessible to prior evaluators. *See* R. 120, Reply to Response to Mot. for Hearing to Determine Mental Competence 5-6, PageID 5309-10.

This information put into context Gabrion's bizarre behavior during trial proceedings, when Gabrion, for example, spoke to a government doctor about his desire to go to the "death chamber" to bring attention to the plight of missing children. R. 142-10, Fallis Report 13, PageID 5668. He testified at the penalty phase of his trial, claiming that his lawyers wanted to put him away so he could not

"get the truth out about abortion, you know, the fact that everybody's murdering off all these boys because they're too hard to raise through abortion." Gabrion Sentencing Testimony Tr. 16. He also offered an allocution, which he concluded by telling the jury not to worry about what happened to him because no matter what he would be fine, and that after September 11, he did not care whether he lived or died. Allocution Tr. 3-4.

Gabrion has previously been found competent, based largely on the conclusion that he was malingering. R. 102, Br. in Support of Mot. to Determine Mental Competence 3-5, PageID 4719-21 (summarizing earlier findings). The new evidence that Gabrion's lawyers submitted undermines the conclusion of malingering. First, § 2255 counsel compiled a robust history of familial mental illness, which was unknown to the trial experts. R. 103-1, Social History 43-146, PageID 4779-882. Mental health practitioners have long emphasized that understanding a patient's family history is important to making a diagnosis; indeed, during post-conviction proceedings in another federal capital case, one of the experts who testified at Gabrion's trial determined that his earlier conclusions in the other case were incorrect after finding out more about the defendant's childhood and family history of mental illness. R. 160-2, Ryan Aff. ¶¶ 12-18, PageID 6052-53. Second, direct appeal counsel, who are particularly experienced with and educated about mentally ill clients, would have testified at a hearing that

Gabrion was incompetent during the entirety of his direct appeal. R. 101, Mot. for Hearing to Determine Mental Competence 2, PageID 4715. Section 2255 counsel also represented to the district court their good-faith belief that Gabrion is not competent to assist them. *Id.* Third, because it is very difficult to maintain feigned symptoms over time, the persistence of Gabrion's symptoms over the seventeen years following his conviction is evidence that he suffered, and suffers, real impairment.

Moreover, because there was never an adversarial competency hearing, the evaluators who concluded that Gabrion was malingering and competent were never confronted with questions about whether malingering and true incompetence could coexist. They can. *See* Richard Rogers et al., *Clinical Assessment of Malingering and Deception* at 115 (Richard Rogers ed., 4th ed. 2018) ("The finding that an inmate patient has malingered one or more symptoms of psychosis does not rule out the presence of true mental disorders."). Finally, because prisoners are always at risk of their mental status deteriorating, even if Gabrion was competent at the time of trial, his present competence should be examined. *See Panetti v. Quarterman*, 551 U.S. 930, 943 (2007).

Most importantly at this stage, the district court denied Gabrion's present counsel any opportunity to develop facts in support of Gabrion's incompetence. For example, counsel sought permission for a psychiatrist to have a follow-up visit

with Gabrion in USP Terre Haute. *See* R. 156, 10/04/18 Opinion 203, PageID 5997 (discussing motion). Counsel explained why the psychiatrist's evaluation was critically important to Gabrion's § 2255 case. They also explained that this psychiatrist had been granted permission to visit inmates in other BOP facilities without incident, and that granting permission for such visits was routine in other courts. Nevertheless, the court ignored the request for months, forcing the cancellation of travel plans that the court was aware had already been made and arranged with the prison. Months later, after the time for the visit had passed, when it was denying the petition, an evidentiary hearing, and discovery, the court denied permission for the visit. R. 156, 10/04/18 Opinion 203, PageID 5997. Additionally, the court denied counsel's discovery requests for Gabrion's BOP records. *Id.* at 195, PageID 5989. Counsel had explained why these records were relevant to Gabrion's mental health and competency claims. R. 67, Am. Br. for Discovery 7, PageID 2610. The court also refused discovery of the materials relied upon by a court-ordered evaluator. Counsel averred that they did not have these records and that the records were not in trial counsel's files. *Id.* at 6, PageID 2609.

Having denied permission for a psychiatric evaluation, having denied all other opportunities for discovery as to Gabrion's mental status, and ignoring the new evidence of incompetence that Gabrion did present, the district court concluded that Gabrion did not present enough information to have a hearing about

31

competence. R. 156, 10/04/18 Opinion 202, PageID 5996. This conclusion is at least debatable, and Gabrion should be granted a COA on the issues of his present incompetence and incompetence at the time of trial.

## IV.  CONCLUSION

Therefore, the claims discussed above, as well as Gabrion's other claims, are debatable. This Court should grant Gabrion a COA on each claim.

**Date:  January 31, 2020**

**INDIANA FEDERAL COMMUNITY DEFENDERS**

By:  /s/ *Monica Foster*
    Monica Foster, Executive Director
    Attorney for Petitioner-Appellant
Business Address:
    111 Monument Circle, Suite 3200
    Indianapolis, Indiana 46204
    Telephone: (317) 383-3520
    Monica_Foster@fd.org

**Respectfully submitted,**

**SCOTT GRAHAM PLLC**

By:  /s/ *Scott Graham*
    Scott Graham
    Attorney for Petitioner-Appellant
Business Address:
    1911 West Centre Avenue, Suite C
    Portage, Michigan 49024
    Telephone: (269) 327-0585
    sgraham@scottgahampllc.com

# CERTIFICATE OF SERVICE

Undersigned counsel certifies that he filed the Petitioner's Reply to Response of the United States to Application for a Certificate of Appealability through the Court's CM/ECF electronic system on January 31, 2020.  See Fed. R. App. P. 25(d)(1)(B); 6 Cir. R. 25(f)(2).  Notice of this filing will be sent through the CM/ECF system to all parties indicated on the electronic filing receipt, namely Assistant United States Attorney Jennifer L. McManus and Assistant United States Attorney Timothy P. VerHey.  Parties may access this filing through the CM/ECF system.

Date:  January 31, 2020            By: /s/ *Scott Graham*

Scott Graham
Attorney for Petitioner-Appellant
Business Address:
SCOTT GRAHAM PLLC
1911 West Centre Avenue, Suite C
Portage, Michigan 49024
Telephone: (269) 327-0585
sgraham@scottgrahampllc.com