**18-2382**
**DEATH PENALTY CASE**

---

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

**MARVIN CHARLES GABRION II,**
*Petitioner - Appellant*

v.

**UNITED STATES OF AMERICA,**
*Respondent - Appellee*

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

---

## PRINCIPAL BRIEF FOR PETITIONER-APPELLANT

---

Monica Foster
Jean E. Giles
Joseph M. Cleary
Indiana Federal Community
Defenders, Inc.
111 Monument Circle, Suite 3200
Indianapolis, Indiana 46204
Telephone: (317) 383-3520
Email: Monica_Foster@fd.org
Email: Jean_Giles@fd.org
Email:  Joe_Cleary@fd.org

Scott Graham
SCOTT GRAHAM PLLC
1911 West Centre Avenue, Suite C
Portage, Michigan 49024
Telephone: (269) 327-0585
Email:  sgraham@scottgrahampllc.com

*Counsels for Petitioner-Appellant*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ vi

I. STATEMENT IN SUPPORT OF ORAL ARGUMENT............................. xii

II. STATEMENT OF JURISDICTION ............................................................1

III. STATEMENT OF ISSUES ........................................................................1

IV. STATEMENT OF THE CASE ...................................................................2

    A. Trial ........................................................................................2

    B. Direct Appeal ...........................................................................8

    C. §2255 Proceedings ...................................................................9

V. SUMMARY OF THE ARGUMENT .........................................................10

VI. ARGUMENT ..........................................................................................11

    A. Gabrion established that he was entitled to a hearing and discovery in his §2255 proceedings....................................................12

    B. Trial counsel was ineffective at both the guilt and penalty phases of Gabrion's trial.................................................................21

        1. Trial counsel failed to adequately investigate the case, leaving them unprepared for the guilt and penalty phases ...................22

            a. Trial counsel did not adequately investigate the government's arguments in aggravation, in particular the argument premised on Chrystal Roach's false testimony....................................................................22

            b. Trial counsel's mitigation specialist never completed his social history report..................................................28

i

c.     Trial counsel retained a single fact investigator to conduct an investigation that needed to reach every region of the country, and did not secure sufficient funding to allow her to work on the case continuously throughout the critical pre-trial investigation period......32

d.     Trial counsel did not retain necessary experts to assist their investigation. ........................................................35

2.     Trial counsel's penalty-phase presentation was deficient ........38

a.     Trial counsel failed to object to evidence they should have objected to .............................................................39

b.     Trial counsel conceded an aggravating factor they should have rebutted ........................................................41

3.     Gabrion was prejudiced by trial counsel's errors .....................43

a.     Gabrion was prejudiced at the penalty phase .................44

i.     Gabrion was prejudiced by trial counsel's failure to adequately investigate the evidence that supposedly supported the aggravating factors....................................44

ii.     Gabrion was prejudiced by trial counsel's failure to oversee an adequate mitigation investigation.................48

b.     Gabrion was prejudiced at the guilt phase......................63

4.     If this Court finds that Gabrion had not yet made a sufficient showing, it should remand for a hearing and discovery on this issue ...............................................................................69

C.     Gabrion was deprived of the effective assistance of trial counsel and representation by conflict-free counsel because one of the attorneys who assisted with his defense, including by personally meeting with him, also represented a key government witness who testified against him    ...........................................................................71

ii

1.      Yates represented competing interests simultaneously ...........72

      a.     Yates' work as an attorney for Gabrion .........................72

      b.     Yates' work as a lawyer for critical penalty phase witness Joseph Lunsford............................................................76

2.      Gabrion was denied his constitutional rights when Yates participated in his defense while representing a key witness against him .......................................................................79

      a.     Yates' concurrent representation of Lunsford and involvement in Gabrion's case created an actual conflict ...................................................................80

      b.     The conflict adversely impacted counsel's performance ................................................................82

3.      If this Court finds that Gabrion has not yet made a sufficient showing, it should remand for a hearing and discovery on this issue ......................................................................83

D.      The government presented expert hair analysis that was false or misleading, in violation of Brady .......................................................86

E.      On remand, this Court should assign the case to a new district judge ...............................................................................93

1.      This Court has the power to reassign this case on remand.......93

2.      The original §2255 judge made rulings while harboring a disqualifying interest................................................................94

3.      Without scrutiny, the court adopted rulings made by a judge with a disqualifying interest in these proceedings....................97

4.      The court denied Gabrion access to the basic tools of investigation, and then, denied his §2255 motion based on speculation .......................................................................99

a. The court would not authorize discovery or a hearing concerning claims regarding Chrystal Roach's testimony and then engaged in speculation to deny the writ ..............................................................100

b. The court refused to authorize discovery or an evidentiary hearing on the ineffective assistance of counsel claims and denied the §2255 motion by inventing strategic reasons with no support in the record ..................................................................101

c. The court refused to issue routine but necessary orders ...............................................................................102

d. The district court issued rulings interfering with Gabrion's right to counsel and impairing counsel's ability to properly represent Gabrion in these proceedings ..............................................................107

e. The lower court denied motions in disregard of clear Circuit precedent............................................................110

5. This court's three-factor test requires reassigning this case to a new judge ...................................................................111

a. The lower court would reasonably be expected to have "substantial difficulty" in putting out of his mind previously expressed views or findings........................112

b. Reassignment is advisable to preserve the appearance of justice................................................................113

c. Reassignment would not entail waste and duplication out of proportion to any gain in preserving the appearance of fairness ................................................113

VII. CONCLUSION ..................................................................115

CERTIFICATE OF COMPLIANCE................................................................116

CERTIFICATE OF SERVICE ...........................................................................117

PETITIONER-APPELLANT'S DESIGNATION OF RECORD..........................118

# TABLE OF AUTHORITIES

## **CASES**

*Andrus v. Texas*, 140 S. Ct. 1875 (2020) ...................................................... 22, 41, 42

*Avery v. Prelesnik*, 548 F.3d 434 (6th Cir. 2008) .............................................. 21, 32

*Bracy v. Gramley*, 520 U.S. 899 (1997) ...................................................... 19, 20, 83

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................ passim

*Campbell v. United States*, 686 F.3d 353 (6th Cir. 2012) ......................................83

*Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000) ......................................................105

*Cornell v. United States*, 472 F. App'x 352 (6th Cir. 2012) ...................... 19, 45, 83

*Cuyler v. Sullivan*, 446 U.S. 335 (1980).................................................................79

*Giglio v. United States*, 405 U.S. 150 (1972) .........................................................89

*Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012)................................. 42, 43, 101

*Kimmelman v. Morrison*, 477 U.S. 365 (1986) ......................................... 36, 43, 101

*Lexon Ins. Co. v. Nasser*, 781 F.3d 335 (6th Cir. 2015).......................................110

*Machibroda v. United States,* 368 U.S. 487 (1962)............................................ 11, 14

*MacLloyd v. United States*, 684 F. App'x 555 (6th Cir. 2017) ..............................13

*Marcrum v. Luebbers*, 509 F.3d 489 (8th Cir. 2007) ...................................... 43, 101

*Martin v. United States*, 889 F.3d 827 (6th Cir. 2018)................................... passim

*Massaro v. United States*, 538 U.S. 500 (2003) .............................................. 16, 20

*Mickens v. Taylor*, 535 U.S. 162 (2002)................................................................79

*Moss v. United States*, 323 F.3d 445 (6th Cir. 2003)........................................ 79, 82

*Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).........................................111

*Napue v. Illinois*, 360 U.S. 264 (1959) .........................................89

*Pannetti v. Quarterman*, 551 U.S. 930 (2007) .........................................109

*Pillette v. Berghuis*, 408 F. App'x 873 (6th Cir. 2010) .................................... 17, 18

*Pola v. United States*, 778 F.3d 525 (6th Cir. 2015) .........................................13

*Porter v. McCollum*, 558 U.S. 30 (2009).........................................106

*Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007) .........................................36

*Rompilla v. Beard*, 545 U.S. at 374 (2005)......................................... passim

*Rorrer v. City of Stow*, 743 F.3d 1025 (6th Cir. 2014) .........................................94

*Rubin v. Gee*, 292 F.3d 396 (4th Cir. 2002).........................................82

*Smith v. United States*, 348 F.3d 545 (6th Cir. 2003).........................................13

*Stevens v. Chapman*, No. 3:20-CV-352, 2021 U.S. Dist. LEXIS 61913 (E.D. Va. Mar. 30, 2021) .........................................92

*Stevens v. McBride*, 489 F.3d 883 (7th Cir. 2007).........................................105

*Stouffer v. Reynolds*, 214 F.3d 1231 (10th Cir. 2000) .........................................36

*Strickland v. Washington*, 466 U.S. 668 (1984) ......................................... passim

*Towns v. Smith*, 395 F.3d 251 (6th Cir. 2005).........................................33

*Townsend v. Sain*, 372 U.S. 293 (1963).........................................12

*United States v. Agurs*, 427 U.S. 97 (1976).........................................91

*United States v. Arny*, 831 F.3d 725 (6th Cir. 2016) .........................................32

*United States v. Ashimi*, 932 F.2d 643 (7th Cir. 1991)......................... 15, 16, 17, 18

*United States v. Ausby*, 916 F.3d 1089 (D.C. Cir. 2019).................................. 90, 91

*United States v. Barrett*, 985 F.3d 1203 (10th Cir. 2021) .......................................14

*United States v. Butler*, 955 F.3d 1052 (D.C. Cir. 2020)...................... 87, 89, 90, 91

*United States v. Gabrion*, 517 F.3d 839 (6th Cir. 2008) ...........................................8

*United States v. Gabrion*, 648 F.3d 307 (6th Cir. 2011) ...........................................8

*United States v. Gabrion*, 719 F.3d 511 (6th Cir. 2013) ...........................................8

*United States v. Lanier*, 988 F.3d 284 (6th Cir. 2021) ....................................... 14, 93

*United States v. Lunsford*, 1:97-CR-81 (W.D. Mich. 1997)....................................80

*United States v. Lunsford*, No. 98-1139 (6th Cir. 1998).........................................77

*Valentine v. United States*, 488 F.3d 325 (6th Cir. 2007).......................... 11, 12, 13

*Wiggins v. Smith*, 539 U.S. 510 (2003)............................................................ passim

*Williams v. Pennsylvania*, 136 S. Ct. 1899 (2016)................................................114

*Wood v. Georgia*, 450 U.S. 261 (1981) ..................................................................79

*Woodson v. North Carolina*, 428 U.S. 280 (1976) .................................................93

## STATUTES

18 U.S.C. §3006A( c)...............................................................................................78

18 U.S.C. §3599(a)(2)............................................................................................107

28 U.S.C. §1291 .........................................................................................................1

28 U.S.C. §2106........................................................................................................93

28 U.S.C. §2253(c)(2)........................................................................................111

28 U.S.C. §2254 ................................................................................................12

28 U.S.C. §2255 ..................................................................................................1

28 U.S.C. §2255(b) ...........................................................................................12

## OTHER AUTHORITIES

ABA Guideline 10.7 .........................................................................................102

ABA Guideline 10.7 Commentary .....................................................................36

*ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (1989) .........................................................................................21

ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.) ............................32

Centers for Disease Control and Prevention, Traumatic Brain Injury & Concussion .....................................................................................................48

FBI, *FBI Testimony on Microscopic Hair Analysis Contained Errors in at Least 90 Percent of Cases in Ongoing Review* (Apr. 20, 2015) ..............................89

*Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* (2016) .................................................................87

Mark Berman, *The Justice Dept. Is Seeking Its First Federal Death Sentences Under Sessions and Expects More to Follow*, Wash. Post (Jan. 9, 2018) ..............62

National Research Council, *Strengthening Forensic Science in the United States: A Path Forward* (2009) (NRC Report).......................................................87

President's Council of Advisors on Science and Technology, *An Addendum to the PCAST Report on Forensic Science in Criminal Courts* (2017)...................87

President's Council of Advisors on Science and Technology, *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* (2016) (PCAST Report) ...............................................................87

*Psychological Evaluations for the Courts* §3.04(b) (3d ed. 2007) ........................107

*Retiring Federal Judge's Biggest Cases: Death Penalty, Street Crime, Mandatory Sentences* ......................................................................................96

*Retiring Judge Doubts Marvin Gabrion Will be Put to Death* ...............................95

Spencer S. Hsu, *FBI admits flaws in hair analysis over decades*, Wash. Post (Apr. 18, 2015) ............................................................................7

The Innocence Project, *FBI Agents Gave Erroneous Testimony in at Least 90% of Microscopic Hair Analysis Cases* (Apr. 20, 2015) ...........................88

Western District of Michigan CJA Plan, Section IV.A.2.h (approved December 5, 2006) ......................................................................78

## **RULES**

§2255 Rule 6 ..................................................................................................19

§2255 Rule 8 ..................................................................................................12

6th Cir. R. 28(b)(1)(A)(i) ...............................................................................118

6th Cir. R. 30(g)(1) ........................................................................................118

6th Cir. R. 32(a) ............................................................................................116

6th  Cir. R. 34(a) ............................................................................................ xii

Fed. R. App. P. 28(a)(10)...............................................................................116

Fed. R. App. P. 32(a)(7)(B) ...........................................................................116

Fed. R. App. P. 32(g)(1) ...............................................................................116

Fed. R. App. P. 34(a) ........................................................................ xii

Fed. R. Civ. P. 59 ...............................................................................110

Fed. R. Evid. 609 ...............................................................................39

# I. STATEMENT IN SUPPORT OF ORAL ARGUMENT

Marvin Gabrion requests oral argument under Federal Rule of Appellate Procedure 34(a) and Sixth Circuit Rule 34(a). Oral argument will aid the Court in assessing the record and errors made in this capital case, in which the district court improperly denied Gabrion's §2255 motion without discovery or an evidentiary hearing.

## II. STATEMENT OF JURISDICTION

The district court had jurisdiction over Gabrion's motion to vacate, set aside, or correct his conviction or sentence under 28 U.S.C. §2255. The district court denied Gabrion's motion and a Certificate of Appealability (COA) on October 4, 2018. R. 156, Op., PageID 6000; R. 158, Order, PageID 6012. Gabrion timely filed a notice of appeal on November 29, 2018, and filed an Application for a COA in this Court on June 17, 2019. R. 169, Notice of Appeal, PageID 6112; Doc. 19, COA App. This Court granted, in part, the Application for a COA on September 10, 2020. This Court has jurisdiction to review the district court's orders under 28 U.S.C. §1291.

## III. STATEMENT OF ISSUES

1. Was Gabrion improperly denied relief, or at least a hearing or discovery, on his claim that trial counsel was ineffective at the penalty phase for, inter alia, failing to adequately investigate mitigation and failing to rebut false statements, premised on demonstrably false testimony, that Gabrion had masterfully manipulated the state court system?

2. Was Gabrion improperly denied relief, or at least a hearing or discovery, on his claim that trial counsel was ineffective at the guilt phase for, inter alia, failing to adequately investigate the government's case, including allowing nearly a year to go by where the sole investigator retained to work on the case was not paid and did no work?

3. Was Gabrion improperly denied relief, or at least a hearing or discovery, on his claim that he was deprived of representation by conflict-free counsel where one of the attorneys who assisted with his defense also represented a key government witness who testified against Gabrion?

1

4.	Was Gabrion improperly denied relief, or at least a hearing or discovery, on his claim that the government failed to disclose, in violation of *Brady*, that the FBI's hair analysis was false or misleading?

5.	Was Gabrion improperly denied a hearing or discovery in his §2255 proceedings, given that there are unresolved factual disputes, and the district court's order denying his §2255 motion engaged in speculation?

6.	If this Court remands the case for further proceedings, should it reassign the case to a new district judge, given that the district judge issued several orders that denied Gabrion due process, and engaged in speculation to deny Gabrion's §2255 motion without allowing factual development?

## IV.	STATEMENT OF THE CASE

### A.	Trial

In June 1999, Marvin Gabrion was indicted in the Western District of Michigan for the murder of Rachel Timmerman. On February 26, 2001, prosecutors noticed intent to seek the death penalty. The district court appointed Paul Mitchell, and, as learned counsel qualified to handle a death penalty case, David Stebbins.

The Western District of Michigan had not previously had a federal death penalty case and Michigan has no death penalty. Gabrion's case was chaotic from the beginning, in part because of the inherently complex nature of a federal capital prosecutions, but more because of Gabrion's mental health problems, the defense team's struggle to secure adequate funding, and the revelation of an ethical breach by a member of the prosecution team.

As to Gabrion's mental health, nearly everyone involved in the case has questioned his competency, including the magistrate judge, who issued an order of reasonable cause for a competency hearing and ordered a mental health evaluation, and the district judge, who sua sponte ordered a competency evaluation.[1] 1:99-CR-76 R. 63, Order; R. 193, Order for Comp. Eval. Throughout the proceedings, Gabrion's mental health problems made it difficult for him to work with counsel, resulting in numerous meandering monologues and culminating in Gabrion punching one of his lawyers in front of the jury. 03/11/2002 Sent. Tr. Vol. I, 75.[2]

As to funding, as lawyers appointed pursuant to the Criminal Justice Act, counsel were dependent on the district court to fund each expenditure, including any investigators, experts, or travel. Counsel struggled to secure the funding necessary to properly investigate and litigate this case. For example, for ten months, the sole investigator retained by the trial team was not paid and did no work on the case. *See* R. 3-1, 6/26/2000 letter Stebbins to Scoville, PageID 1524-25; R. 3-2, 3/9/2001 letter Stebbins and Mitchell to Enslen, PageID 1527-28.

---

[1] Current counsel continues to believe that Gabrion is not competent to proceed with his §2255 motion. Because this Court denied a COA on that issue, it is not addressed in the present brief. Nevertheless, counsel make the Court aware of their good-faith belief that their client cannot understand or assist with the proceedings against him. Counsel also continue to believe that Gabrion was not competent at the time of trial.

[2] Trial transcripts appear at R. 584-97 in the criminal case, 01:99-CR-76.

As to the prosecution team, early in the case, Newaygo County, Michigan Prosecutor Chrystal Roach served as a Special Assistant United States Attorney (SAUSA). Prior to the trial, the Department of Justice removed Roach from this role as a result of her misconduct in this case. Instead of prosecuting Gabrion, her role was converted to that of witness against him. *See* R. 100, §2255 Mot., at 10 n.1, PageID 3896.

The trial commenced on February 11, 2002. 02/11/2002 Tr. Vol. I. At the trial, prosecutors theorized Gabrion murdered Timmerman to prevent her from testifying against him in criminal proceedings in Newaygo County. 02/25/2002 Tr. Vol. IV, 929. Timmerman had alleged that Gabrion raped her, and Gabrion faced charges in Newaygo County for Criminal Sexual Assault. *Id.*

At trial, the only evidence supporting this motive theory came from Chrystal Roach. Roach testified that Gabrion delayed his case and managed to prevent a preliminary examination which would have preserved Timmerman's testimony even though Roach always sought preliminary examinations in assault cases. 02/26/2002 Tr. Vol. V, 1175.

Roach's testimony was also crucial evidence in support of the aggravating factors of 1) obstruction of justice and 2) substantial planning and premeditation. Roach's testimony allowed prosecutors to make a strong case that Gabrion was able to thwart an entire system of justice. 03/15-16/2002 Sent. Tr. Vol. V, 608.

4

Readily available evidence—including the file from Gabrion's own Newaygo County case, as well as other publicly available court records—established that Roach's testimony was false. R. 15-3, Docket Sheets, PageID 1033-1168; R. 15-4, Docket Sheets, PageID 1170-1314. Delays that Roach pointed to were attributable to her office, not Gabrion. And, contrary to Roach's testimony that she always sought preliminary examinations in assault cases, including Gabrion's, Roach's office *never* sought a preliminary examination in any of the hundreds of assault cases in the years surrounding Gabrion's case, and did not seek a preliminary examination in Gabrion's case. *Id.* Nevertheless, trial counsel did not use this readily available evidence to counter Roach's testimony.

During trial proceedings, Gabrion's defense team was assisted by Christopher Yates, then the Federal Defender. Yates previously represented Gabrion on his appeal from his conviction for Social Security fraud. Yates visited Gabrion to consult with him about his case, consulted with Gabrion's lawyers regarding motions strategy, and was involved in the search for Gabrion's social security disability records. *See., e.g.*, R. 16-5, 4/6/2001 letter Stebbins to Yates, PageID 1518-19 (explaining the motions Stebbins would like Yates to assist with); R. 119-1, Yates Dec., PageID 5292-94 (explaining his opinion that he did not represent Gabrion, though he also explained the work he did on Gabrion's case, including visiting Gabrion).

Yates also represented Joseph Lunsford when the government interviewed Lunsford and when Lunsford testified against Gabrion to the grand jury. *See* R. 16-1, 3/30/1998 VerHey letter to Yates, PageID 1491-92; R. 16-3, Lunsford GJ test., PageID 1503-05. Lunsford, who had been incarcerated with Gabrion, provided perhaps the most graphic and disturbing penalty phase evidence against Gabrion, alleging that he saw Gabrion masturbate to a photo of Timmerman's toddler daughter, who the government said Gabrion killed. 03/12/2002 Sent. Tr. Vol. II, 318. During §2255 proceedings, Lunsford recanted this testimony, and said Yates suggested this fact to him. R. 100-4, Lunsford Dec. ¶6, PageID 4700. Lunsford also stated that at the time of trial he wanted to recant and be kept off the witness stand, but Yates told him that if he did back out he would face a harsher sentence. *Id.* ¶7, PageID 4700. Yates, for his part, denied Lunsford's accusation. R. 119-1, Yates Dec. ¶9, PageID 5294.

Among the other evidence against Gabrion was testimony by Douglas Deedrick, who worked in the FBI Hairs and Fibers Unit. Deedrick testified that hairs on duct tape found on a road leading to the boat launch at Oxford Lake where Timmerman's body was recovered had the same microscopic characteristics as Ms. Timmerman's head hair sample. 02/28-03/01/2002 Tr. Vol. VII, 1530-40. Since Gabrion's trial, the FBI has acknowledged that its analysts repeatedly gave flawed testimony about microscopic hair comparison. *See* Spencer S. Hsu, *FBI*

6

*admits flaws in hair analysis over decades*, Wash. Post (Apr. 18, 2015), https://www.washingtonpost.com/local/crime/fbi-overstated-forensic-hair-matches-in-nearly-all-criminal-trials-for-decades/2015/04/18/39c8d8c6-e515-11e4-b510-962fcfabc310_story.html.

Gabrion was convicted on March 5, 2002. 03/04-05/2002 Tr. Vol. VIII, 1775. The case proceeded to the penalty phase. During the penalty phase, federal prosecutors again relied on Roach's testimony, to support the aggravating factors of 1) obstruction of justice and 2) substantial planning and premeditation. 03/15-16/2002 Sent. Tr. Vol. V, 608. Prosecutors argued that Roach's testimony established that Gabrion deserved the death penalty, having hatched and successfully carried out a plan to delay the Newaygo County proceedings until he could kill Timmerman. *Id.* Again, trial counsel failed to use readily available evidence to rebut this damaging (but untrue) testimony.

As to the mitigation investigation, the mitigation specialist retained by Gabrion's trial counsel to help conduct this investigation, James Crates, prepared only a ten-page, double spaced "Abridged Social History." In the ten-page Abridged Social History, Crates acknowledged that he was unable to develop much mitigation evidence, pointing to lack of cooperation from Gabrion and his family. R. 100-5, Abridged Social History, PageID 4713.

Crates, apparently recognizing that his investigation remained insufficient, also wrote, "The research is ongoing. Additional relevant information, especially relevant to Marvin'[s] mental disorders and brain injuries will be provided as it is discovered." *Id.* Yet, despite the mitigation specialist acknowledging that he needed to provide additional information, and promising to do so, he never actually did. The Abridged Social History was the only social history ever prepared by the trial team, and it was never supplemented. *Id.* ¶6, PageID 4702-03.

The jury sentenced Gabrion to death on March 16, 2002.

## B. Direct Appeal

Following Gabrion's conviction and death sentence, the case proceeded to direct appeal. Prior to argument, this Court ordered the parties to brief subject matter jurisdiction. At the parties' request, this Court remanded for an evidentiary hearing to develop the record. On March 14, 2008, a divided panel of this Court, with each judge writing separately, determined that the federal courts had jurisdiction over the case. *United States v. Gabrion*, 517 F.3d 839 (6th Cir. 2008). On August 3, 2011, a divided panel affirmed Gabrion's conviction but vacated his death sentence. *See United States v. Gabrion*, 648 F.3d 307 (6th Cir. 2011). This Court, sitting en banc, reversed the panel, affirming the conviction and death sentence. *United States v. Gabrion*, 719 F.3d 511 (6th Cir. 2013) (en banc).

**C. §2255 Proceedings**

Gabrion filed his §2255 motion on April 27, 2015, filed a redacted version of the §2255 motion on May 29, 2015, and filed an amended §2255 motion on March 8, 2017. Gabrion also sought discovery and an evidentiary hearing where his claims could be adversarially tested. *See* R. 51-1, Br. in Support of Discovery, PageID 2530; R. 67, Am. Br. to Conduct Discovery, PageID 2604; R. 59, Br. in Support of Mot. to Conduct Deps., PageID 2572-77; R. 89-1, Mot. for Evidentiary Hr'g, PageID 3805-45.

Initially, the district court ruled that it would not grant Gabrion's request for discovery at that time because a ruling on the request was, in the court's view, intertwined with the allegations in the §2255 motion. Ultimately, the district court denied Gabrion's §2255 motion without ordering production of a single page of discovery, without allowing the deposition of a single witness, and without holding an evidentiary hearing. R. 156, Op., PageID 5833, 5991, 5996. The district court also denied a COA brief order that did not explain how Gabrion failed to satisfy the relevant legal standard. R. 158, Order, PageID 6012-13.

Gabrion sought a COA from this Court. On September 9, 2020, the Court granted a COA on the following issues: Claim 2 (whether the government knew that the FBI's hair analysis was false or misleading, but failed to disclose that fact to defense counsel in violation of *Brady*, and the evidence is material to

9

establishing federal jurisdiction); Claim 3 (whether trial counsel was ineffective in its mitigation investigation and presentation at the penalty phase); Claim 6 (whether trial counsel was ineffective at the guilt phase by failing to obtain funding, failing to investigate the government's case, and failing to retain investigative services); and Claim 7 (whether trial counsel was ineffective because it deprived Gabrion of representation by conflict-free counsel where one of the attorneys who assisted and met with him represented a key government witness who testified against Gabrion).

## V.  SUMMARY OF THE ARGUMENT

Gabrion has made specific and compelling factual allegations as to each of the claims before this Court—guilt-phase ineffective assistance, penalty-phase ineffective assistance, denial of the right to conflict-free counsel, and the government's *Brady* violation. The district court erred by denying relief on these claims; at minimum, the district court erred by denying these claims without allowing discovery and an evidentiary hearing. This Court should grant relief or remand the case to the district court for an evidentiary hearing and discovery. If the Court remands the case, it should reassign it to a new district judge.

## VI. ARGUMENT

As to each of the four claims on which this Court granted a COA, Gabrion has put forward evidence establishing that he is entitled to relief. In addition, Gabrion specifically moved for discovery and an evidentiary hearing, and the district court denied these motions. Consequently, there are lingering factual questions and disputes related to these claims. These disputes could be resolved by discovery and a hearing—and the existence of these disputes mean that the district court unquestionably erred by refusing to hold a hearing and denying Gabrion the process he is due. *See, e.g.*, *Machibroda v. United States,* 368 U.S. 487 (1962); *Martin v. United States*, 889 F.3d 827 (6th Cir. 2018); *Valentine v. United States*, 488 F.3d 325 (6th Cir. 2007).

Below, Gabrion discusses why he was entitled to discovery and a hearing, and then discusses the specifics of each claim, underscoring what could be learned about each of these claims through discovery and a hearing. Finally, he explains why the district court's refusal to allow a hearing or discovery, among many additional errors that denied Gabrion due process, mean that, if this Court remands the case for an evidentiary hearing and discovery, it should reassign the case to a new district judge.

**A.  Gabrion established that he was entitled to a hearing and discovery in his §2255 proceedings.**

Gabrion is entitled to a hearing and discovery on all four claims, even if this Court determines that he has not yet established that he is entitled to relief. *See Martin*, 889 F.3d at 832; *Valentine*, 488 F.3d at 333.

"Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." §2255(b). This language is intended to incorporate the standard governing evidentiary hearings in habeas corpus cases that was articulated by the Supreme Court in *Townsend v. Sain*, 372 U.S. 293 (1963). *See* Rule 8, Rules Governing Section 2255 Proceedings advisory committee's note (incorporating advisory committee notes to Rule 8, Rules Governing Section 2254 Cases). In *Townsend*, the Court explained, "Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding." 372 U.S. at 312.

Of course, in §2255 cases, unlike §2254 cases, there are no prior state collateral proceedings in which an evidentiary hearing could have occurred. As a result, in §2255 proceedings, anytime there are disputed facts relevant to collateral

review, the federal district court must hold a hearing, because federal court is the only venue where those disputes can be resolved. Unsurprisingly, therefore, this Court has frequently recognized the importance of evidentiary hearings in §2255 cases. *See, e.g.*, *Martin*, 889 F.3d at 832 ("An evidentiary hearing 'is required unless the record conclusively shows that the petitioner is entitled to no relief.'"); *Valentine*, 488 F.3d at 334 ("The defendant's burden to show his right to a hearing is significantly lower than his burden to show he is entitled to §2255 relief."); *Pola v. United States*, 778 F.3d 525, 532 (6th Cir. 2015) ("The evidentiary hearing is mandatory unless 'the record conclusively shows that the petitioner is entitled to no relief.'"); *Smith v. United States*, 348 F.3d 545, 551 (6th Cir. 2003) ("We have observed that a Section 2255 petitioner's burden 'for establishing an entitlement to an evidentiary hearing is relatively light.'").

In fact, a hearing is frequently required to vet even speculative claims in collateral proceedings. This Court has pointed out that whether a petitioner can prove his (potentially initially speculative) claims "would be a proper inquiry for the district court to make after an evidentiary hearing, having considered not only the pleading and the affidavits, but the whole of the testimony." *MacLloyd v.*

*United States*, 684 F. App'x 555, 559 (6th Cir. 2017) (citing *Machibroda*, 368 U.S. at 494).[3]

Gabrion has more than met his burden for a hearing on each of his four claims—ineffective assistance of counsel at the guilt phase, ineffective assistance of counsel at the penalty phase, denial of right to conflict-free counsel, and the government's failure to disclose evidence in violation of *Brady*—and made clear to the district court that he satisfied this standard. He filed a detailed thirty-six-page motion and brief establishing that he met this Court's standard for an evidentiary hearing. R. 89-1, Mot. for Evidentiary Hr'g, PageID 3805-45.

Therefore, as Gabrion explained more fully in his brief to the district court explaining the necessity of an evidentiary hearing, *see id.*, and as this Court's precedent makes abundantly clear, *see e.g.*, *Martin*, 889 F.3d at 832, Gabrion is entitled to an evidentiary hearing.

---

[3] One of this Court's recent cases further demonstrates the importance of hearings in eliciting facts that could not have been uncovered without a hearing, albeit in a different context. *See United States v. Lanier*, 988 F.3d 284 (6th Cir. 2021). There, juror bias was exposed in a fraud case only as consequence of hearing. This Court reiterated that hearings on juror bias must be "constitutionally[ ]meaningful," which is to say, "unhurried and thorough." *Id* at 295.

Likewise, a recent court of appeals opinion in another federal death penalty case, *United States v. Barrett*, 985 F.3d 1203 (10th Cir. 2021), illustrates the importance of hearings in capital §2255 proceedings. In that case, the district court denied Barrett's §2255 motion without a hearing and denied a COA, but, following a hearing, the Tenth Circuit ultimately found that counsel's deficient performance caused prejudice, explaining "at the evidentiary hearing, Mr. Barrett introduced substantial mitigating evidence that bore no resemblance to the constitutionally deficient mitigation case his counsel presented at sentencing." *Barrett*, 985 F.3d at 1233.

Despite this Court's abundant and clear case law on the issue, the district court relied upon an out-of-circuit *direct appeal* opinion to deny an evidentiary hearing in a *collateral proceeding*. Specifically, the district court quotes a Seventh Circuit case which states that "self-serving speculation will not sustain an ineffective assistance claim." R. 156, Op., PageID 5902 (quoting *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991)). In the opinion, the Seventh Circuit specifically points out that "Ashimi makes his claim on direct appeal and, therefore, without benefit of a hearing on this issue. At the very least, then, he faces even more of an uphill fight. As a court of appeals does not hear evidence, our only source of information is the trial record." *Ashimi*, 932 F.2d at 648. The Seventh Circuit goes on, "evidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit." *Id.* at 650. That is when it adds that, "[a] defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *Id.*

Rather than supporting the district court's position, *Ashimi* actually explains the importance of a hearing to assess ineffective-assistance claims. The Seventh Circuit says that self-serving speculation is insufficient to prevail on an ineffective assistance claim—which is uncontroversial—but the Seventh Circuit's suggested course of action is a hearing. Thus, the district court's reliance on *Ashimi* to deny a

15

hearing misconstrues *Ashimi*, in addition to ignoring this Court's clear and well-established precedent.

The Seventh Circuit's analysis in *Ashimi* fully supports Gabrion's position. Ashimi had the opportunity to raise his ineffective assistance of counsel claims in a different forum—§2255—where they could have been fleshed out and would not require speculation to resolve. But he chose not to do so.

In *Massaro v. United States*, 538 U.S. 500 (2003), the Court explained that the process available under §2255 is preferable to direct appeal for the bringing of ineffective assistance of counsel claims precisely because there is the opportunity for further fact-finding through an evidentiary hearing.

Conversely, when the claim is brought on direct appeal it is necessarily based solely upon "a trial record not developed precisely for the object of litigating or preserving the claim and [is] thus often incomplete or inadequate for this purpose." *Id*. at 505. The direct appeal record standing alone frequently "will not disclose the facts necessary to decide either prong of the *Strickland* analysis." *Id.* The trial record "may contain no evidence of alleged errors of omission, much less the reasons underlying them." *Id*. Where the alleged error is one of commission, "the record may reflect the action taken by counsel but not the reasons for it." *Id*. Regarding conflicts of interest, the evidence "might be found only in attorney-

client correspondence or other documents that, in the typical criminal trial, are not introduced." *Id.*

The failure of the lower court to authorize a hearing denied Gabrion the process established in law to test the reliability of the underlying proceedings which resulted in his death sentence.

As to the Sixth Circuit authority the district court pointed to, it cited *Pillette v. Berghuis*, 408 F. App'x 873 (6th Cir. 2010) for the proposition that "[s]peculation cannot suffice to establish the requisite prejudice." R. 156, Op., PageID 5902 (quoting *Pillette*, 408 F. App'x at 887). But like *Ashimi*, *Pillette* emphasizes the importance of evidentiary hearings, rather than offering an excuse not to hold one. Moreover, *Pillette* criticized the district court—not the movant— for speculating, which is exactly what happened in this case. *See Pillette*, 408 F. App'x at 887 ("Although Kimbler *might have testified exactly as the district court speculated* and cast doubt on Brower's perception of the events, it is equally possible that she would have confirmed Brower's account. *The salient point is that nobody knows what she would have said. Speculation cannot suffice to establish the requisite prejudice.* This is particularly true where, as here, *the district court granted Pillette an evidentiary hearing and afforded him every opportunity to drum up any evidence available to support his claim.*") (emphasis added) (internal

citations omitted). Like *Ashimi*, *Pillette* fully supports Gabrion's position that he was entitled to a hearing.

Gabrion is also entitled to discovery. Gabrion requested leave to depose witnesses including:

- trial counsel; the mitigation investigator; and the fact investigator;
- consulting counsel who he alleged had a conflict of interest;
- SAUSA and Newaygo County Prosecutor Chrystal Roach who was dismissed as SAUSA for ethical lapses in this case;
- some of the trial mental health experts;
- the pathologist who testified the decedent was alive when she was placed in Oxford Lake (contrary to Gabrion's §2255 expert).

R. 59, Br. in Support of Mot. to Conduct Deps., PageID 2572-77.

Gabrion also moved for the production of documents, and explained why these documents were relevant to his claims, including:

- Documents reviewed by government mental health experts that appear never to have been provided to, or requested by, trial counsel.
- Rachel Timmerman's probation file and records related to a group home where the decedent was apparently ordered to reside following a violation of her probation which would have provided an alternative explanation of her motive to leave her father's home that was unrelated to Gabrion (and unexplored by trial counsel).
- All evidence within the government's possession regarding the whereabouts of Shannon VerHage, the alleged child victim whose remains have never been recovered and who was believed by her family members to be alive. The SAUSA in this case also made comments to the media that Ms. VerHage left the State of Michigan alive.
- Gabrion's social security disability records. These support the claim that counsel was ineffective in failing to litigate competency issues. These records were not contained in trial counsel's file though that file did contain memos detailing the importance of these records and the difficulties encountered securing them. Gabrion was granted social security disability prior to the homicide here and was additionally required

18

> to have a payee because of his disabilities. The Social Security Administration claims they gave the records to the government.
> • All records maintained by the United States Probation Office on Gabrion's social security fraud case. Gabrion suggested the aforementioned social security records may be within the files of the USPO.

R. 51-1, Br. in Support of Mot. for Discovery, PageID 2530; R. 67, Am. Br. to Conduct Discovery, PageID 2604.

In a §2255 proceeding, the district court may authorize discovery "for good cause." Rule 6, Rules Governing Section 2255 Proceedings. "Good cause" for discovery "is established 'where specific allegations . . . show reason to believe that [the movant] may, if the facts are fully developed, be able to demonstrate' entitlement to relief." *Cornell v. United States*, 472 F. App'x 352, 354 (6th Cir. 2012) (quoting *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997)) (alterations in original).

Denying Gabrion's requests for discovery, the district court determined that there was insufficient factual support for Gabrion's claims, and used that as a reason to deny Gabrion any opportunity to factually develop his claims. *See* R. 156, Op., PageID 5983-91. For example, addressing Gabrion's request to depose trial counsel, the district court reasoned that "[e]liciting the reasons for counsel's decisions would not benefit his claims," which it said were meritless. *Id.* at PageID 5983. But eliciting the reasons for counsel's decisions—such as whether they were strategic reasons or based on ignorance of the law or facts—is virtually

the only way to resolve his ineffective assistance claims, and the district court could not have reasonably concluded the claims were meritless without eliciting this information.

Discovery is, by definition, the way the parties discover information in litigation. Certainly parties must do some investigation before formal discovery, to determine what they need to request in discovery. And just as obviously, discovery itself opens additional avenues for investigation, and perhaps additional discovery. Preliminary investigation can give a sense who should be deposed. And then those depositions reveal additional issues that should be investigated. Likewise, documents turned over in discovery can reveal additional documents that should be requested, or reveal additional avenues for investigation or additional witnesses who should be deposed. By denying Gabrion any discovery, the district court not only prevented him from questioning witnesses he knew he needed to question, and obtaining documents he knew he needed to review. Denying any discovery also prevented Gabrion from learning about additional witnesses and documents that may have supported his claims.

Because the district court denied all discovery, Gabrion had nothing approaching "a full opportunity to prove facts establishing ineffectiveness of counsel" or his other claims. *Massaro*, 538 U.S. at 505-06. It was an abuse of discretion for the district court to rule that Gabrion's claims had insufficient factual

20

support prior to discovery, let alone as the reason for denying discovery. *See Bracy*, 520 U.S. at 908-10.

Therefore, as explained in his detailed motions setting forth precisely what discovery he requested and why he was entitled to that information, *see* R. 51-1, Br. in Support of Disc., PageID 2530; R. 59, Br. in Support of Mot. to Conduct Deps., PageID 2565; R. 67, Am. Br. to Conduct Disc., PageID 2604. Gabrion has shown "good cause" for discovery.

**B.      Trial counsel was ineffective at both the guilt and penalty phases of Gabrion's trial.**

Gabrion's counsel was ineffective at both the guilt and penalty phases of his trial. *See Strickland v. Washington*, 466 U.S. 668, 690-92 (1984). Trial counsel's overarching error was simply failing to investigate the case. *See Wiggins v. Smith*, 539 U.S. 510, 524-27 (2003) (quoting *ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (1989)); *Avery v. Prelesnik*, 548 F.3d 434, 437 (6th Cir. 2008). The specific errors that resulted from the failure to adequately investigate emerged at both the guilt and penalty phases, partly because the government's theory of motive was also its primary explanation for why Gabrion deserved the death penalty.

Gabrion has made discrete claims of guilt-phase ineffective assistance and penalty-phase ineffective assistance. However, because the guilt and penalty phases of all capital trials are inextricably intertwined, and because this was

especially true in Gabrion's case, the investigative failures are best discussed together, even if the prejudice must be analyzed separately. This section begins with an explanation of some of the myriad investigative failures by Gabrion's trial team, and then turns to prejudice at the penalty phase and prejudice at the guilt phase.

**1.      Trial counsel failed to adequately investigate the case, leaving them unprepared for the guilt and penalty phases.**

Trial counsel did not adequately investigate the government's case. Inadequate funding was an issue throughout the trial proceedings. Trial counsel did not take the necessary steps to secure adequate funding. Trial counsel also failed to ask for appropriate continuances to ensure they had enough time to investigate the government's case. With insufficient time and money, trial counsel conducted an inadequate investigation.

**a.      Trial counsel did not adequately investigate the government's arguments in aggravation, in particular the argument premised on Chrystal Roach's false testimony.**

A competent penalty-phase investigation must examine aggravating factors supporting imposition of the death penalty. *See Rompilla v. Beard*, 545 U.S. 374, 383 (2005). The Supreme Court recently reaffirmed *Rompilla*, holding that trial counsel was ineffective by "fail[ing] adequately to investigate the State's aggravating evidence, thereby forgoing critical opportunities to rebut the case in

aggravation." *Andrus v. Texas*, 140 S. Ct. 1875, 1881-82 (2020); *see also id.* at 1884.

The government posited that Gabrion killed Rachel Timmerman in order to prevent her from testifying against him in a separate state court prosecution for sexual assault. Throughout the capital trial, the prosecution argued that Gabrion was a mastermind who manipulated the state court proceedings against him. Though this theme began in the guilt phase, when Newaygo County prosecutor Chrystal Roach testified about the progress of Gabrion's case through the Newaygo County courts, its effects were most acutely felt in the penalty phase. Trial counsel did nothing to establish that Roach's guilt-phase testimony was false. Court records conclusively establish that 1) her testimony was untrue as to what happened in Gabrion's case; and 2) she falsely testified about her habits in other similar cases that she sought to contrast to Gabrion's.

One of Roach's false statements was that she "tried" to have a preliminary examination "every time" "in cases involving assault" because she "fe[lt] strongly that in cases involving assault, that prelims should occur prior to trial." 02/26/2002 Tr. Vol. V, 1175. The preliminary examination is important because it is an opportunity to lock down the prosecutrix's testimony, and there was no preliminary examination in Gabrion's case. Roach's testimony was the only support for the government's argument that Gabrion manipulated the Newaygo County court

system to prevent the preliminary examination that would have preserved Timmerman's testimony.

If Roach actually had sought preliminary examinations in all assault cases, that would have indicated that Gabrion was uniquely capable of thwarting the Newaygo County prosecutors' strategy, particularly as Roach was the elected prosecutor in an office of just two attorneys. This also supported the government's argument that, having successfully prevented Timmerman from testifying at a preliminary examination while she was in jail on drug charges, Gabrion had strong motive to kill Timmerman once she was released, before she could testify against him at a trial. *See* 03/15-16/2002 Sent. Tr. Vol. V, 607-09.

The actual facts belie Roach's testimony. In reality, Newaygo County prosecutors had *never* filed a motion for a preliminary examination in the more than 750 felony assault complaints filed between January 1, 1996, and December 31, 2001, the timeframe that includes Gabrion's case. R. 15-3, Docket Sheets, PageID 1033-1168; R. 15-4, Docket Sheets, PageID 1170-1314.[4] The readily available Newaygo County Court records flatly contradict Roach's testimony. The factual discrepancy is striking: Roach testified that she *always* sought a preliminary examination; the records showed that she *never* sought a preliminary examination.

---

[4] Docket sheets are also an attachment to the Amended §2255 Motion. *See generally* R. 100-1 through 100-3.

The actual facts reveal there was nothing unusual about how Gabrion's case was processed in state court.

Roach also falsely testified that she moved to have the rape case against Gabrion remanded to the Newaygo County district court for a preliminary examination. 02/26/2002 Tr. Vol. V, 1165. However, the Newaygo County Court record from Gabrion's case establishes that Gabrion's attorney, not the prosecutor, requested the remand for the preliminary examination. R. 1-2, 04/29/97 Tr., PageID 147.

Roach also falsely testified that she requested the preliminary examination because she thought the case was moving too slowly. 02/26/2002 Tr. Vol. V, 1165. Contrary to this claim, records show not only that Roach did not request the preliminary examination, but also that she sought to delay a pretrial hearing that was already set. R. 1-1, Docket Sheet, PageID 142.

Court records conclusively establish that Roach's testimony did not accurately state what happened in Gabrion's case or other cases. Furthermore, no lesser authority than the judge who did the preliminary examination in the state cases—Newaygo County Judge Kevin Drake—reviewed the original court file and said that he could not say that Gabrion manipulated the proceedings. R. 141-1, Judge Drake Interview Report, PageID 5543.

There was no impediment to verifying Roach's statements. But Gabrion's trial counsel did not seek to present Judge Drake as a trial witness, did not cross-examine Judge Drake on this topic when he testified for the government at trial, and did not present their own client's state court file that would conclusively rebut Roach's false testimony.

Investigating a client's prior criminal cases is a necessary part of the investigation in a capital case. *See Rompilla*, 545 U.S. at 383 ("There is no need to say more, however, for a further point is clear and dispositive: the lawyers were deficient in failing to examine the court file on Rompilla's prior conviction."). And Gabrion's Newaygo County case was not even really a prior case. The Newaygo County case was an integral part of the prosecution's theory of the federal case, and the lynchpin of their argument for the death penalty. Roach was their star witness. The federal prosecutor's reliance on the Newaygo County case to establish Gabrion's dangerousness was "an obvious reason" why counsel should have been ready to use records from that case to rebut false testimony. *Id*.

If trial counsel had been familiar with their client's Newaygo County file, they should have realized that Roach's testimony was false, because, contrary to her testimony, Roach did not request a remand or preliminary examination in Gabrion's case. If they had realized that Roach's testimony about Gabrion's state case was false, they should have rebutted it. This was an opportunity to expose that

the government's star witness was lying. At that point, they should have taken steps to see if Roach was lying about other cases, as well. If they had, they would have realized that what she was saying was true in *every* case was true in *no* case. Armed with this knowledge, they could have told the jury that the government's star witness was lying, not only about their client's case, but about every assault case her office handled, all in an effort to make Gabrion look deceitful and manipulative.

Trial counsel's failures are even more inexcusable because they were on notice to be particularly vigilant about Roach. She had a history of misconduct in this case. Earlier in the proceedings, Roach had been designated as a SAUSA. She was removed from this role by the Department of Justice for misconduct *in Gabrion's case*. R. 100, Am. §2255 Motion, PageID 3903. Gabrion's lawyers were required to do more than they did to rebut any prosecution witness on a critical penalty phase issue. They should have been particularly vigilant to Roach's testimony because she had already shown a willingness to act unethically in seeking to punish Gabrion.

Additionally, this work could easily have been done with no assistance from their mentally ill client. Given the challenges presented by Gabrion's mental illness, competent counsel should have focused on this sort of records collection, which did not depend on Gabrion's ability to assist them.

27

Trial counsel's failure to use readily available records to rebut Roach's demonstrably false testimony, while inexcusable, is perhaps unsurprising, because it was not the only failure in trial counsel's preparation for the penalty phase. Trial counsel also failed to investigate other important penalty-phase witnesses, including Jason Cross, Shannon Cross, Greg Leon, Joe Lunsford, Nathan Brewster, Lloyd Westcomb, Tim Timmerman, and Ailene Wolf. *See generally* R. 100, Am. §2255 Mot. Trial counsels' failure to rebut Roach's false testimony is part and parcel of an overall failure to adequately investigate, and thus competently litigate, Gabrion's case.

**b.     Trial counsel's mitigation specialist never completed his social history report.**

Another key investigative failure is that trial counsel's mitigation specialist never completed Gabrion's social history. The mitigation specialist retained by trial counsel, James Crates, prepared a ten-page, double spaced "Abridged Social History." In the ten-page Abridged Social History, apparently recognizing that he had not conducted a sufficient investigation, he wrote, "The research is ongoing. Additional relevant information, especially relevant to Marvin'[s] mental disorders and brain injuries will be provided as it is discovered." R. 100-5, Abridged Social History, PageID 4713.

Yet, despite acknowledging that he needed to provide additional information, and promising to do so, he never actually did. The Abridged Social

28

History quoted above was the *only* social history ever prepared by the trial team, and it was never supplemented. R. 100-5, Crates Aff. ¶6, PageID 4702-03.

Supreme Court cases emphasize the importance of a thorough life history investigation. In *Wiggins*, like here, trial counsel conducted some mitigation investigation. *See Wiggins*, 539 U.S. at 518. However, counsel failed to pursue leads that reasonable counsel would have pursued. *Id.* at 533-34. In failing to pursue these leads, they missed "powerful" mitigation evidence, such as deprivation, physical abuse, and sexual molestation during Wiggins' childhood. *Id.* at 534-35. The Supreme Court held that trial counsel's mitigation investigation fell below objective professional standards.

Similarly, in *Rompilla*, the Supreme Court noted that "[t]his is not a case in which defense counsel simply ignored their obligation to find mitigating evidence, and their workload as busy public defenders did not keep them from making a number of efforts, including interviews with Rompilla and some members of his family, and examinations of reports by three mental health experts who gave opinions at the guilt phase." *Rompilla*, 545 U.S. at 381. The Supreme Court also noted that lack of cooperation from the client or his family does not relieve counsel of the obligation to conduct a thorough mitigation investigation. *Id.* at 381. Ultimately, the Supreme Court held that Rompilla's trial counsel failed to conduct a sufficiently thorough mitigation investigation, even though trial counsel

29

presented some mitigating evidence despite resistance from their client. *Id.* at 382-83.

The affidavit of Russell Stetler, the National Mitigation Coordinator for the federal death penalty projects, explains how these standards apply to Gabrion's case, ultimately concluding that Gabrion's trial counsel failed to comply with prevailing professional norms. R. 103-4, Stetler Dec. ¶1, PageID 4891-4986.

Among other things, Stetler's affidavit notes the significant barriers that must be overcome in order to uncover mitigating evidence, explaining,

> it is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socioeconomic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members. These inquiries invade the darkest, and most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed. Only with time can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions. In my professional opinion, an experienced mitigation specialist requires, at minimum, hundreds of hours to complete an adequate social history — even working under intense time pressure. One nationally recognized authority in mitigation investigation, Lee Norton, writing in 1992, stressed the cyclical nature of the work and estimated that hundreds of hours will typically be required.

*Id.* ¶¶ 31-32, PageID 4913-14.[5]

---

[5] The §2255 mitigation specialists conducted a far more thorough mitigation investigation. In line with Stetler's observations, they report that Gabrion's "family members feel great shame about their past. It was only after Marvin's current lawyers, mitigation specialists, and investigators spent many hours building relationships of trust with his family that they were willing to reveal a number of vitally important details about Marvin's life and environment." R. 103-1, Social History, PageID 4737.

In short, "The investigation needed to expand beyond Gabrion's immediate family to identify friends, neighbors, aunts, uncles, cousins, teachers, classmates, and co-workers who could provide insights into the family's dysfunction, Marvin's poor academic performance in spite of high intellectual potential, and every aspect of parental maltreatment and neglect." R. 103-4, Stetler Dec. ¶148, PageID 4984. Specifically, "[n]umerous 'red flags' should have prompted specific areas of investigation: the mother's 'nervous breakdown,' the parents' promiscuity and interpersonal violence, familial alcoholism and substance abuse, and the medical neglect of Marvin in childhood." *Id.* And "[a]ll the etiologies of potential brain damage needed to be investigated thoroughly: not just the traumatic head injuries, but the childhood fever, abuse of alcohol, inhalants and street drugs, and potential exposure *in utero* and in early childhood to neurotoxins." *Id.*

Crates' investigation did not touch on most of these areas. Crates also failed to obtain records that would have supported arguments in mitigation. The failure to conduct a thorough, multigenerational social history supported by records was particularly significant error because Gabrion engaged in bizarre and disruptive behavior throughout the trial, and, indeed, throughout the prior decade or more of his life. Establishing that Gabrion suffered from mental health problems would have been mitigating evidence and helped explain Gabrion's behavior. The government contended that Gabrion was not mentally ill, but malingering. 03/14-

15/2002 Sent. Tr. Vol. V, 643. Evidence of mental health problems earlier in Gabrion's own life, and in his family history, was critical to rebutting the government's argument that Gabrion was malingering.

In sum, Crates' investigation and ten-page Abridged Social History barely scratched the surface of the available mitigating evidence.

**c. Trial counsel retained a single fact investigator to conduct an investigation that needed to reach every region of the country, and did not secure sufficient funding to allow her to work on the case continuously throughout the critical pre-trial investigation period.**

Yet another key investigative failure is that the defense team did not have consistent assistance from an investigator working on guilt-phase issues. Such assistance is necessary to "discover[] and develop[] the facts that must be unearthed." American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 958 (2003) (hereafter 2003 Guidelines).

A thorough investigation is never optional. "Under *Strickland*, trial counsel has a duty to investigate his case." *Avery*, 548 F.3d at 437. "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." *Rompilla*, 545 U.S. at 387 (quoting 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.)); *see also United States v. Arny*, 831 F.3d 725, 734 (6th Cir. 2016) (counsel's failure to investigate and

interview witnesses with information concerning client's guilt or innocence was objectively unreasonable); *Towns v. Smith*, 395 F.3d 251, 258-59 (6th Cir. 2005) (pursuing a "strategy" that does not require interviewing a possible witness, despite the fact that the witness is "known and potentially important," is objectively unreasonable "making a fully informed decision . . . impossible").

A thorough investigation was particularly necessary here. Gabrion had lived and worked in every region of the country. The government's case posited that Gabrion had murdered four people in addition to Timmerman, including Timmerman's daughter Shannon VerHage, whose death the government was not able to officially confirm. In just the few months after Timmerman's body was discovered, Gabrion was alleged to have been in Indiana, Arkansas, Kentucky, Virginia, and New York.

Despite the enormous scope of the investigation to be conducted, Gabrion's trial team included a single investigator to handle the guilt-phase investigation. The investigator they retained was not paid and did no work for the first ten months of 2000. *See* R. 16-7, 6/26/2000 letter Stebbins to Scoville, PageID 1524-25, ("Because we do not have approval from the Sixth Circuit our investigators and experts have not been paid, and consequently are not working on this case because of a lack of funding. This appears to be an usually [sic] cumbersome process that prevents us from investigating the case and preparing for trial. . . We are finding it

impossible to investigate and prepare the case without the assistance of investigators and experts."); R. 16-8, 3/9/2001 letter Stebbins and Mitchell to Enslen, PageID 1527-28, ("[W]e are concerned that once again our investigators are not being compensated and understandably are not willing to continue to devote the time necessary to complete the investigation in this case.").[6]

Without the assistance of an investigator to conduct a thorough investigation, trial counsel did not step in to perform the investigator's tasks themselves—nor could they. "[T]he prevailing national standard of practice forbids counsel from shouldering primary responsibility for the investigation. Counsel lacks the special expertise required to accomplish the high quality investigation to which a capital defendant is entitled and simply has too many other duties to discharge in preparing the case." 2003 Guidelines at 958. "The assistance of an investigator who has received specialized training is indispensable to discovering and developing the facts that must be unearthed." *Id.*

For almost a year, while a capital trial was pending, no investigator was working on the case, making a thorough investigation impossible. Not having an investigator working on the case led to critical information not being presented during trial proceedings. For example, as discussed above, trial counsel did not use

---

[6] The plural "investigators" refers to the fact investigator, working on guilt-phase issues, and the mitigation specialist, working on penalty-phase issues.

Gabrion's Newaygo County case file to rebut the false and misleading testimony of Chrystal Roach. As another example, trial counsel also knew that Gabrion was required to have a payee for the SSI benefits he had received since 1993. No investigator ever followed up on that lead, although it could have resulted in information that helped Gabrion, particularly as his competence to be tried was in question.[7]

### d. Trial counsel did not retain necessary experts to assist their investigation.

Yet another critical investigative failure is that trial counsel did not retain key experts to help them assess the allegations against Gabrion or cross-examine the government's witnesses. As the most egregious example, trial counsel did not retain a pathologist, either to testify or as a consultant. Trial counsel failed to do so

---

[7] Additional gaps in trial counsel's investigation—discussed more fully in the section on prejudice, below—include: failure to uncover witnesses who could have undermined Lloyd Westcomb's credibility, despite the government's argument that Westcomb's testimony "all by itself proves to you the defendant is the killer," Tr. 1700; failing to uncover witnesses who would have undermined the government's timeline by establishing that Gabrion was at a campground on June 25, 1997; failure to uncover witnesses who would have undermined the government's theory that Gabrion used John Weeks to lure Timmerman from her home, and then killed Weeks; failing to uncover a witness, Walter D. Hamilton, whose testimony would have impeached the testimony of Linda Coleman; failure to uncover Timmerman's motive to disappear, namely, that her probation officer ordered her to move from her father's home into a group home; failure to follow up on handwriting analysis which said Timmerman wrote letters saying she had started a new life; failure to uncover witnesses who saw Timmerman alive after she was supposedly abducted and never seen again; failure to present credible evidence of alternative suspects, including David Gabrion and Eddie Start; failure to uncover impeachment material against additional witnesses, including David Gabrion, Detective Richard Miller, and Nathan Brewster. *See generally* R. 100, Am. §2255 Mot.

despite the cause and location of death being crucial to whether the federal government had jurisdiction over the case. Counsel's failure to retain a pathologist is more inexplicable because the manner of death was alleged as an aggravator and they had funds approved for a pathologist.

Expert assistance is critical in complex criminal cases. *See Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir. 2007) (the "most egregious type [of case is] wherein lawyers altogether fail to hire an expert"). Counsel cannot simply assume the accuracy of the prosecution's expert's findings or rely upon their lay knowledge of a subject to effectively cross-examine the government's expert. Doing so fails to provide the defendant with the "ample opportunity to meet the case of the prosecution," and undermines "the reliability of the adversarial testing process." *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (internal quotation marks and citations omitted). Rather, "[w]ith the assistance of appropriate experts, counsel should . . . aggressively re-examine all of the government's forensic evidence, and conduct appropriate analyses of all other available forensic evidence." ABA Guideline 10.7 Commentary.

Failure to consult with forensic experts prior to cross-examining the prosecution's experts renders counsel unable to "develop the defense theory through cross-examination of the State's witnesses." *Stouffer v. Reynolds*, 214 F.3d 1231, 1234 (10th Cir. 2000).

And while the general principle that expert assistance is critical applies to every capital case, the need for experts, and specifically a pathologist, was particularly acute in this case. There was no eyewitness testimony concerning Timmerman's death. The government relied upon the fact she was found in a federally owned portion of Oxford Lake and its pathologist's testimony that she died of drowning. If she had died even a few hundred feet from where she was found, on the private portion of the lake; or on private land surrounding the lake, there would have been no federal jurisdiction. *See generally Gabrion*, 517 F.3d at 839. Thus, if she did not die by drowning on federal land, but was put on federal land after her death, the case would have been prosecuted under Michigan law, which abolished the death penalty in 1847.

A pathologist was also critical because in the penalty phase the government presented powerfully graphic and disturbing testimony about the fear Timmerman confronted as she drowned, and alleged that she died in a particularly heinous manner as an aggravating factor. For example, the government's pathologist explained that, while still conscious, "[t]he person is choking, of course gagging. Oftentimes there is vomiting . . . some of the vomited material is inhaled into the lungs, and this will take place again or occur over a period of roughly a minute or so . . . after there is a sufficient amount of time when the individual has been deprived of oxygen, then unconsciousness will result." 03/11/2002 Sent. Tr. Vol. I,

59-60. He also explained that, as a person anticipates being drowned, "the struggle and anxiety will increase as the person gets closer to the water surface and is aware of what's going to go on, and obviously would increase after the point of being submerged in the water, and there would be panic. Sometimes there's a loss of bowel and bladder control in these cases as the person is -- as the anxiety level is sufficiently high." *Id.* at 61-62. If Timmerman died before she was put in the lake, however, this powerful testimony regarding death by drowning would be irrelevant.

Trial counsel apparently saw the importance and value an expert in pathology could provide in requesting and securing funding for such an expert. Yet, counsel then failed to retain a pathologist and failed to secure appropriate funding for a separate expert on jurisdiction. Trial counsel retained jurisdiction expert Chris Shafer, who billed them $8,682.27. The district court agreed to pay only $3,682.27. Trial counsel Paul Mitchell paid the remainder of the bill personally. This created a conflict of interest and a disincentive to retain additional experts.

**2.      Trial counsel's penalty-phase presentation was deficient.**

Trial counsel's penalty-phase presentation was deficient. Among their many errors, trial counsel failed to object to the introduction of irrelevant, unreliable, and

prejudicial evidence during the penalty phase, including allegations of bad acts presented to the jury through speculation and hearsay.

**a.      Trial counsel failed to object to evidence they should have objected to.**

Trial counsel operated under a fundamental misunderstanding regarding what evidence was admissible at Gabrion's sentencing hearing. This became clear when counsel tried to impeach a government penalty phase witness with a misdemeanor conviction, which is not permitted under Federal Rule of Evidence 609. When the government objected, counsel responded that "the rules" did not apply to the proceeding, and said he had not objected to the government's hearsay evidence because "the rules do not apply to this hearing." 03/11/2002 Sent. Tr. Vol. I, 148. Based on this misunderstanding, counsel did not seek to limit any of the government's evidence in aggravation during the penalty-phase testimony, creating the very real possibility that Gabrion was sentenced to death based on irrelevant and unreliable evidence in violation of the Eighth Amendment.

Supposedly as evidence of future dangerousness in prison, the government introduced evidence implying that Gabrion killed Robert Allen, Wayne Davis and John Weeks. *Id.* at 34-37. These allegations were not included in any government notice.  The allegations were not subjected to any pre-trial reliability analysis by the court. Counsel did not seek a hearing, did not argue relevance or

39

reliability, and did not specifically argue how these allegations did not advance the government's position that Gabrion would be a danger in prison.

Counsel apparently thought they were not permitted to test the reliability of this evidence because "the rules" did not apply to penalty-phase testimony in a death penalty case. *Id.* at 148. Counsel were not just permitted to test the reliability and relevance of this evidence, but required to, in order to be functioning as reasonably competent counsel.

Trial counsel's fundamental misunderstanding resulted in additional unreliable "bad acts" evidence being admitted against Gabrion with no reliability or relevance testing. For example, the government offered the following evidence that was never tested for reliability and never linked to future dangerousness in the BOP:

- Committed arsons or attempted arsons.
- Bothered a neighbor and pulled him from a lawn mower.
- Grabbed a woman's breast and crotch.
- Talked about surveillance equipment and tapping into phone lines.
- Put his hands in finished concrete.
- Threw a dog against a wall.
- Kept a large bullfrog lying on its back on a mattress in his home, 12 inches away from a 14-inch doll wearing only little girl panties. Both the frog and the doll were spread eagled and had what appeared to be dried bodily fluids on them.
- Looked at a photo of Rachel Timmermans's infant daughter while masturbating.
- Made people feel uneasy.

*See generally* Sent. Tr. Vols. I-V. Counsel should have objected to this evidence.

40

**b.** **Trial counsel conceded an aggravating factor they should have rebutted.**

Trial counsel stated that Gabrion was guilty of the aggravating factor of obstruction of justice, even though there was compelling evidence to counter this aggravating factor, which the government had the burden to prove beyond a reasonable doubt.[8] 03/11/2002 Sent. Tr. Vol. I, 44. Counsel stated that Gabrion was guilty of obstructing justice despite Gabrion's Newaygo County case file showing that the government's support for this aggravator (Roach's testimony) was false and misleading.

Conceding this aggravator was yet another error resulting from investigative failures. *See Andrus*, 140 S. Ct. at 1875 ("[C]ounsel left all of that aggravating evidence [related to Andrus' prior behavior in custody] untouched at trial—even going so far as to inform the jury that the evidence made it 'probabl[e]' that Andrus was 'a violent kind of guy.'"); *Rompilla*, 545 U.S. at 383 (trial counsel

---

[8] Counsel made several additional errors: They failed to refute the government's argument that Gabrion was a sophisticated actor because he had independently established a 501(c)(3) organization, even though counsel knew that they themselves had filed the relevant documents. They failed to appropriately cross-examine government witness, and professional snitch, Jason Cross. And they entirely failed to investigate, prepare, and present evidence that would have countered the government's evidence of future dangerousness by showing how the federal Bureau of Prisons could have handled Gabrion in prison if he had been sentenced to life, or showing the BOP evaluations that judged his risk for potential harm to others in an institutionally setting to be low. PageID 1707-13.

required to examine their client's own case files if they know the prosecution will rely on them as aggravation).[9]

Without hearing any evidence or receiving any affidavit from counsel, the district court found counsel conceded aggravating factors to focus on mitigating factors: "it was not unreasonable for counsel to concede this issue as part of a strategic decision to focus on more promising avenues, like the mitigating factors." R. 156, Op., PageID 5925. Here, the district court has pulled facts out of thin air; its conclusion is unsupported by the record. As in *Andrus*, "counsel never offered, and no evidence supports, any tactical rationale for the pervasive oversights and lapses." 140 S. Ct. at 1883. Moreover, even if the court's concocted case were true, it would be very poor strategy indeed to concede the aggravator with the strongest correlation to death sentences when available evidence establishes its factual premise is demonstrably false.

---

[9] *See also Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012) ("We recognize that conceding a continuing-threat aggravator is not necessarily deficient performance and may even help build credibility with the jury. But it is particularly unreasonable when, as here, counsel presents a beggarly mitigation case and, worse, reinforces the conceded aggravator both by failing to challenge the government's case in aggravation (impeachable though it was) and by characterizing the mitigation evidence, as well as his client, as 'scar[y].'") (modification in original) (citation omitted); *Marshall v. Hendricks*, 307 F.3d 36, 100 & n.45 (3d Cir. 2002) (remanding for further factual development as to penalty-phase ineffective assistance in part because he told the jury that it had already found the aggravating factor, rather than instructing it to deliberate again about whether the prosecutor had established the aggravating factor beyond a reasonable doubt).

The district court's contrived rationale is also contrary to the evidence because trial counsel actually presented a "beggarly" mitigation case that had its genesis in a woefully deficient mitigation investigation. *See Hooks v. Workman*, 689 F.3d 1148, 1206 (10th Cir. 2012). The "beggarly" mitigation case undermines the district court's conclusion that counsel made a strategic choice to focus its efforts on presenting a persuasive mitigation case. *Id.*

At minimum, the district court's conclusion is premature: "The Supreme Court has held in several cases that the habeas court's commission is not to invent strategic reasons or accept any strategy counsel could have followed, without regard to what actually happened[.]" *Marcrum v. Luebbers*, 509 F.3d 489, 502 (8th Cir. 2007) (citing *Rompilla*, 545 U.S. at 395-96 (O'Connor, J., concurring); *Wiggins*, 539 U.S. at 526-27; *Kimmelman*, 477 U.S. at 385.

**3. Gabrion was prejudiced by trial counsel's errors.**

Of course, even though trial counsel's errors were egregious, in order to be entitled to relief, Gabrion must also show that he was prejudiced. *See Strickland*, 466 U.S. at 690-92. Gabrion was prejudiced by trial counsel's failures, because trial counsel's inadequate investigation left them unprepared to competently litigate the case and resulted in many errors during the trial itself. If there is a question about whether Gabrion was prejudiced, it cannot be answered without an evidentiary hearing.

43

**a. Gabrion was prejudiced at the penalty phase.**

As to prejudice at the penalty phase, there are myriad reasons why, but for counsel's errors, "there is a reasonable probability that at least one juror would have struck a different balance" and voted for a sentence of life rather than death. *Wiggins*, 539 U.S. at 537. The limited scope of Crates' Social History and the lack of records Crates obtained left the defense unable to rebut the government's aggravators, unprepared to make a persuasive mitigation case, and vulnerable to claims of malingering.

**i. Gabrion was prejudiced by trial counsel's failure to adequately investigate the evidence that supposedly supported the aggravating factors.**

First, Gabrion was prejudiced because trial counsel's inadequate investigation of aggravating factors meant that damaging, but untrue, evidence went unrebutted during penalty phase, when prosecutors relied on Roach's guilt-phase testimony to argue Gabrion's crime was "an assault on our system of criminal justice." 03/15-16/2002 Sent. Tr. Vol. V, 608. Prosecutors claimed that Gabrion prevented a trial on sexual assault charges in Newaygo County by "maneuver[ing]" through the Newaygo County court system, masterfully delaying his case and preventing Timmerman from testifying against him, and ultimately killing Timmerman before she could testify. *Id.* The notion that Gabrion had the unique ability to "maneuver[] around through the Newaygo County court justice

system," *id.*, supported the argument that Gabrion was an evil manipulative mastermind who could bend the justice system to his will and thus, deserving of society's ultimate punishment.

This portrayal of Gabrion was supported *only* by Roach's testimony. Roach's testimony was thus crucial evidence in support of the aggravating factors of 1) obstruction of justice and 2) substantial planning and premeditation.

Roach's testimony also strongly supported a future dangerousness argument. Jury research shows future danger is the most persuasive factor when determining who is sentenced to death. *See generally* John Blume et al., *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 Cornell L. Rev. 397 (2001). Despite the importance of this factor and the critical role Roach's testimony played in proving it, trial counsel did nothing to rebut or challenge it. The records that would have shown the sophism of the government's narrative were readily available to trial counsel—indeed, some of the most important records were in their client's own file.

According to the district court, Roach's testimony presented no problems for Gabrion because it was not indisputably false and, in any case, benefitted him. Both arguments are unconvincing. At minimum, both arguments are premature without an evidentiary hearing to resolve factual disputes. Even without a hearing, it is clear that Roach's testimony is contrary to court records. And it is

incomprehensible how testimony that was the government's only support for the theory that Gabrion masterfully manipulated the state court system could have benefitted him.

First, the district court said that although the "evidence suggests that Gabrion, not the prosecutor, sought the remand[,] [o]n the other hand, the evidence also indicates that the prosecutor (*who may have been* Roach) initially brought the remand request to the attention of the court. Thus, in that respect, the prosecutor asked for the remand." R. 156, Op., PageID 5838 (emphasis added). The district court further speculates that "*[i]t is also possible that Roach asked for the remand by suggesting it to Gabrion's attorney before the hearing.*" *Id.* (emphasis added). "Accordingly," the district court concludes, "the evidence before the Court does not demonstrate that Roach's testimony is indisputably false." *Id.* This is absurd. It is also wholly unsupported by the record.

If there is some reason the record does not accurately reflect what happened during the Newago proceedings—and Gabrion contends there is not—the district court has identified precisely a situation where a hearing and discovery are most necessary. Gabrion has pointed to discrepancies between Roach's testimony about the court proceedings and the court records of those proceedings. If the district court hypothesizes there may be a benign explanation for those discrepancies, it should allow discovery and a hearing to test that hypothesis. The district court

46

cannot just conjure an explanation out of thin air, then rely on that explanation to deny relief.

Second, the district court suggests that Roach's false testimony helped Gabrion's case rather than prejudiced him. Here again, the district court makes a factual assumption, saying that the evidence of obstruction would look even worse if Gabrion's counsel requested the remand, as the court records indicate, than if the prosecution requested it, as Roach falsely testified. R. 156, Op., PageID 5838. The district court's reasoning is that if Gabrion's counsel requested the remand, "the remand served no purpose but to delay the proceedings." *Id.* Because the district court did not allow for any factual development of the actual reasons Gabrion's counsel requested and later waived a remand, there is no factual support for this assertion. If speculation were permitted, it is equally plausible that Gabrion requested a preliminary examination because Gabrion was denying guilt, and he wanted to subject Timmerman's story to adversarial testing.

Moreover, even if there is some possibility that Roach's testimony could have told a story wherein Gabrion manipulated the proceedings by *requesting* the preliminary examination, the fact is that she told a story wherein Gabrion manipulated the proceedings by *preventing* a preliminary examination. The district court has essentially endorsed a heads I win, tails you lose theory. But readily available court records rebut Roach's testimony and the trial court's speculation.

Gabrion's trial counsel did not use those records to challenge her false testimony. At minimum, these are factual questions that require a hearing.

**ii.     Gabrion was prejudiced by trial counsel's failure to oversee an adequate mitigation investigation.**

As to mitigating evidence, the kind of mitigation evidence that Gabrion's post-conviction counsel uncovered is comparable to the mitigation evidence that post-conviction counsel uncovered in *Wiggins* and *Rompilla*, and in both of those cases the Supreme Court found not only deficient performance but also prejudice. *See Rompilla*, 545 U.S. at 393; *Wiggins*, 539 U.S. at 534-37.

Gabrion's §2255 Motion laid out evidence of mitigating factors that trial counsel did not sufficiently investigate or present. These failures were reflected in the jury's penalty phase verdict findings. Specifically, not a single juror found that "Defendant has suffered traumatic brain injuries which have led to neurological impairments, including Geschwind syndrome." Trial Docket R. 526, Penalty Phase Special Verdict Form 7. However, new evidence set forth as part of Gabrion's §2255 proceedings reveals that Gabrion suffered 16 motor-vehicle crashes and head injuries. R. 103-1, Social History, PageID 4756-64. It is well known that multiple brain injuries, even mild ones, can cause serious deficits. *See* Centers for Disease Control and Prevention, Traumatic Brain Injury & Concussion, https://www.cdc.gov/traumaticbraininjury/outcomes.html (last visited May 14, 2021).

Likewise, no juror found that "Defendant suffers from a brain dysfunction which has impaired his ability to control his conduct and to function in the absence of strong support and guidance." Trial Docket R. 526, Penalty Phase Special Verdict Form 7. Nor did even one juror find that "Defendant committed the offense under severe mental or emotional disturbance." *Id.* Further, only three jurors found that "Defendant was not provided with the necessary parental guidance as an adolescent which prevented him from acquiring the necessary social skills and maturity to deal with adult situations and traumas." *Id.* at 6. Six jurors found that "Defendant's upbringing, early family life, and childhood contributed to his adult psychological deficits and criminal conduct." *Id.*

Current counsel has uncovered evidence that would have supported jurors finding the existence of all these mitigating factors. *See generally* R. 103-1, Social History, PageID 4733-4883.[10] For example, post-conviction mitigation specialists learned that the Gabrion home in Round Lake was so stark that it had an outhouse. *Id.*, PageID 4746. From their stark house in Round Lake, the family moved to a filthy house in White Cloud. *Id.*, PageID 4747. Friends describe the stench and the

---

[10] Consistent with *McKoy v. North Carolina*, 494 U.S. 433 (1990), jurors in Gabrion's case were told that they could consider particular mitigating factors they personally found. Jurors who did not find particular mitigating factors did not include them in their sentencing calculus.

filth and the plates of long abandoned food frequently strewn around the house. *Id.*, PageID 4748.

People recall that Gabrion wore shoes that were too big for him and split down the back, and clothes that were ill-fitting and ragged. *Id.*, PageID 4747. Other children noticed and made fun of him. *Id.*

Gabrion's family members physically abused him, and each other. Gabrion's father, Marvin Sr., physically abused Gabrion, including beating his head against a wall. *Id.*, PageID 4745. Gabrion's mother, Elaine, physically abused Gabrion. *Id.*, PageID 4746. Marvin Sr. physically abused Elaine. *Id.*, PageID 4746. And Gabrion's brothers, who were physically imposing, physically attacked him on a number of occasions. *Id.*, PageID 4745-46. Once, his two brothers held him down and tried to smash his head with a large rock. *Id.*, PageID 4746. When Marvin was twelve, his brother Michael shot at him with a gun. *Id.*

This conduct was well beyond sibling rivalry. Gabrion's parents and siblings encouraged his brothers' violence toward him. When Gabrion was four, his family forced him to box with his older brother, gathering around and urging the boys to fight each other. *Id.*, PageID 4745.

Gabrion was not nurtured in any known way. The lack of maternal comfort was especially obvious. To the extent that Gabrion's mother Elaine did teach her children anything, it was to steal; she encouraged criminal conduct. *Id.*, PageID

4751-52. But more notable is Elaine's abandonment of her children. She left the family home and children several times to be with men with whom she was having affairs. *Id.*, PageID 4739. She did not hide this from her children.

Family friends also report that Elaine had inappropriate sexual boundaries, including reports of a sexual relationship with her son, David, and reports of sex with a boyfriend of one of her older daughters. *Id.*, PageID 4743-44.

Gabrion not only observed his mother's inappropriate sexual activities and lack of boundaries, but also suffered or observed sexual abuse as a child. Gabrion and his brother Mike spent time alone with an older neighbor, who brought them to his house under the auspices of having them help rake the yard. *Id.*, PageID 4738. While they were there, the neighbor molested one or both of the boys. At some point, one of the boys ran out in order to get help. *Id.* When a friend arrived to help, the older neighbor was in bed with the other boy. *Id.* The friend explained that the boy who had run for help was aware that his brother was being molested and was probably also molested. *Id.* Gabrion's mother told him that the abuse was nothing and he should not think about it or tell anyone about it. *Id.*, PageID 4739.

Gabrion's parents treated him differently than his siblings. Marvin Sr. gave Gabrion the impression that he was a lesser person than his siblings. *Id.*, PageID 4746. When finances were tight, Marvin Sr. suggested selling Gabrion. *Id.* Gabrion knew this because his father talked about it openly. *Id.* Gabrion's parents gave his

siblings better quality clothes than Gabrion. *Id.*, PageID 4745-46. His brothers not only beat Gabrion, they constantly heaped emotional abuse on him as well. *Id.*, PageID 4746. His parents' actions added to the emotional abuse.

The government contends Gabrion was malingering mental illness and that argument carried the day with the jury and later this court. 03/14-15/2002 Sent. Tr. Vol. V, 643. Trial counsel offered no evidence that there is a long history of documented mental illness in Gabrion's immediate family even though there is a scientifically established link between major mental illness in families and its development in a particular individual. "A family history of bipolar disorder is one of the strongest and most consistent risk factors for bipolar disorders. There is an average 10-fold increased risk among adult relatives of individuals with bipolar I and bipolar II disorders." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 130 (5th ed. 2013) (DSM-5). "Schizophrenia and bipolar disorder likely share a genetic origin, reflected in familial co-aggregation of schizophrenia and bipolar disorder." *Id.* This family history is also relevant because understanding a person's family history is necessary to making a proper diagnosis.

Experts who have testified in capital cases also recognize the importance of family history. For example, in Richard Stitt's federal capital trial, Dr. Ryan (the same Dr. Ryan who testified for the Government in this case) testified that Stitt

met the criteria for psychopathy. Dr. Ryan based his trial diagnosis on documents pertaining to the defendant and his history provided by the government, his clinical interview of Stitt and two psychological instruments he administered. Years later, during Stitt's habeas proceedings, Dr. Ryan was provided with information about Stitt's chaotic upbringing, and "most significantly, that acute mental illness has been diagnosed in Mr. Stitt's mother and at least one (and possibly two) of her siblings." *See* R. 160-2, Ryan Dec. ¶14, PageID 6052. Dr. Ryan opined that all the information about Stitt's background would have been "important for [his] evaluation," and in particular the information about Stitt's familial history of major mental illness would have been "very helpful" because of the genetic component of bipolar and other mood disorders. *Id.* ¶15, PageID 6052. "With an awareness of Mr. Stitt's reportedly remarkable family history of bipolar disorder, his behavior could be cast in a dramatically different light." *Id.* ¶16, PageID 6052.

At least four generations in Gabrion's family have been substantially impacted by mental illness and substance abuse. R. 103-1, Social History, PageID 4779. Substance abuse is frequently a result of unmedicated mental health problems. *See, e.g.*, Sarah Turner et al., *Self-medication with Alcohol or Drugs for Mood and Anxiety Disorders: A Narrative Review of the Epidemiological Literature*, 9 Depression and Anxiety 851 (2018). Several family members have received treatment and hospitalization for diagnosable mental illnesses throughout

the years. R. 103-1, Social History, PageID 4779. Several have also faced legal consequences for their substance abuse. *Id.* Many of Gabrion's close relatives have been diagnosed with Bipolar Disorder, Schizophrenia, or Major Depressive Disorder. Some of these relatives have required inpatient mental health commitments. At least one has committed suicide; a couple others attempted suicide.

The social history prepared by Gabrion's §2255 team details the history of mental illness and substance abuse in Gabrion's family. *See id.*, PageID 4779-82. None of this was contained in trial counsel's Abridged Social History. No evidence was presented concerning the well-documented multigenerational history of mental disorders/substance abuse and its future generations. The records documenting this family history—records created by persons with no incentive to lie or exaggerate and at time prior to Timmerman's homicide—would have gone a long way in rebutting the government's claims of malingering.

This family history includes that Elaine was treated for a "nervous breakdown" when Gabrion was between seven and nine years old. *Id.*, PageID 4789. Marvin's paternal step-grandfather Vern Gabrion abused alcohol. Many in the family believed Vern sexually abused his step-daughters, Gabrion's aunts. *Id.*, PageID 4871. Gabrion's sister Gloria was molested and receives treatment from a psychiatrist and psychologist. *Id.*, PageID 4790-91. His sister Yvonne suffers from

depression. She refuses to take medication and instead treats herself with health foods. *Id.*, PageID 4791. Gabrion's brother David takes antidepressant and antipsychotic medication. *Id.*, PageID 4791-92. Both of Gabrion's brothers have a history of substance abuse. *Id.* Four of Gabrion's nieces and nephews have substance abuse problems. *Id.*, PageID 4793-95.

The investigation by Gabrion's §2255 team also revealed an "astonishing number of motor-vehicle accidents and head injuries, beginning around the time of his high-school graduation." R. 103-1, Social History, PageID 4756-64. While Crates' Abridged Social History noted three possible head injuries, *see* R. 100-5, Abridged Social History, PageID 4706-09, the more-thorough post-conviction Social History reports a startling seventeen accidents and head injuries:

1.      Gabrion was "apparently involved in a serious automobile accident," resulting in serious injury near his family's home in White Cloud. His sibling remembered that on Marvin's graduation night, "he came up and had borrowed one of Dad's cars, and he drove off the road into a cemetery, with the car landing propped up on a tomb stone at an angle. He came to me and I helped him get the car down. He was definitely drunk, but that's the first time I'd seen him that way.''

2.      During the mid-1970s in Tucson, Arizona, Gabrion's then-girlfriend reports, she and Gabrion were in a car accident. Both their heads hit the windshield and broke it.

3.      A friend recalled that Gabrion was in a car accident near Robinson Lake in 1974.

4.      Marvin Sr. told family that Marvin Gabrion used to race motor bikes in Arizona. He said he banged his head up a lot while racing.

5.	Gabrion and his girlfriend were on a motorcycle and hit a car, in Seattle. They were not wearing helmets. Gabrion had a big lump on his head. One family member remembered seeing a newspaper article about the accident, recalling that it was ''a pretty bad wreck.'' A sibling recalled that "when they were in Washington, Marvin had this motorcycle accident when he run into the side of a car. He flew over the hood with no helmet on, and went headfirst into the door of the truck. Marvin and [his girlfriend] told me the story, and that's all he said about it." Elaine Gabrion had Marvin Gabrion's medical records about the motorcycle accident. Elaine told Marvin's sibling that Marvin was not supposed to drink---that drinking would make his personality change. He was supposed to keep taking medicine. The sibling thinks maybe the medicine interacted with alcohol.

6.	Marvin's employment records at Hydaker-Wheatlake Co. report another car accident, this one in 1976. Marvin Gabrion "was hit broadside while entering a gas station, other drivers fault."

7.	In August, 1983, Marvin was evaluated at Gerber Memorial Hospital after being found with a strong odor of alcohol on his breath, staggering, and slurring his words, trying to tow a damaged vehicle from an accident scene. He sustained a laceration to his chin, suggesting involvement in an accident.

8.	Marvin's sibling reported several more accidents. "One night (Marvin Gabrion) got really trashed and he was spinning donuts when he crashed into this chain link fence. Marvin went headfirst through the windshield and showed up at (the sibling)'s place with his head covered in blood."

9.	Another time, "Marvin got drunk as a loon and ran a motorcycle into a telephone pole. It split his helmet wide open. He came to me with blood pouring out of his head. The pole was shredded. But he did not go to the hospital on that one either. This happened sometime in the early to mid-80s."

10.	A family friend had two separate fights with Marvin. In one fight, he used a baseball bat to hit Marvin very hard on the head.

11.	Police records reported that Marvin Gabrion was observed towing his vehicle which had run off the road and struck a power pole in Newaygo in October, 1985. He apparently struck his head: jail records report injuries to his head and chin.

12. In January, 1987, Marvin Gabrion was arrested for driving into a vehicle while drunk. He was extremely intoxicated.

13. On March 28, 1992, Marvin Gabrion was involved in an automobile accident near Cedar Springs, Michigan.

14. While being treated for the 1992 car accident, Marvin contracted Hepatitis C, an illness that can impact cognitive function and mental capacities of those affected. A significant percentage of patients with chronic HCV experience cognitive deficits, especially in the domains of attention, learning, psychomotor speed, and mental flexibility. Findings further suggest that chronic HCV in combination with comorbid chronic illness may result in increased levels of cognitive dysfunction, especially in the presence of alcoholic hepatitis.

15. Marvin Gabrion was admitted to Saint Mary's Health Services in Grand Rapids on November 6, 1993 with a head injury. He was apparently involved in a "carjacking" and was then assaulted with an unknown object to the head.

16. Marvin's nephew remembered Marvin Gabrion talking about his Nissan Z car, which he crashed into a tree.

17. Marvin Gabrion was arrested on September 14, 1997 following a traffic accident. According to the report, Gabrion's vehicle crossed the center line and struck an on-coming car head-on.

*Id.*, PageID 4756-64.

Medical records also note the problems brought on by these injuries, such as, "Severe challenges of attention, stream of awareness, concentration, and investment in sustained ideational activity which compromises basic functional abilities." *Id.*, PageID 4761 (quoting Hope Network medical records).

Gabrion did not begin to have behavior problems or run-ins with law enforcement until around the time of his high school graduation, which is when he

suffered one of his first serious head injuries. *Id.*, PageID 4765.[11] People observed a dramatic change in Gabrion's personality around this time, and contemporaneous medical records detail the dramatic cognitive and behavioral impairments Gabrion was experiencing, and also showed that he was not able to manage his medication because he lacked a stable and supportive place to live. *Id.*, PageID 4760-63.

Medical records generated well before Timmerman's death also reveal Gabrion's responsiveness to medication, when he took it. R. 120-1, Pine Rest Christian Hospital Records, PageID 5317-18. Responsiveness to appropriate medication is a sign that he was not malingering mental illness at the time of trial. His doctor referred him to Newaygo County Community Mental Health and provided the number for various homeless shelters. R. 103-1, Social History, PageID 4762-63.

At trial, the government sponsored a lot of evidence it claimed went to future dangerousness that presented Gabrion as difficult and bizarre. He entered people's homes uninvited. He was frequently drunk. He was loud and obnoxious. He became physically abusive for no reason and then would apologize. He behaved boorishly to the spouses of his male acquaintances. He was alleged to have a dead bullfrog and a naked female doll on his bed containing dried and wet

---

[11] Additionally, mental illness commonly manifests in early adulthood. It is thus unsurprising that Gabrion's problems began around this time whether they are a result of brain damage, mental illness, or a combination.

bodily fluids. He engaged in overt religiosity. He lived on the roof of a house during one period of homelessness. He falsely told people, including his family who knew better, that he had been in Vietnam and the CIA. As an adult, he once kept putting his hands in wet concrete. The person who was laying the concrete asked him to stop but he kept doing it. All of these behaviors predated Timmerman's homicide. *See generally* R. 103-1, Social History, PageID 4733.

All of this is evidence of mental illness that predates Timmerman's death. But the jury was unable to see this evidence in that way because counsel failed to fully investigate and present Gabrion's familial history of mental illness and substance abuse, as well as his upbringing. When the government presented—with no adversarial testing—its false narrative that Gabrion was a master manipulator capable of bending Michigan's criminal justice system to his will, it was virtually impossible for the jury to see this evidence as indicative of mental illness rather than pure evil.

Moreover, Gabrion engaged in behavior indicative of serious mental illness throughout the trial proceedings. On the fourth day of trial, the Court noted that for the past three-and-a-half days "there have been numerous times when [Gabrion] has become very agitated and has whispered loudly, leaving aside the loud burping and other personal noises he has made, when he has whispered and sometimes talked very loudly." 1:99-CR-76 02/28/2002 Chambers Conf. at 13. The following

day, against the advice of counsel and his clear best interest, Gabrion testified in narrative form. He told the jury he had "no choice but to offend some of you, as I am the speaker of the truth." He noted that he was trying to stay within "certain decent boundaries" but then rambled off into irrelevant tangents which, predictably, drew objections for relevance that were sustained. 03/01/2002 Tr. (Gabrion testimony).

During the penalty phase, Gabrion again testified against the advice of counsel and his own best interests. In a hearing held prior to that testimony, Gabrion claimed one of the marshals was calling himself Theodore Bundy, an apparent reference to serial killer Ted Bundy. Gabrion inexplicably expressed a preference to go straight to cross examination without any direct examination. Under questioning by the court, Gabrion was wholly unable to explain to the court the definition of "truth" though he repeatedly expressed a desire to testify in order to "get the truth out." 03/14/2002 Sent. Tr. Vol. IV.

Gabrion's conduct caused nearly everyone involved—including the magistrate judge and district judge who presided over the trial—to question Gabrion's competence to proceed. The magistrate judge specifically expressed concern that "[t]he more you make these claims that don't seem to have any basis in fact, the more I begin to wonder whether you understand the proceedings and you can make rational decisions." 11/01/1999 Hr'g Tr., 13. Counsel expressed

concerns about Gabrion's competency throughout the proceedings. Despite these concerns, and Gabrion's behavior, trial counsel waived an adversarial competency hearing. There has never been an adversarial competency hearing in Gabrion's criminal case or in these proceedings.

In addition to being prejudiced because trial counsel did not present available mitigating evidence, including evidence relevant to mental illness, Gabrion was prejudiced because trial counsel did not rebut aggravating evidence. Roach's testimony was crucial evidence in support of the aggravating factors of 1) obstruction of justice and 2) substantial planning and premeditation. Roach's testimony allowed prosecutors to make a strong case that Gabrion was able to thwart an entire system of justice. It is a small leap to conclude that nothing short of execution could prevent this from reoccurring in the future.

Additionally, in assessing whether effective adversarial testing of the aggravating factors and the newly uncovered, powerful mitigation evidence would have convinced at least one juror to strike a different balance and vote for life, it is worth keeping in mind that death sentences are exceedingly rare—that is, convincing one juror to vote for life is not an overly tall order, even in cases with serious aggravators.

In cases where federal prosecutors have asked a jury to sentence the defendant to death, the jury has opted for a life sentence *twice as often* as a death

sentence. *See* Mark Berman, *The Justice Dept. Is Seeking Its First Federal Death Sentences Under Sessions and Expects More to Follow*, Wash. Post (Jan. 9, 2018), https://www.washingtonpost.com/news/post-nation/wp/2018/01/09/the-justice-department-is-seeking-its-first-federal-death-sentences-under-sessions-and-expects-more-to-follow/?utm_term=.232e170c717e.

Some examples of federal cases where federal juries have opted for life sentences include:

- Larry Lujan, D.N.M., No. 05-924: Kidnapping murder of a sixteen-year-old potential federal witness in a drug case. The victim was forced to perform oral sex, beaten, and nearly decapitated with a meat cleaver. The defendant was also linked by DNA evidence to a prior murder of another couple.
- Coleman Johnson, W.D. Va., No. 3:00CR00026: Used a pipe bomb to kill his eight-months-pregnant ex-girlfriend to avoid the child support he would have to pay.
- Thomas Pitera, E.D.N.Y., No. 90-0424 (RR): Contract killer for the Mafia convicted of six murders, several of which involved torturing the victims, dismembering their bodies, and burying them in a deserted marsh.
- Steven Green, W.D. Ky., No. 5:06-CR-00019-TBR: Convicted of murdering a family of four, including two children, and raping and murdering their daughter.
- John Richard Mayhew, S.D. Ohio, CR No. 02 03-16: Convicted of murdering his ex-wife, her boyfriend, and his own eighteen-year-old daughter, with whom he had an incestuous relationship.
- Steven Northington, E.D. Pa., No. 2:07-CR-00550-RBS: Convicted of murdering six people by arson to retaliate against a federal informant. Among the victims were four children.
- Oscar Grande and Israel Cisneros, E.D. Va., No. 04-CR-83: Defendants, members of the MS-13 street gang, convicted of the stabbing murder of a pregnant seventeen-year-old, who was targeted because she was a former member of the gang who had become a federal informant.

These examples of federal capital cases resulting in life sentences, particularly when considered in combination with the low rate of death sentences in federal capital cases, reveal that jurors are willing to consider and impose life sentences in highly aggravated cases when counsel performs pursuant to constitutional mandates. Given these examples, it is reasonable to conclude that at least one juror who heard the mitigating evidence that Gabrion's trial counsel failed to uncover would have struck a different balance and voted for life. It is even more reasonable to think that at least one juror would have voted for life if Gabrion's trial counsel had presented the available mitigating evidence and used available evidence to question the government's presentation of aggravating factors.

**b.** **Gabrion was prejudiced at the guilt phase.**

Trial counsel's unprofessional errors also prejudiced Gabrion at the guilt phase. For one, Gabrion was prejudiced by trial counsel's failure to investigate competence and insist on an adversarial competency hearing, despite Gabrion's bizarre behavior and consistent concerns about his competency to proceed, discussed above. *See* Section VI.B.3.a.ii.

In addition, Gabrion was prejudiced by trial counsel's failure to uncover evidence that would have cast doubt on the government's theory of the case. The government's theory was that Gabrion kidnapped and murdered Rachel

Timmerman to avoid prosecution on the sexual assault case pending in Newaygo County. The government posited that Gabrion enlisted John Weeks to trick Timmerman into a date and had her bring along her daughter Shannon. The government said that Timmerman and Shannon were never seen again (except at Oxford Lake) after they left for Timmerman's date with John on or about June 3, 1997. According to the government, Gabrion then murdered both Rachel and Shannon and subsequently John Weeks as well. The final piece of the puzzle for the government was that, prior to her murder, Gabrion had Timmerman write letters recanting the assault allegations and claiming to move out of state with another man. There was however, significant evidence that could have been easily produced that cast doubt on this narrative. The defense completely failed to investigate this and use this evidence at trial.

To begin with, Timmerman had her own motive to leave town. Her probation officer had concluded that she was not performing adequately on probation and had ordered her to leave her father's home and live in a group home (Liz's House). Her step-mother had taken her to a meeting at Liz's House on May 30, 1997. R 16-11, Police Report, PageID 1534-35.

At trial, counsel cross-examined Timmerman's father and sister about Liz's House but they denied knowledge. Counsel failed to call Timmerman's step-mother, probation officer, or anyone from Liz's House who could have

provided information to show Timmerman had reasons to disappear that were wholly unrelated to Gabrion. Velda Timmerman told the FBI that Timmerman had been "acting crazy the week before she disappeared." R.16-12, Velda Timmerman FBI int., PageID 1537.

In a similar vein, there was ample evidence contradicting the government theory that Timmerman was never seen alive after she left on her date. Det. Miller testified to the grand jury that "we have other people that have told us that they have seen her later on that same day and possibly have seen her a day or two later . . . ." R. 15-13, Miller GJ test., PageID 1385; *see also, e.g.*, R. 15-14, news article, PageID 1388-89 (news article in which Tim Timmerman says that "Rachel left here on June 3 and she was seen, in town, on the fourth").

Tina Kanady and Roxanne Vanslyke were friends. Vanslyke was acquainted with Timmerman. On the evening of June 3 (hours after she supposedly left home with "John"), Timmerman came by the trailer where Kanady was staying and Vanslyke was apparently visiting and invited them to a party she was going to at Pig's Point. *See* R. 15-15, Kanady GJ test., PageID 1391-94; R. 15-16, VanSlyke GJ test., PageID 1396-1433; R. 15-17, VanSlyke FBI int., PageID 1435-37. Kanady testified to the grand jury that she did not go because she did not have a babysitter for her son, who often played with Shannon VerHage when Timmerman and Shannon visited.

Other people who may have seen Timmerman on and after June 3 include Danny Holmes (R. 15-18, Holmes FBI int., PageID 1439-43; R. 15-19, Holmes GJ test., PageID 1445-61) and Teresa Start (R. 15-20, Start GJ test., PageID 1463-77).

The initial FBI field memos said that when Timmerman left home she told others that she would be gone for a few days and took a change of clothes. *See* R. 15-21, FBI field memo, PageID 1479-84. It is undisputed that when Timmerman's body was found on July 5, she was wearing different clothes than what she was wearing when she left home on June 3.

The last people to see Timmerman before she left home on June 3 were Minda Armstrong, and Susannah Schmaltz. Timmerman's father, Tim, testified that he was home that day as well and saw her leave. However, the girls' statements do not mention Tim being present and Timmerman's step-mother said that Tim was not home when Timmerman left. *See* R. 15-22, Police report, PageID 1486-88. Det. Miller testified to the grand jury that she was last seen by "her stepmother, her stepsister, and a family friend." R. 15-13, Miller GJ test., PageID 1385. That discrepancy went unexplored at trial.

Timmerman was not reported missing for several weeks, which lends some credence to the theory that she may have originally left home of her own volition.

Around the middle of June, letters from Timmerman began to arrive in Newaygo County. There were letters to her father and the judge on the state case and Prosecutor Roach. The letters were post-marked from Little Rock, Arkansas. The letters to Tim Timmerman indicated Rachel left town to get married and start a new life. The letters to the judge and prosecutor on the assault case requested that the charges against Gabrion be dropped and that Timmerman not be charged with making a false police report. When Prosecutor Roach received her letter from Timmerman, she dismissed the case against Gabrion. Roach did not try to contact Timmerman or her family and she did not ask law enforcement officials to do so. The letters were accepted at face value.

At trial, the government told the jury in its opening statement that Gabrion had forced Timmerman to write these letters 02/25/2002 Tr. Vol. IV, 935. The government made a similar argument in closing, contending that Timmerman was merely following Gabrion's "script" 03/04-05/2002 Tr. Vol. VIII, 1686. The government also told the jury, "the defendant was writing these letters himself." *Id.*

The government's position was false; it was undermined by a report prepared by the government's experts. The government ultimately presented the letters to specialized examiners. The examiners determined that four

67

letters were "written in Rachel Timmerman's hand." The letters "contained the same sentence structure, consistency and thought processes throughout the writings." R. 15-18, FBI report, PageID 1332. The structure was very different than letters allegedly written by Gabrion. The examiners "further opined that Timmerman was probably not under extreme duress when she penned the letters and GABRION probably did not dictate the letters to her." *Id.*

Further, the government's theory was that John Weeks was allegedly last seen in mid-June of 1997. However, there were witnesses (Christopher Dragun and Theodore Braun) who saw Weeks after that. *See* R. 16-25, Police Report, PageID 1592-1613.

Finally, Gabrion has submitted convincing evidence to establish that he was prejudiced at least by trial counsel's failure to retain a pathologist, as the pathologist retained by Gabrion's §2255 counsel, Dr. Spitz, concluded that it was not possible to say whether Timmerman was alive when she was placed in Oxford Lake. R. 103-5, Spitz Aff. ¶7, PageID 4989. If Timmerman was already dead when she was put in Oxford Lake, as Dr. Spitz concluded is possible, trial counsel could have credibly argued that the government was unable to prove beyond a reasonable doubt that she was killed on federal land, thus negating the basis for

68

federal jurisdiction. Dr. Spitz's affidavit is enough to establish at least that the possibility of prejudice should have been explored at an evidentiary hearing.

Which raises the most important reason the district court's prejudice analysis was erroneous: While holding that Gabrion had not proved that he was prejudiced, the district court denied Gabrion's discovery motions and refused to hold an evidentiary hearing even though Gabrion presented specific factual allegations that call into question key parts of the government's case, including the basis for federal jurisdiction.

**4.    If this Court finds that Gabrion had not yet made a sufficient showing, it should remand for a hearing and discovery on this issue.**

The district court faults Gabrion for not conclusively establishing deficient performance or prejudice, but the district court also denied Gabrion the discovery and hearing that would have made it possible for him to conclusively prove his claims. For example, the district court says, "Gabrion notes that the investigator primarily responsible for researching issues related to the guilt phase of the case, Patricia Hubbard, was not paid and did not perform significant work for a period of 10 months in 2000. However, Gabrion does not indicate how this impaired his case or what evidence she failed to discover. Thus, Gabrion has not shown that he was prejudiced by the lack of additional investigative assistance or expert opinion." R. 156, Op., PageID 5879.

69

This statement misrepresents the evidence Gabrion presented. Gabrion has pointed to specific evidence that the trial team failed to uncover: the records from Gabrion's Newaygo County case and other Newaygo County cases, which established that Roach's testimony was false, as well as numerous witnesses who could have impeached government witnesses or offered evidence that undermined the government's arguments or supported Gabrion's case. More importantly, this statement actually highlights, rather than disproves, the need for discovery and a hearing. The district court was not in a position to reach its conclusion without hearing from the trial team, and in particular Hubbard, who could have explained exactly what she would have done during those ten months had she been be able to work on the case.

As to the Social History presented by Gabrion's current counsel, the district court also states that, "Few of the facts in the Social History are supported by evidence before the Court. The Social History recites a long narrative about Gabrion and his family members with mostly oblique references to the documentation or witnesses supporting it. It contains no sworn statements or corroborating evidence, and no identifiable means of verifying the assertions it makes." R. 156, Op., PageID 5916. In fact, the mitigation investigators who prepared it submitted sworn affidavits that each statement in the Social History was supported by a document or witness. *See* R. 103-2, Waller Aff., PageID 4885-

70

86; R. 103-3, Wilson Aff., PageID 4888-89. Had the district court convened a hearing, it would have heard directly from those witnesses, and could have assessed their credibility. Here again, the district court's statement actually reveals the importance of a hearing, rather than showing why a hearing was unnecessary.

The court also actively interfered with counsel's ability to investigate its mental health case. It refused to issue routine orders for Gabrion's BOP mental health and medical records. It prevented the psychiatrist retained by Gabrion from seeing him by refusing to issue a customary order allowing the visit. And then it faulted Gabrion for "not offer[ing] any evidence to suggest that his current condition is any different from what it was at the time of trial." R. 156, Op., PageID 5993.

These are but three examples of specific issues that would have been explored at a hearing and further developed through discovery, had the district court not used the lack of testimony from witnesses as a reason to refuse to hear testimony from witnesses.

**C.**  **Gabrion was deprived of the effective assistance of trial counsel and representation by conflict-free counsel because one of the attorneys who assisted with his defense, including by personally meeting with him, also represented a key government witness who testified against him.**

Gabrion was denied his right to assistance of conflict-free trial counsel when Christopher Yates, the Federal Public Defender in the District, simultaneously participated in Gabrion's defense while representing a key witness against

Gabrion. Yates was a member of Gabrion's defense team, or, at a minimum, a consultant or advisor to the team, to whom conflicts rules would still apply. While Yates' full involvement is currently not known because Gabrion was denied discovery and a hearing, we do know Yates was significantly involved in crucial aspects of Gabrion's defense. At a minimum, he consulted on motions, met with Gabrion in order to convince Gabrion that his trial attorneys were doing a good job, and examined jurisdictional challenges. At the same time, Yates represented Joseph Lunsford when the government interviewed Lunsford about Gabrion, when Lunsford testified before the grand jury against Gabrion, and most likely when Lunsford testified at trial (something that would be clearer if discovery had occurred).

**1.      Yates represented competing interests simultaneously.**

**a.      Yates' work as an attorney for Gabrion**

After the government indicted Gabrion, Yates became involved in Gabrion's capital case. Yates had represented Gabrion in an appeal from Gabrion's conviction for social security fraud. R. 119-1, Yates Dec. ¶2, PageID 5292. The first thing Yates did when he entered the capital case was to meet with Gabrion as part of the trial court's plan to address Gabrion's complaints about his trial counsel. Yates then became involved in the heart of Gabrion's defense. Yates consulted with Gabrion's attorneys regarding motions and strategy, personally

visited Gabrion to consult with him about his case, and was involved in the search for evidence in support of Gabrion's penalty phase defense. *See, e.g.*, R. 16-5, 4/6/2001 letter Stebbins to Yates, PageID 1518-19 (explaining the motions Stebbins wanted Yates to assist with). Yates, through an affidavit, denies that he "represented" Gabrion. R. 119-1, Yates Dec. ¶5, PageID 5293. He does, however, acknowledge that he visited Gabrion to discuss the case and encourage him to cooperate with his attorneys, and provided research assistance to Gabrion's attorneys, and consulted with them about the case. *Id.* ¶¶7, 8, PageID 5293-94. This constitutes representation.

An April 6, 2001, letter from trial counsel Stebbins to Yates reveals the depth of Yates' involvement in Gabrion's defense and trial counsel's reliance on Yates' assistance and advice:

> At this stage, we would like assistance in the research and preparation of a Motion challenging the death penalty in general and *as applied in this case*, and challenging the *specific aggravating circumstances* (both statutory and non-statutory) that the government intends to rely on. In addition, *we need help drafting the Jurisdiction Motion*.

R. 16-5, 4/6/2011 letter Stebbins to Yates, PageID 1518 (emphasis added).

Further, Stebbins specifically asked Yates to review examples of motions and "come up with a comprehensive challenge to the death penalty and the aggravating circumstances in this case," saying that such efforts "would lift an

enormous load from us [Stebbins and Mitchell]" *Id.*, PageID 1519. Stebbins

indicated he would get in touch with Yates "in the next week or so" regarding

possible suppression issues. *Id.* He also told Yates that he planned to "sit down

with you [Yates] and Paul [Mitchell] and see exactly where we are and how we can

force more discovery out of the government." *Id.*

The letter also discussed jurisdictional issues that were critical to the case.

Specifically, the issue was whether the victim was killed on federal land.[12] If she

was not, there was no federal jurisdiction and, because Michigan does not have the

death penalty, no capital charge. With regard to the jurisdiction issue, Stebbins'

letter to Yates indicated that a defense expert had "some interesting ideas that are

contrary to the government's expert." *Id.* Stebbins asked Yates to "contact Paul,"

so Yates and Paul Mitchell could "discuss that Motion." *Id.* Stebbins closed his

letter:

> I hope to be in Grand Rapids on the 19th and 20th.
> Hopefully we can all get together and discuss these
> matters in more detail. Do not hesitate to contact me next
> week or any other time if you have questions or need
> additional information. *We all appreciate your able and
> willing assistance*.

---

[12] The importance of the jurisdiction issues is discussed more fully in Arguments B and D, Gabrion's ineffective assistance of counsel and *Brady* claims.

*Id.*, PageID 1520 (emphasis added). Thus, at a minimum Yates was involved in legal issues involving a "comprehensive" death penalty challenge, suppression, discovery, and jurisdiction.

Additionally, Yates unsuccessfully assisted trial counsel in trying to recover Gabrion's social security records, which potentially were critical penalty-phase evidence regarding proof of Gabrion's mental illness. Gabrion's Presentence Report[13] in the Social Security fraud case—on which Yates represented him on appeal—indicates that the probation officer who prepared the report was familiar with Gabrion's Social Security records, which suggests that the records should have been available.

Yates' involvement in the case was encouraged by the district court. On February 21, 2001, the trial judge praised Yates in a letter to Gabrion: "I have also spoken with the Federal Public Defender, Christopher Yates, and asked him to assist Mr. Mitchell. You will find Mr. Yates, in addition to being a fine lawyer, also an individual of unquestioned integrity." R. 16-6, 2/21/2001 letter Bell to Yates, PageID 1522. Further, at a May 23, 2001, hearing, Mitchell addressed the

---

[13] This document is sealed and not part of the record on appeal, but the record does include evidence that trial counsel sought assistance from Yates with tracking down Gabrion's social security records, and it is no great leap to think that the person who represented Gabrion on an appeal for social security fraud may be able to locate his social security records. Most importantly, this is precisely the sort of issue that would have been addressed at a hearing, if the district court had not improperly denied one. In addition, Gabrion specifically asked to seek discovery from the Probation Office and to depose Yates, but was denied.

trial court, saying, "myself, Yates, and Stebbins have lobbied to get him [Gabrion] moved." *See* R. 100, Am. §2255 Mot., PageID 3928.[14]

As will be discussed below, Yates' involvement in Gabrion's defense is incomprehensible given his previous and ongoing representation of government cooperator Joseph Lunsford.

**b.      Yates' work as a lawyer for critical penalty phase witness Joseph Lunsford**

On March 30, 1998, while Gabrion was the primary and apparently the only suspect in Rachel Timmerman's murder, the government conducted a proffer interview with Yates' client Joseph Lunsford. Lunsford had recently been sentenced for mailing threatening communications to the president. *See* R. 16-4 Lunsford dkt., PageID 1508. The government expressed interest in talking with Lunsford and provided proffer terms and conditions. *See* R. 16-1, 3/30/1998 VerHey letter to Yates, PageID 1491-92. Yates and his client signed the proffer agreement, and Lunsford began cooperating with the government. *See id.*, PageID 1492. Based on how proffers nearly always come about, Yates, as Lunsford's lawyer, almost certainly orchestrated the proffer. Discovery would pin that down.

---

[14] The primary transcript of that hearing does not include this exchange, which occurred during a separately recorded, in camera, proceeding. *See* 1:99-CR-76 R. 214, Trans. of Mot. Hr'g, PageID 1950).

Lunsford, represented by Yates, sat down with a detective and a special agent on March 30, 1998, and talked about sharing a cell for a month with Gabrion. *See* R. 16-2, Lunsford FBI int., PageID 1494. The detailed single-spaced proffer notes span more than seven pages. *See id.*, PageID 1494-1501. During the proffer, Lunsford provided the evidence regarding Shannon VerHage that was crucial during the penalty phase of Gabrion's case.

A year later, on May 6, 1999, Lunsford testified against Gabrion before the grand jury. *See* R. 16-3, Lunsford GJ test., PageID 1503. Lunsford again was represented by Yates. *See id.*, PageID 1504-05. Yates continued representing Lunsford at least until his appeal became final in 1999. *See United States v. Lunsford*, No. 98-1139 (6th Cir. 1998), Doc. 7.

Lunsford's testimony constituted perhaps the most graphic and disturbing penalty-phase evidence in Gabrion's trial. Lunsford (a convicted child molester) testified that, while he was incarcerated with Gabrion, he witnessed Gabrion masturbate to a photo of baby Shannon. *See, e.g.*, R. 100-4, Lunsford Dec. ¶6, PageID 4700. This testimony reflected statements Lunsford had made during his March 30, 1998 proffer and his grand jury testimony. *See* R. 16-2, Lunsford FBI int., PageID 1496; R. 16-3, Lunsford GJ test., PageID 1503.

The prosecution emphasized this testimony during its penalty-phase closing argument. It alleged that Gabrion had done "unspeakable vile things" with the photograph. *See* R. 103-4, Stetler Dec. ¶134, PageID 4976.

Lunsford *recanted* this testimony in 2016, signing a declaration stating that his testimony regarding seeing Gabrion masturbating to a photo of baby Shannon was false, and that Yates had suggested this "fact" to him. R. 100-4, Lunsford Dec. ¶6, PageID 4700. Lunsford also stated that, at the time of Gabrion's trial, Lunsford had wanted to recant and remain off the witness stand, but Yates told him that if he backed out he would face a harsher sentence. *See id.* ¶7; PageID 4700. Yates has denied Lunsford's accusation that Yates suggested any false facts. R. 119-1, Yates Dec. ¶9, PageID 5294.

Gabrion's §2255 counsel filed a motion to have counsel appointed for Lunsford before Lunsford recanted his sworn testimony, but the district court denied this motion, stating, "The Court is aware of no authority under which it can appoint counsel to a third party, in these or any other circumstances, and Movant has offered none." R. 72, Order, PageID 2631.[15]

---

[15] The court's statement is baffling. Lunsford, of course, had counsel—Yates—when he presented as a trial-level witness in this very case. The fact that he was now presenting as a §2255 witness is not a distinction that makes a difference. The district's CJA plan in effect when the request for counsel was made provided the court wide latitude for appointment of counsel. Section IV.A.2.h of the W.D. Michigan CJA Plan (approved December 5, 2006) authorizes appointment of counsel when the interests of justice require and the person "is involved in 'ancillary matters …' pursuant to subsection (c) of the CJA [18 USC §3006A( c)]". In

**2.** **Gabrion was denied his constitutional rights when Yates participated in his defense while representing a key witness against him.**

The Sixth Amendment right to effective counsel includes a "correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). To prevail on a claim that he was denied his Sixth Amendment right to conflict-free counsel, a habeas petitioner must generally "establish that the conflict of interest adversely affected his counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 174 (2002); accord *Strickland*, 466 U.S. at 692. When a defendant demonstrates an actual conflict and an adverse effect on counsel's performance, courts presume prejudice. *Moss v. United States*, 323 F.3d 445, 455 (6th Cir. 2003).[16]

The trial court clearly knew of the conflict, as evidenced by the court's own letter, telling Gabrion that Yates could not represent him. *See* R. 2-6, 2/21/2001

---

determining whether representation in an ancillary matter is appropriate, the CJA Plan directs the court to consider whether appointment is necessary "to protect a constitutional right."

Clearly, Lunsford's constitutional rights were at stake since he was recanting testimony given under oath. Undersigned counsel were trying to balance their obligations to represent their client zealously while simultaneously respecting the constitutional rights of third parties. There was nothing out of the ordinary with Gabrion's lawyers' request, and it should have been granted.

[16] Unconstitutional multiple representation never constitutes harmless error. *Cuyler v. Sullivan*, 446 U.S. 335, 349 (1980). Once a court concludes that a defendant's lawyer had an actual conflict of interest, it should refuse to "indulge in nice calculations" regarding the "amount of prejudice" attributable to that conflict. *Id.* (citation omitted). The conflict itself demonstrates denial of the defendant's right to effective assistance of counsel. *Id.* A defendant who makes a showing that a conflict of interest actually affected the adequacy of the representation he or she received "need not demonstrate prejudice in order to obtain relief." *Id.* at 349-50.

letter Bell to Gabrion, PageID 1522. Lunsford's case had been before the same trial judge: Judge Bell. *See United States v. Lunsford*, 1:97-CR-81 (W.D. Mich. 1997). And Yates, of course, knew about the conflict. At Gabrion's initial appearance, the magistrate judge had told Gabrion that he could not have Yates as an attorney because Yates had "informed the Court that he will not be able to represent you because of a conflict of interest." 1:99-CR-76, R. 599, 6/29/1999 Arraign. Tr., 5. Even though everyone knew about Yates' conflict, they failed to appreciate that the conflict prevented Yates not only from the formality of filing an appearance on the case, but also from the actuality of representing him in other ways, including consulting with counsel and meeting with Gabrion about the case.

Here, despite the district court's refusal to allow discovery or a hearing, Gabrion has shown an actual conflict and an adverse effect on counsel's performance. If this Court finds that he has not yet made this showing, at a minimum, this Court should find that district court should not have denied Gabrion's claim without discovery and a hearing.

a.  **Yates' concurrent representation of Lunsford and involvement in Gabrion's case created an actual conflict.**

Yates represented a witness who testified against Gabrion while also participating in Gabrion's defense:

| | |
|---|---|
| July 1997 | Yates appointed to represent Lunsford on charge of threatening the president. |

80

| | |
|---|---|
| November 1997 | Federal Defender's office headed by Yates appointed to represent Gabrion on charge of misuse of a Social Security Number. |
| January 1998 | Lunsford, represented by Yates, sentenced 36 mos. |
| March 1998 | **Lunsford, represented by Yates at the proffer, proffers evidence against Gabrion.** |
| July-August 1998 | Gabrion sentenced 60 mos. for misuse of SSN. **Yates personally represents Gabrion on appeal.** |
| May 1999 | **Lunsford, represented by Yates as a material witness, testifies against Gabrion to Grand Jury.** |
| June 1999 | Gabrion, based in part on Lunsford's testimony, indicted for murder. |
| February-April 2001 | Judge Bell sends letter to Gabrion **indicating that he asked Yates to "assist" with Gabrion's defense.**<br><br>Stebbins **sends letter to Yates explaining the help they want from Yates in Gabrion's case**, including assistance drafting a motion challenging the aggravating circumstances, assistance drafting the jurisdiction motion, and assistance coming up with a plan to get more discovery from the Government. |
| March 2002 | **Lunsford testifies against Gabrion in the penalty phase.**<br><br>Gabrion, based in part on Lunsford's testimony, sentenced to death. |

Thus, at the time that Yates was actively involved in Gabrion's defense—

strategizing with defense counsel, conducting research, and providing his "able and

willing assistance," R. 16-5, 4/6/2001 letter Stebbins to Yates, PageID 1520, he knew that Lunsford had proffered critical evidence against Gabrion and testified against Gabrion in front of the grand jury.

Yates worked on Gabrion's defense while representing a critical penalty phase witness against Gabrion; as such, Gabrion has pointed to specific instances in the record that suggest an actual conflict. *See Moss*, 323 F.3d at 463. An attorney need not appear or file something on behalf of a client in order to create a constitutional violation. *See, e.g.*, *Rubin v. Gee*, 292 F.3d 396, 399-400 (4th Cir. 2002).

**b.    The conflict adversely impacted counsel's performance.**

Gabrion's defense was adversely affected by Yates' participation. Even without a hearing, it is known that Yates actively advocated for Gabrion to be transferred to a federal correctional facility in Milan, Michigan. Ultimately, five witnesses testified for the government at Gabrion's penalty phase about his conduct at Milan. Yates' affidavit admits that he took this action. R. 119-1, Yates Dec. ¶7, PageID 5293.

Additionally, according to Lunsford's declaration, Yates provided facts to Lunsford that led to his testimony about Gabrion masturbating to the photograph of baby Shannon. R. 100-4, Lunsford Dec. ¶6, PageID 4700. Yates suggesting such facts to a witness who then testified to them clearly harmed Gabrion. Further, when

82

Lunsford attempted to recant his testimony and not testify, Yates did not tell him he could not commit perjury in a capital homicide case. Rather, he advised Lunsford that it was too late to back out and told him that he would have to serve his entire state sentence before serving his federal time. *Id.* ¶7, PageID 4700. Yates' loyalty to Lunsford led him to provide advice to Lunsford that was to Gabrion's detriment.

**3.      If this Court finds that Gabrion has not yet made a sufficient showing, it should remand for a hearing and discovery on this issue.**

While the district court faulted Gabrion for failing to establish that he and Yates had an attorney-client relationship or show an adverse effect, *see* R. 156, Op., PageID 5855, it is the district court's refusal to allow discovery or a hearing that prevented Gabrion from fully developing such evidence. Gabrion was entitled to discovery because he made specific allegations and explained how the information he sought would support his allegations. *See Bracy*, 520 U.S. at 908-10; *Cornell*, 472 F. App'x at 354. Likewise, he was entitled to an evidentiary hearing, as an evidentiary hearing "is required unless the record conclusively shows that the petitioner is entitled to no relief." *Campbell v. United States*, 686 F.3d 353, 357 (6th Cir. 2012).

While the extent of Yates' full involvement in Gabrion's defense is perhaps not apparent from the record, Yates clearly was involved in Gabrion's representation to a significant degree that demonstrates a conflict of interest. The

83

record shows he engaged in certain legal activities throughout the case. Though his affidavit indicates that, in his view, he "never represented Mr. Gabrion in connection with his murder case," R. 119-1, Yates Dec. ¶5, PageID 5293, Yates does not get to decide whether he represented Gabrion—the law and ethics cannons dictate that. He did speak with defense counsel about the case; he provided research assistance, including researching whether federal jurisdiction over the crime existed, *id.* ¶9, PageID 5294; he visited Gabrion to discuss the case and encourage him to cooperate with his attorneys, *id.* ¶7, PageID 5293; and he strategized about discovery with the attorneys.

Gabrion was not afforded the opportunity to depose Yates or other people who participated in Gabrion's defense at trial. Nor was Gabrion permitted to cross-examine Yates or other witnesses whose testimony could provide facts that would allow the district court to make an informed decision if there is any doubt that Yates represented Gabrion. Yates should be required to explain exactly why he represented Gabrion after Lunsford proffered against him, and then testified against him in both the grand jury and capital jury. Yates and Lunsford should explain what happened when Lunsford says he told Yates prior to his testimony that the damning statements about the photo were not true. Further, Gabrion was entitled to question all members of the defense team about Yates' role in the case. Most specifically, Mitchell and Stebbins, who were happy to receive aid from

Yates, should have been required to describe their understanding of how Yates became involved and why he was crucial to the defense.

Moreover, Yates' affidavit points to yet another factual dispute that should have been addressed in a hearing. In its response to the §2255 motion, the government stated, "Lunsford said that he had not received any benefit for his proffer, and was not promised any time off for his testimony." R. 119, Gov. Resp., PageID 5141. However, in Yates' affidavit he stated that he advised Lunsford there could be a benefit to his testimony. Yates stated that "I made clear to Mr. Lunsford – as I always did to everyone of my co-operating clients – that his ability to obtain any benefit from his proffer statements and testimony depended upon his truthfulness." R. 119-1, Yates Dec. ¶9, PageID 5294.

Yates' statement indicates that Lunsford expected a benefit and he discussed with Lunsford receiving a benefit from his proffer statements and testimony. This further necessitates additional factual development through discovery and a hearing. Gabrion should have been provided with his files and Lunsford's full files from the Federal Defenders Office.

Additionally, Gabrion was unable to obtain his Social Security records through discovery, and he was also unable to question Yates as to his knowledge regarding those records. Gabrion specifically and unsuccessfully requested that the district court order discovery related to these records. R. 67, Am. Br. to Conduct

85

Discovery, PageID 2610-11. Gabrion also unsuccessfully sought to depose Yates. R. 59, Br. in Support of Mot. to Conduct Deps., PageID 2574-75.

By denying an evidentiary hearing and any discovery, the district court prevented Gabrion from developing his allegations of prejudice.

**D.      The government presented expert hair analysis that was false or misleading, in violation of Brady.**

At the time of Gabrion's trial, the government knew (or should have known) that the FBI's hair analysis was false or misleading, but failed to disclose that to defense counsel, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

The hair analysis was important evidence of federal jurisdiction in this case. The location of Rachel Timmerman's murder was a crucial issue at trial because, to establish federal jurisdiction, the government had to prove that the murder occurred in the southern portion of Oxford Lake. To support its theory about the location of the murder, the government called FBI lab analyst Douglas Deedrick. Deedrick testified that hair on a piece of duct tape found near a road by the boat launch close to Oxford Lake, "exhibited the same microscopic characteristics as the victim's head hair sample." 02/28-03/01/2002 Tr. Vol. VII, 1539-40.

At the time of Gabrion's trial, "many forensic feature-comparison methods" (i.e. methods seeking to determine whether a questioned sample is likely to have come from the same source as a known sample, such as microscopic hair comparison, bite-mark comparison, and shoe-print comparison) were "*assumed*

86

rather than *established* to be foundationally valid based on appropriate empirical evidence." PCAST Report at 122;[17] *see also* NRC Report at 160-61.[18] "*[N]o empirical studies whatsoever*" supported the scientific validity and reliability of microscopic hair comparison. PCAST Addendum at 2, 6.[19]

Although the FBI and DOJ have frequently relied on microscopic hair comparison, they have been on notice of hair comparison's lack of validity or reliability since long before the NRC Report or PCAST Report were published. *See United States v. Butler*, 955 F.3d 1052, 1053 (D.C. Cir. 2020) ("At his trial, [which took place "[a]lmost fifty years ago,"] an FBI forensic expert testified that hairs found on the victim were microscopically identical to Butler's hair. The government recently acknowledged, though, that hair evidence of the kind introduced against Butler was false and exceeded the limits of science, and that the prosecution knew or should have known as much at the time of his trial.").

---

[17] President's Council of Advisors on Science and Technology, *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* (2016) (PCAST Report), https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensic_science_report_final.pdf.

[18] National Research Council, *Strengthening Forensic Science in the United States: A Path Forward* (2009) (NRC Report), https://www.ojp.gov/pdffiles1/nij/grants/228091.pdf.

[19] President's Council of Advisors on Science and Technology, *An Addendum to the PCAST Report on Forensic Science in Criminal Courts* (2017) (PCAST Addendum), https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensics_addendum_finalv2.pdf.

The PCAST Report noted that, by the 1990s, scholarship had raised criticism of hair analysis, citing methodological flaws in studies. *See* PCAST Report at 118-19 & n.352. "Moreover, a 2002 FBI study, by Houck and Budowle, showed that hair analysis had a stunningly high error rate in practice: Of hair samples that FBI examiners had found in the course of actual casework to be microscopically indistinguishable, 11% were found by subsequent DNA analysis to have come from different individuals." PCAST Addendum at 6. In that study, "FBI personnel used mitochondrial DNA analysis to reexamine 170 hair samples from previous cases in which the FBI's lab had performed microscopic hair examination. The authors found that, in 9 of 80 cases (11 percent) in which the FBI Laboratory had found the hairs to be microscopically indistinguishable, the DNA analysis showed that the hairs actually came from *different* individuals." PCAST Report at 121. In other words, "*[w]hen hair examiners conclude in casework that two hair samples are microscopically indistinguishable, the hairs often (1 in 9 times) come from different sources.*" *Id.*[20]

The FBI itself conducted the 2002 study. The PCAST report assembles research showing flaws in hair comparisons. The FBI has since admitted that FBI

---

[20] *See also* The Innocence Project, *FBI Agents Gave Erroneous Testimony in at Least 90% of Microscopic Hair Analysis Cases* (Apr. 20, 2015), https://innocenceproject.org/fbi-agents-gave-erroneous-testimony-in-at-least-90-of-microscopic-hair-analysis-cases/#:~:text=After%20an%20in%2Ddepth%20investigation,erroneous%20statements %20or%20submitted %20laboratory.

expert testimony exceeded the limits of science in at least 90% of cases worked in the era of this investigation.[21] This confirms that FBI hair analysts, including analyst Deedrick, overstated their findings based on flawed methods.

Pursuant to *Brady*, the government must disclose evidence favorable to the defendant and material to either guilt or punishment. *Brady*, 373 U.S. at 87. The standard is an objective one. *Brady* violations do not depend on "bad faith," and "good faith" cannot satisfy *Brady*. *Id.* Moreover, "the government's knowing presentation of false evidence against a criminal defendant is 'incompatible with rudimentary demands of justice.'" *Butler*, 955 F.3d at 1057 (quoting *Giglio v. United States*, 405 U.S. 150, 153 (1972)) (citing *Napue v. Illinois*, 360 U.S. 264 (1959)).

The evidence at issue is the unreliability of the government's supposedly scientific evidence. There is no question this evidence is favorable to Gabrion.

As to materiality, in a case with testimony similar to the testimony at Gabrion's trial, the D.C. Circuit recently determined that there was a "reasonable likelihood that the false hair evidence introduced against [the defendant] could have affected the jury's verdict." *Butler*, 955 F.3d at 1053.

---

[21] FBI, *FBI Testimony on Microscopic Hair Analysis Contained Errors in at Least 90 Percent of Cases in Ongoing Review* (Apr. 20, 2015), https://www.fbi.gov/news/pressrel/press-releases/fbi-testimony-on-microscopic-hair-analysis-contained-errors-in-at-least-90-percent-of-cases-in-ongoing-review.

In *Butler*, the government's trial analyst testified that the subject hairs were "alike in all identifiable microscopic characteristics," but also "noted that 'hairs do not contain enough identifying characteristics to be positively identified as originating from a certain head of a certain individual to the exclusion of all other individuals in this race group.'" *Id.* at 1056 (quoting transcript). At Gabrion's trial, the analyst said, "there were hairs on the tape [found near a road by the boat launch] that exhibited the same microscopic characteristics as the victim's head hair sample." 02/28-03/01/2002 Tr. Vol. VII, 1539-40. In *Butler*, "[i]n 2015, more than four decades after Butler's convictions, the government reviewed his case as part of the overall examination of cases involving the use of discredited hair microscopy analysis." 955 F.3d at 1057. The government determined that the hair-comparison testimony or lab report included statements that exceeded the limits of science and were thus invalid. *Id.* The similar testimony in Gabrion's case also exceeded the limits of science and was invalid.

In explaining why this evidence was material, the D.C. Circuit pointed out that the reasonable-likelihood standard is relatively low: "the defendant need show only that the false testimony 'undermines confidence' in the verdict. Thus, even if the false testimony '*may* not have affected the jury's verdict,' it is material if the evidence reasonably *could* have affected the verdict." *Id.* at 1058 (quoting *United States v. Ausby*, 916 F.3d 1089, 1093 (D.C. Cir. 2019)). This test is "quite easily

90

satisfied." *Id.* "The standard is 'strict' against the government, 'not just because [the cases] involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process.'" *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976)) (modification in original). Because the trial process' truth-seeking function is corrupted, the reasonable-likelihood standard involves "a veritable hair trigger for setting aside the conviction" or "virtual automatic reversal of a criminal conviction." *Id.*

More specifically, false hair comparison testimony can be material whenever the "'false hair-comparison testimony' . . . 'was neither the sole piece of evidence on which the prosecution hung its case nor redundant or irrelevant.'" *Butler*, 955 F.3d at 1058 (quoting *Ausby*, 916 F.3d at 1094-95). Indeed, in *Butler*, there was "substantial corroborative evidence"—what the prosecution's closing argument described as "[c]orroboration, corroboration, corroboration." *Id.* at 1059 (quoting transcript).

The court noted both that Butler was convicted almost fifty years ago, and that, although "limitations [in hair comparison] were long known to the government, prosecutors continued to rely on hair evidence at trial." *Id.* at 1053. It also emphasized that DNA testing had exonerated several men convicted in trials involving hair evidence. *Id.* at 1053-54. Applying the lenient standard, the court remanded with instructions to grant the §2255 motion. *Id.* at 1064.

Courts also regularly convene evidentiary hearings in cases involving forensic errors. *See, e.g.*, *Stevens v. Chapman*, No. 3:20-CV-352, 2021 U.S. Dist. LEXIS 61913, at *18-21, *61 (E.D. Va. Mar. 30, 2021) (granting an evidentiary hearing).

Gabrion was not only denied relief, he was not even given the opportunity to develop his arguments through an evidentiary hearing or discovery. If there is any question about when the FBI became aware of problems in the validity or reliability of hair-comparison evidence, or whether the evidence prejudiced Gabrion, then discovery and a hearing should have taken place. Given the importance of the hair-comparison evidence—the government used this evidence to place the alleged offense within federal jurisdiction, and to convict Gabrion— Gabrion should have at least been granted discovery and an evidentiary hearing on the *Brady* issue.

In addition, Gabrion's §2255 alleged that the government withheld several other pieces of information in violation of *Brady*. For example, the government failed to disclose significant impeachment evidence concerning Gregory Leon, such as his complete and accurate criminal history and the deal that Roach may have reached with him resulting in a 223-day time-served sentence for gagging and brutally raping his ex-wife. *See* R. 100-3, Judgment, PageID 4696–97. The government also failed to disclose an agreement that federal prosecutors reached

with Nathan Brewster to help him hire a private investigator. *See* R. 141-3, Brewster Aff. ¶3, PageID 5547. And the government failed to disclose information regarding the competency of witness Lloyd Westcomb. This Court did not grant a COA on these other pieces of withheld evidence, but they could impact the prejudice resulting from the hair analyst's misleading testimony.

**E.      On remand, this Court should assign the case to a new district judge.**

**1.      This Court has the power to reassign this case on remand.**

This Court has "the power, under appropriate circumstances, to order the reassignment of a case on remand pursuant to 28 U.S.C. §2106." *United States v. Lanier*, 988 F.3d 284, 298 (6th Cir. 2021). "In no proceeding is the need for an impartial judge more acute than one that may end in death." *In re Al-Nashiri*, 921 F.3d 224, 239 (D.C. Cir. 2019).

Because of the death penalty's "finality," and its "qualitative difference from a sentence of imprisonment, however long," the "need for reliability" is magnified. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). Mistakes in capital cases have deadly consequences. Thirteen federal executions were carried out between July 2020 and January 2021. To the extent executions may have seemed theoretical in the past, they no longer can be viewed that way. The need for reliable fact-determination procedures is at its apex in capital cases. What occurred here falls far short of a reliable fact-finding procedure.

As importantly, because this is a federal death sentence, Gabrion, unlike condemned state-court offenders, has only one opportunity—this one—to litigate the fairness of his convictions and death sentence in collateral proceedings. We can, and must, do better than the process that has been afforded Gabrion to-date. In this case, that necessitates reassignment.

When considering reassignment, the Court is guided by three factors:

(1) whether the original judge would reasonably be expected to have substantial difficulty in putting out of his or her mind previously expressed views or findings; (2) whether reassignment is advisable to preserve the appearance of justice; and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Rorrer v. City of Stow*, 743 F.3d 1025, 1049 (6th Cir. 2014). With this framework in mind and for the reasons that follow, Gabrion asks the Court to reassign this case to a different judge for any remand proceedings it orders.

**2. The original §2255 judge made rulings while harboring a disqualifying interest.**

In April 2015, the original petition was filed before the trial judge, Judge Bell. Gabrion filed motions that were important but so routine in death penalty litigation as to border on banal. Gabrion requested leave to take the depositions of potential critical witnesses: trial counsel; the mitigation investigator; the fact investigator; consulting counsel who he alleged had a conflict of interest; and the SAUSA and Newaygo County Prosecutor whose testimony was the primary focus

94

of the prosecutorial misconduct claim and who was dismissed as SAUSA for ethical lapses in this case. R. 59, Br. in Support of Mot. to Conduct Deps., PageID 2572-77. The court ruled that because the discovery request was necessarily intertwined with the allegations in the §2255 motion, it would rule on those requests when it ruled on the §2255 motion. R. 74, Order, PageID 2633.

Gabrion also moved for the production of various documents, including: documents reviewed by government mental health experts that appear never to have been provided to, or requested by, trial counsel; various documents related to the handwriting analysis conducted by the FBI concluding Gabrion did not author letters sent by the decedent (which the government introduced at trial and argued Gabrion authored); Gabrion's social security disability records (which would have shown the government declared Gabrion so mentally ill he required benefits and a payee for those benefits). R. 51-1, Br. in Support of Mot. for Discovery, PageID 2530; R. 67, Am. Br. to Conduct Discovery, PageID 2604. Judge Bell similarly denied these requests. R. 74, Order, PageID 2633.

As Judge Bell's retirement became imminent, he granted interviews to local media. The WOOD-TV website contains a written article and two videos, describing Gabrion's case as the court's "most high profile case" in his thirty-year judicial career. *See Retiring Judge Doubts Marvin Gabrion Will be Put to Death*,

http://woodtv.com/2016/12/16/retiring-judge-doubts-marvin-gabrion-will-be-put-to-death/ (last visited May 16, 2021).

The court was asked if he considered Gabrion "evil" compared to other defendants and responded: "Yes. You said it and I agreed with you." The court described Gabrion's eyes as "evil." The court also claimed Gabrion "had tried that on me. I just looked right back at him, and then I said, on the record, 'The record should reflect Mr. Gabrion is staring at me and has stared at me for the last two hours, and it's having no effect whatever upon me.'" Nothing like this appears in the record.

The court said that Gabrion "recently" assaulted his attorney in a visiting room. According to the court, she had to be "rescued" by nearby prison guards. This event did not occur in the court's presence, is not a matter of record in the district court, and did not involve §2255 counsel who by that time had been representing Gabrion for years.

The court speculated whether Gabrion would be executed, suggesting the chances were no better than 50/50. The court reflected that when he was assigned Gabrion's case, he told his wife "that this guy and I are going to be synonymous for months and years to come, and it's true."

In another article, Judge Bell said Gabrion is "in the right place," apparently referencing death row. *Retiring Federal Judge's Biggest Cases: Death Penalty,*

96

*Street Crime, Mandatory Sentences*; https://www.mlive.com/news/grand-

rapids/2016/11/retiring_federal_judge_death_p.html (last visited May 11, 2021).

Gabrion moved for recusal. R. 91, Mot. for Recusal, PageID 3847. Judge

Bell never ruled on the motion. After the recusal motion was filed, he did not issue

additional order. Following his retirement, the case was reassigned to Chief Judge

Jonker. On the day of transfer, Gabrion, unopposed, requested a status conference.

R. 96, Unopposed Mot. for Status Conf., PageID 3880. Many motions remained

pending. The purpose of the request was to "provide the parties with an

opportunity to discuss with the Court the case and future steps to be taken toward

resolution." *Id.* Chief Judge Jonker denied the motion, finding it "not necessary."[22]

R. 99, Order, PageID 3885. This early ruling portended the judge's later orders that

refused reasonable requests to ensure a fair process in this capital case.

3.      **Without scrutiny, the court adopted rulings made by a judge with a disqualifying interest in these proceedings.**

Gabrion asked Chief Judge Jonker to reconsider whether to permit

discovery, in part because Judge Bell had a disqualifying interest expressed in the

public comments he made to the media. R. 121-1, Mem. in Support of Motion for

---

[22] Gabrion's Indiana lawyers have never met the §2255 judge in the years this case was pending. The Indiana Federal Community Defenders Office was asked to take this case as a courtesy to the court because there is a dearth of capital defense lawyers in Michigan. Significant resources, both financial and human, were diverted from their primary mission—serving clients in the Southern District of Indiana.

Scheduling Order, PageID 5323; *see also In re Al-Nashiri*, 921 F.3d at 240-41 (because recusal required, 460 rulings required reconsideration). Chief Judge Jonker issued a carte blanche denial, noting that Judge Bell had "taken well-deserved Senior Status." R. 125, Order, PageID 5353.

Further, Gabrion filed a detailed 36-page motion and brief establishing that a hearing was mandated. R. 89-1, Motion for Evidentiary Hearing, PageID 3808-45. Despite this more than adequate showing, the district judge denied the motion. R. 156, Op., PageID 6000.

The legal standard for these requests is lenient. *See Martin*, 889 F.3d at 832. Nevertheless, and despite the critical need for reliable fact-finding procedures in capital cases, Chief Judge Jonker denied any discovery and a hearing when he denied the petition on the merits. *See* R. 156, Op., PageID 5795-6010.

The decision to rule on the discovery requests at the same time it ruled on the §2255 motion defies logic. Discovery is what makes it possible for parties to discover the information that the fact-finder needs to reach a well-reasoned conclusion fully informed by the relevant facts. It does not make sense to rule on discovery at the same time as reaching a conclusion because, by definition, what is learned in discovery is what is needed to reach a reasonable conclusion. This is particularly true in a §2255 case, where, unlike a §2254 case, the only factual development about collateral claims, such as ineffective assistance and *Brady*,

must happen in the federal court, because there is no state-court proceeding where a record could have been developed.

The district court's decision to rule on the discovery requests at the same time as it resolved Gabrion's claims indicates that, at best, the district court did not understand the rules and caselaw governing §2255 proceedings. At worst, it indicates that the district court decided early on that it would deny Gabrion's §2255 motion and retrofit an explanation around that decision. There is no other explanation for how the district court could have spent so many pages of its order engaging in rank speculation about Gabrion's claims, and then using that speculation to justifying denying access to the tools—discovery, as well as a hearing—that would have made that speculation unnecessary.

**4.     The court denied Gabrion access to the basic tools of investigation, and then, denied his §2255 motion based on speculation.**

The failures of the district court are much more than issuing incorrect adverse rulings. The court refused to permit Gabrion to use the tools the law provides—indeed, mandates—for investigating and testing the reliability of convictions and death sentences. It then repeatedly engaged in speculation to deny Gabrion's §2255 motion.

**a.      The court would not authorize discovery or a hearing concerning claims regarding Chrystal Roach's testimony and then engaged in speculation to deny the writ.**

Gabrion alleged that removed SAUSA and Newaygo County Prosecutor Chrystal Roach perjured herself in order to further the government's "obstruction of justice" theory.[23]  In resolving this issue, the district judge speculated about what Roach's testimony "possibl[y]" meant. R. 156, Op., PageID 5838. The district judge found that although the record reflects that Roach did not request the remand she claimed to have requested, "[i]t is also *possible* that Roach" made a suggestion to the defense attorney, and that what she meant when she said she requested an action from the court was that she suggested an action to the defense attorney." *Id.*, PageID 5838 (emphasis added). And the district judge points to the actions of an unnamed prosecutor "who *may have been Roach*" as further support that Roach's testimony was truthful. *Id.* (emphasis added). The record of the hearing where this occurred contains absolutely no suggestion Roach was present or that Roach suggested to defense counsel that such a motion be made. In light of the fact Roach's office *never* asked for a preliminary hearing (contrary to her trial testimony) in the hundreds of assault cases her office handled before and after Gabrion's, the court's scenario is patently implausible. However implausible, the

---

[23] This Court declined to issue a COA on the Roach claim but did grant a COA on the ineffective assistance of counsel claim which subsumes the Roach claim.

100

court's choosing to embrace a speculative theory while denying the discovery tools that would confirm or defeat this theory is problematic.

**b.**     **The court refused to authorize discovery or an evidentiary hearing on the ineffective assistance of counsel claims and denied the §2255 motion by inventing strategic reasons with no support in the record.**

Gabrion's trial involved no adversarial testing of two aggravating factors because, during the penalty phase, Gabrion's own attorney told the jury that his client murdered Timmerman to obstruct justice, despite contrary evidence. Without holding a hearing or authorizing the depositions of trial counsel to determine whether this was a strategic decision, the district judge concluded that "it was not unreasonable for counsel to concede this issue as part of a strategic decision to focus on more promising avenues, like the mitigating factors." R. 156, Op., PageID 5925. There is no evidence in the record to suggest that trial counsel conceded this issue as part of a strategic decision to focus on other areas.

The district judge's reliance on its invented factual inferences contravenes the Supreme Court's instruction that "the habeas court's commission is not to invent strategic reasons or accept any strategy counsel could have followed, without regard to what actually happened[.]" *Marcrum v. Luebbers*, 509 F.3d 489, 502 (10th Cir. 2007) (citing *Rompilla*, 545 U.S. at 395-96; *Wiggins*, 539 U.S. at 526-27; *Kimmelman*, 477 U.S. at 385. The district judge's conjecture also ignores the paltry mitigation case counsel actually presented. *See Hooks*, 689 F.3d at 1206.

**c.      The court refused to issue routine but necessary orders.**

The court denied Gabrion the basic tools necessary to investigate his mental health issues and then denied the mental health portions of the motion finding Gabrion failed to sustain his burden of proof. R. 156, Op., PageID 5903. In June 2017, Gabrion requested an order directing the BOP to provide his medical, including mental health, records to counsel. R. 124, Mot. for Release of Medical Records, PageID 5345. The routine nature of such a request in a death penalty case cannot be overstated. The 2003 Guidelines [24] and 2008 Supplementary Guidelines[25] require counsel to secure said records as part of counsel's investigation. Since being federally incarcerated in March 2002, he had received medical and psychological evaluations and treatment. At the time of the request, there was a competency motion pending.

The court denied the motion, "for the same reason the Court re-affirms Judge Bell's Order on discovery generally." R. 125, Order, PageID 5353. The court said there "is no good cause at this time to open the door to this new information." *Id*. The court denied the request to keep the motion under seal even

---

[24] The Commentary to ABA Guideline 10.7 requires counsel to use "all appropriate avenues" including subpoenas and court orders to obtain all potentially relevant information concerning "medical records," and "criminal and correctional records." 2003 Guidelines at 1025.

[25] Supplementary Guideline 10.11(B) requires the defense team to "conduct an ongoing, exhaustive and independent investigation" from a "broad set of sources" that includes "medical history; "adult health information"; "mental health history"; and "prior adult . . . correctional experience." *Supplementary Guidelines for the Mitigation Function of Defense Teams in Capital Cases*, 36 Hofstra L. Rev. 677, 689 (2008).

though it clearly contained the impressions of the attorneys concerning their investigation and was thus work product. *Id.*

The facility where Gabrion is housed, unlike other maximum-security facilities housing death-sentenced persons, requires a court order to permit experts to see clients. In March 2018, counsel asked the court for an order allowing an expert psychiatrist to see their client. R. 155, Mot. for Order Authorizing Visit, PageID 5780. Gabrion explained that continued evaluation was "crucial" to Gabrion's preparation of his case.

The motion was filed on March 12, 2018, and indicated that a professional visit had been scheduled for March 28, 2018.[26] The court ruled on the motion when it ruled on the petition—seven months later.[27] In denying the request, the court said "The Court previously authorized this same psychiatrist to visit Gabrion in 2015 (ECF No. 34), and authorized another psychiatrist to visit him before that (R. 747). He does not provide a reason for his latest motion." R. 156, Op., Page ID 5997.

Although Gabrion's request was reasonable at any time in light of the serious competency issues that permeated the case, it is untrue that Gabrion

---

[26] Advanced scheduling is required at the prison where Gabrion is housed.
[27] Repeated calls to chambers beseeching the court for a ruling were unavailing. Obviously, this professional visit, including flights, had to be cancelled.

provided no reason why a psychiatrist needed to visit Gabrion. In his motion, he told the court:

a.  Mr. Gabrion's mental health was a primary focus at trial.

b.  None of Mr. Gabrion's court appointed counsel are trained in psychiatry, psychology, neuropsychology or medical science in general.

c.  Not surprisingly, Mr. Gabrion's mental status has not improved during his time on death row.

d.  It has been more than 16 years since Mr. Gabrion stood trial. That he was deemed competent to stand trial is not dispositive to the task before counsel in these §2255 proceedings. Counsel needs to understand what happened at trial and whether what occurred complied with Sixth and Eighth Amendment requirements that are relevant to the case.

e.  In the more than 16 years that have passed since trial, Mr. Gabrion's bizarre conduct has continued unabated. Mr. Gabrion's three direct appeal counsel have a combined experience of dealing with mentally ill clients that exceeds 100 years. Each of them has detailed experiences with Mr. Gabrion to undersigned counsel that are highly unusual, and sustained over the decade plus that they represented Mr. Gabrion. They have described personal encounters with Mr. Gabrion that can only be described as bizarre. Each of Mr. Gabrion's direct appeal counsel hold the opinion that Mr. Gabrion is mentally ill and currently incompetent.

f.  A defense mental health professional testified at trial that Mr. Gabrion was *not* mentally ill. Trial counsel have told undersigned counsel that this came as a surprise to them, that they expected this expert to opine that Mr. Gabrion was indeed mentally ill. This will be a piece of a larger claim that counsel rendered ineffective assistance. See generally, Stevens v. McBride, 489 F.3d 883 (7th Cir. 2007) (failure to know the content of the defense mental health expert's trial testimony was ineffective assistance of counsel requiring vacation of the death sentence); Combs v. Coyle, 205 F.3d 269, 288 (6th Cir. 2000) (presentation of defense mental health professional who "surprised" counsel when he testified in ways helpful to the prosecution rendered representation below the prevailing professional norms of reasonably competent counsel).

g.  Current counsel have visited Mr. Gabrion dozens of times and speak with him telephonically regularly. He is as mentally ill a person as any of us has encountered. He speaks in nonsequiturs. He has firm fixed beliefs that are not true. Many of them involve political figures and movie stars. He is unkind and accusatory toward counsel, then can turn on a dime and be sorrowful. He obsesses about unusual things. These are all traits of persons suffering from extreme mental illness. That these traits have persisted consistently for over a decade is some evidence that Mr. Gabrion was not malingering mental illness as the government argued at trial.

h.  Counsel's investigation to-date reveals an extreme family history of mental illness. Many of Mr. Gabrion's close relatives have been diagnosed with Bipolar Disorder, Schizophrenia, or Major Depressive Disorder. Some of these relatives have required inpatient mental health commitments. At least one has committed suicide; a couple others attempted suicide. Records of these diagnoses and hospitalizations have been and are being collected.

i.  The evidence of Mr. Gabrion's family history of mental illness is critically important because it makes him more vulnerable to suffer from similar disease systems. His family history also provides some evidence that Mr. Gabrion was not malingering

105

> mental illness as the government argued at trial. "A family history of bipolar disorder is one of the strongest and most consistent risk factors for bipolar disorders. There is an average 10-fold increased risk among adult relatives of individuals with bipolar I and bipolar II disorders. Magnitude of risk increases with degree of kinship. Schizophrenia and bipolar disorder likely share a genetic origin, reflected in familial co-aggregation of schizophrenia and bipolar disorder."
> DSM-5 (2013) at 130.

> j. In spite of the importance of collecting all record data on family members for capital sentencing, Porter v. McCollum, 558 U.S. 30 (2009), trial counsel here did not have any of the records concerning familial mental health. It also appears that trial counsel did not procure Mr. Gabrion's Social Security records even though it appears that Mr. Gabrion was on Social Security Disability for mental health related reasons.

R. 155, Mot. for Order Authorizing Visit.[28]

It is irrelevant that another mental health professional had been authorized to see Gabrion[29] and that the psychiatrist in question had previously seen him. Continued observation by a forensic psychiatrist is fundamental to a reliable evaluation. If the district judge was under the misapprehension that a single visit or handful of visits was adequate for a defense evaluation, it was incorrect. Mental illness waxes and wanes, and bipolar disorder is a disease that needs to be observed over a period of time because of its fluctuations between manic episodes and

---

[28] This motion was filed *ex parte*, so there is no PageID number.

[29] This professional was hired *as a consultant only*. It is also worth noting that the government used numerous mental health professionals at trial. And the government has the luxury of sending a prisoner to its facilities where the prisoner is under 24-hour observation for as long as the government deems necessary.

depressive symptoms.[30] If the district court was unaware of these realities, counsel could have furnished the necessary explanation had the court ordered supplemental briefing, scheduled a hearing, or at least extended the courtesy of a ruling prior to the order on the merits. The denial of orders to provide BOP medical records or for access for a defense expert to evaluate Gabrion undermined Gabrion's right to counsel.

**d.    The district court issued rulings interfering with Gabrion's right to counsel and impairing counsel's ability to properly represent Gabrion in these proceedings.**

The court interfered with Gabrion's right to counsel[31] when it refused to order BOP records be provided to counsel. In July 2017, Gabrion developed a debilitating full-body skin disease that continuously worsened, was impervious to treatment, and required hospitalization. R. 131, Mot. Release Med. Records, PageID 5364. Gabrion filed a motion under seal describing the condition and asked the court to order the hospital and BOP to produce Gabrion's records to counsel. Gabrion asked that the records not be provided to the government unless and until a claim was raised which gave the government a right to them. Counsel

---

[30] "[F]amily history and records of past mental health treatment may be essential in criminal dispositional evaluations . . . ."  Melton et al., *Psychological Evaluations for the Courts* §3.04(b) (3d ed. 2007).

[31] Gabrion in entitled to counsel in pursuit of relief under §2255 because this is a capital case. 18 U.S.C. §3599(a)(2).

sought these records to be able to confer with experts to determine appropriate treatment, in an effort to work with BOP to alleviate Gabrion's suffering.

The court denied the motion, stating: "This is a Section 2255 proceeding to test the constitutionality of Mr. Gabrion's prior criminal proceedings, resulting in a sentence of death. Counsel has been appointed to represent Mr. Gabrion on those issues, not on any issues related to his conditions of confinement, or the adequacy of his medical care." R. 134, Order, PageID 5371. The court also denied the motion to maintain the motion under restricted access, opening it to public and prosecutorial view, despite the fact it contained information about Gabrion's medical condition.

A few months later, Gabrion renewed the motion because his condition had significantly worsened and in the previous two months, four attorney visits had been cancelled or cut short due to Gabrion's pain. The court denied the motion and, although the motion contained medical information and information concerning interactions between counsel and their client, the court denied the request for restricted access. R. 149, Order, PageID 5749.

Counsel understood their role as post-conviction counsel. Counsel was not attempting to file a civil lawsuit and litigate prison conditions or the adequacy of medical treatment. Gabrion's lack of medical progress was impeding counsel's

ability to represent him *in these proceedings*, as detailed in his motions.[32] *The only thing counsel requested were their client's medical records*. Denial of such a benign request is puzzling at best.

The court's refusal to issue a routine order allowing Gabrion's expert psychiatrist to meet with him for evaluation purposes also interfered with his right to counsel. The grounds for the denial were unsound. Moreover, there was then pending a motion for a competency hearing. After denying Gabrion the tools to build a competency claim, the court denied the claim, finding "Gabrion's present counsel have not offered any evidence to suggest that his current condition is any different from what it was at the time of trial." R. 156, Op., PageID 5993. It is false that Gabrion offered nothing different from what was presented at trial, but what is important here is that the court denied Gabrion the ability to present different psychiatric opinions by its refusal to issue an order permitting the psychiatrist to meet with Gabrion.[33] Similarly, the court rejected claims relating to counsel's presentation of Gabrion's mental health case at trial when it was the court's actions that caused the deficiency. Moreover, the timing of the denial—

---

[32] The Indiana defenders routinely work with penal facilities when their clients' medical issues are interfering with the defenders' ability to represent the client in their criminal matters. Frequently, with clients who suffer mental health disorders, as Gabrion does, a trusted defender can help a mentally ill or potentially paranoid client see the wisdom of complying with medically appropriate treatment regiments.

[33] *Cf. Pannetti v. Quarterman*, 551 U.S. 930, 943 (2007) ("All prisoners are at risk of deteriorations in their mental state.").

seven months after the request was made when the court was aware that arrangements for the visit had been made and in the opinion denying the §2255 motion on the merits—is demonstrative of the court's lack of evenhandedness.

**e.      The lower court denied motions in disregard of clear Circuit precedent.**

Gabrion filed a timely Rule 59 motion after judgement was entered in this case. R. 160-1, Rule 59 Mot., PageID 6018. With the motion, he filed a request for permission to exceed the 10-page limit. R. 160, Mot. Excess Page, PageID 6015. The court ultimately allowed the filing of the motion and denied it on the merits, R. 164, Order, PageID 6065, but denied an unopposed request that it be deemed filed the day it was filed, not the day the court granted permission to file it oversized. R. 166, Order, PageID 6103; R. 168, Order, PageID 6109. *Lexon Ins. Co. v. Nasser*, 781 F.3d 335 (6th Cir. 2015) dictates the result; the court should have docketed the filing of the Rule 59 motion the day it was filed, not two weeks later when it was authorized to be filed in excess of page limits. 781 F.3d at 337-38. The court's misconstruction of circuit precedent required counsel to file its notice of appeal two weeks earlier than it otherwise would have had to file. Because lead counsel is from a foreign jurisdiction with its own primary responsibilities this was not an insignificant imposition

The court also denied a COA with nary a word's justification, requiring extensive briefing and litigation in this Court before the appeal could even get underway. What the court did is in derogation of this Court's clear precedent.

It is improper to issue a blanket denial of a COA (or, for that matter, a blanket grant of a COA) without "undertak[ing] the individualized determination of each claim presented by petitioner." *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001). In deciding whether to grant or deny a COA, the court must "consider each issue raised by [petitioner] under the standards set forth by the Supreme Court in *Slack* [*v. McDaniel*, 529 U.S. 473 (2000)]." *Id.*

The district court's brief order denying Gabrion a COA, *see* R. 158, Order, PageID 6012-13, did not "provide any analysis whatsoever as to whether [petitioner] had made a 'substantial showing of the denial of a constitutional right'[,]" *Murphy*, 263 F.3d at 467 (quoting 28 U.S.C. §2253(c)(2); *Slack*, 529 U.S. at 483). The two sentences the district court spent stating that no COA should issue do not analyze any of Gabrion's eleven claims, let alone state specifically why any claims fail to meet the *Slack* standard.

**5. This court's three-factor test requires reassigning this case to a new judge.**

If the Court remands this case, it should assign a new judge.

**a.** **The lower court would reasonably be expected to have "substantial difficulty" in putting out of his mind previously expressed views or findings.**

If this Court remands for further proceedings such as discovery and/or an evidentiary hearing, this would not be a typical remand. When reversals are necessary, it is frequently because the lower court made discrete errors. And unlike most cases, here, the lower court was the finder of both the law and the facts.

The district court thwarted each of Gabrion's legitimate attempts to engage the appropriate apparatus for testing the reliability of convictions and sentences, when the law says the need for reliability in the fact-finding process is at its highest level. In violation of clear circuit precedent, specifically precedent mandating hearings when there are disputed facts in §2255 cases, the district court prevented Gabrion from properly investigating his case. It then blamed Gabrion for failures of proof that were the consequence of these rulings. The district court then attempted to prevent appellate review by denying a certificate of appealability on all claims, deviating from clear precedent by failing to conduct an individualized analysis of each claim under the COA standard. That denial of process required the significant and needless expenditure of judicial resources in this Court.

All of these facts, taken together, demonstrate the lower court would have "significant difficulty" putting aside the previous findings in which it made assumptions and assumed what evidence would show.

**b.  Reassignment is advisable to preserve the appearance of justice.**

The district judge has shown a determination to divine nonexistent testimony and an unwillingness to provide the due process that the Supreme Court, this Court, and federal statutes require. This hostility toward Gabrion is evident; the taint of that hostility will remain if the district judge continues to preside over the case. The district judge has ruled on every request either in blind support of the court's predecessor or based primarily on speculation that is untethered to facts in any way. The appearancce of justice requires reassignment.

**c.  Reassignment would not entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.**

Chief Judge Jonker did not preside over the trial, so there would be no loss of the institutional or intangible knowledge that comes from presiding over a lengthy trial. Gabrion concedes that some duplication of effort would be required should the Court reassign this case for remand. However, the duplication required is not out of proportion to the gain in preserving the appearance of fairness.

In *In re Al-Nashiri*, 921 F.3d 224, the Circuit disqualified the lower-court judge and ruled that 460 of his previous written rulings in the case had to be

considered anew by the new judge. The court noted the importance of the

proceedings:

> [W]e cannot forget that the government seeks to impose the ultimate penalty against Al-Nashiri. Because the imposition of death by public authority is … profoundly different from all other penalties, the Supreme Court has been particularly sensitive to ensure that every safeguard is observed. In no proceeding is the need for an impartial judge more acute than one that may end in death.

*Id*. at 239 (citations and internal quotes omitted).

The court explained: "[S]urely the public's interest in efficient justice is no

greater than its interest in impartial justice." *Id*. at 240. "[T]he appearance of bias

demeans the reputation and integrity not just of one jurist, but of the larger

institution of which he or she is a part." *Williams v. Pennsylvania*, 136 S. Ct. 1899,

1909 (2016).

## VII. CONCLUSION

Therefore, Gabrion is entitled to relief, or at least an evidentiary hearing and discovery, on each of these claims. Further, if this Court remands the case for further proceedings, it should reassign the case to a new district judge.

**Date: May 17, 2021**

By: /s/ *Monica Foster*
    Monica Foster
    Jean E. Giles
    Attorneys for Petitioner-Appellant
Business Address:
    Indiana Federal Community
    Defenders, Inc.
    111 Monument Circle, Suite 3200
    Indianapolis, Indiana 46204
    Telephone: (317) 383-3520
    Email: Monica_Foster@fd.org
    Email: Jean_Giles@fd.org

By: /s/ *Scott Graham*
    Scott Graham
    Attorney for Petitioner-Appellant
Business Address:
    SCOTT GRAHAM PLLC
    1911 West Centre Avenue, Suite C
    Portage, Michigan 49024
    Telephone: (269) 327-0585
    Email: sgraham@scottgahampllc.com

**Respectfully submitted,**

By: /s/ *Joseph M. Cleary*
    Joseph M. Cleary
    Attorney for Petitioner-Appellant
Business Address:
    Indiana Federal Community
    Defenders, Inc.
    111 Monument Circle, Suite 3200
    Indianapolis, Indiana 46204
    Telephone: (317) 383-3520
    Email: Joe_Cleary@fd.org

# <u>CERTIFICATE OF COMPLIANCE</u>

In accordance with Federal Rules of Appellate Procedure 28(a)(10), 32(a)(7)(B), and 32(g)(1), and Sixth Circuit Rule 32(a), Undersigned counsel certifies that this brief contains 27,349 words, as counted using Microsoft Word's (version 16.36) word-count function. *See* Fed. R. App. P. 32(g)(1).

**SCOTT GRAHAM PLLC**

Date: May 17, 2021          By:    /s/ Scott Graham
                                    Scott Graham
                                    Attorney for Petitioner-Appellant
                                    1911 West Centre Avenue, Suite C
                                    Portage, Michigan 49024-5399
                                    (269) 327-0585
                                    sgraham@scottgrahampllc.com

# CERTIFICATE OF SERVICE

Undersigned counsel certifies that he filed the Petitioner-Appellant's Principal Brief through the Court's CM/ECF electronic system on May 17, 2021, See Fed. R. App. P. 25(d)(1)(B); 6 Cir. R. 25(f)(2). Notice of this filing will be sent through the CM/ECF system to all parties indicated on the electronic filing receipt, namely Assistant United States Attorney Jennifer L. McManus and Assistant United States Attorney Timothy P. VerHey. Parties may access this filing through the CM/ECF system.

**SCOTT GRAHAM PLLC**

Date: May 17, 2021

By: /s/ Scott Graham
    Scott Graham
    Attorney for Defendant-Appellant
    1911 West Centre Avenue, Suite C
    Portage, Michigan 49024-5399
    (269) 327-0585
    sgraham@scottgrahampllc.com

# APPELLANT'S DESIGNATION OF RECORD

In accordance with this Circuit's Rules 28(b)(1)(A)(i) and 30(g)(1),

Appellant includes this designation of relevant documents from the trial court.

**DISTRICT COURT**
**1:15-CV-447**

| Description | Date | Record No. | Page ID |
|---|---|---|---|
| Motion to Vacate, Set Aside or Correct Sentence | 05/29/15 | 15 | 885-1488 |
| Continued Exhibits – Motion to Vacate, Set Aside or Correct Sentence | 05/29/15 | 16 | 1489-1732 |
| Motion for Leave to Conduct Discovery | 01/29/16 | 51 | 2528-2539 |
| Brief in Support of Motion to Conduct Depositions | 02/02/16 | 59 | 2565-2577 |
| Amended Motion for Discovery | 03/14/16 | 67 | 2604-2613 |
| Order | 04/20/16 | 72 | 2631 |
| Order Denying Motion for Discovery | 09/20/16 | 74 | 2633-2637 |
| Motion for Evidentiary Hearing | 12/19/16 | 89 | 3805-3845 |
| Unopposed Motion for Status Conference | 02/01/17 | 96 | 3880-3881 |
| Certificate re: Motion Concurrence | 02/01/17 | 97 | 3882 |
| Order | 03/08/17 | 99 | 3884-3886 |

| Description | Date | Record No. | Page ID |
|---|---|---|---|
| First Amended Motion to Vacate, Set Aside or Correct Sentence | 03/08/17 | 100 | 3887-4713 |
| Continued Exhibits First Amended Motion | 03/08/17 | 103 | 4731-5000 |
| Government's Response in Opposition to Amended Motion to Vacate, Set Aside or Correct Sentence | 05/22/17 | 119 | 5057-5304 |
| Reply to Government's Response to Motion ton for a Hearing to Determine Mental Competence | 05/23/17 | 120 | 5305-5318 |
| Order Denying Motion for Scheduling Order | 06/20/17 | 125 | 5352-5354 |
| Order Denying Leave to File Under Restricted Access | 07/25/17 | 134 | 5371 |
| Opinion | 10/04/18 | 156 | 5795-6010 |
| Order Denying Certificate of Appealability | 10/04/18 | 158 | 6012-6013 |
| Order – Granting Leave to File Motion for Reconsideration | 11/08/18 | 164 | 6065-6066 |
| Motion for an Order Directing the Clerk to File Movant's Rule 50 Motion Nunc Pro Tunc | 11/15/18 | 166 | 6103-6107 |
| Order Denying Nunc Pro Tunc Motion | 11/16/18 | 168 | 6109-6111 |
| Notice of Appeal | 11/29/18 | 169 | 6112 |

**DISTRICT COURT**
**1:99-CR-76**

| Description | Date | Record No. | Page ID |
|---|---|---|---|
| Transcript of Motion Hearing | 07/09/01 | 214 | 1790-1956 |

**COURT OF APPEALS**
**18-2382**

| Description | Date | Record No. | Page ID |
|---|---|---|---|
| Application for a Certificate of Appealability | 06/17/19 | 19 | 1-162 |
| Order Granting in Part Application for Certificate of Appealability | 09/10/20 | 30-2 | 1-4 |