No. 18-2382

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

MARVIN CHARLES GABRION II,

*Petitioner-Appellant,*

v.

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

On Appeal from the United States District Court
for the Western District of Michigan
No. 1:15-cv-447

## BRIEF FOR APPELLEE

ANDREW BYERLY BIRGE
*United States Attorney*

JENNIFER L. McMANUS
TIMOTHY P. VERHEY
*Assistant United States Attorneys*
Post Office Box 208
Grand Rapids, Michigan 49501-0208
(616) 456-2404

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT REGARDING ORAL ARGUMENT ................................ x

STATEMENT OF JURISDICTION ....................................................... 1

ISSUES PRESENTED ......................................................................... 2

STATEMENT OF THE CASE ............................................................... 3

    1.    Evidence of Gabrion's guilt ..................................... 3

    2.    Penalty-phase evidence ......................................... 11

    3.    Direct appeal ........................................................ 25

    4.    Section 2255 proceedings ...................................... 28

SUMMARY OF THE ARGUMENT ...................................................... 31

STANDARD OF REVIEW ................................................................... 34

ARGUMENT ...................................................................................... 35

I.    The Hair Analysis Evidence Was Not Material to Federal
Jurisdiction ................................................................................ 36

II.    Gabrion's Counsel Provided Effective Representation in the Guilt
Phase of His Trial ....................................................................... 47

    A.    Counsel's guilt-phase performance was objectively
reasonable. .......................................................... 49

        1.    Counsel obtained adequate funding and conducted a
reasonable guilt-phase investigation ......................... 50

        2.    Counsel retained appropriate experts to assist in its
guilt-phase investigation. ...................................... 58

    B.    Gabrion has not demonstrated guilt-phase prejudice. ......... 62

III. Gabrion's Counsel Provided Effective Representation in the Penalty Phase of His Trial. ...........................71

    A.    Counsel's penalty-phase performance was objectively reasonable. ...........................72

        1.    Counsel conducted a reasonable penalty-phase investigation. ...........................72

        2.    Counsel made appropriate objections to the aggravating evidence. ...........................88

        3.    Counsel's concession that Gabrion murdered Rachel to obstruct justice was objectively reasonable. ...........................93

    B.    Gabrion has not demonstrated prejudice. ...........................95

IV. Gabrion Was Not Deprived of His Right to Conflict-Free Counsel. ...........................101

    A.    Background ...........................102

    B.    Yates did not represent Gabrion in the murder case. ...........................106

    C.    Gabrion failed to identify an adverse effect arising from Yates's representation of Lunsford. ...........................109

    D.    The district court did not abuse its discretion in denying discovery and a hearing on this issue. ...........................113

V. Reassignment is not properly before the Court but is unwarranted, in any event. ...........................115

CONCLUSION ...........................123

CERTIFICATE OF SERVICE ...........................124

CERTIFICATE OF COMPLIANCE ...........................125

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS 126

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arredondo v. United States,*
178 F.3d 778 (6th Cir. 1999).......................................................35, 115

*Bigelow v. Haviland,*
576 F.3d 284 (6th Cir. 2009)................................................................51

*Bobby v. Van Hook,*
558 U.S. 4 (2009).............................................................. passim

*Brady v. Maryland,*
373 U.S. 83 (1963)....................................................................27, 36

*Brecht v. Abrahamson,*
507 U.S. 619 (1993).............................................................................45

*Brent v. Wayne County Dept. of Human Servs.,*
901 F.3d 656 (6th Cir. 2018)............................................................122

*Brooks v. Bobby,*
660 F.3d 959 (6th Cir. 2011).............................................................109

*Brooks v. Tenn.,*
626 F.3d 878 (6th Cir. 2010)..............................................................37

*Brown v. United States,*
No. 16-2457, 2017 WL 4863173 (6th Cir. 2017)..............................119

*Byrd v. Collins,*
209 F.3d 486 (6th Cir. 2000)...............................................................44

*Caudill v. Conover,*
881 F.3d 454 (6th Cir. 2018)...............................................................84

*Cuyler v. Sullivan,*
446 U.S. 335 (1980)..........................................................................109

*Davis v. Larson,*
769 F. App'x 233 (6th Cir. 2019)......................................................44, 46

*Dawson v. United States,*
702 F.3d 347 (6th Cir. 2012)..................................................................34

*Dillard v. Burt,*
194 F. App'x 365 (6th Cir. 2006)............................................................44

*Evans v. Cockrell,*
285 F.3d 370 (5th Cir. 2002)..................................................................62

*Gabrion v. United States,*
129 S. Ct. 1905 (2009).............................................................................26

*Garza v. Ryan,*
No. CV-14-01901-PHX-SRB, 2017 WL 1152814
(D. Ariz. Mar. 28, 2017) .......................................................................85

*Harrington v. Richter,*
562 U.S. 86 (2011)...................................................................................61

*Harris v. Lafler,*
553 F.3d 1028 (6th Cir. 2009)................................................................38

*Hawkins v. Rivard,*
No. 16-1406, 2016 WL 6775952 (6th Cir. 2016) ...............................119

*Hooks v. Workman,*
689 F.3d 1148 (10th Cir. 2012)..............................................80, 81, 94

*Hunter v. Burt,*
No. 19-1460, 2019 WL 5571472 (6th Cir. Sept. 5, 2019)....................62

*In re Al-Nashiri,*
921 F.3d 224 (D.C. Cir. 2019) ............................................................121

*Jamison v. Collins,*
291 F.3d 380 (6th Cir. 2002)..................................................................37

*Jurek v. Texas,*
428 U.S. 262 (1976)................................................................................92

*Knowles v. Mirzayance,*
556 U.S. 111 (2009)................................................................48

*Kyles v. Whitley,*
514 U.S. 419 (1995)................................................................37

*Lexon Ins. Co. v. Nasser,*
781 F.3d 335 (6th Cir. 2015)..................................................118

*Marshall v. Hendricks,*
307 F.3d 36 (3d Cir. 2002)......................................................95

*Martin v. United States,*
889 F.3d 827 (6th Cir. 2018).............................. 35, 116, 117

*McPherson v. Kelsey,*
125 F.3d 989 (6th Cir. 1997)......................... 56, 64, 73, 93

*Mickens v. Taylor,*
535 U.S. 162 (2002)........................................ 109, 112, 113

*Montgomery v. Bobby,*
654 F.3d 668 (6th Cir. 2011)..................................... 36, 37

*Moss v. United States,*
323 F.3d 445 (6th Cir. 2003)................................... 107, 109

*Napue v. Illinois,*
360 U.S. 264 (1959)................................................... 44, 45

*Newland v. Hall,*
527 F.3d 1162 (11th Cir. 2008).............................................48

*Phillips v. United States,*
734 F.3d 573 (6th Cir. 2013)................................................34

*Pillette v. Berghuis,*
408 F. App'x 873 (6th Cir. 2010).........................................78

*Pitsonbarger v. Gramley,*
141 F.3d 728 (7th Cir. 1998)................................................68

*Pola v. United States,*
778 F.3d 525 (6th Cir. 2015)................................................................35

*Pough v. United States,*
442 F.3d 959 (6th Cir. 2006)...............................................................34

*Rompilla v. Beard,*
545 U.S. 374 (2005)..................................................................... 82, 83

*Rosencrantz v. Lafler,*
568 F.3d 577 (6th Cir. 2009)......................................................... 45, 47

*Rubin v. Gee,*
292 F.3d 396 (4th Cir. 2002)..............................................................108

*Sagan v. United States,*
342 F.3d 493 (6th Cir. 2003)..............................................................116

*Santosuosso v. United States,*
No. 95-3146, 1996 WL 15631 (6th Cir. Jan. 16, 1996).....................106

*Schreane v. Ebbert,*
864 F.3d 446 (6th Cir. 2017)...............................................................72

*Sears v. Upton,*
561 U.S. 945 (2010)............................................................................92

*Smith v. United States,*
348 F.3d 545 (6th Cir. 2003)...............................................................78

*Solomon v. United States,*
467 F.3d 928 (6th Cir. 2006)..............................................................116

*Stanford v. Parker,*
266 F.3d 442 (6th Cir. 2001)........................................................ 78, 113

*Stoia v. United States,*
22 F.3d 766 (7th Cir. 1994)........................................................ 106, 114

*Strickland v. Washington,*
466 U.S. 668 (1984).............................................................................48

*Strickler v. Greene,*
527 U.S. 280 (1999)...............................................................36, 37

*Thomas v. Lumpkin,*
995 F.3d 432 (5th Cir. 2021).............................................................74

*Thomas v. United States,*
849 F.3d 669 (6th Cir. 2017).............................................................77

*Tinsley v. Million,*
399 F.3d 796 (6th Cir. 2005).............................................................62

*Truesdale v. Moore,*
142 F.3d 749 (4th Cir. 1988).............................................................100

*United States v. Ashimi,*
932 F.2d 643 (7th Cir. 1991)........................................................76, 77

*United States v. Brown,*
332 F.3d 363 (6th Cir. 2003).............................................................34

*United States v. Butler,*
955 F.3d 1052 (D.C. Cir. 2020) ..........................................44, 45, 46, 47

*United States v. Cronic,*
466 U.S. 648 (1984)........................................................................113

*United States v. Davis,*
769 F. App'x 227 (6th Cir. 2019)....................................................45, 46

*United States v. Fields,*
761 F.3d 443 (5th Cir. 2014).......................................................passim

*United States v. Fields,*
763 F.3d 443 (6th Cir. 2014).............................................................45

*United States v. Gabrion,*
517 F.3d 839 (6th Cir. 2008)......................................................26, 41, 42

*United States v. Gabrion,*
648 F.3d 307 (6th Cir. 2011).......................................................passim

*United States v. Gabrion,*
719 F.3d 511 (6th Cir. 2013) ....................................................... passim

*United States v. Martini,*
31 F.3d 781 (9th Cir. 1994) ...................................................... 106, 107

*United States v. Munoz,*
605 F.3d 359 (6th Cir. 2010) ...........................................................51

*United States v. Runyon,*
707 F.3d 475 (4th Cir. 2013) ...........................................................92

*United States v. Webster,*
392 F.3d 787 (5th Cir. 2004) .........................................................113

*Valenzuela v. United States,*
217 F. App'x 486 (6th Cir. 2007).....................................................115

*Wiggins v. Smith,*
539 U.S. 510 (2003) ................................................................. 82, 83

*Williams v. Pennsylvania,*
579 U.S. 1, 136 S. Ct. 1899 (2016) ................................................121

**Statutes**

18 U.S.C. § 3593(c) ........................................................................90

21 U.S.C. § 848(q) ..........................................................................50

28 U.S.C. § 1291 ..............................................................................1

28 U.S.C. § 2106 ...........................................................................116

28 U.S.C. § 2253(a) ..........................................................................1

28 U.S.C. § 2255 .............................................................. 1, 28, 34, 35

**Rules**

Rule 6, 28 U.S.C. foll. § 2255.....................................................35, 113

Rule 8, 28 U.S.C. foll. § 2255.........................................................117

**Other Authorities**

*ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, Investigation 11.4.1 (1989)................................87

*ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, The Defense Case at the Sentencing Phase 11.8.6 (1989)....................................................................................87

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, History of Guideline 1.1, 31 Hofstra L.R. 913 (2003)...............................................................................86

John B. Gould & Lisa Greenman, Report to the Committee on Defender Services, Judicial Conference of the United States; Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases (2010) ....................................................................................50

Stebbins an*d Kenny, Zen and the Art of Mitigation Presentation, or, the Use of Psycho-Social Experts in the Penalty Phase of a Capi*tal Trial, The Champion (Aug 1986), reprinted in California Death Penalty Defense Manual, Vol. 11 (1987 Supp.) ................................................74

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Oral argument is unnecessary in this case because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument. This Court is familiar with this matter, having presided over the direct appeal, including en banc proceedings.

# STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction over Marvin Gabrion's motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1291 and 2253(a). The Court issued a certificate of appealability limited to the following issues:

> Claim 2 (whether the government knew that the FBI's hair analysis was false or misleading, but failed to disclose that fact to defense counsel in violation of *Brady*, and the evidence is material to establishing federal jurisdiction);
>
> Claim 3 (whether trial counsel was ineffective in its mitigation investigation and presentation at the penalty phase);
>
> Claim 6 (whether trial counsel was ineffective at the guilt phase by failing to obtain funding, failing to investigate the government's case, and failing to retain investigative services); and
>
> Claim 7 (whether trial counsel was ineffective because it deprived Gabrion of representation by conflict-free counsel where one of the attorneys who assisted and met with him represented a key government witness who testified against Gabrion).

(COA, Doc. 30-2, p.3.)

1

## ISSUES PRESENTED

1.     Did the government knowingly present false or misleading FBI hair analysis evidence, and was any such evidence material to establishing federal jurisdiction?

2.     Was Gabrion's counsel ineffective at the guilt phase of his trial by failing to obtain funding, investigate the government's case, or retain investigative services?

3.     Was Gabrion's counsel ineffective in its mitigation investigation and presentation at the penalty phase of his trial?

4.     Was Gabrion deprived of his right to representation by conflict-free counsel?

5.     Has Gabrion satisfied his burden to demonstrate that this matter, if remanded, should be reassigned to a different judge?

<u>**STATEMENT OF THE CASE**</u>

In its opinion, the district court exhaustively set forth the factual background in this matter, including the voluminous evidence of Gabrion's guilt and the aggravating factors supporting the sentence of death. A brief overview of the evidence presented at trial, the issues resolved on appeal, and the § 2255 proceedings below, is set forth here.

**1. Evidence of Gabrion's guilt**

**Physical evidence.** Gabrion was indicted for murdering Rachel Timmerman after her body was discovered in July 1997 in Oxford Lake, Michigan, federal property within the Manistee National Forest. Physical evidence linked Gabrion to the murder: Rachel's body was found chained to two cinderblocks secured by two padlocks. (R.588: Tr. IV, 998, 1002, 1008.)[1] The blocks were indistinguishable from blocks found at Gabrion's house. (*Id.* at 1027-31; R.591:Tr. VII, 1493-1511.) Paint and adhesive on the blocks attached to Rachel's body was chemically indistinguishable from that on blocks found on Gabrion's property. Spray

---

[1] "R.__" refers to docket entries in the criminal case, W.D. Mich. No. 1:99-cr-76. Due to the age of the case, Page ID numbers are not readily available for many of these documents. "CivR.__" refers to docket entries in the civil case, W.D. Mich. No. 15-cv-447. This response adopts the district court's citation conventions. *See* CivR.156: Op., PageID.5796 n.1.

paint in cans found at Gabrion's house was chemically indistinguishable from the paint on the blocks on Rachel's body. (R.588: Tr. IV, 1043-45; R.591, Tr. VII: 1557-67.) Keys found at Gabrion's house fit the padlocks used to attach the blocks to Rachel's body. (R.588: Tr. IV, 1032-38, 1040-42.)

**Motive.** The government presented evidence that Gabrion killed Rachel because she had accused him of rape and the matter was proceeding to trial. This took several forms:

- **Gabrion's threats.** Witnesses testified that Rachel was reluctant to report the rape because Gabrion had threatened to kill her if she did. (R.473: 2/26/02 Tr. 17; R.471: 2/27/02 Tr. 34; R.589: Tr. V. 1218-19.) He also said he would kill her baby daughter, Shannon, and make her watch. (R.589: Tr. V, 1219.)

- **The letters.** After Rachel left her home for the last time in June 1997, Rachel's father, the prosecutor, and the judge presiding over the rape case received letters purportedly written by her retracting the rape allegations and stating that she had moved to Arkansas with a man named Delbert, whom none of her family or friends had heard of, to start a new life. (R.589: Tr. V, 1238-40, 1168-69; Gov't

Exs. 62, 64-66; R.472: 2/25/02 Tr. 13-19.)[2] The letters arrived in the same envelopes imprinted with a holographic NASA space station stamp that Gabrion used in his own correspondence. (R.589: Tr. V, 1245-46, 1255-57; Gov't Exs. 67-69.) All but one of the letters were mailed June 14 or later—after Rachel was likely already dead. (R.459: 2/26/02 Tr. 16.)

- **Gabrion's testimony.** Gabrion testified at trial that Rachel died because she was going to be a witness: "I think what you did is you forced her to testify in a case against a person lying in a case which forced her to become a victim to a crime"; "she kept talking and talking and talking to the police." (R.461: 3/1/02 Tr. 68, 73.)

- **Timing.** Rachel was seen alive for the last time on or about June 3, a few days after a hearing that would have preserved her testimony in the rape case was adjourned. Evidence suggested Gabrion delayed court proceedings until he could get access to her. Rachel filed the rape complaint on October 31, 1996; Gabrion first

---

[2] A few months earlier, Gabrion had expressed interest in buying a car, referring to himself as "Lance" (a name he periodically used as an alias), and advising the seller that he wanted a car that could make it to Arkansas. (R.590: Tr. VI, 1437-38.)

appeared on January 21, 1997. Rachel was in jail from January 8 to May 5, 1997. Gabrion twice changed lawyers; he waived a preliminary examination, and, when one was scheduled anyway for June 5, he waived it again.

- **Gabrion's additional threats.** In the interim, from Rachel's release on May 5, to her disappearance on June 3, Rachel was terrified: she called the sheriff's office twice after encountering Gabrion, hysterical, to establish "a trail" in case Gabrion followed through with his threat to kill her. (R.589: Tr. V, 1207-10.) On Memorial Day, she went to a friend's house, shut the blinds and curtains and began pacing, telling her friend that Gabrion had raped her, the court case was coming up, and he was going to kill her for it. (*Id.* at 1224-27.)

**Other physical and testimonial evidence.** Witnesses and other evidence placed Gabrion on the scene with Rachel near where her body was found, and connected him to a boat he likely used to drown her.

- **Gabrion on the scene.** Witnesses saw Gabrion with Rachel at the shore of Oxford Lake in June 1997, a few weeks before her body was found in it. They were in a black pickup truck with a boat in the

back end. (R.670: Coleman Dep. 5-16; R.591: Tr. VII, 1575-82 (Kirk).) Gabrion, "glaring like he was mad," nearly running a couple off the two-track road to Oxford Lake. (R.590: Tr. VI, 1306-09, 1320, 1329-33.)

- **Gabrion with the boat.** During the predawn hours of June 6, 1997, Gabrion was seen at his home unloading a boat from a pickup truck. Once it was out, he removed blocks and chains from the boat, rinsed it out, and used a grinder on it, before reloading the blocks and chain and driving the boat away in his truck. (R.590: Tr. VI, 1406-15.) Later, neighbors and a passerby remembered that Gabrion had a small aluminum fishing boat for sale with its registration numbers ground off. (R.471: 2/27/02 Tr. 57; R.590: Tr. VI, 1398, 1426-28, 1432-35.) When asked why the numbers had been removed, Gabrion said, "it's none of your fucking business." (R.590: Tr. VI, 1428-29, 1434.)

- **Evidence at Gabrion's campsite.** Witnesses camping on Little Manistee River testified that in early June 1997, Gabrion had introduced himself as "Lance," told them a story about where he was camping with his family that they later realized was a lie, and

asked them to keep his aluminum fishing boat for him. (R.589: Tr. V, 1196-1204; R.590: Tr. VI, 1445, 1448, 1451-52.) The evening of June 6, Gabrion showed up with bruises and scratches on his face, with patches of hair missing, and delivered the boat. (R.590: Tr. VI, 1451-53; R.588: Tr. IV, 1053-54.) At Gabrion's actual campsite at Hungerford Lake, about 6.5 miles from the scene of the murder, police found chain, duct tape, bolt cutters, and, in the campfire pit, a package of silicone baby nipples and a woman's hair clip, similar to the kind Rachel wore. (R.588: Tr. IV, 997, 1098-1108; R.472: 2/25/02 Tr. 9.)

**Gabrion's flight and capture.** After Rachel disappeared, Gabrion began keeping his distance from Michigan and using false identities.

- He contacted a real estate broker to sell his Altona store, advising that he was unavailable to meet, but mailed the broker a key in an envelope with a holographic imprinted stamp with a "NASA/space station" design. (R.589: Tr. V, 1244-46; Gov't Ex. 69.) In July, Gabrion's mother asked his brother David to "remove some items" from the store. (R.589: Tr. V, 1258.) David had just been released from jail, where he had received two letters from Gabrion in

envelopes with the same "NASA/space station design. (*Id.* at 1255-57; Gov't Exs. 67 & 68.) Gabrion knew he was wanted for questioning (R.471: 2/27/02 Tr. 17-21), but he stayed away from Michigan.

- Before Labor Day in 1997, Gabrion concocted a ruse to obtain personal identification information from a man named Robert Strevels: he placed an ad for a carpenter, "interviewed" Strevels for the position, then told Strevels he was not needed. (R.590: Tr. VI, 1462-66.) He used Strevels's information to obtain a driver's license in Strevels's name. (*Id.* at 1467.)

- Gabrion identified himself as Robert Strevels to a man he encountered in West Virginia. Gabrion, sporting a new beard, asked about buying property in a remote area up a creek. He said his wife had died in a carjacking and he wanted to get away from it all. (R.591: Tr. VII, 1545-47.)

- In October 1997, Gabrion was finally arrested in New York, where he was using a post office box in the name of Robert Allen, and carrying the Robert Strevels false identification. (R.591: Tr. VII, 1476-78.) An FBI agent served a subpoena for hair samples on

9

Gabrion the following week, when Gabrion had a full head of hair. (*Id.* at 1480-81.) But analysts initially could not compare a pubic hair found in Rachel's jeans with Gabrion's hair because after his arrest and receipt of the subpoena, he shaved all the hair off his body. (R.591: Tr. VII, 1536-39.)

**Gabrion's admissions.** Several witnesses testified about inculpatory admissions Gabrion made.

- In June 1997, he told his nephew that if he were to kill someone, he would wrap them in chicken wire and chains with bricks and put them in a muddy lake. (R.471: 2/27/02 Tr. 41-42.)

- That same month, Gabrion told a friend, "it is not hard to get rid of somebody; you just weigh them down and throw 'em in the lake." (*Id.* at 14.)

- Gabrion told Lloyd Westcomb, who had known Gabrion since childhood, that he "got rid of" his girlfriend "permanently" by binding her with chains and blocks and throwing her over a boat. (R.590: Tr. VI, 1354-55.) Westcomb relayed this to his mother, who testified via deposition. (*Id.* at 1354-55; R.669: K. Westcomb Dep. 7-10.)

- While in jail awaiting trial, Gabrion offered a fellow inmate $500 to buy land on Oxford Lake so the property would be private, not federal, land. He gave the inmate a hand-drawn map of Oxford Lake that had markings showing "Body Found 1 of 3." (R.589: Tr. V, 1276-85; Gov't Ex. 70.)

- In March 2001, Gabrion talked to a reporter, drew another map of the lake, and said the baby items found at the campsite were for his dog. (R.589: Tr. VI, 1292.) He wanted the reporter to help him determine the boundary lines of Oxford Lake between the private and federal property. (*Id.* at 1296-97.)

- Gabrion told an inmate he killed Rachel because she screamed rape and he "had to take care of business." (R.594: S. Tr. II, 355-56.) He also said there was another body in the lake. (*Id.*)

**2. Penalty-phase evidence**

Fifty-eight witnesses testified for the government in the penalty phase.[3] The evidence was the subject of pretrial motion practice and

---

[3] The statutory aggravating factors were: (1) Gabrion murdered Rachel in an especially heinous, cruel and depraved manner; and (2) Gabrion murdered Rachel after substantial planning and premeditation. The non-statutory aggravating factors alleged were: (1) Gabrion is likely to be dangerous in the future; (2) Rachel was a unique and individual human

hearings; the defense succeeded in limiting some of it. The government agreed that its evidence relating to the statutory aggravating factors that Gabrion killed Rachel after substantial planning and premeditation, and in a heinous manner, would be limited to evidence admitted in the guilt phase as to the manner of her death (except that the government intended to (and did) recall the forensic pathologist to testify that death by drowning is a drawn-out process, accompanied by panic, pain, and fear). (R.385: 1/11/02 Hr'g Tr., 86-88; R.593: S. Tr. I, 58-64.) The court excluded grand jury testimony that Gabrion had said he hated Rachel and planned to drown her, where the witness had died by the time of the trial. (R.395: 1/25/02 Op. at 14.) The government agreed to call only five victim impact witnesses. The government proved the obstruction of justice aggravating factor through the motive evidence presented in the

---

being whose loss has and will impact her family; (3) Gabrion caused the disappearance or death of eleven-month-old Shannon VerHage (Rachel's baby); and (4) Gabrion murdered Rachel to obstruct justice and retaliate against her in regard to another offense. (R.220: Am. Notice.)

guilt phase—that Gabrion killed Rachel to prevent her from testifying against him in the rape case and in retaliation for reporting it.

Prior to trial, the government provided the defense with a 13-page outline identifying all penalty phase witnesses and summarizing their anticipated testimony. (R.385: 1/11/02 Hr'g Tr., 83-85; R.652: 8/10/05 Mot.; R.653-1: Br.; R.653-2: 12/18/01 Letter.)[4] Much of the evidence supporting the non-statutory aggravating factor that Gabrion was responsible for the death of Rachel's infant daughter, Shannon VerHage, was also largely established in the guilt phase by the fact that the baby disappeared with Rachel. But several witnesses also testified in the penalty phase that Gabrion admitted he killed Shannon because he did not know what to do with her. (R.593: S. Tr. I, 150-53 (Cross); 197-98 (Love); R.594: S. Tr. II, 313 (Lunsford).) The government also offered evidence that Gabrion remained a danger to the community.

---

[4] This letter is not in the record, but Gabrion's trial counsel acknowledged receiving it on the record, and stated that the letter, and an in-person meeting to discuss the anticipated evidence, effectively rendered moot a discovery motion they had filed. (R.385: 1/11/02 Hr'g Tr., 83-84.) This included the fact that the government intended to introduce evidence related to the disappearances of Robert Allen, Wayne Davis, and John Weeks, contrary to Gabrion's assertion that notice of that intended evidence was not given (Gabrion Br. at 39).

**Evidence of Gabrion's assaults and threats.**

- **Sexual assaults of women and girls.** Without consent, Gabrion grabbed a woman's breasts and crotch (R.593: S. Tr. I, 106-13 (Goller)); climbed into bed with a woman (*id.* at 113-23 (McGraw)), and peeped on and grabbed a 12-year-old girl's "private parts" (*id.* at 132-50 (Niewiek).)

- **Assaults on his neighbors.** Gabrion once pulled a neighbor off his lawnmower and attacked him; he took another neighbor's dog, who ended up dead, and threatened to kill him and "dust the bitch," referring to the neighbor's wife (R.593: S. Tr. I, 93-99, 100-03 (Bacons); R.594: S. Tr. II, 241-46 (Cass).) Two neighbors had their homes intentionally set on fire after conflicts with Gabrion. (R.593: S. Tr. I, 71-75, 85-87; 93-99.) Gabrion once threatened to kill people after being asked to leave a neighbor's party, and shortly thereafter, rifle shots were fired from the direction of Gabrion's home. (R.593: S. Tr. I, 174-79, 186-89.) On another occasion, a neighbor noticed Gabrion aiming a rifle at her from his upstairs window as she helped her child climb into the back seat of the family car. (R.594: S. Tr. II, 287-91.)

- **Assaults on others living in his community.** During a card game with the Lilly family, Gabrion beat and kicked Dennis Lilly; punched his wife in the face, grabbed her by the hair and slammed her head onto the floor three times; beat their ten-year-old son; and threw the family dog against the wall. (R.593: S. Tr. I, 209-24). Thomas Niewiek rented an apartment to Gabrion; after Gabrion assaulted Niewiek's stepdaughter, Niewiek told Gabrion he was being evicted. Gabrion grabbed a knife and threatened Niewiek and his wife with it, saying he would kill them: that he'd throw Niewick in the river and no one would find his body. (*Id.*, 132-50.)

**Evidence linking Gabrion to the disappearance of others.**

- **Robert Allen**, a homeless man, disappeared in 1996. Gabrion assumed his identity and arranged for his social security disability benefits to be deposited into a bank account he controlled. In 1998, Gabrion was convicted of wrongfully misappropriating Allen's benefits. (R.594: S. Tr. II, 441-54.)

- **Wayne Davis**, a witness in the rape case (R.594: S. Tr. II, 390-92, 418), went missing after Gabrion was released on bond. Davis had asked Darlene Lazo to give him a ride to court on February 13,

1997, so he could plead guilty to a drunk driving charge. He expected to serve 90 days in jail and bought cigarettes and puzzles to keep him occupied there. (*Id.* at 397-98.) Davis never mentioned any plans about leaving the state. (*Id.* at 399, 419.) Lazo saw Davis and Gabrion together at Davis's home on February 12; when she arrived to take Davis to the courthouse the next morning, he was gone. On the door was a note purportedly from Davis stating that he had gone to California because he was scared to go to jail. Lazo did not believe it. (*Id.* at 399-401.) Lazo noticed that even though it was winter, the army jacket Davis always wore was still in his home. (*Id.* at 404-05.) The following month, Gabrion brought Davis's property (with the serial numbers scratched off) to a consignment shop to sell it. (R.594: S. Tr. II, 391-94, 406-12, 412-17.)[5]

- **John Weeks** occasionally worked for Gabrion. In May or June 1997, Gabrion asked him to call a woman named Rachel to set him up, and Weeks did so. (R.594: S. Tr. II, 423-27.) Campers saw Weeks

---

[5] After the trial, Davis's body was found in a lake located near Gabrion's family home.

16

with Gabrion on June 5, the day before Gabrion showed up with bruises and scratches on his face and asked them to store his boat. (R.588: Tr. IV, 1053-55; R.590: Tr. VI, 1451-52.) On June 22, Weeks told his girlfriend he was going on a "dope run" to Texas with Gabrion and would be gone a week to ten days. (*Id.* at 427.) Gabrion confirmed the trip, but claimed it was to pick up Christian books. (*Id.* at 429.) About two weeks later, Gabrion resurfaced and told Weeks's girlfriend that he had dropped Weeks off in Arizona. No one has seen Weeks since June 22, 1997. (*Id.* at 420-31, 435-37.)

**Evidence of Gabrion's dangerousness in custody.**

- Gabrion was caught with weapons in his cell, including metal shards and razors. (R.594: S. Tr. II, 324-29, 377-80.) He also hid nail clippers, which can be used to unlock handcuffs. (*Id.* at 307-09.)

- Gabrion, who has Hepatitis C, threw urine and feces at prison employees and started a fire in his cell. (*Id.* at 310-13.) He also made a fake gun from bars of soap. (*Id.* at 367-72, 385-89.)

- Gabrion attempted to bribe jail trustees to open cell doors for him. (R.594: S. Tr. II, 336-41.) He also posed as the Clerk of the U.S.

17

District Court and attempted to arrange his own prison transfer. (*Id.* at 293; R.593: S. Tr. I, 91.)

- Gabrion talked about escaping many times. (R.594: S. Tr. II, 35-54.) He tried to kick the metal sheeting in his cell to loosen it to make a weapon, and he kept chicken bones to make shanks (weapons). (*Id.*) He made threatening remarks about female guards, saying he would kill them. (*Id.*)

**Mental health evidence.** One of the defense's principal penalty phase arguments was that Gabrion suffered from mental health issues, perhaps resulting from head injuries, and this mitigated his culpability. Gabrion's mental health was the subject of intense scrutiny from the beginning of the case. He was assessed three times for competency; on each occasion, he was deemed competent. (R.268: 5/8/00 E. Fallis, FMC Fort Worth Psychological Evaluation (sealed) ("Fallis Report"); R.211: 6/18/01 C. Frank, Henry Ford Behavioral Center (sealed) ("Frank Report"); R.314: 10/22/01 DeMier, FMC Springfield Psychological Evaluation (sealed) ("DeMier Report").) Each examiner also determined that Gabrion was feigning or "malingering" mental illness. (R.268: Fallis Report, at 17; R.211: Frank Report, at 8; R.314: DeMier Report, at 19.)

During the penalty phase, additional witnesses testified about Gabrion's mental health.

- **Scharre.** Dr. Douglas Scharre testified for the defense. Based only on a review of records, Scharre testified that Gabrion suffered from frontal lobe dysfunction and Geschwind Syndrome, possibly resulting from motor vehicle accidents. (R.539: 3/13/02 Tr. 9, 12-13.) He said the syndromes are characterized by poor planning and disorganization, hypergraphia (repetitive writing), and hyperreligiosity. (*Id.* at 23, 29-31.) Scharre testified that Gabrion was not malingering (*id.* at 68-74, 79-80), and one side of Gabrion's brain was darker than the other on a PET scan. (*Id.* at 39.) Gabrion's CAT scans were normal, which Scharre said supported his opinion that a head injury, rather than a structural lesion, caused the PET asymmetry. (*Id.* at 41-45.) Scharre admitted the only evidence he had of any accident was Gabrion's self-report of a 1992 car accident. (*Id.* at 52-55.)[6]

---

[6] During its rebuttal, the government presented evidence that Gabrion staged the 1992 car accident in an effort to obtain insurance money. See CivR.119: Gov't Resp. to § 2255 Mot., PageID.5094 (discussing testimony of Scott Vanderveen, R.543: 3/14/02 Tr. 4-18).

- **Jackson.** Dr. Newton Jackson also testified for the defense. He reviewed records and interviewed Gabrion three times. (R.541: 3/14/02 Tr. 6-10, 13.) He concluded that Gabrion was delusional, his behaviors were consistent with a possible mental illness (*id.* at 8), and he suffered from psychological deficits (*id.* at 29), though he did not view Gabrion as "mentally ill" (*id.*). Jackson nonetheless concluded that several adverse influences on Gabrion during his developmental years may have had "a serious adverse effect upon him as a functioning individual." (*Id.* at 17.) These included a childhood illness resulting in hospitalization and surgery, parental abandonment and neglect, substance abuse by Gabrion and his parents, family dysfunction and abuse, and auto accidents. (*Id.* at 15-19.) Based on all of this, Jackson determined that Gabrion suffered from "a number of disorders" which, while not "coalesc[ing] together to arrive . . . at a single diagnosis" reflected that Gabrion had features of several personality disorders: histrionic, antisocial, and narcissistic. (*Id.* at 24-26.) He saw some evidence of malingering, but he did not think it explained all of Gabrion's presentation. (*Id.* at 11-13, 29.) Gabrion thwarted Jackson's attempts to conduct a thorough examination by refusing to cooperate

in the third interview and refusing to participate in testing. (*Id.* at 13-16.)

- **Dr. David Griesemer**, a neurologist, testified during the government's penalty phase rebuttal. Griesemer testified that he reviewed Gabrion's medical records to determine if he had any neurological impairment. (R.544: 3/14/02 Tr. 6.) Griesemer reviewed the PET, CAT, and EEG records and found no evidence of brain injury. (*Id.* at 9.) Griesemer testified that in auto accidents, victims tend to experience acceleration-deceleration injuries where the head jerks forward and back. There would be evidence of contusions or blood on the brain if that occurred, and Gabrion's 1992 CAT scan taken at the time of the purported accident did not show any such injury. (*Id.* at 15-17.) Griesemer testified that a PET scan is not a diagnostic tool used to evaluate brain injury, and Gabrion's PET scan did not show trauma. (*Id.* at 20, 36.) He concluded that Gabrion test results, indicating severe mental impairment, were not explained by traumatic brain injury. Gabrion showed complex functioning in obtaining false identification, conducting bank transactions, and planning the murder. (*Id.* at 11-12, 22-24.)

- **Dr. Thomas Ryan,** a clinical psychologist, reviewed records, interviewed and tested Gabrion. (R.546: 3/15/02 Tr. 2-7.) Ryan found Gabrion to be a malingerer. He testified that if Gabrion had suffered a traumatic brain injury, he would have started with a severe impairment that would have improved over time, but Gabrion's purported illness had worsened. Gabrion's tests showed him to be severely impaired; however, his real-life activities showed that he has a much higher level of functioning. The testing data made no clinical sense when compared to Gabrion's everyday behavior. (*Id.* at 10-22.)

- **Dr. Gregory Saathoff**, a psychiatrist, also interviewed Gabrion. Saathoff testified that he was a consultant to maximum security prisons and had interviewed hundreds of prisoners. (R.546: 3/15/02 Tr. 28.) He reviewed records and interviewed Gabrion. (*Id.* at 30-33.) Saathoff stated that he had examined the same CAT and PET scans as Scharre had, and disagreed that they showed any indication of brain injury. (*Id.* at 34.) Saathoff also disagreed that Gabrion suffered from frontal lobe injury or Geschwind Syndrome. For example, Saathoff stated that Gabrion's claim that the FBI had moved Rachel's body was not an example of "confabulation" but was a shrewd

recognition that he could defeat a federal conviction if he could persuade the jury that she had been killed at the north end of Oxford Lake, which was private property. (*Id.* at 45-48.) He also disagreed that Gabrion's writings were proof of a brain injury, as some of his writings were coherent, particularly when Gabrion needed services from the jail. This indicated malingering. (*Id.* at 52-58.)

**Other mitigating evidence.** The defense called several additional witnesses during the penalty phase.[7] The overall defense mitigation strategy was evident from defense counsel's opening statement—in light of Gabrion's outbursts, inflammatory testimony, and other conduct such as punching his own attorney in the face, all in front of the jury, and the volume of the anticipated aggravating evidence, the defense had little choice but to acknowledge that Gabrion was not "a good person." (R.593: S. Tr. I, 46.) Defense counsel attempted to persuade the jury to choose a life sentence over death by presenting the evidence noted above relating to Gabrion's mental health, and evidence relating to his childhood, including his difficult upbringing, his relatively normal behavior through

---

[7] The defense also filed many motions, which succeeded in limiting some of the government's proofs. See CivR.119: Gov't Resp., PageID.5085-88.

high school, his substance abuse, and his car accidents, which the defense suggested, aided by expert testimony, might have affected his brain functioning. See CivR.119: Gov't Resp., PageID.5092-93. They also presented witness testimony about BOP's ability to house Gabrion securely and thereby minimize any future dangerousness. (R.574: 3/13/02 Tr. 3-5.)

Gabrion also testified—against his counsel's repeated advice— stating, among other things, that his childhood was no worse than that of the average poor white man in Northern Michigan, that he had acted as Robert Allen's personal representative, that he had set up a charitable trust for missing children, that he'd used another identity in California, and that Rachel had said her father abused her, stating, "[s]ome of them people really don't have the right to feel grief of like, but I mean, if it was my daughter, I would certainly feel some damn grief too." (R.542: 3/14/02 Tr. 17-18.)

The jury deliberated for two days before returning its penalty phase decision. They unanimously found all the statutory and non-statutory aggravating factors beyond a reasonable doubt. (R.526: Verdict Form, at 1-5.) They also found mitigating factors proven. All twelve jurors found

as a mitigating factor that Gabrion "has features of several personality disorders, including histrionic personality disorder, narcissistic personality disorder, and borderline personality disorder." (*Id.* at 7.) All twelve also found that Gabrion "grew up in an impoverished and violent environment, and was the victim of abandonment, neglect, and emotional, psychological and physical abuse as a child" and "was not a disciplinary problem in school and does not have any history of criminal conduct before the age of 23." (*Id.* at 6.) Nine found that Gabrion's "abuse of drugs, alcohol and chemical inhalants contributed to his criminal conduct." (*Id.* at 7.) Some jurors found other mitigating factors; all twelve wrote in an additional factor, that the loss of his life would be significant to his family. Ultimately, the jury found the aggravating factors outweighed the mitigating factors so as to warrant a sentence of death. (*Id.* at 9.)

### 3. Direct appeal

Gabrion was appointed new counsel on appeal, who raised over 20 issues. The appeal lasted over eleven years: first, the Court identified six questions relating to the district court's subject matter jurisdiction over the case. This necessitated a remand for further evidentiary

development; ultimately, the Court issued a divided opinion finding jurisdiction. *United States v. Gabrion,* 517 F.3d 839 (6th Cir. 2008) (*Gabrion I*). Gabrion's appellate counsel sought rehearing en banc and certiorari, but those petitions were denied. *United States v. Gabrion*, Nos. 02-1386/1461/1570 (6th Cir. Aug. 26, 2008); *Gabrion v. United States*, 129 S. Ct. 1905 (2009).

The panel solicited supplemental briefing, heard argument, and, in a divided opinion, rejected all of Gabrion's claims except three. *United States v. Gabrion*, 648 F.3d 307 (6th Cir. 2011) (*Gabrion II*). The majority determined that the death penalty should be vacated on two grounds, and said it was "troubled" by what it perceived as uneven treatment of pro-death penalty and anti-death penalty jurors during voir dire, but declined to reach the issue. *Id.* at 324, 328, 344-45.

One of the claims the Court rejected was that Gabrion was incompetent to stand trial. 648 F.3d at 318. The Court noted that nine mental health experts had evaluated Gabrion, all of whom except one (Dr. Scharre, who did not examine him) had found that he was malingering mental illness, and agreed that the records demonstrated that Gabrion "knew what he was doing." *Id.* at 320. The Court also

rejected Gabrion's claim that the government violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by not disclosing a Department of Justice report concerning the conduct of Chrystal Roach, the Michigan prosecutor who had handled the rape case against Gabrion and briefly served as a Special Assistant U.S. Attorney in pretrial proceedings, stating that Roach's testimony as a fact witness at the trial related to "peripheral and uncontested facts"; therefore, the Court "confidently . . . believe[d]" that the absence of the report "did not affect the result of the guilt phase of the trial." *Id.* at 336. And the Court rejected claims challenging the admission of evidence of unadjudicated acts during the penalty phase; the constitutionality of the Federal Death Penalty Act; the indictment's failure to allege statutory aggravating factors; the district court's handling of a statement by the jury foreperson that he knew Gabrion was "off the wall" prior to trial, and its refusal to include prison regulations in the jury instructions.

The Court reheard the case en banc and issued an opinion affirming Gabrion's conviction and reinstating the death sentence. *United States v. Gabrion*, 719 F.3d 511 (6th Cir. 2013) (*Gabrion III*). The Court also rejected Gabrion's claim that the district court had treated pro- and anti-

death penalty jurors differently, rejected three arguments Gabrion said the panel had overlooked, and adopted the panel's reasoning rejecting all of Gabrion's other claims. *Id.* at 535.

In addressing Gabrion's many arguments on direct appeal in the panel opinion, the Court summarized the circumstantial evidence of Gabrion's guilt, which it characterized as "overwhelming." *Gabrion II*, 648 F.3d at 317. The Court stated three additional times that the evidence of Gabrion's guilt was "overwhelming." *Id.* at 337, 338, 345 n.16. In the en banc opinion, the Court also characterized the "government's case for aggravation" as "overwhelming." *Gabrion III*, 719 F.3d at 525. The Court observed, "Gabrion killed Timmerman in an undisputedly horrific manner, killed her infant daughter, likely killed three other people who either witnessed his crimes or whose death was otherwise useful to him, and terrorized countless people who crossed his path." *Id.*

### 4. Section 2255 proceedings

Gabrion was again appointed new counsel to represent him in post-conviction proceedings, and in April 2015, they filed a motion to vacate Gabrion's sentence under 28 U.S.C. § 2255. (CivR.1; CivR.15, PageID.885 (redacted motion).) In January 2016, the government filed a response

(CivR.42: PageID.1976). Gabrion's post-conviction counsel thereafter filed various motions, including motions for discovery, for an evidentiary hearing, to stay the period for amendment as of right, and for a status conference.

The district court (Judge Bell) conducted a motion hearing and denied the motions seeking discovery and a hearing without prejudice. (CivR.75: Tr., PageID.2638; CivR.74: Order, PageID.2633.) The matter was later reassigned to Chief Judge Robert J. Jonker due to Judge Bell's retirement. Judge Jonker permitted Gabrion to file an amended § 2255 motion, and denied his renewed motions for discovery and a hearing without prejudice as premature. (CivR.99: Order, PageID.3884; CivR.100: Am. § 2255 Mot., PageID.3887.)

The government filed a response to the amended § 2255 motion (CivR.119: PageID.5057), Gabrion filed a reply (CivR.141: PageID.5380), and the district court issued a 206-page opinion denying the motion, denying various other motions Gabrion had filed, and denying a certificate of appealability as to all issues raised in Gabrion's motion (CivR.156: Op., PageID.5795; CivR.157: Order, PageID.6011; CivR.158: Order, PageID.6012; CivR.159, Judgment, PageID.6014.)

This Court granted a certificate of appealability as to the four issues identified above. Additional facts relevant to the issues certified for appeal are set forth in the argument sections below.

## SUMMARY OF THE ARGUMENT

None of the four issues certified for appeal has merit.

First, the brief hair analysis testimony was not material to federal jurisdiction. The testimony—that some but not all the hairs on a piece of duct tape found near Oxford Lake bore the same microscopic characteristics as Rachel's hair—was qualified and only minimally probative. Federal jurisdiction was established primarily through the testimony of witnesses who saw Rachel alive near the lake—with Gabrion—at the time she was killed; the pathologist's determination that drowning was the most likely cause of death; the presence of restraints and padlocks on Rachel's body; and Gabrion's own admissions.

Second, the district court correctly found that Gabrion's counsel provided effective representation during the guilt phase of his trial. Gabrion challenges two aspects of his trial counsel's performance: their alleged failure to investigate records supposedly establishing that Newaygo County prosecutor Chrystal Roach testified falsely and their alleged failure to secure testimony of a pathologist. Gabrion has not demonstrated that Roach's testimony was false, but even if it was, this Court aptly characterized Roach's entire testimony as "peripheral" and

31

not material to the jury's finding of guilt. Nor was Gabrion's counsel ineffective for not securing a pathologist. The government's pathologist admitted what Gabrion says should have been secured from an expert: asphyxiation, rather than drowning, could not be ruled out as the cause of death. The district court correctly found that Gabrion failed to show that his counsel performed deficiently or that he was prejudiced by his counsel's performance in the guilt phase of the trial.

Third, the district court was also correct in finding that Gabrion's counsel provided effective representation during the penalty phase of his trial. The record establishes that his experienced counsel exhaustively investigated potential mitigating evidence. They hired experts and a mitigation specialist who spent 1,000 hours trying to build the mitigation case. In short, the record conclusively refutes the notion that Gabrion's counsel put on a "beggarly" mitigation case. And, importantly, Gabrion has not uncovered any evidence that establishes a reasonable probability that the jury, if informed of the additional information Gabrion's post-conviction counsel gathered in the years following his conviction, would reach a different sentencing decision. It is all similar in kind, and much of it far more attenuated from Gabrion than what *was* presented.

32

Fourth, Gabrion was not denied his right to conflict-free counsel. As the district court found, the Federal Public Defender, Christopher Yates, did not represent Gabrion: though Yates had previously represented him in another case, by the time he was indicted for murder, Yates had represented a witness who provided information against Gabrion. Accordingly, the court advised Gabrion that Yates could not represent him. Yates did not create an attorney-client relationship with Gabrion by providing administrative and research support to his appointed attorneys. In any case, Gabrion has not identified an adverse effect on Yates's performance of these minor duties arising from the conflict.

Finally, the issue of whether this matter should be reassigned to a different judge has not been certified for appeal and is thus not properly before the Court. In any case, Gabrion has not met the standard for reassignment, an extraordinary power to be used with the greatest reluctance. He has not shown that Judge Jonker is biased against him or entrenched in any positions; that reassignment is needed to preserve the appearance of justice; or that reassignment would not entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

## **STANDARD OF REVIEW**

When reviewing the denial of a motion under 28 U.S.C. § 2255, the Court reviews legal issues de novo and upholds factual findings unless they are clearly erroneous. *Phillips v. United States*, 734 F.3d 573, 580 (6th Cir. 2013). Claims of ineffective assistance of counsel present mixed questions of law and fact, which the Court reviews de novo. *Dawson v. United States*, 702 F.3d 347, 349 (6th Cir. 2012). Denial of a *Brady* claim is also reviewed de novo. *United States v. Brown*, 332 F.3d 363, 369 (6th Cir. 2003). The Court reviews a district court's decision not to hold an evidentiary hearing for abuse of discretion. *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

# <u>ARGUMENT</u>

The record conclusively establishes that Gabrion is not entitled to § 2255 relief. In that circumstance, no hearing is required. *See* § 2255(b); *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999); *Pola v. United States*, 778 F.3d 525, 532 (6th Cir. 2015). Gabrion attempts to manufacture a material factual dispute requiring resolution, but there is none. This is not a case like *Martin v. United States*, 889 F.3d 827 (6th Cir. 2018) (Gabrion Br. 11-14, 98), where the government conceded that the movant's allegations, if true, would entitle him to relief, *id.* at 831. Nor is there any good cause for discovery. *See* Rule 6 of the Rules Governing Section 2255 Proceedings (establishing good cause standard). Therefore, as to each claim, the district court correctly denied relief, and did not abuse its discretion by declining to hold a hearing or authorize discovery.[8]

---

[8] The Court did not certify for appeal the issues of whether the district court abused its discretion by denying Gabrion's requests for discovery and for an evidentiary hearing, stating instead that those issues were not yet ripe for decision and that it would rule on the requests after briefing. (Doc. 30-2, p.3.) The government incorporates by reference the arguments advanced in its response in opposition to Gabrion's application for a certificate of appealability (Doc. 25, Resp. at 125-37), and otherwise addresses why no hearing or discovery is needed to resolve each certified issue for appeal in the argument section for that issue.

## I. The Hair Analysis Evidence Was Not Material to Federal Jurisdiction.

The hair analysis evidence in this case was a miniscule part of the proofs establishing Gabrion's guilt, and was not material to federal jurisdiction. Gabrion argues that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by not disclosing that microscopic analysis of hairs found on a piece of duct tape discovered near Oxford Lake was false and misleading. (Br. 86, addressing § 2255 Mot. Ground 6, certified Appeal Claim 2.)[9] But the district court correctly rejected Gabrion's *Brady* claim on the ground that the hair analysis evidence he challenges was not material.

To establish a *Brady* violation, a defendant must satisfy three requirements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Montgomery v. Bobby*, 654 F.3d 668, 678 (6th Cir. 2011) (quoting *Strickler v. Greene*, 527 U.S.

[9] Page number references to Gabrion's brief refer to internal pagination, at the bottom of each page.

280, 281–82 (1999)). "Prejudice (or materiality) in the *Brady* context is a difficult test to meet . . . ." *Jamison v. Collins*, 291 F.3d 380, 388 (6th Cir. 2002). To establish prejudice, "the nondisclosure [must be] so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Montgomery* 654 F.3d at 678 (quoting *Strickler*, 527 U.S. at 281). A reviewing court should assess all the evidence when making this determination and not focus only on the allegedly exculpatory facts in isolation. *Id.* at 678; *Brooks v. Tenn.*, 626 F.3d 878, 892 (6th Cir. 2010) (quoting *Kyles v. Whitley*, 514 U.S. 419, 436 (1995)). Cumulative evidence is therefore not "material" for purposes of the *Brady* rule. *Montgomery,* 654 F.3d at 678; *Brooks,* 626 F.3d at 892.

At Gabrion's trial, an FBI analyst, Douglas Deedrick, testified that some hairs on a piece of discarded duct tape found near the shore of Oxford Lake exhibited the same microscopic characteristics as Rachel's (though one—a gray hair—did not). (CivR.156: Op., PageID.5803.) Gabrion now argues that this testimony was false based on various studies indicating that prior to 2000, when it began using mitochondrial DNA testing on hair, some FBI lab analysts made erroneous statements in describing the significance and certainty of microscopic hair analysis.

Gabrion does not allege that his prosecution team knew about any alleged errors, but is apparently proceeding on the theory that an analyst's knowledge is imputed to the entire prosecution team. *See, e.g., Harris v. Lafler*, 553 F.3d 1028, 1033 (6th Cir. 2009).

For several reasons, the district court was correct that the challenged hair evidence was not material. The fact that some hairs on the duct tape had the same microscopic characteristics as hair from Rachel's head was offered to support the government's theory that Gabrion murdered Rachel on federal property—i.e., by drowning her in the southern portion of Oxford Lake, the Manistee National Forest. (R.429: Superseding Indictment.) Ultimately, though, as the district court found, "any evidence undermining the FBI's hair analysis would not have impacted the outcome of Gabrion's proceedings." (CivR.156: Op., PageID.5968.)

**First**, the testimony was only minimally probative. Deedrick never testified that he was certain the hairs came from Rachel; to the contrary, his testimony was limited and qualified:

- Deedrick testified that microscopic hair analysis is "not absolute" and that by the time he was testifying (2002), microscopic testing

was usually performed in tandem with mitochondrial DNA testing (R.591: Tr. VII, 1534-35);

- Deedrick acknowledged that mitochondrial DNA testing would have provided information to confirm or refute the microscopic hair analysis, but was not performed on the hairs taken from the duct tape (*id.* at 1541);

- Deedrick testified that one of the hairs taken from the duct tape was gray—*not* the same as Rachel's (*id.* at 1539-40).

In addition, Deedrick provided testimony that was favorable to Gabrion's defense:

- Fibers and fingerprint lifts collected from items found in Gabrion's campsite, vehicles, and residence had no association with Rachel (*id.* at 1542);

- The duct tape with the hairs was a different kind of tape from that found on Rachel's face (*id.* at 1543-44);

- A hair was found inside Rachel's jeans, but he was unable to compare it to Gabrion's (since Gabrion had shaved his hair); it was later sent for mitochondrial DNA testing and was determined *not* to be from Gabrion (R.592: Tr. VIII, 1670 (Stewart)).

The hair evidence was thus minimally probative in supporting the government's theory that Rachel was killed on federal property, and, on balance, was largely favorable to Gabrion.

**<u>Second</u>**, there was other, far more probative, evidence establishing that Gabrion murdered Rachel on federal property. The most significant evidence on this point was the testimony of two eyewitnesses, Linda Coleman and her daughter, Kathy Kirk, who encountered two men and a woman on the shore of the lake in June 1997. The three were in a black pickup truck with a boat loaded in the back. Coleman and Kirk identified Gabrion as one of the men in the truck; the woman was Rachel. (R.670: Coleman Dep. 5-16; R.591: Kirk, Tr. VII, 1575-82.) Putting this testimony in context, the last time anyone saw Rachel was on or about June 3, 1997, when she left home to go on a date, telling her father she would return in a couple of hours. (CivR.156: Op., PageID.5799; R.472: 2/25/02 Tr. 10.) John Weeks had set up the date (unbeknownst to Rachel, as a favor to Gabrion). Prior to this, Rachel had told several people she feared Gabrion would carry out his threats to kill her for bringing rape charges against him. (CivR.156: Op., PageID.5798.) The testimony of Kirk and Coleman placed Rachel alive with Gabrion on National Forest property at about

the time her death occurred. The pathologist who examined Rachel's body estimated that she had been dead between three and four weeks before her body was discovered, on July 5, 1997. (R.459: Cohle Tr. 16.) A forensic entomologist testified that Rachel's body began floating on the surface of Oxford Lake on July 1 or 2, 1997, and given its positioning, surrounded by a thick mat of vegetation, the body could not have floated there after being thrown in elsewhere. (R.589: Merritt, Tr. V, 1148.) Corroborating this testimony, other witnesses testified that they had seen Gabrion at the lake with a similar vehicle and boat at the same time. (R.590: Hall, Tr. VI, 1307.) And, as discussed above (pp. 7-8), in the predawn hours of June 6, 1997, other witnesses saw Gabrion back at his home, unloading chains and blocks from a boat, and later grinding off its serial numbers.[10]

Coleman and Kirk's eyewitness testimony corroborated the forensic evidence found at the time Rachel's body was recovered, which strongly

---

[10] This Court previously concluded that "[b]ased on the evidence presented at trial, if the jury found that Gabrion murdered Timmerman on federal property, it must have necessarily also found that Gabrion murdered Timmerman by drowning her in the southern portion of Oxford Lake owned by the federal government." *Gabrion I*, 517 F.3d at 876 (Moore, J., concurring), opinion joined in relevant part (V) by the Court, *Gabrion II*, 648 F.3d at 330. In discussing the evidence, the Court referenced "the physical evidence regarding the location and condition of Timmerman's body when it was discovered" and noted that "additional

suggested she died by drowning. Rachel had been handcuffed and her eyes and mouth were wrapped in duct tape. Her body was also bound by chains, which were attached to cement blocks. The chains, locks, blocks and paint found on them were all matched to property Gabrion possessed. (R.588: Tr. IV, 1042-43; R.591: Tr. VII, 1523, 1559-62.) And, of course, the pathologist determined that the cause of Rachel's death was drowning. (R.459: Cohle Tr. 26.) All of this was consistent with Gabrion's own

---

evidence" also placed Gabrion on federal property, at or near Oxford Lake:

> Pearl Hall and Ron Hall testified that when they were driving to Oxford Lake in June 1997 in preparation for turtle-trapping season, they encountered a pick-up truck driven very fast in the other direction, with a boat sticking out the back of it. J.A. at 1252-59 (Trial Tr. at 1306-32). Pearl Hall testified that Gabrion was driving the truck. J.A. at 1256 (Trial Tr. at 1320: 16-19). Ron Hall testified that when he subsequently got out of his own vehicle to look at the lake, he saw "marks where someone had drug [sic] one [boat] out of there." J.A. at 1261 (Trial Tr. at 1333: 6). Kathy Kirk testified that when she visited Oxford Lake with her mother in June 1997, they saw at the lake a pick-up truck with a boat in the back with two men and one woman in it. J.A. at 1396-1401 (Trial Tr. at 1574-79). Kirk testified that Gabrion was one of the men in [the] truck that day, J.A. at 1401 (Trial Tr. at 1579: 3-14), and that she recognized the woman later when she saw her pictures in the news as the woman drowned in Oxford Lake (Timmerman). J.A. at 1404 (Trial Tr. at 1582: 1-11).

*Gabrion I*, 517 F.3d at 875-76.

admissions, such as when he told his nephew in June 1997 that if he were to kill someone, he would wrap them in chicken wire and chains with bricks and put them in a muddy lake. (R.471: 2/27/02 Tr. 41-42; *see also id.* at 14 (Gabrion said to someone else, "it is not hard to get rid of somebody; you just weigh them down and thrown 'em in the lake"; R.590: Tr. VI, 1354-55 (Gabrion told Lloyd Westcomb that "he got rid of" his girlfriend "permanently" by binding her with chains and blocks and throwing her over a boat).)

In sum, the district court correctly concluded that the discovery of the hair and duct tape on the Oxford Lake trail was not material to his guilt or to the existence of federal jurisdiction. The duct tape did not match any of the duct tape found on Rachel's body or that found in Gabrion's home, the analyst acknowledged the hair comparison results were not absolute, and one of the hairs on it was gray, not consistent with Rachel's. That some of the hairs were similar to Rachel's hair suggested her presence on the road leading to Oxford Lake, which corroborated the eyewitness testimony of Kirk and Coleman—but that testimony was already comprehensively corroborated by the testimony of other witnesses, the physical evidence, and the fact that the victim's body was

discovered there. Thus, the district court correctly concluded that any evidence undermining the FBI's hair comparison would not have affected the outcome of the trial. (CivR.156: Op., PageID.5968.)

Finally, Gabrion's reliance on *United States v. Butler*, 955 F.3d 1052 (D.C. Cir. 2020) (Def. Br. 89), is misplaced. In *Butler*, the D.C. Circuit held that admission of microscopic hair evidence that was erroneous in two key respects warranted reversal of a murder conviction under *Napue v. Illinois*, 360 U.S. 264 (1959). *See Butler*, 955 F.3d 1057.[11] To prove a *Napue* claim, a defendant must show that the challenged testimony was false, that the prosecution knew it was false, and that it was material. *Davis v. Larson*, 769 F. App'x 233, 236 (6th Cir. 2019), *reh'g denied* (May 9, 2019) (citing *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000)). A new

---

[11] Although Gabrion included a cite to *Napue* in the heading for Ground One (CivR.100: Am. § 2244 Mot., PageID.3895), which was not certified for appeal, he did not raise it in Ground Six, which merely included a three-sentence claim that Deedrick's testimony constituted one of several allegedly "independent[] . . . *Brady* violations." (*Id.* at PageID.4034.) Accordingly, the district court did not address *Napue*, and to the extent the certificate of appealability is deemed to encompass a claim under *Napue*, rather than under *Brady*, it was arguably improvidently granted and the Court may decline to review it. *See, e.g., Dillard v. Burt*, 194 F. App'x 365, 370 (6th Cir. 2006) (declining to review issues that petitioner "had not set forth in his petition" and that the district court "had not addressed").

trial is generally required if "the false testimony could ... in any reasonable likelihood have affected the judgment of the jury[.]" *Napue*, 360 U.S. at 271. This materiality standard is "lower" and thus "more favorable to the defendant" than the materiality standard for a general *Brady* withholding violation. *Rosencrantz v. Lafler*, 568 F.3d 577, 587 (6th Cir. 2009). Nonetheless, collateral relief is not warranted for a *Napue* violation if the error is harmless—that is, "if the uncorrected testimony would likely fail to 'substantially influence' the jury's verdict." *Id.* at 588 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

*Butler* is inapposite. First, in *Butler*, the hair analysis testimony was indisputably false. This is a requirement for relief under *Napue*. *United States v. Davis*, 769 F. App'x 227, 236-37 (6th Cir. 2019) (citing *United States v. Fields*, 763 F.3d 443, 461-62, 463 (6th Cir. 2014)). There, the hair examiner testified that a hair found at the crime scene could be associated with a specific individual to the exclusion of all others, and then applied a statistical probability to that association (an error rate of 4 in 10,000). 955 F.3d at 1058-59. This allowed the prosecution to argue that a hair found on the victim matched the defendant's hair. *Id.* at 1057. Years later, the Justice Department determined that such probability

45

analysis was not supported by science. The FBI conducted a systemic review of cases in which microscopic hair evidence had been introduced—including Butler's—and determined the opinion rendered was scientifically invalid. *Id.*

As summarized above, here, Deedrick's testimony was more equivocal. He did not testify that the hair on the duct tape could be associated with an individual (Rachel) *to the exclusion of others*, and did not offer any probabilities along with his conclusion that the hairs found on the tape were similar to the victim's. To the contrary, he acknowledged that microscopic hair analysis was "not absolute," that mitochondrial DNA testing would have yielded a more certain result but was not performed, and that one of the hairs was not consistent with Rachel's.

Moreover, unlike in *Butler*, and as the district court found, the hair evidence here was not material. A *Napue* violation requires reversal if it "could … in any reasonable likelihood have affected the judgment of the jury." *Davis*, 769 F. App'x at 232 (citing *Napue*). As noted above, this is a lower materiality standard than *Brady*'s. A divided panel in *Butler* found the hair testimony material because the principal other evidence inculpating the defendant was the testimony of two cooperating

witnesses, both of whom were untrustworthy. No other scientific evidence linked the defendant to the crime, except the presence of paint chips on Butler's clothing, which could have been present for other reasons. As a result, the *Butler* panel majority found that the hair testimony was "especially weighty." 955 F.3d at 1059.

Here, as discussed above, there was ample other, more probative evidence, both of Gabrion's guilt and that the murder occurred on federal property. Accordingly, there is no reasonable likelihood that the challenged testimony affected the outcome of the trial or the sentence imposed. And, it may safely be said that the testimony did not "substantially influence" the jury's verdict or the conclusion that Rachel died on federal property. *See Rosencrantz*, 568 F.3d at 588 (applying *Brecht* harmless error standard to *Napue* claim).

## II. Gabrion's Counsel Provided Effective Representation in the Guilt Phase of His Trial.

Gabrion was afforded not merely effective, but excellent, assistance of counsel. Two attorneys were appointed to represent him: Paul Mitchell, a criminal defense attorney in Grand Rapids, Michigan, who had been practicing for over 18 years and was frequently appointed to federal criminal cases in the Western District of Michigan, and, as

"learned counsel," David C. Stebbins, a criminal defense attorney practicing in Columbus, Ohio, with experience in other capital cases.

Generally, to establish a claim of ineffective assistance of counsel, a defendant seeking post-conviction relief must prove that his counsel's performance was deficient and that the deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show deficient performance, the petitioner must establish that counsel's performance "fell below an objective standard of reasonableness," and that in the absence of those errors a reasonable probability exists that "the result of the proceeding would have been different." *Id.* at 687-88 (1984); *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (finding that petitioner must show that counsel's performance fell below prevailing professional norms). The same standard applies to death penalty cases. *E.g., Newland v. Hall,* 527 F.3d 1162, 1184 (11th Cir. 2008). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland,* 466 U.S. at 697. The district court correctly found that Gabrion failed to satisfy either *Strickland* prong.

As this Court recognized on direct appeal, Gabrion's "counsel showed great dedication to Gabrion, even after he punched one of them [Stebbins] in the face." 648 F.3d at 336; 719 F.3d at 535 (adopting panel's disposition of claim). Gabrion asserted a host of claims alleging ineffective assistance of counsel during the guilt phase of his trial (§ 2255 Mot. Ground 3), but this Court has narrowed the issue certified for appeal to whether his trial counsel was ineffective for "failing to obtain funding, failing to investigate the government's case, or failing to retain investigative services." (Doc. 30-2, COA, at 3.)

### A. Counsel's guilt-phase performance was objectively reasonable.

Gabrion's brief on appeal alleges that his counsel's performance in the guilt phase was deficient in two respects: (1) they did not retain more than one fact investigator and did not secure sufficient funding to facilitate the investigator's work (Argument B.1.c, Br. at 32); and (2) they did not retain necessary experts to assist their investigation (Argument B.1.d., Br. at 35.) Neither of these arguments has merit.

49

**1. Counsel obtained adequate funding and conducted a reasonable guilt-phase investigation.**

Gabrion acknowledges that his trial counsel engaged a fact investigator (Br. at 32). This was in addition to the mitigation specialist, James Crates, whose job it was to investigate the mitigation facts for the penalty phase of the trial. The district court certified budget expenditures of $730,168.52, including nearly $200,000 in investigative and expert funding. (CivR.44-1: Am. Budget Cert., PageID.2393.) The defense funding substantially exceeded the average cost of a federal death penalty case that went to trial at the time (between 1989 and 1997 the average cost was $269,139; between 1998 and 2004, it was $620,932).[12] Gabrion points to letters Gabrion's counsel wrote in June 2000 and March 2001 complaining about the pace of compensation, but the district court examined the delays, which were mostly attributable to the need for this Court to approve expenses in excess of the $7,500 budget cap in 21 U.S.C. § 848(q), and noted that the trial in Gabrion's case occurred a

---

[12] *See* John B. Gould & Lisa Greenman, Report to the Committee on Defender Services, Judicial Conference of the United States; Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases (2010), at 27, available at http://www.uscourts.gov/services-forms/defender-services/publications/update-cost-and-quality-defense-representation-federal.

year *after* the March 2001 letter. (CivR.156: Op., PageID.5879-81.) The letters thus do nothing more than establish that over the three-year lifespan of the murder case, there were some procedural delays in processing expense requests that apparently resolved a year before the trial began. Further, as the district court also pointed out, the record indicates that counsel was diligent in pursuing payments to the investigators, not deficient for failing to secure them.

Moreover, Gabrion fails to identify any investigation that should have been undertaken that wasn't and that reasonably might have led to a different outcome in the guilt phase of the trial. A defendant who alleges that his counsel was ineffective for failing to investigate must allege with specificity what the investigation would have revealed and how it would have altered the outcome. *E.g., Bigelow v. Haviland*, 576 F.3d 284, 289 (6th Cir. 2009) (failure to investigate possible alibi established deficient performance and demonstrated reasonable probability that adequate investigation could have changed the outcome); *United States v. Munoz*, 605 F.3d 359, 379 (6th Cir. 2010) (alleged failure to investigate and call character witnesses failed *Strickland* test because

there was no reasonable probability that doing so would have affected the outcome of the trial).

For the most part, Gabrion does not even articulate *what* should have been investigated. He articulates only two "examples." First, he says Gabrion's counsel should have investigated his Newaygo County rape case file and exposed the allegedly false and misleading testimony of Chrystal Roach, the government's supposed "star" witness. (Gabrion Br. at 26.) The district court correctly concluded that Gabrion failed to demonstrate that Roach testified falsely, let alone that her peripheral testimony made any difference to the determination of guilt. *See Gabrion II*, 648 F.3d at 337 (characterizing Roach's testimony as "peripheral" and "far from critical in establishing Gabrion's guilt"). Indeed, Roach's direct examination accounts for only ten of over 2,500 transcript pages. (R.589: Tr. V, 1161-71.) She testified to receipt of the letter purportedly from Rachel retracting the rape allegations and to the progress of the rape case against Gabrion through the state court system. Roach testified that she issued a complaint and warrant against Gabrion in August 1996, and that Gabrion was arraigned on the charge on January 21, 1997 (*id.* at 1161); that preliminary examinations at which Rachel would have

testified were scheduled but never occurred (*id.* at 1161-66, 1146-51); and that Gabrion twice switched attorneys, which caused delay (*id.* at 1164).

It was the government's theory at trial that Gabrion attempted to delay the progress of the case until he could get access to Rachel, who was in jail from January 8 to May 5, 1997. As evidence of this, the government pointed to: Gabrion's decision to change lawyers twice; his decision to waive a preliminary examination twice; the fact that the rape case had not progressed from the time he first appeared in January to June 1997; evidence that Gabrion, in fact, threatened Rachel on her release from jail; and evidence that Gabrion was responsible for sending the letters in June 1997, following Rachel's disappearance, that purported to exonerate him. (R.592: Tr. VIII, 1680-88 (Gov't closing).)

In his Section 2255 motion, Gabrion contended that this entire narrative was "false" because, he said, Roach made two false statements. First, he challenged Roach's cross-examination testimony that she felt "strongly that in cases involving assault, that prelims [preliminary examinations] should occur prior to trial" and that she "tried to do it every time." (R.589: Tr. V, 1175.) Gabrion contends that this was "false" because he says some records he obtained from the Newaygo County

53

Court show that Roach did not insist on preliminary examinations in all assault cases. The government explained that there were many reasons why these records fell far short of establishing that Roach's testimony was false (CivR.119: Gov't Resp., PageID.5117-18), and the district court agreed that they failed to do so. (Op., PageID.5837.) More importantly, the court said, "even if her statements were false, Roach's practice in other cases has little bearing on Gabrion's case." (*Id.*) This is plainly correct.

Roach's other purportedly false statement was her testimony that she had moved to have the rape case remanded to district court for a preliminary examination. This was false, Gabrion contends, because a transcript of the proceeding indicates that Gabrion's attorney, not Roach, requested the remand. Again, as to this issue, the government explained why the transcript did not establish that Roach's testimony was perjurious (CivR.119: Gov't Resp., PageID.5119-20.) The district court agreed that the transcript did not demonstrate that Roach's testimony was false (Op., PageID.5838), but noted that even if it was Gabrion's attorney who requested the remand, pointing that out to the jury would not have been in his interest: If it was actually Gabrion who, after

requesting a preliminary examination, again withdrew the request, that would support the government's theory that his conduct was driven by a desire to manipulate and delay the proceedings. (*Id.*)

Critically, though, aside from Roach's testimony, there is abundant—overwhelming—other evidence that he killed Rachel, and did so in an effort to forestall the rape proceedings. It is undisputed that Gabrion changed lawyers twice; that he demanded then waived his right to a preliminary examination twice; that as a result of these delays, the case stood in the same position in June 1997 (nearly a year after the August 1996 rape) as it was four months earlier, in February 1997. In the interim, Rachel repeatedly said she was terrified because Gabrion had threatened to kill her for reporting the rape. It is undisputed that Rachel disappeared before the rape trial proceeded further, and her body was found, chained with blocks like those found at Gabrion's house and weighted with locks to which he held the keys, around the time letters "exonerating" him of the rape started to appear. Given this evidence, and Gabrion's failure to demonstrate that the records establish that Roach actually testified falsely in any material way, Gabrion has not

55

demonstrated that his counsel acted unreasonably in not somehow using the records to "expose" the allegedly false testimony.

The only other example Gabrion cites[13] is that no one allegedly followed up on the "lead" that "Gabrion was required to have a payee for the SSI benefits he had received since 1993." (Br. at 35.) This, he says, "could have" resulted in information that was helpful in establishing his lack of competency. (*Id.*) The district court thoroughly and persuasively analyzed and discredited this unsupported assertion. (CivR.156: Op. at PageID.5940-43.) First, Gabrion has not demonstrated that the records would have been helpful. Even *if* a payee was designated because the SSA determined in 1992 that Gabrion was incapable of managing his benefit payments[14] and trial counsel could have discovered records so indicating,

---

[13] In a footnote, Gabrion lists "[a]dditional gaps" in trial counsel's investigation. Arguments averted to in such a perfunctory way are considered waived. *E.g., McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997). The government responds to Gabrion's claims of prejudice arising from these alleged deficiencies in Section 2.B., below. For any additional alleged "gaps" referenced in Gabrion's footnote, the government relies on the district court's reasoning, which is thorough, sound, and unchallenged in any meaningful or specific way by Gabrion.

[14] As the district court noted, in Gabrion's initial competency examination, the government advised Dr. Fallis that Gabrion's disability benefits were awarded because of "mental impairment," but SSA did not complete disability testing because it did not want to contest the issue,

that determination "would have been thoroughly undermined by other evidence presented at trial." (*Id.* at PageID.5942.) For example, the reason he was getting benefits in the first place was because he faked a car accident to defraud an insurance company. And he engaged in other conduct demonstrating his ability to engage in complex thought processes near the time of the murder: as noted earlier, Gabrion placed an ad for a carpenter, "interviewed" a man for the job, then stole his identity in an apparent effort to escape detection (R.590: Tr. VI, 1462-67); similarly, he set up a bank account and post office box to receive benefits intended for Richard Allen.

Moreover, as the district court noted, Gabrion's counsel repeatedly had Gabrion examined for competency and engaged numerous experts in an effort to develop favorable evidence regarding Gabrion's mental health. (CivR.156: Op., PageID.5942.) Gabrion was examined three times for competency; on each occasion, he was deemed competent. (R.268: Fallis Report; R.211: Frank Report; R.314: DeMier Report.) Six additional witnesses testified about Gabrion's mental health during the

whereas Gabrion reportedly told the Bureau of Prisons that his benefits were for a bad back. (CivR.156: Op., PageID.5941, citing Fallis Report 6.)

penalty phase. Of these nine experts, this Court observed on direct appeal, only one (Scharre, who did not examine Gabrion) testified "that Gabrion was not malingering, not consciously faking insanity in an effort to disrupt the proceedings." *Gabrion II*, 648 F.3d at 320 & n.3. Gabrion has failed to demonstrate that his counsel acted unreasonably in not procuring the disability benefits payee records. Nor, as set forth below, is there a reasonable probability that the records would have made any difference in the jury's determination of guilt.

### 2. Counsel retained appropriate experts to assist in its guilt-phase investigation.

Gabrion's trial counsel engaged numerous experts, securing tens of thousands of dollars of court funding to compensate them. (CivR.44-1: Am. Cert., PageID.2393.) Gabrion identifies only two claimed deficiencies in his counsel's performance with regard to experts: they did not engage a pathologist to offer an opinion on the cause of Rachel's death, and Attorney Mitchell paid a portion of the defense expert's jurisdictional expert's bill out of his own pocket, rather than insisting on additional

funding from the court. Neither claim comes close to establishing that counsel performed below an objectively reasonable standard.

First, the pathologist. Gabrion argues that if his counsel had retained a pathologist, "counsel could have credibly argued that the government was unable to prove beyond a reasonable doubt that [Rachel] was killed on federal land, thus negating the basis for federal jurisdiction." (Br. 68.) To prove this to the district court, the defense proffered the affidavit of a pathologist, Dr. Spitz, who opined that the evidence could not exclude the possibility that Rachel was asphyxiated elsewhere and then deposited into Oxford Lake. (CivR.103-5: Spitz Aff. ¶ 9, PageID.4989; CivR.156: Op., PageID.5878.)

But, as the district court found, Gabrion's counsel established that. The court noted that the pathologist who examined Rachel, Dr. Cohle, "conceded that he could not 'rule out that [Rachel] was asphyxiated … at some other time and then dumped into the lake.'" (CivR.156: Op., PageID.5878, quoting Cohle Tr. 35.) Thus, the district court concluded, Cohle's "opinion is entirely consistent with Dr. Spitz's opinion that the 'forensic evidence' does not exclude the possibility of asphyxiation." (*Id.*) Because of this, the court determined that Spitz's affidavit did not

59

establish that Gabrion's counsel was ineffective for failing to secure such expert testimony at the time of trial. (*Id.*)

That conclusion is plainly correct. Gabrion's counsel concluded his cross-examination of Cohle with the concession, ensuring its dramatic effect. Further, the defense knew it would be able to obtain the concession, and made that a centerpiece of its opening statement:

> The cause of death in this case, according to the government, is drowning. And Dr. Cohle, who is their forensic specialist here, who is this town's foremost medical examiner, will tell you that his opinion is that she drowned. However, he will not and cannot rule out another cause of death, and that would be asphyxiation. There is nothing from Dr. Cohle's testimony that you can take that she drowned, and that was --that is what the evidence in this case will show.

(R.588: Tr. IV, 937.) In closing, Gabrion's counsel returned to Cohle's diffidence about the cause of death, and argued that this proof fell short of proof beyond a reasonable doubt. (R.592: Tr. VIII, 1739-41.)

Gabrion's counsel thus elicited on cross-examination the very concession Gabrion now says should have been presented by a defense expert. Further, defense counsel obtained the concession from the medical examiner who examined the body and whose job it was to determine the cause of death. This was skilled—not deficient—advocacy. It is impossible to imagine what more the defense could have gained by

retaining a paid consultant to give the same opinion. It certainly was not objectively unreasonable for Gabrion's counsel to decline to do so. *See, e.g., Harrington v. Richter*, 562 U.S. 86, 111 (2011) ("*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense. In many instances cross-examination will be sufficient to expose defects in an expert's presentation.").

The only other specific argument Gabrion advances is that Attorney Mitchell paid part of the jurisdictional expert's bill. (Def. Br. 38.) This is a perplexing claim, as it is difficult to see how an attorney is to be faulted for sacrificing his own compensation to make good on a payment promised to a retained expert. In any case, as the district court observed (CivR.156: Op., PageID.5882), Gabrion failed to identify any other experts who should have been consulted, let alone what they would have said and how there is a reasonable likelihood that the testimony would have affected the jury's determination of guilt. This is fatal to his claim. An attorney cannot be deemed to have acted unreasonably in failing to investigate or retain unidentified experts in unidentified areas to give testimony on unidentified topics. Even claims that a specific type of

expert should have been retained cannot succeed based on mere speculation. *See, e.g., Hunter v. Burt*, No. 19-1460, 2019 WL 5571472, at \*2 (6th Cir. Sept. 5, 2019) (unpublished order) (denying certificate of appealability where habeas petitioner failed to demonstrate that identification expert would have testified favorably) (citing *Tinsley v. Million*, 399 F.3d 796, 810 (6th Cir. 2005)); *see also Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) (rejecting habeas petitioner's "unsupported claims regarding . . . [an] uncalled expert witness" as "speculative and disfavored"). Though such claims are often rejected for lack of prejudice, here, where Gabrion has not even identified the topics on which his counsel purportedly failed to retain experts to address, the ineffective assistance claim should fail under both *Strickland* prongs. Moreover, as explained above, any funding issues were resolved a year before Gabrion's trial began.

## B. Gabrion has not demonstrated guilt-phase prejudice.

As this Court said four times in its opinion affirming Gabrion's conviction, the evidence of Gabrion's guilt in this case was overwhelming. *Gabrion II*, 648 F.3d at 317, 337, 338 & 345 n.16 (6th Cir. 2011) (panel op.). As to Gabrion's principal claim, regarding his counsel's failure to

investigate Roach's "false" testimony, it is readily apparent that Gabrion suffered no prejudice as a result of this "peripheral" (*Gabrion II*, 648 F.3d at 337) testimony. As explained above, Roach's allegedly false testimony about how often she requested preliminary examinations and which party requested a remand for a prelim before Gabrion waived it again was not—as Gabrion contends (e.g., Br. 23)—the "only" evidence that Gabrion manipulated the Newaygo County court system to prevent Rachel from giving testimony. Again, it is *undisputed* that Gabrion twice changed lawyers; that he waived his right to a preliminary examination twice; and that the case stood in the same position in June 1997 (nearly a year after the August 1996 rape) as it was four months earlier, in February 1997. And, of course, Rachel's body was found (just after she reported to others that she was terrified Gabrion was going to kill her) around the time letters arrived "exonerating" Gabrion in envelopes bearing his signature stamp.

In short, there was abundant other evidence of Gabrion's motive (see *supra* pp. 4-6), and, more broadly, of his guilt (see *supra* pp. 3-11). He literally had the key to the locks on the chains that bound Rachel's body. (R.588: Tr. IV, 1032-42.) This was not a close case as to guilt. That

is dispositive as to the potpourri of additional alleged investigative failures that Gabrion raises in his discussion of guilt-phase prejudice (Br. at 63-69.) Gabrion merely repeats the issues he raised in the district court without addressing why the district court's resolution of those issues was incorrect. Given this perfunctory treatment, and the overwhelming nature of the evidence of Gabrion's guilt, this Court need not even consider these issues. *McPherson*, 125 F.3d at 995. Briefly:

- **Competence.** (Br. 63.) Gabrion's counsel exhaustively investigated Gabrion's competence. As the district court observed, "the evidence of Gabrion's competence to stand trial is exceedingly strong." (CivR.156: Op., PageID.5871.) Each of the three competency evaluations (Fallis, Frank, and DeMieier) determined that Gabrion was competent and malingering, findings reiterated by the penalty-phase experts. (*See* supra, pp. 18-23.) As this Court put it on direct appeal, "Gabrion knew what he was doing"—he was "malingering," or "faking incompetence in order to disrupt the trial." *Gabrion II*, 648 F.3d at 320. By not insisting on an adversarial proceeding on competence, Gabrion's attorneys were able initially to keep the first two competency

evaluations—which contained damaging conclusions concerning Gabrion's manipulation and malingering—from the government. The district court thoroughly discussed the voluminous evidence of Gabrion's competence and his attorneys' efforts to investigate it. (CivR.156: Op., PageID.5860-75.) Moreover, Gabrion's post-conviction counsel did not offer any information or opinion to contradict the multiple expert opinions presented in the trial proceedings. Accordingly, Gabrion has not demonstrated that he suffered any prejudice in connection with his counsel's investigation of his competency.

- **Evidence that Rachel had "her own motive to leave town."** (Br. 64.) As the district court found, Gabrion's claim that Rachel might have wanted to leave town to avoid placement in a group home did not matter to the case: "Rachel's motive for leaving home is irrelevant to Gabrion's guilt. It does not matter what reasons she may have had for leaving; what matters is that he killed her after she did so." (CivR.156: Op., PageID 5887.) Even if Rachel did want to leave home, and that was brought out

at trial, there is no reasonable probability the jury would have found Gabrion not guilty.

- **Evidence "contradicting the government theory that [Rachel] was never seen alive after she left on her date."** (Br. 65.) Gabrion argues that his lawyers were ineffective because they failed to investigate and contest the prosecution claim that Rachel was not seen alive after she left her dad's house on June 3 except when Linda Coleman and her daughter saw her with Gabrion near Oxford Lake. The district court correctly found that it made no difference in the outcome of the trial whether Rachel was last seen on June 3 or June 6. (CivR.156: Op., PageID.5843.) Nothing about the government's case hinged on Rachel having been killed or not seen again on June 3, 4, or 5; in fact, it was the government's theory that Gabrion probably killed her on or about June 6 (e.g., R.592: Tr. VIII, 1691-92, Gov't closing).

- **Evidence that Rachel "was probably not under extreme duress when she penned the letters" exonerating Gabrion.** (Br. 67-68.) This is a repackaged prosecutorial

misconduct claim that the district court correctly rejected (CivR.156: Op., PageID.5841), for which this Court did not grant a certificate of appealability. A report generated early in the investigation by FBI communications examiners said Rachel was "probably" not under "extreme" duress when she wrote the letters exonerating Gabrion, and that, based on review of other Gabrion writings, which they perceived as lacking a coherent structure, Gabrion "probably" did not "dictate" the letters to her. (CivR.15: Mot. Ex. 1.8, PageID.1332.) As the district court noted, the examiners who authored the report had limited information, and the basis of the equivocal opinion—that Gabrion's letters typically lacked a coherent structure—was contradicted by the testimony of Gabrion's own trial expert, Dr. Scharre, who saw "plenty of good coherent writing and purposeful writing" by Gabrion. (Op., PageID.5842, citing Scharre S. Tr. 61.) Moreover, as the district court noted, "[t]he notion that Rachel wrote the letters of her own accord, and affirmed what was in them, is simply unbelievable." (Op., PageID.5887.) Moreover, abundant other evidence established that Gabrion did force her to write the

letters: the letters came in Gabrion's signature envelopes, their timing benefited him, and their contents mirrored Gabrion's own prior statements and used terms uncommon for Rachel but common for Gabrion (e.g., a "Christian" man). (R.589: Tr. V, 1238-40, 1168-69, 1245-46, 1255-57; Gov't Exs. 62, 64-69). All but one of the letters were mailed June 14 or later—after Rachel was likely already dead. (R.459: 2/26/02 Tr. 16.) (Gov't Resp. Page-ID.5125-27.) No reasonable juror would have accepted such a preposterous argument, had Gabrion's lawyers made it. *Strickland* does not require trial counsel to make implausible arguments. *E.g., Pitsonbarger v. Gramley*, 141 F.3d 728, 738 (7th Cir. 1998) (defense counsel does not act ineffectively when he chooses not to argue an issue which is doomed to fail).

- **Evidence that John Weeks was seen after mid-June 1997.** (Br. 68.) Gabrion asserts, without explanation, that the defense should have called two witnesses, Christopher Dragun and Theodore Braun, who might have testified to seeing John Weeks after the government claims Gabrion disposed of him. It is unclear how this is relevant to the guilt phase of the trial. (Before

the district court, Gabrion claimed that his counsel should have called the two men to cast doubt on the claim that Gabrion murdered Rachel by drowning her in Oxford Lake.) Whatever the exact claim, the district court explained why, given their statements, calling Braun and Dragun would have done more harm than good: they said they last saw Weeks approximately June 13; Weeks had a lot of money, which Weeks told Dragun he got because he picked up a female for a hit man living in Grand Rapids; Weeks told Braun he got his money from a man he worked for named Marvin, and that he had called the victim and tried to persuade her to become involved with him, before delivering the female to his boss, who killed her. Weeks also mentioned helping his boss get rid of a body. (CivR.156: Op., PageID.5799.) Indeed, but for hearsay and confrontation concerns, the *government* would have called them to testify about Weeks's statements.

And as to the failure to call a pathologist, Gabrion plainly has not demonstrated prejudice. As discussed above, the only testimony Gabrion says should have been presented—that the cause of death could have

been something other than drowning, such as asphyxiation—was already before the jury, because Gabrion's counsel extracted it from the government's own witness. Moreover, as discussed above, there was other evidence supporting the government's theory that Rachel drowned, and therefore that federal jurisdiction was proper: two eyewitnesses who saw Gabrion near Oxford Lake, with Rachel, around the time she was killed, the circumstances, location, and positioning of Rachel's body when it was found, including the fact that duct tape, chains, and cement blocks were used, and Gabrion's own admissions to multiple people suggesting that he had killed Rachel by throwing her in a lake.

In sum, Gabrion has not come close to establishing prejudice under *Strickland.* Nor has he identified any specific allegations that would warrant authorizing discovery or conducting a hearing. Even if deficient performance could be shown, and all facts were developed in Gabrion's favor, he could not demonstrate prejudice: the evidence of his guilt was overwhelming. Accordingly, the district court acted well within its discretion in declining to grant discovery or hold a hearing to resolve Gabrion's guilt-phase ineffective assistance of counsel claims.

### III. Gabrion's Counsel Provided Effective Representation in the Penalty Phase of His Trial.

Gabrion's counsel also conducted an extensive mitigation investigation, hired multiple experts, and made an effective penalty phase presentation to the jury. In his § 2255 motion, Gabrion asserted numerous claims of ineffective assistance of counsel during the penalty phase (CivR.100: Am. § 2255 Mot., Ground 4), but this Court narrowed the issues for appeal, certifying only the following issue: "whether trial counsel was ineffective in its mitigation investigation and presentation at the penalty phase." (COA, Doc. 30-2, at 3.)

Gabrion argues that his counsel failed to adequately investigate the government's case in aggravation, particularly as to Chrystal Roach's testimony (Argument B.1.a, Br. 22-27), and that their mitigation investigation was incomplete (Argument B.1.b, Br. 27-32). As to presentation, Gabrion argues that his counsel was ineffective for failing to object to certain evidence (Argument B.2.a, Br. 39-40) and for conceding the aggravating factor that Gabrion murdered Rachel to obstruct justice (Argument B.2.b, Br. 41-43).

To the extent those arguments fall within the scope of the certificate of appealability this Court granted, the Court should affirm the district court's decision rejecting them for lack of merit.

### A. Counsel's penalty-phase performance was objectively reasonable.

#### 1. Counsel conducted a reasonable penalty-phase investigation.

Gabrion alleges two main investigative failures as to the penalty phase: again, he argues that his trial counsel was ineffective for failing to investigate Chrystal Roach's records of requesting preliminary examinations (Br. 23-28, 44-48), and he argues that his counsel failed to conduct an adequate mitigation investigation (Gabrion Br. 28-32, 48-63).

The Chrystal Roach arguments are outside the scope of the certificate of appealability. The certificate this Court granted authorizes Gabrion to address whether counsel was ineffective in its *mitigation* investigation and presentation at the penalty phase (Doc. 30-2, COA, at 3); it does not authorize Gabrion to challenge his counsel's performance relating to aggravating evidence. The Court should therefore decline to consider this issue. *See, e.g., Schreane v. Ebbert*, 864 F.3d 446, 454 (6th Cir. 2017) (declining to address issue outside scope of certificate). In any

case, as discussed below, Roach's testimony was not material to the jury's sentencing decision.[15]

Gabrion mostly complains that his counsel did not do enough to investigate potential mitigating evidence. But the district court correctly determined that Gabrion's counsel conducted an extensive mitigation investigation in this case, and he failed to identify any substantially different mitigating evidence that, if presented, was reasonably likely to result in a different sentence. (CivR.156: Op., PageID.5898-5918.) The court thoroughly analyzed each of Gabrion's voluminous claims, concluding that the years-long mitigation investigation conducted by a mitigation specialist who spent at least 1,000 hours on it, overseen by experienced capital attorney David Stebbins—who had written an article about the importance of conducting a thorough mitigation investigation

---

[15] Gabrion also lists multiple other penalty witnesses that Gabrion's counsel supposedly failed to investigate (Br. 28). But he does not advance any specific argument or explain why the district court erred in rejecting the claims directed at those witnesses (*see, e.g.*, CivR.156: Op., PageID.5948-51; PageID.5966-68.) The arguments are therefore both outside the scope of the certificate of appealability and waived. *McPherson*, 125 F.3d at 995. In any case, the district court was correct for the reasons it articulated.

cited in the ABA Guidelines then in effect[16]—was not deficient. This is plainly correct. Gabrion repeatedly suggests that his counsel must have been ineffective because 15 years later, with the benefit of time and hindsight, post-conviction counsel discovered more evidence of his background similar to what was presented at trial. But that is not the standard, as the district court recognized: the question is not whether more could have been discovered, but whether the investigation that counsel did was reasonable. (*E.g.*, *id.* at PageID.5917, citing *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009)). *See also Thomas v. Lumpkin*, 995 F.3d 432, 454 (5th Cir. 2021) ("Our concern is not whether counsel at trial could have done more. That is often, maybe always, the case.").

This case is like *United States v. Fields*, 761 F.3d 443 (5th Cir. 2014), where the defendant's post-conviction counsel found more, but similar, mitigating evidence than what was presented at trial. The district court found that insufficient to establish ineffective assistance of counsel—without holding a hearing or granting discovery—and the Fifth

---

[16] *See* Stebbins and Kenny, *Zen and the Art of Mitigation Presentation, or, the Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, The Champion (Aug 1986), reprinted in California Death Penalty Defense Manual, Vol. 11, p. 87H-37 et seq. (1987 Supp.) cited in 1989 ABA Guidelines, Guideline 11.8.6 n.4. (CivR.119-2, PageID.5295.)

Circuit denied a certificate of appealability, stating that the lengthier, "multi-generational" social history may have offered "more detail about each category of mitigation evidence" but "reasonable jurists would not disagree with the district court's determination that the new evidence . . . [was] not materially different from that presented at trial." *Id.* at 458.

Here, as in *Fields*, post-conviction counsel discovered *more* information about Gabrion and his family, but nothing that is materially different from what Gabrion's counsel did present, and nothing that would change a juror's vote. Gabrion cites the fact that some of his extended family members have varying degrees of mental health issues, that he had an impoverished and dysfunctional childhood, and that people have mentioned that he's had head injuries over the years. All this and more was presented at his trial: 13 witnesses testified for the defense during the penalty phase, including experts. As this Court observed, "Gabrion presented numerous mitigation witnesses, including four mental health experts. . . . [T]he mitigation evidence was designed to demonstrate Gabrion's poor upbringing, lack of appreciation for the wrongfulness of his conduct, and the existence of mental health issues

due to injuries sustained in car accidents. . . ." *Gabrion II*, 648 F.3d at 341-42.

This extensive presentation had an effect: for example, 12 jurors found both that Gabrion did not have disciplinary problems in school or criminal conduct before age 23, and that he grew up "in an impoverished and violent environment, and was the victim of abandonment, neglect, and emotional, psychological and physical abuse as a child." (R.526: Penalty Phase Verdict Form, at 6.) And all 12 jurors found that Gabrion "has features of several personality disorders, including histrionic personality disorder, narcissistic personality disorder, and borderline personality disorder." (*Id.* at 7.) Nine jurors found as a mitigating factor that Gabrion's "abuse of drugs, alcohol and chemical inhalants contributed to his criminal conduct." (*Id.*) Post-conviction counsel's social history, while lengthy, adds nothing material to the mix, as the district court found. (CivR.156: Op., PageID.5916.)

Gabrion presses two main points.

**First**, he says the district court misunderstood the required showing for an evidentiary hearing on an ineffective assistance claim because, among other cases, the court cited *United States v. Ashimi*, 932

F.2d 643, 650 (7th Cir. 1991), for the proposition that speculation will not sustain an ineffective assistance claim. (Br. 15-16.) The district court did not misunderstand anything. Although *Ashimi* was a direct appeal case, the Seventh Circuit's point that idle speculation about, for example, what a putative witness would say under oath, will not sustain an ineffective assistance claim, applies with equal force where the claim is presented in a collateral motion: "[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness *or an affidavit*." 932 F.2d at 650 (emphasis added). That is, where the basis of the claim is that someone will testify about something bearing on the defendant's case, courts require that the petitioner present an affidavit from that person or provide some other assurance that the person will testify consistent with the defendant's speculation.

Indeed, it is the law in this Circuit (and every other circuit) that a convicted defendant seeking habeas relief must make a threshold showing beyond mere speculation or conclusory, unsupported allegations to warrant an evidentiary hearing. *See, e.g., Thomas v. United States*, 849 F.3d 669, 681 (6th Cir. 2017) ("Bald assertions and conclusory allegations do not provide sufficient ground ... to require an evidentiary hearing.")

(citing *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001)). To be sure, the burden borne by a § 2255 movant to obtain an evidentiary hearing is not especially onerous. *See Smith v. United States*, 348 F.3d 545, 551 (6th Cir. 2003). But there must be some basis to believe that, if a hearing were held, the defendant could establish entitlement to collateral relief. The district court correctly found that Gabrion did not make that showing.

Moreover, the district court referenced *Ashimi* and the other cases in the context of discussing Gabrion's unsupported assertions that the eight experts who examined him at the time of trial and said he was not mentally ill would have changed their minds if presented with the information in post-conviction counsel's social history.[17] Gabrion did not present a single affidavit from a mental health professional stating that

---

[17] Gabrion also criticizes the district court's reliance on *Pillette v. Berghuis*, 408 F. App'x 873, 887 (6th Cir. 2010) (Br. 17), for the proposition that speculation is insufficient to sustain a claim of prejudice. But like *Ashimi*, the district court cited *Pillette* in the context of addressing Gabrion's failure to identify any opinion different from the eight opinions offered at trial that he was not mentally ill at the time he murdered Rachel or at the time of trial. (CivR.156: Op., PageID.5902.) In *Pillette*, the district court held a hearing, but a witness who had given an ambiguous statement did not testify. Therefore, this Court held that the district court improperly speculated that the witness would have testified favorably to the petitioner. Gabrion is incorrect in asserting that the district court engaged in the same kind of speculation here: Gabrion did not identify a witness whose testimony might have entitled him to relief.

Gabrion is or was mentally ill. With eight opinions on one side, and zero on the other, there was nothing for the court to hold a hearing on, and no good cause to warrant discovery.

On this point, also, *Fields* is instructive. There, the defendant "speculate[d] that brain damage may have occurred due to his upbringing and attempted suicides." 761 F.3d at 461. But the defense expert at trial did not find any suggestion of congenital or acquired brain damage, and defense counsel relied on the expert. In that circumstance, the Fifth Circuit found that reasonable jurists would not even debate the district court's conclusion that counsel's performance was objectively reasonable. *Id.* Likewise, Gabrion's speculation that he might have brain damage or suffer from unspecified mental illness(es), contradicting the opinions of eight experts who examined him at the time of his trial—is insufficient to establish either deficient performance by his counsel or prejudice, or cause to explore the issue further via discovery or a hearing. Gabrion repeats his citation to 17 examples of rumored head injuries over the years—including the 1992 accident he faked for the insurance money—without addressing the district court's detailed discussion of this list, and the reasons why this recitation failed to establish that his counsel was

ineffective in its presentation. (CivR.156: Op., PageID.5906-07.) To begin with, at least five of the incidents—the ones that "provide the most detailed and compelling evidence of possible brain injury stemming from head trauma" (*id.* at PageID.5906)—*were* discussed at the trial. As the court noted, the other incidents (which were not established by any contemporaneous records or witness accounts confirming any significant head or brain injury) did "not add much." (*Id.*)

**<u>Second</u>**, Gabrion says his attorneys performed deficiently—and he was prejudiced thereby—because they put on only a "beggarly" mitigation case. (Br. 42 n.9, 43, citing *Hooks v. Workman*, 689 F.3d 1148, 1206 (10th Cir. 2012).) But this case is nothing like *Hooks*. There, the defense called only three witnesses in the penalty phase—the defendant's mother, his sister, and an unprepared expert. He asked only four questions of the sister, and barely more of the mother. *Id.* at 1202-03. The expert, ostensibly called to opine that the defendant lacked the mental capacity to carry off a cold-blooded, premeditated murder, was manifestly unprepared, as he admitted on cross-examination that he had not read the police reports, listened to the defendant's tape-recorded confession,

or seen any photos from the case. *Id.* at 1203. Indeed, the expert did more damage than good, describing the defendant as "violent" and "crazy." *Id.* Defense counsel apparently failed to explore "readily available evidence" that would have revealed that the defendant suffered from enduring mental-health problems arising from birth trauma and other head injuries that cause organic brain damage, as diagnosed by a mental health expert. *Id.* at 1205. Thus, that mitigation case was "beggarly."

This mitigation case was not. Though the written "social history" Crates prepared was not lengthy, it touched on all the important areas that Gabrion's new counsel stress are important, and it attached nearly 200 pages of records. Gabrion points to no actual basis for his suggestion that additional mitigation investigation was not conducted merely because there was no formal supplementation to the written history. Much of the additional mitigation information was presented through Dr. Newton Jackson, who testified that Gabrion was delusional, and suffered from psychological deficits (*id.* at 29), though he did not view Gabrion as "mentally ill" (*id.*). Jackson nonetheless concluded that several adverse influences on Gabrion during his developmental years may have had "a serious adverse effect upon him as a functioning individual." (R.541:

3/14/02 Tr. 6-10, 13, 17, 29.) These included a child-hood illness resulting in hospitalization and surgery, parental abandonment and neglect, substance abuse by Gabrion and his parents, family dysfunction and abuse, and auto accidents. (*Id.* at 15-19.)

Indeed, Gabrion's trial counsel presented evidence in all the categories he now lists. Gabrion's brief focuses mostly on family dysfunction, highlighting things like "[h]is clothes were ill-fitting and ragged" and his mother was neglectful. (Br. 50.) But Gabrion's trial attorneys put on witnesses such as Dr. Jackson who established that his childhood was difficult—and it worked, as all twelve jurors found that he grew up "in an impoverished and violent environment, and was the victim of abandonment, neglect, and emotional, psychological and physical abuse as a child." (R.526: Penalty Phase Verdict Form, at 6.)

Thus, this case is not anything like *Wiggins v. Smith*, 539 U.S. 510, 537 (2003), or *Rompilla v. Beard*, 545 U.S. 374 (2005) (Br. 29, 101), cases that the district court correctly distinguished. (CivR.156: Op., PageID.5910-11.) In *Wiggins*, the district court explained, defense counsel relied exclusively on a presentence report and social services records and did not conduct any investigation, and therefore failed to

discover or present any evidence of the defendant's dysfunctional social and family history, including repeated physical and sexual abuse he suffered. (*Id.*, citing *Wiggins*, 539 U.S. at 523.) And in *Rompilla*, the district court explained, defense counsel failed to examine a readily available file of the defendant's prior conviction for rape (even though he knew it would be used as an aggravating factor), and therefore failed to discover records pointing to the defendant's mental illness, his low cognitive functioning, and alcohol abuse, which might have countered a benign impression of his upbringing and mental capacity. (*Id.* at PageID.5911, citing *Rompilla*, 545 U.S. at 389-91.) As the district court concluded, those cases are inapposite because here, Gabrion's counsel did conduct an extensive mitigation investigation and "presented evidence of virtually all the mitigating factors mentioned in *Rompilla*, including alcohol abuse, parental abandonment, psychological deficits, and the possibility of brain damage." (*Id.* at PageID.5911.)

This case is like *Van Hook*.[18] There, the Supreme Court held that this Court erred in holding that counsel rendered deficient performance

---

[18] Although *Van Hook* is a § 2254 case, the Court held that, "[e]ven without the [AEDPA]'s added layer of deference to state-court

by conducting a mitigation investigation but "failing to find more." 558 U.S. at 11. The claim there was similar to Gabrion's: "What his counsel did discover, the argument goes, gave them 'reason to suspect that much worse details existed,' and that suspicion should have prompted them to interview other family members—his stepsister, two uncles, and two aunts—as well as a psychiatrist who once treated his mother, all of whom 'could have helped his counsel narrate the true story of Van Hook's childhood experiences.'" *Id.* (quoting court of appeals opinion, 560 F.3d at 528). "But[,]" the Court cautioned, "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." *Id.* "[G]iven all the evidence that they unearthed from those closest to Van Hook's upbringing and the experts who reviewed his history, it was not unreasonable for his counsel not to identify and interview every other living family member. . . ." *Id. See also Caudill v. Conover*, 881 F.3d 454, 462 (6th Cir. 2018) ("[Caudill's] lawyer had no constitutional obligation to identify and interview distant relatives, former childhood neighbors,

---

judgments," the petitioner was not entitled to collateral relief. 558 U.S. at 7.

past boyfriends, and acquaintances who would provide similar information. It was reasonable for her lawyer to assume that those closest to Caudill—her immediate family—would have the most detailed information about her life, and would provide the most compelling testimony as a result.") After all, the *Van Hook* Court observed, "[t]his is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face." *Id.* (contrasting *Wiggins* and *Rompilla*). The district court correctly found that Gabrion has not demonstrated any deficiency in counsel's performance—and no amount of discovery or testimony at a hearing would establish otherwise.

Though Gabrion once again cites the opinion of a non-lawyer, Russell Stetler, for the proposition that his lawyers did not conduct a sufficient mitigation investigation (Br. 30-31), the district court correctly found otherwise. Stetler, who at the time he submitted his affidavit in this case was with the Capital Defense Network, an organization dedicated to "[s]upporting the Capital Defense Lawyer," http://capdefnet.org/ is not a neutral arbiter, and other courts have declined to rely on his opinion. *See, e.g., Garza v. Ryan*, No. CV-14-01901-

PHX-SRB, 2017 WL 1152814, at *8 (D. Ariz. Mar. 28, 2017) ("The Court will deny expansion of the record to include the Stetler declaration. The Court is familiar with the legal standards involved in evaluating ineffective assistance of counsel claims."). Further, Stetler relied on the *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, History of Guideline 1.1, 31 Hofstra L.R. 913, 920 (2003). Those Guidelines were not even in place until a year after Gabrion was sentenced to death, and the Supreme Court has reserved judgment as to whether they are "so detailed that they would 'interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.'" *Van Hook*, 558 U.S. at 8 & n.1. *See also id.* at 13-14 (Alito, J., concurring to emphasize "the opinion in no way suggests that . . . 2003 Guidelines . . . have special relevance in determining whether an attorney's performance meets the standard required by the Sixth Amendment").

Instead, the 1989 ABA Guidelines in place at the time Gabrion's case was investigated and tried provide that a sentencing phase investigation "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that

may be introduced by the prosecutor." Guideline 11.4.1 ("Investigation.")[19] The Guideline states that potential witnesses should be interviewed, which include witnesses familiar with the client's life history who might testify about "mitigating reasons for the offense(s), and/or other mitigating evidence to show why the client should not be sentenced to death." *Id.* It states that counsel should consider presenting evidence on "family and social history (including physical, sexual or emotional abuse, neighborhood surrounding and peer influence)." Guideline 11.8.6 ("The Defense Case at the Sentencing Phase.") Stebbins was well-familiar with these standards, having penned an article on the art of mitigation that was included in the Guidelines, *see supra* n.16. *See also* R.127: 10/24/00 Hr'g on Gov't Mot. for Psychological Evaluation, at 9 (Stebbins, "I've done this a long time but I also read the case law addressing what counsel has to do in death penalty cases to prepare for mitigation phase, and they clearly state that you've got to do a complete, thorough investigation even to make the kind of determination as to what should be presented in mitigation."). There is little doubt that Gabrion's

---

[19] Available at
https://www.americanbar.org/content/dam/aba/administrative/death_penalty_representation/1989guidelines.pdf.

counsel and his mitigation specialist were fully aware of the need to conduct a thorough mitigation investigation, and did so. They did not present a "beggarly" mitigation case.

## 2. Counsel made appropriate objections to the aggravating evidence.

Taking one remark from his counsel during the penalty phase out of context and citing zero authority, Gabrion argues that his counsel suffered from a "fundamental misunderstanding regarding what evidence was admissible" in the penalty phase. (Br. 39.) Gabrion notes that when Attorney Mitchell attempted to impeach a witness with a misdemeanor conviction, the government objected that the impeachment was not permissible under the Federal Rules of Evidence. But as Mitchell correctly pointed out (R.593: S. Tr. I, 148), the rules do not apply to a federal death penalty proceeding, so the objection was not sustained. From this, Gabrion infers that his counsel was unaware of the need to "test the reliability and relevance" of the penalty-phase evidence. But Gabrion does not address the district court's comprehensive and persuasive analysis rejecting his claim. (CivR.156: Op., PageID.5926-34.)

First, the district court noted that Gabrion's counsel *did* file a pre-trial motion seeking to limit evidence of dangerousness to evidence that

he would be a danger in a prison setting. (*Id.* at PageID.5927, citing R.263: Def.'s Mot. in Limine.) The government thereafter provided notice of the evidence it intended to introduce,[20] the court conducted a hearing (R.385: 1/11/2002 Mot. Hr'g Tr. 84, 88-89), and, recognizing that Gabrion's "history of past violence is undoubtedly relevant to the issue of future dangerousness, within or outside the prison setting" (R.395: 1/25/2002 Op. 9), the court declined to "set forth a per se rule prohibiting evidence of future dangerousness outside the prison setting." (*Id.* at 8.) However, the court granted a defense motion to exclude grand jury testimony of a witness who had died by the time of the trial (Dennis Cartwright),[21] stating that although the testimony had "some indicia of reliability in that it was made under oath and ha[d] been corroborated[,]" it did not meet "the heightened standard of reliability that must be applied to evidence in capital cases." (*Id.*) Thus, Gabrion's claim that somehow counsel and the district court did not consider the reliability of information *at all* is belied by the record.

---

[20] As noted earlier (at n.4), Gabrion's assertion that he was provided with no notice "implying that Gabrion killed Robert Allen, Wayne Davis and John Weeks" (Br. 39) is incorrect.

[21] Cartwright had testified in the grand jury that Gabrion had said he hated Rachel and planned to drown her. (R.395: 1/25/02 Op. at 14.)

On direct appeal, this Court also declined to craft a per se rule that evidence must have some direct link to the prison setting, as Gabrion had not indicated which acts would be relevant only outside prison, and it was "unclear" to the Court "which acts would fall outside of this limitation," were the Court to impose it. *Gabrion II*, 648 F.3d at 349. The Court also rejected Gabrion's claim that admission of evidence of unadjudicated acts violated the Constitution, noting that the Federal Death Penalty Act not only did not require adherence to the Federal Rules of Evidence, but "does not even speak of 'evidence'" at all, but more broadly of "information" [18 U.S.C. § 3593(c)] and that "the unique context of the penalty phase—the ultimate object of which is not the determination of the objective fact of the defendant's guilt or innocence but the much more abstract, irreducibly moral determination of whether an individual, already adjudicated guilty, deserves mercy or death—presents distinct reliability concerns that could be plausibly thought to merit a different, much broader set of limitations on what information may be considered." *Id.*

With this background in mind, the district court correctly rejected both Gabrion's relevance and reliability claims. The court observed that given Gabrion's violent and bizarre conduct in front of the jury (including

90

punching his attorney in the face), his counsel explained their strategy to the jury: focus on how Gabrion came to be the way he is rather than try to persuade the jury that Gabrion is a good person. (CivR.156: Op., PageID.5930 (quoting counsel's penalty phase opening argument).) The court also observed that Gabrion still had not demonstrated what evidence was only relevant in a prison setting, noting that evidence that he attacked others was relevant to his propensity for violence against others, and that even the arsons he committed or attempted were relevant, given that he had started a fire in and outside his cell at Milan. (*Id.*, citing S. Tr. II, 311.) A few incidents were less relevant, such as tapping phones, but they still had *some* relevance—for example, tapping the phones demonstrated a level of sophistication that undercut Gabrion's claim of mental impairment. The court reasonably concluded that the least relevant incident, involving the bullfrog and the doll, could not reasonably be viewed as affecting the jury's sentencing decision. (*Id.* at PageID.5931-32.) This is plainly correct.

The district court was equally correct in rejecting Gabrion's reliability argument. The court noted that Gabrion had not offered a reliability test that should have been used, given that neither the

Constitution nor the FDPA requires reliability to be determined based on the Federal Rules of Evidence—and Gabrion still has not done so, simply stating in conclusory fashion that the information was "unreliable." He does not explain how or why, or cite any authority in support of his argument. The district court distinguished the authority he cited before that court and additionally cited Supreme Court authority holding that no particular reliability test applies and that the jury is to be given a broad array of information. (*Id.* at PageID.5933, citing *Jurek v. Texas*, 428 U.S. 262, 276 (1976), and *Sears v. Upton*, 561 U.S. 945, 950 (2010)). The court also observed that the Fourth Circuit has held that reliability is to be assessed by the jury, rather than by the judge. (*Id.*, citing *United States v. Runyon*, 707 F.3d 475, 506 (4th Cir. 2013) ("[I]t is the jury, not the judge, that determines whether the evidence offered by the prosecution is sufficiently reliable to support an aggravating factor."). For these reasons, Gabrion has failed to demonstrate that his counsel performed unreasonably by not further objecting on the basis of reliability.

### 3. Counsel's concession that Gabrion murdered Rachel to obstruct justice was objectively reasonable.

Gabrion says his attorneys were ineffective for conceding the obstruction of justice factor because there was "compelling" evidence to counter it. (Br. 41.)[22] The "compelling" evidence was—once again—Chrystal Roach's testimony about her practices with respect to preliminary examinations, generally, and in Gabrion's state rape case. For all the reasons stated above, this was not compelling evidence. The testimony was not even clearly false, and in all events was unimportant.

By the time the penalty phase began, the jury had already found Gabrion guilty, and the motive for the murder was that Gabrion did not want Rachel to testify against him. The guilty verdict was unsurprising because, as set forth above, the evidence—both of guilt and motive—was overwhelming. By conceding the factor—which, essentially, the jury had

---

[22] Gabrion again includes a footnote listing—but not arguing or supporting—other alleged "errors" his counsel made in the penalty phase. (Br. 41, n.8.) These perfunctory arguments are not developed and are therefore waived. *McPherson*, 125 F.3d at 995. In any case, the district court addressed and correctly rejected those arguments. (CivR.156: Op., PageID.5945 (501(c)(3) organization); PageID.5946-48 (Jason Cross); PageID.5921 (BOP could have handled his dangerousness).) The government relies on that reasoning, which Gabrion has not addressed.

already found, Gabrion's counsel maintained credibility and shifted the focus away from that factor and toward the mitigating evidence—that is, away from the question of whether Gabrion "was a good person" and toward "how he got" to be the way he was. (R.593: S. Tr. I, 46-47.) It required no speculation on the district court's part to divine that this was Gabrion's counsel's strategy: that is what they told the jury. And it was a sensible strategy, given that, as the district court observed, it was "abundantly clear that Gabrion killed Rachel to avoid prosecution for the rape charge." (CivR.156: Op., PageID.5925.) It is actually hard to see how a strategic decision by Gabrion's trial attorneys *not* to concede that factor, and invite the government to pile on during the sentencing phase, would have been effective.

In this respect, Gabrion's reliance on *Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012) (.Br. 42 n.9), is again misplaced. In *Hooks*, the defendant's counsel conceded a continuing-threat aggravating factor, declining to "soften . . . [the] edge" of an armed robbery conviction by drawing out facts such as that the defendant immediately told his mother about having stolen $35 from a liquor store, and how his mother had marched her son straight to the police to confess his crime. *Id.* at 1205-

06. It is difficult to see how drawing out facts about how often Roach requested preliminary examinations would have had the same "softening" effect here. Further, as noted above, in *Hooks*, defense counsel made only a "beggarly" mitigation presentation, and in this case, counsel went to great lengths to investigate and present mitigating evidence.[23]

## B. Gabrion has not demonstrated prejudice.

Gabrion has also failed to show that there is a reasonable probability that had his counsel performed differently in the penalty phase, the jury would have made a different sentencing decision.

**First**, as to the obstruction factor arguments—that Gabrion's counsel was ineffective for not investigating records relating to Roach's practices in handling preliminary examinations, or for conceding that Gabrion murdered Rachel to obstruct justice, plainly there is no prejudice. As noted earlier, this Court characterized Roach's testimony as "peripheral[.]" *Gabrion II*, 648 F.3d at 337. The district court reasoned that while her testimony was "more relevant" to the penalty phase, "to

---

[23] Gabrion's only other case, *Marshall v. Hendricks*, 307 F.3d 36, 100 & n.45 (3d Cir. 2002), is also inapposite. There, defense counsel conceded the *only* aggravating factor, and the jury was instructed that it was not at issue, contrary to New Jersey law.

show substantial planning and premeditation for the offense, as well as obstruction of justice," even as to those issues, it "certainly [was] not necessary[.]" (CivR.156: Op., PageID.5836.)

The motive the government presented in the guilt phase was that Gabrion sought to prevent the rape trial from going forward. As noted earlier, a mountain of evidence supported it: regardless of the challenged aspects of Roach's testimony, Gabrion did delay the trial proceedings by twice requesting different lawyers and demanding then waiving preliminary examinations; Rachel was terrified in the weeks preceding her death, telling others that she was trying to leave "a trail" in case Gabrion followed through with his threat to kill her (R.589: Tr. V, 1207-10), and that the court case against Gabrion was coming up, and he was going to kill her for it (*id.* at 1224-27); around the time Rachel's body was found, the letters exonerating him, worded in preposterous terms that mirrored Gabrion's own earlier-given account to the police, arrived; Gabrion told an inmate he killed Rachel because she screamed rape and he "had to take care of business" (R.594: S. Tr. II, 355-56); Gabrion himself testified that Rachel died because she was going to be a witness: "I think what you did is you forced her to testify in a case against a person

96

lying in a case which forced her to become a victim to a crime"; "she kept talking and talking and talking to the police." (R.461: 3/1/02 Tr. 68, 73.) Gabrion has not demonstrated—and cannot demonstrate—prejudice arising from his counsel's alleged failure to investigate the basis for Roach's peripheral testimony, or from the concession on the obstruction of justice factor.

**Second**, as to the aggravating evidence, Gabrion has not demonstrated that any proposed objections would have been sustained. As explained above, Gabrion's counsel challenged the admissibility and relevance of the aggravating information to be presented, but this Court and the district court correctly recognized that a broad swath of information is permitted in the sentencing phase of a federal capital trial. And if any individual piece of aggravating information can now, in hindsight, be regarded as perhaps too prejudicial, or not relevant or reliable enough, Gabrion has not shown—and cannot show—that there is any reasonable probability it would have made a difference. As this Court put it in the en banc opinion, the "government's case for aggravation" was "overwhelming." *Gabrion III*, 719 F.3d at 525. "Gabrion killed Timmerman in an undisputedly horrific manner, killed her infant

97

daughter, likely killed three other people who either witnessed his crimes or whose death was otherwise useful to him, and terrorized countless people who crossed his path." *Id.*

**<u>Third</u>**, as for the supposed inadequacies of the mitigation investigation and presentation, as discussed above, Gabrion's counsel *did* present evidence on all the topics he raises: Gabrion's substance abuse and mental health issues, including his alleged brain injuries, and his family dysfunction and impoverished childhood. But here, as in *Van Hook*, "even if . . . counsel performed deficiently by failing to dig deeper, [he] suffered no prejudice as a result." 558 U.S. at 12. As the district court observed, "[t]o establish prejudice, in this context, [Gabrion] must 'point to evidence that differ[s] in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing.'" (CivR.156: Op., PageID.5918, quoting *Caudill*, 881 F.3d at 464) (internal citation omitted). *See also Fields*, 761 F.3d at 458 (reasonable jurists would not disagree with district court's finding that additional evidence of defendant's "poverty, neglect, abuse, trauma, and history of incarceration, as well as social history records and interviews of additional family members" and his "[m]ental illness and family history

of mental illness" would not have changed the outcome of the proceedings, given "severe" aggravating factors and that the newly identified evidence was not "materially different" from what was presented).

For example, Gabrion raises the fact that in another federal capital case involving defendant Richard Stitt, Dr. Ryan (who also testified in Gabrion's case) testified that additional information about Stitt's family history of major mental illness would have been "very helpful" in evaluating Stitt. (Br. 52-53.) But Gabrion's current counsel did not provide *any* basis to conclude that the additional information they uncovered about second and third-generation extended family members would have changed the opinion of the eight experts who examined him at the time of trial and concluded that he was malingering mental illness, but not actually mentally ill. They did not present an affidavit from Dr. Ryan or any of the other mental health professionals—or from any new mental health expert—offering a different opinion.

Nor does Gabrion's current team address the district court's point that additional information that Gabrion has mental health issues is not necessarily mitigating. (CivR.156: Op., PageID.5904.) As the district

court explained, evidence that Gabrion might have inherited a mental illness "would not necessarily have helped his case, as it could have reinforced the jury's belief that he 'poses a future risk of violence.'" (*Id.*, quoting *United States v. Fields*, 761 F.3d 443, 459 (5th Cir. 2014), and citing *Truesdale v. Moore*, 142 F.3d 749, 755 (4th Cir. 1988) ("Mental health evidence . . . is a double-edged sword that might as easily have condemned [the defendant] to death as excused his actions.")). In the end, Gabrion's current counsel has identified no information that is sufficient to counterbalance the "overwhelming" evidence in aggravation, which established that he is "impulsive, narcissistic, antisocial, and sexually preoccupied"; that he "exhibits a 'heedless disregard for consequences,'" and he "views relationships as a means to satisfy his own desires, and has very little concern for the well-being of others." (*Id.*, citing Jackson S. Tr. I 26, 31; Scharre S. Tr. I 20, 46.) In short, they have not demonstrated a reasonable probability that if more information about Gabrion's extended family's mental health issues, or his family dysfunction and impoverished childhood had been presented, there is a reasonable probability that the jury would have made a different sentencing decision. And because they have not made this threshold

showing, they have not demonstrated good cause for discovery or any need for an evidentiary hearing.

## IV. Gabrion Was Not Deprived of His Right to Conflict-Free Counsel.

Gabrion was fully and well-represented by Attorneys Mitchell and Stebbins throughout the murder case proceedings; as the district court correctly found, he was not represented by Attorney Christopher Yates, the Federal Public Defender for the Western District of Michigan at the time. Yates provided research, logistical, and administrative support in his role as the head of the Public Defender's Office. Gabrion's current counsel exaggerate the nature and significance of this assistance. (Argument C, Br. 71-86.) The record conclusively establishes that everyone—Gabrion, Stebbins, Mitchell, and the district court—was well aware that Yates had a conflict of interest and therefore could not represent Gabrion. This is not a case where an attorney provided "shadow" representation. Moreover, as the district court also correctly

determined, Gabrion has not identified any adverse effect from Yates's tangential involvement in the case arising from the conflict.

## A.    Background

Gabrion was charged in two federal cases—this one (the murder case), and an earlier social security fraud case for stealing benefits belonging to Robert Allen. The murder case was still being investigated when Gabrion was charged in the social security case. A CJA-appointed lawyer represented Gabrion in the social security case, a trial was held, and, in the summer of 1998, Gabrion was convicted and sentenced to five years in prison. Gabrion asked for new counsel on appeal, and Yates was assigned.

Earlier, in January 1998, Yates, then an Assistant Public Defender, represented Joseph Lunsford for mailing a threatening communication to the president. In connection with that representation, in March 1998, Yates accompanied Lunsford to a proffer interview, during which Lunsford told the FBI about things Gabrion had said and done when they were housed together at the Newaygo County Jail a few months before (December 1997). In May 1999, Yates was present outside the grand jury room when Lunsford testified about the information he had disclosed.

(CivR.119-1, Yates Aff. ¶ 4, PageID.5293.) When Gabrion was charged in the murder case in June 1999, Paul Mitchell was appointed to represent him; though Gabrion wanted to speak with Yates about the case, the magistrate judge advised him, "he will not be able to represent you because of a conflict of interest." (R.599: Arr. Tr. 4-5.)

Because Yates had assumed the role of Federal Public Defender in September 1998, and had a relationship with Gabrion due to his prior representation, from time to time during the course of the murder proceedings, Yates provided logistical, administrative, and research support to Gabrion's appointed attorneys (Mitchell and Stebbins). For example, in February 2001, when Gabrion complained about the slow pace of the proceedings, Judge Bell responded that the delays were not Mitchell's fault, and noted that he had asked Yates to assist Mitchell. (CivR.16-6, PageID.1522.) In April 2001, Stebbins followed up with a letter to Yates requesting assistance on motions, including a motion challenging the death penalty, the aggravating circumstances the government intended to rely on in seeking the death penalty, jurisdiction, and discovery issues. (CivR.16-5, PageID.1518-19.) In an affidavit responding to Gabrion's conflict-of-interest claims, Yates confirmed that

103

he visited with Gabrion from time to time, conducted legal research, and spoke with Mitchell and Stebbins generally about the case in his role as Federal Public Defender. (CivR.119-1, Aff. ¶¶ 7, 8, PageID.5293-94.) He further stated that, consistent with the record, everyone involved in the case, including Gabrion, was aware of his conflict of interest, and that as a result of it, he could not represent Gabrion in the murder case. (*Id.* at ¶ 5, PageID.5293.)

After the jury found Gabrion guilty, Lunsford was one of the 58 witnesses who testified in the penalty phase of the trial. He testified that Gabrion said "they were never going to find" baby Shannon. (R.594: S. Tr. II at 316.) He also testified that one night he was walking by Gabrion's jail cell and he saw Gabrion "masturbating to the picture of the baby, Shannon." (*Id.* at 318.) Lunsford said he was serving state sentences for felonious assault and indecent exposure, prior to beginning to serve a three-year sentence for his federal offense. (*Id.* at 313, 321.) He said he had not been promised any time off his sentence for his testimony. (*Id.* at 320.) Attorney Mitchell cross-examined Lunsford about his prior crimes (which included three convictions for indecent exposure), whether he had received any promises or benefit for his testimony, and a letter

Gabrion had written the governor saying that Lunsford had threatened to kill the governor. (*Id.* at 320-21, 322-23.) Lunsford's testimony covered 11 of over 1,000 penalty phase transcript pages.

In 2016, more than 14 years after Lunsford testified, Gabrion's post-conviction counsel filed a declaration from Lunsford recanting one aspect of his testimony. (CivR. 100-4, Lunsford Decl., ¶ 6, PageID.4700.) Lunsford claimed that his testimony about Gabrion masturbating to a photo of baby Shannon was not true, that Yates had suggested it, and that when he attempted to back out, Yates told him it was "too late to back out" and if he did, he would have to serve his "entire 30 year indeterminate state sentence before serving the federal time." (*Id.* at ¶¶ 6, 7.) Yates states that these allegations are "completely false." (CivR.119-1: Yates Aff., ¶ 9, PageID.5294.)

The district court denied Gabrion's conflict of interest claim because there was "no evidence that Yates actually represented Gabrion" in the murder case. (CivR.156: Op., PageID.5854.) In addition, the court found that even if Yates's actions could be characterized as amounting to "representation," the claim also failed as a matter of law because Gabrion failed to identify any "adverse effect" on his actions undertaken in that

capacity arising out of the conflict. (*Id.* at PageID.5855-57.) The court denied Gabrion's request for discovery and a hearing on the claim because Gabrion had not given it reason to believe that he would be entitled to relief if the facts were more fully developed. (*Id.* at PageID.585.)

## B. Yates did not represent Gabrion in the murder case.

As a general rule, an attorney who does not enter an appearance, does not sign a single pleading on a client's behalf, and never appears in court in a case, does not represent the client for purposes of an "actual conflict" claim. As the district court correctly found, the right to effective assistance of counsel "only applies to the 'lawyer who is representing the criminal defendant or otherwise appearing on the defendant's behalf in the case.'" (CivR.156: Op., PageID.5854, quoting *United States v. Martini*, 31 F.3d 781, 782 (9th Cir. 1994) (citing *Stoia v. United States*, 22 F.3d 766, 768 (7th Cir. 1994)).) "It does not apply to 'every lawyer a criminal defendant consults about his case.'" (*Id.*, quoting *Santosuosso v. United*

*States*, No. 95-3146, 1996 WL 15631, at \*3 (6th Cir. Jan. 16, 1996) (citing

*Martini*, 31 F.3d at 782).)

Of course, there may be exceptions, which the district court acknowledged. (CivR.156: Op. at PageID.5855 (noting, "[t]here may be occasions where an attorney represents a criminal defendant behind the scenes" and citing *Moss v. United States*, 323 F.3d 445, 459 (6th Cir. 2003)). But no exception applies here. Yates did not represent Gabrion, on the record or behind the scenes. He was expressly told that Yates could *not* represent him, and Yates did not appear in court on his behalf, direct any strategy, or play any other substantive role in his defense.

This case is not like *Moss*. There, the defendant's attorney communicated with the U.S. Attorney's Office on his behalf, traveled out-of-state to interview witnesses on his behalf, entered an appearance and appeared in court at his arraignment, and met alone with the defendant six times thereafter. *Id.* at 456-58. And in *Moss*, the Court found that the attorney-client relationship created by these activities ceased shortly after the arraignment, even though the attorney continued to provide "de minimis assistance" to the defendant's on-the-record attorney thereafter. *See id.* at 458-59. At best, Yates's tangential involvement in the case is

akin to the "de minimis" post-arraignment assistance the attorney provided in *Moss*.

Nor is this case like *Rubin v. Gee*, 292 F.3d 396, 399-400 (4th Cir. 2002), the only other case Gabrion cites for the proposition that conduct of a behind-the-scenes lawyer can deprive a defendant of his constitutional right to counsel. In *Rubin*, counsel collected $150,000 to represent the defendant (more than later-hired trial counsel), served as her counsel from the night she was involved in a homicide "until the end of trial" and spent "'by far' the most time with [her] in the events leading up to trial." *Id.* at 405. Even in those circumstances, the Fourth Circuit panel assigned to the case was divided as to whether counsel actually represented the defendant for purposes of her conflict-of-interest claim. *See id.* at 407 (Motz, J., dissenting). Here, Gabrion has not identified any actions undertaken by Yates that could reasonably be interpreted as constituting actual representation, given the disclosed conflict and statements on the record that Yates was not representing him. The district court therefore correctly found that Gabrion's claim fails on the basis that Yates never represented him in the murder case.

## C. Gabrion failed to identify an adverse effect arising from Yates's representation of Lunsford.

The district court also correctly determined that Gabrion's claim fails as a matter of law because he has not identified any adverse effect on Yates's tangential involvement in the murder case arising from his loyalty to Lunsford. Unlike most ineffective assistance of counsel claims, a defendant who claims his counsel actively represented conflicting interests does not need to demonstrate *Strickland* prejudice—i.e., that. absent counsel's deficient performance, the outcome of the proceeding would have been different. *Cuyler v. Sullivan*, 446 U.S. 335, 345 (1980); *Brooks v. Bobby*, 660 F.3d 959, 962 (6th Cir. 2011). Nonetheless, he must still demonstrate the existence of an "actual conflict"—meaning, "a conflict of interest that adversely affects [his] counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002). As the district court explained (CivR.156: Op., PageID.5856), there must be a causal connection or nexus between the conflict and counsel's performance. The defendant must show that "the *conflict of interest* affected his counsel's performance." *Taylor*, 535 U.S. at 173-74 (emphasis added); *Moss*, 323 F.3d at 469 ("*Sullivan* requires that [petitioner] demonstrate a nexus between the conflict and adverse effect on counsel's performance").

Gabrion cites two alleged adverse effects: Yates "actively advocated for Gabrion to be transferred to a federal correctional facility in Milan, Michigan" and "Yates provided facts to Lunsford that led to his testimony about Gabrion masturbating to the photograph of baby Shannon." (Br. at 82.) Neither suffices to establish an actual adverse effect. First, the transfer. As the district court pointed out, Gabrion himself wanted to be transferred to Milan—indeed, he went so far as to impersonate the Clerk of the Court in an effort to accomplish it. (CivR.156: Op. at PageID.5855, citing R.214: 5/23/01 Hr'g Tr. 27.) And Attorney Mitchell agreed he should be moved. (*Id.*, citing 5/23/01 Hr'g Tr. 14.) More importantly, Gabrion never explains how assisting Gabrion in his effort to move to a different prison facility was adverse to his interests, or was causally connected to Yates's representation of Lunsford. While it's true that "witnesses testified for the government at Gabrion's penalty phase about his conduct at Milan" (Gabrion Br. 82), nothing about Yates's loyalty to Lunsford *caused* Gabrion to engage in conduct while at Milan that led to inmates testifying against him. Plenty of inmates at other institutions (including Lunsford, who was housed with Gabrion at Newaygo County Jail) also testified against Gabrion during the penalty phase. (*E.g.*,

Brewster, R.594: S. Tr. II, 355-56 (while at Calhoun County Jail, Gabrion talked about escaping, made weapons, and said he killed Rachel because she screamed rape and he "had to take care of business"); Lucas (R.594: S. Tr. II, 369-71 (while at Newaygo County Jail, Gabrion talked about making weapons and escaping); Carney (R.594: S. Tr. II, 380-81 (while at Newagyo County Jail, he found a soap gun in cell block where Gabrion had recently been).) Helping Gabrion succeed in his goal of moving to Milan was not an adverse effect.

Nor does Lunsford's allegedly false testimony supply the requisite causal link. Even if Lunsford testified falsely (in part), and at Yates's direction, it had no effect on Yates's conduct in the murder case. Yates assisted with research and provided logistical and administrative support to Gabrion's *two* appointed attorneys. Even if this somehow qualified as "representation," it was not affected by Lunsford's false testimony. An attorney who coaches his client to lie under oath surely is subject to criminal and professional sanctions. And a defendant who is convicted or subjected to increased punishment because of false, material testimony has redress. But that is not the basis of a *Sixth Amendment* claim based on an actual conflict of interest, unless the false testimony

can be said to have affected (adversely) the conduct of counsel in representing the defendant. *See generally Taylor*, 535 U.S. at 176 (noting that the purpose of the *Sullivan* exception to "ordinary requirements of *Strickland*" is "not to enforce the Canons of Legal Ethics, but to apply needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel."). For example, as the district court noted, an attorney's conflict might inhibit effective cross-examination of a witness, if the attorney simultaneously represents that witness. (CivR.156: Op. at PageID.5856-57.) No such thing occurred here—Attorney Mitchell vigorously cross-examined Lunsford. (R.594: S. Tr. II at 320-23.) There is no indication that Yates's loyalty to Lunsford led him to conduct inadequate research or adversely affected the logistical or administrative support he provided.

The requirement to show prejudice under *Strickland* is a foundational element of a Sixth Amendment ineffective assistance of counsel claim. An exception is made only "where assistance of counsel has been denied entirely or during a critical stage of the proceeding[,]" rendering "the likelihood that the verdict is unreliable . . . so high that a

case-by-case inquiry is unnecessary" or "in 'circumstances of that magnitude[.]'" *Taylor*, 535 U.S. at 166 (quoting *United States v. Cronic*, 466 U.S. 648, 569 n.26 (1984)). Where, as here, a defendant has not demonstrated that an attorney's conflict adversely affected the attorney's performance in his case, he has not established an ineffective assistance of counsel claim based on an actual conflict of interest.

### D. The district court did not abuse its discretion in denying discovery and a hearing on this issue.

Gabrion repeatedly asserts that he was entitled to depose various people—Yates, trial counsel, unspecified "other people who participated in Gabrion's defense at trial"—to explore whether Yates and Gabrion had an attorney-client relationship or to show an adverse effect. (Br. 83.) But as noted earlier, under Rule 6(a), Gabrion must show "good cause" to obtain discovery; the rule does not authorize a "fishing expedition." *See United States v. Webster,* 392 F.3d 787, 802 (5th Cir. 2004) (denying COA as to denial of discovery in capital § 2255 case because petitioner was trying "to use the habeas corpus discovery mechanism to explore his case 'in search of its existence'"). This Court "will not find that a district court erred by denying a fishing expedition masquerading as discovery." *Stanford,* 266 F.3d at 460. Because Gabrion has not demonstrated that

Yates represented him in the murder trial and has not demonstrated the existence of any adverse effect on Yates's tangential involvement in the murder case, he has not demonstrated good cause for discovery.

Nor has he raised any factual dispute necessitating an evidentiary hearing. As the district court noted, Yates provided an affidavit asserting that he did not represent Gabrion or provide legal advice to him, and though Gabrion was "in a position to know whether that is true," he did not "offer any facts or evidence to rebut Yates' assertions." (CivR.156: Op., PageID.5855.) Gabrion's post-conviction counsel have scoured the record, and secured and reviewed trial counsel's files, amassing a file exceeding 100,000 pages. (CivR.75: 3/9/16 Hr'g re Movant's Mot. for Discovery, PageID.2642.) They have "interviewed trial counsel[.]" (*Id.*) Yet they have discovered nothing to cast doubt on the accuracy of Yates's assertions—which are consistent with the record—that he did not represent Gabrion in the murder case. For example, they have not presented an affidavit from either Mitchell or Stebbins (or Gabrion himself) indicating that Yates had more significant involvement in the murder case than he identified in his affidavit. *Compare, e.g., Stoia*, 22 F.3d at 772-73 (describing how the defendant had presented affidavits of

114

his trial attorneys indicating that another attorney "directed the trial strategy"). An evidentiary hearing is not required if there is no disputed issue of fact; that is, if the record "conclusively show[s] that the prisoner is entitled to no relief." *Arredondo*, 178 F.3d at 782. *See also Valenzuela v. United States*, 217 F. App'x 486, 491 (6th Cir. 2007) ("In the absence of any evidence raising a factual dispute, the district court did not abuse its discretion by refusing to hold an evidentiary hearing.").

The record conclusively establishes that all parties and the district court were aware of Yates's conflict and the fact that Yates could not represent Gabrion, and refutes the notion that Yates represented Gabrion. Further, Gabrion has failed to identify an actual adverse interest meriting exploration at an evidentiary hearing. Accordingly, the district court did not abuse its discretion in declining to convene one.

## V. Reassignment is not properly before the Court but is unwarranted, in any event.

Gabrion did not seek a certificate of appealability on the issue of whether this case should be reassigned to a different district court judge (Argument E, Br. 93-114), and this Court did not certify it. Accordingly,

the Court should not consider it. In any case, Gabrion does not come close to satisfying the demanding standard for reassignment.

This Court has authority to reassign a case on remand under 28 U.S.C. § 2106. But reassignment is an "extraordinary power" that "should be used 'infrequently and with the greatest reluctance.'" *Martin v. United States*, 889 F.3d 827, 835 (6th Cir. 2018) (quoting *Sagan v. United States*, 342 F.3d 493, 501 (6th Cir. 2003)). In determining whether to reassign a case, the Court looks to three factors:

> (1) whether the original judge would reasonably be expected to have substantial difficulty in putting out of his or her mind previously expressed views or findings; (2) whether reassignment is advisable to preserve the appearance of justice; and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Solomon v. United States*, 467 F.3d 928, 934 (6th Cir. 2006). None of those factors supports reassignment here.

**First**, there is not the slightest indication that Judge Jonker would reasonably be expected to have substantial difficulty in putting out of his mind previously expressed views or findings. Gabrion lists a potpourri of legal rulings that he somehow construes as evidence of bias or entrenchment. But mere disagreement with judicial rulings is not a basis

for reassignment. If this Court identifies any basis for a remand, nothing in the record suggests that Judge Jonker would be unable to "revisit the matter with a complete open mind." *Martin*, 889 F.3d at 836.

Gabrion accuses Judge Jonker of adopting allegedly biased rulings made by his predecessor, Judge Bell, on preliminary discovery matters "without scrutiny," of denying "basic" tools of investigation and access to "routine" records, and of denying motions "in disregard of clear Circuit precedent." (Br. at pp. 93-114.) These attacks are without basis. Judge Jonker adopted Judge Bell's approach of waiting until the initial briefing was complete to determine whether discovery or a hearing was warranted because that is consistent with the Rules Governing 2255 Proceedings and the practice in the district. *See, e.g.*, Rule 8(a), 28 U.S.C. foll. § 2255 (directing district court judge to review "the answer" and other materials to determine "whether an evidentiary hearing is warranted"). Given the voluminous claims asserted, this also made eminent good sense, and is consistent with this Court's approach. *See* Doc. 30-2, COA, p.3 (indicating that Gabrion's requests for discovery and an evidentiary hearing were "premature" before briefing was completed).

Ultimately, Gabrion failed to establish a need for discovery on any of his claims because Judge Jonker determined that even if the facts were developed in his favor, relief would be unwarranted. Gabrion has been given ample resources to pursue his claims—three attorneys, an investigator, and multiple experts. Further, at the hearing on Gabrion's motion for broad, sweeping discovery, his counsel stated that they had "secured and reviewed trial counsel's files and many of the expert files," and that their file exceeded 100,000 pages. (CivR.75: 3/9/16 Hr'g Tr., PageID.2641.) No review of the record in this case can reasonably be construed as denying Gabrion the resources or tools he needs; where records or other demands were denied, ample justification was given.

Nor has Gabrion identified any rulings that are "in disregard of clear Circuit precedent." He points to Judge Jonker's order denying his motion to deem his Rule 59 motion filed on a date earlier than it was actually filed. (Br. at 110) He says this ruling defied the "clear precedent" of *Lexon Ins. Co. v. Nasser*, 781 F.3d 335 (6th Cir. 2015), even though the basis for his motion was that precedent was *not* sufficiently clear on the point, and without addressing Judge Jonker's explanation why *Lexon* was inapposite or his concern that the relief requested would contravene

118

Rule 6(b)(2) of the Federal Rules of Civil Procedure. (CivR.168: Order, PageID.6110.) If anything, Judge Jonker's order evinces extraordinary regard for ensuring that Gabrion's rights were protected, urging his counsel to file a notice of appeal using the most conservative timeline (since even if he were to deem the Rule 59 motion as having been filed earlier than it was, there was no guarantee this Court would agree). (*Id.* at PageID.6111.) And even if Judge Jonker was wrong, the consequence was that Gabrion's counsel had to file a one-sentence notice of appeal two weeks earlier than they otherwise would have. That is not any hardship, let alone a substantial one. Equally meritless is the suggestion that the district court's denial of a certificate of appealability failed to conform to precedent. It is "not necessary for the court to reassess each claim prior to denying a COA." *Brown v. United States,* No. 16-2457, 2017 WL 4863173, at *3 (6th Cir. 2017) (order). The court may rely on "the reasoning in its opinion denying (petitioner's) § 2255 motion" in declining to grant a COA. *Hawkins v. Rivard,* No. 16-1406, 2016 WL 6775952, at *2 (6th Cir. 2016) (order). Judge Jonker's 206-page opinion contained ample reasoning to support his denial of a COA as to each claim. His

failure to repeat his analysis separately in the COA order is not evidence of bias or entrenchment.

**Second**, reassignment is not needed to preserve the appearance of justice. Gabrion asserts that Judge Jonker has demonstrated "hostility" toward him, but he gives no examples of it. He reiterates his baseless claim that Judge Jonker ruled "in blind support" of Judge Bell and accuses him of otherwise ruling "primarily on speculation[.]" But Judge Jonker's rulings were not founded on speculation. For example, Gabrion complains that Judge Jonker engaged in undue speculation when he noted that there are reasonable explanations for what Gabrion contends is Roach's "false" testimony about preliminary examinations. (Br. 46.) But the district court ultimately resolved the issues involving Roach on materiality and prejudice grounds—that is, though the district court said what is obvious—it is not clear that Roach purposefully "lied" about such minor procedural details—in the end, it was the sheer unimportance of the challenged testimony that doomed those claims. (*See, e.g.*, CivR.156: Op., PageID.5838 ("there is no possibility that any falsehood in Roach's statement could have affected the jury's decision"; PageID.5881 n.15 (Gabrion's counsel was not ineffective for failing to discover evidence "of

allegedly false statements . . .by Chrystal Roach" because "none of these statements are material to the outcome of Gabrion's case" and thus, "failure to discover this evidence did not prejudice him")). In any case, this factor is supposed to consider the "appearance of justice"—for example, in one of the two cases Gabrion cites (Br. at 113-14), *In re Al-Nashiri*, 921 F.3d 224 (D.C. Cir. 2019), the fact that a military judge had received an employment offer from the Department of Justice—a party to the case—created an "appearance" that his orders might not have been "the product of his considered and unbiased judgment, unmotivated by improper considerations." *Id.* at 237. Likewise, in his other case, *Williams v. Pennsylvania*, 579 U.S. 1, 136 S. Ct. 1899 (2016), the judge had previously been a prosecutor who had recommended that the death penalty be sought in that very case. Gabrion points to nothing of the sort here.

**Third**, reassignment would entail waste and duplication grossly out of proportion to any gain in preserving the appearance of fairness. This is plain, given that there is no concern at all about the appearance of fairness. And even Gabrion concedes—as he must—that "some duplication of effort would be required should the Court reassign this

case for remand." (Br. at 113.) That is a gross understatement. Judge Jonker spent an extraordinary amount of time carefully evaluating Gabrion's voluminous claims, and drafted a detailed, thorough, 206-page opinion. He has presided over the § 2255 matter since February 2017—for more than four years. Reassignment is disfavored when a case involves a long, time-consuming record. *Brent v. Wayne County Dept. of Human Servs.*, 901 F.3d 656, 670 (6th Cir. 2018). It should not be ordered here.

## **CONCLUSION**

For the foregoing reasons, the Court should affirm the judgment of the district court.

<div style="margin-left:50%">

Respectfully submitted,

ANDREW BYERLY BIRGE
United States Attorney

</div>

Dated: October 14, 2021   /s/ Jennifer L. McManus
<div style="margin-left:50%">

JENNIFER L. McMANUS
TIMOTHY P. VERHEY
Assistant United States Attorneys
P.O. Box 208
Grand Rapids, Michigan 49501-0208
(616) 456-2404

</div>

# CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2021, the foregoing document was electronically filed. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

I further certify that a copy of the foregoing document was mailed on this date to the opposing party if he/she was not registered to receive the document by the Court's electronic filing system.

/s/ Jennifer L. McManus
JENNIFER L. McMANUS
Assistant United States Attorney
Post Office Box 208
Grand Rapids, MI 49501-0208
(616) 456-2404

# CERTIFICATE OF COMPLIANCE

A word count was made using Word 365 and the brief contains 24,332 words. This exceeds the type-volume limitation of 19,500 provided by Rule 32(a)(7)(B) and 6 Cir. R. 32(b)(2). Concurrent with the filing of this brief, the government is filing a motion for leave to file a brief in excess of the limit.

<div style="text-align: right">

ANDREW BYERLY BIRGE
United States Attorney

</div>

Dated: October 14, 2021 /s/  Jennifer L. McManus
JENNIFER L. McMANUS
Assistant United States Attorney
P.O. Box 208
Grand Rapids, Michigan 49501-0208
(616) 456-2404

# <u>DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS</u>

| Description of Entry | Date | Record Entry Number | Page ID Number Range |
|---|---|---|---|
| Docket No. 1:15-cv-447 | | | |
| Motion Vacate and exhibits (Restricted Access) | 04/27/15 | 1-2 | 1-850 |
| Motion Vacate and exhibits (Redacted) | 05/29/15 | 15 | 885-1023 1024-1488 |
| Continued Exhibits to Motion | 05/29/15 | 16 | 1489-1732 |
| Govt Response and exhibits | 01/25/16 | 42 | 1976-2193 |
| Am. Budget Cert. (05/23/02) | 01/25/16 | 44-1 | 2393 |
| Order Denying R.51 | 09/20/16 | 74 | 2633-2637 |
| Hrg Tr. Mo for Discovery held 03/09/16 | 10/05/16 | 75 | 2638-2666 |
| Order Granting Motions | 03/08/17 | 99 | 3884-86 |
| Amended 2255 Motion | 03/08/17 | 100 | 3887-4713 |
| Cont. Exhibits to 2255 Motion | 03/08/17 | 103 | 4731-5000 |
| Govt Response to 2255 Motion and Attachments | 05/22/17 | 119 | 5057-5304 |
| Gabrion Reply to Response | 08/31/17 | 141 | 5380-5541 |
| Opinion | 10/04/18 | 156 | 5795-6010 |
| Order Denying 2255 Motion | 10/04/18 | 157 | 6011 |
| Order denying cert. of appeal | 10/04/18 | 158 | 6012-13 |

| | | | |
|---|---|---|---|
| Judgment | 10/04/18 | 159 | 6014 |
| Order denying motion to file Rule 59 | 11/16/18 | 168 | 6109-6111 |
| Docket Sheet 1:99-CR-76 | NA | NA | NA |
| Frank Psychological Evaluation (06/18/01) (SEALED) | 06/29/01 | 211 | 1-9 |
| Am. Death Penalty Notice | 07/11/01 | 220 | |
| Fallis Psychological Evaluation (05/08/00) (SEALED) | 08/09/01 | 268 | 1-17 |
| DeMier Psychological Evaluation (10/22/01) (SEALED) | 11/02/01 | 314 | 1-23 |
| Opinion | 01/25/02 | 395 | 1-16 |
| Superseding Indictment | 02/14/02 | 429 | |
| Penalty Phase Verdict Form | 03/18/02 | 526 | |
| Motion for Leave to File | 08/10/05 | 652 | |
| Brief in Support | 08/10/05 | 653 | |
| Exhibit Deposition Transcript of Katherine Westcomb | 11/21/05 | 669 | |
| Exhibit Deposition Transcript of Linda Coleman | 11/21/05 | 670 | |

| Description of Proceeding or Testimony | Date of Hearing | Record Entry Number | NA |
|---|---|---|---|
| Hrg Govt Mo for Psych Eval. | 10/24/00 | 127 | 1-20 |
| Hrg on Substantive Motions to dismiss 177 & 180 | 05/23/01 | 214 | 1-167 |

| | | | |
|---|---|---|---|
| Pretrial Motion Hearing | 1/11/02 | 385 | 1-137 |
| Excerpt of Trial Testimony – Stephen Cohle | 2/26/02 | 459 | 1-42 |
| Excerpt of Trial Testimony – Marvin Gabrion | 3/01/02 | 461 | 1-109 |
| Excerpt of Trial Testimony – Love, Wismar, Wolf, S. Timmerman, Michael Gabrion, D. Bacon | 2/27/02 | 471 | 1-76 |
| Excerpt of Trial Testimony – L. Timmerman | 2/25/02 | 472 | 1-28 |
| Excerpt of Trial Testimony – Gilligan, Shane Timmerman | 2/26/02 | 473 | 1-23 |
| Excerpt of Sent. Testimony – Scharre | 03/13/02 | 539 | 1-83 |
| Excerpt of Sent. Testimony – Jackson | 03/14/02 | 541 | 1-41 |
| Excerpt of Sent. Testimony – Marvin Gabrion | 03/14/02 | 542 | 1-18 |
| Excerpt of Sent. Testimony – Scott Vanderveen | 03/14/02 | 543 | 1-19 |
| Excerpt of Sent. Testimony – Dr. David Griesemer | 03/14/02 | 544 | 1-41 |
| Excerpt of Sent. Testimony – Dr. Thomas Ryan Dr. Gregory Saathoff | 03/15/02 | 546 | 1-60 |
| Excerpt of Sent. Testimony – Cunningham | 03/13/02 | 574 | 1-28 |
| Trial Transcript, vol. 4 | 02/25/02 | 588 | 913-1135 |

| | | | |
|---|---|---|---|
| Trial Transcript, vol. 5 | 02/26/02 | 589 | 1136-302 |
| Trial Transcript, vol. 6 | 02/27/02 | 590 | 1303-474 |
| Trial Transcript, vol. 7 | 02/28/02 and 03/01/02 | 591 | 1475-638 |
| Trial Transcript, vol. 8 | 03/04/02 and 03/5/02 | 592 | 1639-811 |
| S. Tr. I | 03/11/02 | 593 | 1-229 |
| S. Tr. II | 03/12/02 | 594 | 230-469 |
| Arraignment | 06/29/99 | 599 | 1-9 |